# EXHIBIT A

(Appellant's Opening Brief)

*6/21/2004*

*COPY*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION TWO

| | | |
|---|---|---|
| **PEOPLE OF THE STATE OF CALIFORNIA,** | ) ) ) | No. A105203 |
| Plaintiff and Respondent, | ) | |
| v. | ) ) | |
| **RICHARD JUNIEL, Jr.,** | ) ) | |
| Defendant and Appellant. | ) ) | |
| *AVA Lynette McDonald* | ) | |

Alameda County Superior Court No. C14523A
Honorable Julie Conger, Judge

*2324 85  2 Boxes*

DOCKETED
SAN FRANCISCO

JUN 2 2 2004

By    P. MONTOYA
No.   SF2004 0A0340

*3/18/04*

LAWRENCE A. GIBBS (No. 98866)
P.O. Box 7639
Berkeley, California 94707
Tel: (510) 525-6847

Attorney for Appellant
Richard Juniel, Jr.
By Appointment of the Court of Appeal
Independent Case System

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF APPEALABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.    THE TRIAL COURT COMMITTED REVERSIBLE ERROR UNDER
      BOTH STATE AND FEDERAL LAW BY DENYING MR. JUNIEL'S
      MOTIONS TO SEVER THE TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      A.    Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      B.    Legal Landscape . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            1.    Antagonistic Defenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      C.    Inadmissible Character Evidence and Bad Acts Evidence
            Admitted At Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            1.    Evidence Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            2.    Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      D.    Judicial Economy Did Not Justify Joinder . . . . . . . . . . . . . . . . . 21

      E.    Federal Constitutional Violation . . . . . . . . . . . . . . . . . . . . . . . . 23

      F.    Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

II.   THE TRIAL COURT ERRED UNDER EVIDENCE CODE SECTIONS
      1101 AND 352, AND VIOLATED MR. JUNIEL'S FEDERAL DUE
      PROCESS RIGHTS BY ADMITTING EVIDENCE OF HIS PRIOR BAD
      ACTS AND BAD CHARACTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      A.    Error Under State Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      B.    Due Process Clause Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      C.    Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

III.   THE TRIAL COURT ERRED BY RULING THAT MR. JUNIEL HAD
       'OPENED THE DOOR' TO A DETAILED ACCOUNT OF A PRIOR
       BAD ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

       A.   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

       B.   Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

            1.   Evidence Code Section 356 and 'Opening the Door' . . . . . .  32

            2.   Mr. Juniel's Question and the Irrelevant and Prejudicial
                 Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

       C.   Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

IV.    THE TRIAL COURT ERRED BY ADMITTING EVIDENCE SUBJECT
       TO THE ATTORNEY-CLIENT PRIVILEGE WITHOUT CONDUCTING
       THE REQUISITE SECTION 402 HEARING . . . . . . . . . . . . . . . . . . . . . . .  36

       A.   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

       B.   Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

       C.   Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

V.     THE TRIAL COURT VIOLATED MR. JUNIEL'S CONSTITUTIONAL
       RIGHTS BY FORCING HIM TO DECLARE IN ADVANCE WHETHER
       HE WOULD TESTIFY IN HIS OWN DEFENSE . . . . . . . . . . . . . . . . . .  42

       A.   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

       B.   Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

            1.   The Requirements of *Brooks v. Tennessee* . . . . . . . . . . . . . .  43

            2.   Limitations on a Trial Judge's Discretion . . . . . . . . . . . . .  46

       C.   Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

VI.   THE TRIAL COURT'S BELATED DECISION TO ADMIT AVA'S
      DOMESTIC ABUSE EVIDENCE AND ITS SUBSEQUENT
      LIMITATIONS ON MR. JUNIEL'S PRESENTATION OF EVIDENCE
      DENIED HIM THE RIGHT TO DUE PROCESS AND THE RIGHT TO
      PRESENT A DEFENSE .................................... 52

      A.   Background ......................................... 52

      B.   Analysis ........................................... 54

           1.   The Trial Court's Mid-Trial Reversal ................. 55

           2.   Limitations on Mr. Juniel's Testimony ................ 56

           3.   Limitations on Mr. Juniel's Closing Argument .......... 58

           4.   Conclusion ..................................... 58

VII.  THE TRIAL COURT VIOLATED STATE AND FEDERAL LAW BY
      REFUSING TO INSTRUCT ON THE LESSER-INCLUDED OFFENSE
      OF VOLUNTARY MANSLAUGHTER .......................... 60

      A.   Failure to Instruct ................................... 60

      B.   Federal Law ........................................ 62

      C.   Prejudice ........................................... 63

VIII. THE TRIAL COURT VIOLATED STATE AND FEDERAL LAW BY
      REFUSING TO GIVE CALJIC No. 8.73 ........................ 65

IX.   THE PROSECUTOR COMMITTED MISCONDUCT DURING
      CLOSING ARGUMENT ................................... 67

      A.   Background ......................................... 67

      B.   Analysis ........................................... 68

      C.   Prejudice ........................................... 71

CONCLUSION .................................................. 73

## TABLE OF AUTHORITIES

### FEDERAL CASES

Apprendi v. New Jersey (2000)
530 U.S. 466 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62,63,66

Bean v. Calderon (9th Cir. 1998)
163 F.3d 1073 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Bell v. Cone (2002)
535 U.S. 685 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Bittaker v. Woodford (9th Cir. 2003)
331 F.3d 715 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Brooks v. Tennessee (1972)
406 U.S. 605 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43,44,46,48

Bruton v. United States (1968)
391 U.S. 123 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Chapman v. California (1967)
386 U.S. 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23,30,49,63

Cole v. Arkansas (1948)
333 U.S. 196 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Conde v. Henry (9th Cir. 1999)
198 F.3d 734 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Darden v. Wainwright (1986)
477 U.S. 168 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Donnelly v. DeChristoforo (1974)
416 U.S. 637 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

French v. Jones (6th Cir. 2003)
332 F.3d 430 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Herring v. New York (1975)
422 U.S. 853 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

<u>McKinney</u> v. <u>Rees</u> (9th Cir. 1993)
993 F.2d 1378 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28,29

<u>Milton</u> v. <u>Morris</u> (9th Cir. 1985)
767 F.2d 1443 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

<u>Sheppard</u> v. <u>Rees</u> (9th Cir. 1980)
909 F.2d 1234 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

<u>Shillinger</u> v. <u>Haworth</u> (10th Cir. 1995)
70 F.3d 1132 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

<u>United States</u> v. <u>Brady</u> (9th Cir. 1978)
579 F.2d 1121 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

<u>United States</u> v. <u>Davis</u> (1st Cir. 1980)
623 F.2d 188 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,14

<u>United States</u> v. <u>LaMorte</u> (2d Cir. 1991)
950 F.2d 80 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

<u>United States</u> v. <u>Lane</u> (1986)
474 U.S. 438 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23,25

<u>United States</u> v. <u>Mack</u> (9th Cir. 2004)
362 F.3d 597 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57,58,59

<u>United States</u> v. <u>Mayans</u> (9th Cir. 1994)
17 F.3d 1174 quoting <u>United States</u> v. <u>Bradley</u> (9th Cir. 1993) 5 F.3d 1317 . . . . 28

<u>United States</u> v. <u>Phillips</u> (7th Cir. 1975)
527 F.2d 1021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

<u>United States</u> v. <u>Vasquez-Velasco</u> (9th Cir. 1994)
15 F.3d 833 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

<u>United States</u> v. <u>White</u> (8th Cir. 2003)
341 F.3d 673 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

<u>United States</u> v. <u>Ziperstein</u> (7th Cir. 1979)
601 F.2d 281 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## STATE CASES

Benson v. Honda Motor Co. (1994)
26 Cal.App.4th 1337 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32,33

Blackburn v. Superior Court (1993)
21 Cal.App.4th 414 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Calderon v. Superior Court (2002)
87 Cal.App.4th 933 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,20,30

Carlton v. Superior Court (1968)
261 Cal.App.2d 282 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Fortes v. Municipal Court (1980)
113 Cal.App.3d 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

In re McArtney (1966)
64 Cal.2d 830 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Nielsen v. Superior Court (1997)
55 Cal.App.4th 1150 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

People v. Almaraz (1985)
173 Cal.App.3d 304 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

People v. Anderson (1990)
52 Cal.3d 453 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

People v. Arias (1996)
13 Cal.4th 92 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32,34

People v. Bain (1971)
5 Cal.3d 839 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69,70

People v. Balcom (1994)
7 Cal.4th 414 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27,30

People v. Barton (1995)
12 Cal.4th 186 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61,62

People v. Box (2000)
23 Cal.4th 1153 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,11

People v. Boyde (1988)
46 Cal.3d 212 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,14

People v. Breaux (1991)
1 Cal.4th 281 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

People v. Breverman (1998)
19 Cal.4th 142 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60,61,63

People v. Brown (1988)
46 Cal.3d 432 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

People v. Carmen (1951)
36 Cal.2d 768 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

People v. Cash (2003)
28 Cal.4th 703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

People v. Charles (1967)
66 Cal.2d 330 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25,30

People v. Claxton (1982)
612 Cal.App.3d 638 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

People v. Coleman (1975)
13 Cal.3d 867 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

People v. Cuccia (2002)
97 Cal.App.4th 785 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45,47,49,50

People v. Cummings (1993)
4 Cal.4th 1233 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,14,15

People v. Diaz (1987)
195 Cal.App.3d 1375 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

People v. Doolittle (1972)
23 Cal.App.3d 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

People v. Earp (1999)
20 Cal.4th 826 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

People v. Edelbacher (1989)
47 Cal.3d 983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  68

People v. Ervin (2000)
22 Cal.4th 48 ) ( . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

People v. Espinoza (1992)
3 Cal.4th 806 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  68,71

People v. Farmer (1989)
47 Cal.3d 888 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  70

People v. Filson (1994)
22 Cal.App.4th 184, overruled on other grounds, People v. Martinez (1995) 11 Cal.4th
434 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

People v. Flannel (1979)
25 Cal.3d 668 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  60,61

People v. Frank (1985)
38 Cal.3d 711 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

People v. Gambos (1970)
5 Cal.App.3d 187 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32,34

People v. Gatlin (1989)
209 Cal.App.3d 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12,19

People v. Graham (1969)
71 Cal.2d 303 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

People v. Greenberger (1997)
58 Cal.App.4th 298 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

People v. Hardy (1992)
2 Cal.4th 86 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

People v. Haston (1968)
69 Cal.2d 233 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

People v. Hutton (1986)
187 Cal.App.3d 934 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

People v. Jackson (1996)
13 Cal.4th 1164 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,14,15,19

People v. Jenkins (2000)
22 Cal.4th 900 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

People v. Jones (1992)
 2 Cal.App.4th 867 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

People v. Jones (2004)
30 Cal.4th 1084 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35,41,46

People v. Keenan (1988)
46 Cal.3d 478 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,19,21,22

People v. Kelley (1967)
66 Cal.2d 232 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

People v. Lasko (2000)
23 Cal.4th 101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60,63,66

People v. Marshall (1996)
13 Cal.4th 799 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

People v. Massie (1967)
66 Cal.2d 899 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,12,13,23,24
                                                                                        25

People v. McDermand (1984)
162 Cal.App.3d 770 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

People v. Memro (1995)
11 Cal.4th 786 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

People v. Mincey (1992)
2 Cal.4th 408 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

People v. Mosher (1969)
1 Cal.3d 379 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

People v. Ortiz (1978)
22 Cal.3d 38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,20

People v. Perry (1972)
7 Cal.3d 756 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

People v. Pinholster (1992)
1 Cal.4th 865 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

People v. Sam (1969)
71 Cal.2d 194 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

People v. Smallwood (1986)
42 Cal.3d 415 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19,21,22

People v. Snow (2003)
30 Cal.4th 43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

People v. Thompson (1988)
45 Cal.3d 86 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

People v. Turner (1984)
 37 Cal.3d 302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,14

People v. Valdez (2004)
32 Cal.4th 73 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

People v. Valentine (1946)
28 Cal.2d 121 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

People v. Vargas (1987)
195 Cal.App.3d 1385 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

People v. Watson (1956)
46 Cal.2d 818 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23,63

People v. Wickersham (1982)
32 Cal.3d 307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

People v. Williams (1975)
13 Cal.3d 559 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

People v. Zapien (1993)
4 Cal.4th 929 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Titmas v. Superior Court (2001)
87 Cal.App.4th 738 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38,39

Woods v. Superior Court (1994)
25 Cal.App.4th 178 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## STATE STATUTES

Evid. Code
    § 352 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    § 356 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,11,26,27,28
                                                        32,38,56
    § 400 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    § 917(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    § 1101(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    § 1109(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Penal Code

    § 187 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    § 1098 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    § 1237 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## JURY INSTRUCTIONS

CALJIC 4.40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CALJIC 8.50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

CALJIC No. 8.73 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,65

                          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

## INTRODUCTION

Richard Juniel and his girlfriend Ava McDonald were charged with the murder of Stacey Alexander. The state was determined to try them together in a joint trial. From the beginning, it was clear that a joint trial would be difficult, contentious, and complicated, because it was clear that the defendants would present wholly antagonistic defenses—Ava sought to blame Richard, while Richard claimed no involvement in the crime.

Indeed, from the outset, Ava accused Richard not just of killing Stacey, but also of a host of other crimes and bad acts: myriad acts of domestic violence, spousal abuse, child abuse, drug dealing, death threats, and infidelity. In order to shift culpability for the crime solely onto Richard's shoulder's, Ava sought to admit evidence of all of these acts.

The court thus faced two fundamentally important and interrelated issues before trial: whether to try the defendants together, and whether to allow Ava to admit bad acts and bad character evidence against Richard. The court ruled that Ava could not admit her proffered evidence, and it therefore ruled that there was no need to sever the trial. Given the warring defenses to the crime, the trial should have been severed anyway, but the court's initial decision was at least premised on a sound legal ruling that Ava's proffered evidence was both irrelevant to the crime at hand and highly prejudicial to Richard.

But midway through trial, the judge, in a stunning about-face, changed her mind and decided to allow Ava to attack Richard with dozens of prior acts of abuse and violence. The judge never explained exactly how Ava's evidence was relevant to the charged crime—she simply stated, vaguely, that Ava's constitutional right to present

-1-

a defense demanded the admission of the evidence concerning Mr. Juniel's prior bad acts and bad character. And although the earlier ruling to the contrary was the very foundation of her decision to maintain a joint trial, she still refused to sever the case even after that foundation was removed.

Ava then presented an entire defense based on smearing Mr. Juniel. She presented evidence that Richard was constantly sleeping with other women, including her sister, who performed sexual favors on Richard in exchange for drugs. She presented evidence that Richard repeatedly brutalized her, hitting her, punching her, throwing her into closets and through windows. She presented evidence that he beat her child, hitting him and throwing bottles and lit matches at him. She presented evidence that he pointed his gun at her head and called her the enemy. Ava's evidence went on and on.

The evidence, which had nothing to do with the crime, piled up. Mr. Juniel, who had chosen to represent himself after being given an incompetent appointed attorney, had to defend himself against two accusers, the district attorney and Ava. As the parties attacked each other, the trial spun out of control. Filled as it was with so much irrelevant testimony, the trial took far longer than anticipated, to everyone's frustration. The frustration and chaos in the courtroom led to a host of trial errors.

At the end of it all, both Ava and Richard were found guilty. But the trial that produced the guilty verdicts did not remotely comport with usual standards of trial practice. Indeed, it failed comply with the fundamental principles of criminal jurisprudence as set forth in the Constitution and state and federal case law. The trial, filled with raft of irrelevant and prejudicial evidence and a raft of errors, was fundamentally unfair.

## STATEMENT OF APPEALABILITY

Judgment was pronounced on December 15, 2003. (CT 469.) On the same day, appellant filed a timely notice of appeal. (CT 468.) This appeal is from a final judgment of conviction and is authorized by Penal Code section 1237.

## STATEMENT OF THE CASE

On May 30, 2003, the Alameda County district attorney filed an information against appellant Richard Juniel and co-defendant Ava McDonald, charging them with murder in violation of Penal Code section 187. (CT 160.) The murder count added a special allegation that Mr. Juniel used a firearm in violation of section 12022.53(d). (CT 161.) Mr. Juniel was also charged with unlawful firearm possession in violation of section 12021(e) and possession of an assault weapon in violation of section 12280(b). (CT 161-162.) Mr. Juniel pled not guilty. (CT 163.)

Trial began on August 11, 2003. (CT 295, RT 57.) The jury began its deliberations on September 18. (CT 355.) On September 25, the jury found both Mr. Juniel and co-defendant McDonald guilty as charged. (CT 435-439.)

Mr. Juniel was sentenced on December 15, 2003. (CT 469.) The court imposed a sentence of 25 years to life for the first degree murder conviction, a consecutive term of 25 years to life for the 12022.53 enhancement, an additional consecutive term of 8 months for the unlawful firearm possession count, and a concurrent term of 8 months for the assault weapon count. (CT 508.) Mr. Juniel filed a timely notice of appeal on December 15. (CT 468.)

## STATEMENT OF FACTS

Stacey Alexander was killed in Oakland on the night of March 4, 2002. She died of three gunshot wounds to the head, arm, and back. (RT 97-98, 108.) Police received several calls immediately after the shooting and officers arrived at the scene quickly. (RT 441-442, 456, 633-634, 701-702, 1050-1051.) They found Stacey's body slumped over on the back porch of the house at 5423 Dover Avenue. (RT 444-447, 1052.)

Shortly after they arrived, police received reports from several witnesses who had observed some of the events surrounding the shooting. The witnesses gave varying and somewhat inconsistent accounts of the assailant or assailants and the car that had been used in the shooting. Witness Jayshree Chander, for example, told police that after she heard gunshots and a woman screaming, she saw a man running fast on the sidewalk, and then she also saw a man and a woman sitting in a car. (RT 1277-1279, 1283-1285.) She described the car as an American model, possibly a Buick. (RT 1284.) Another witness said that he had seen two black males in the car used in the shooting. (RT 502.) One witness described the car as an Acura or Lexus. (RT 599.)[1]

Although they received a somewhat confusing mix of information from witnesses, police soon pulled over appellant Richard Juniel and co-defendant Ava McDonald, who were driving in Ava's Acura sedan. (RT 640-642, 831-832.) Ava was driving the car and Richard rode in the passenger seat. (RT 644-645, 832-835.) Ava and Richard made no attempt to flee or resist. (RT 644, 854.)

Police brought witnesses to the spot where they pulled the Acura over and

---

[1]    At a pretrial hearing, Officer Brock testified that the car had been described as a dark colored Lexus or Acura. (Pretrial RT 49.)

conducted a field lineup. Again, the witnesses were unable to provide much clear information. Witness Chander told police that she was 80% sure that the Acura was the car she had seen earlier. (RT 838, 1286.) As a result, the police seized the car as evidence. (RT 838-839, 1054-1055.)

But Chandler was unable to identify Mr. Juniel or Ms. McDonald as the people she had seen; in fact, Ms. Chander actually pointed out a bystander to police and told them it was the man she had seen running earlier. (RT 1287.) Nor was any other witness able to identify Mr. Juniel and Ms. McDonald as the assailants they had seen commit the killing. (RT 837, 846-847, 861, 1109, 1224.)

Apparently due to the confused witness accounts, the police did not arrest Richard and Ava. Police informed them, however, that if they wanted to get their car back, they had to come down to the station. (RT 1978.) Richard and Ava therefore agreed to accompany police to the station house. (RT 1056-1057, 1447, 1978.) They were released in the morning. (RT 1450.)

During the subsequent investigation, police became more convinced that Mr. Juniel and Ms. McDonald had committed the crime. One week after the shooting, police called them and told them to come down to the station to get the Acura back. (RT 1077-1078, 1452-1453, 1978.) When Richard and Ava arrived, they were arrested and charged with Stacey's murder. (RT 1079, 1121.)

The prosecution's theory of the case was that Richard and Ava had killed Stacey as a result of an ongoing dispute between various friends and family members. (RT 67-74.) The dispute apparently started as a result of a strained relationship between Angelina Bryant and Sia, Ava's sister. Angelina testified that she was unsure how the bad feelings had come about between her and Sia. (RT 164-165, 236-240, 1388-1389.)

On March 3, Angelina and Sia met on the street where they got in an argument that escalated into a physical confrontation. (RT 167-173.) Several other people got involved, including Angelina's grandmother Luella Smith, who struck Sia. (RT 175, 319-321.) That night, Rita Ammons, Ava and Sia's mother, called Luella Smith to try to resolve the confrontation. (RT 1317.) At one point, Angelina took the phone away from Luella; she and Rita argued over the phone. (RT 179-181, 1318-1319.)

According to Angelina, she saw Mr. Juniel that night at a liquor store. He did not seem upset, but he said that he had heard about her confrontation with Sia. (RT 184.)[2] Later that night, Angelina received a call from Ava. (RT 185.) Ava was apparently upset that Angelina had disrespected her mother, and she told Angelina that once Angelina completed her pregnancy, "your ass is mine." (RT 186, 1348, 1394.)

Angelina told her friend Stacey Alexander about the dispute. (RT 188.) When Ava later drove up in her car, Stacey confronted Ava. (RT 189-190, 194-197.) Ava pulled a baseball bat out of her trunk, and Stacey pulled out a knife. (RT 198-202, 261-279, 1396-1398.) A neighbor broke up the fight, but before going inside, Angelina said she heard Ava threaten to get a gun and "pop" Stacey. (RT 202.) Angelina's aunt, Cathy Rivers, also testified that Ava threatened to kill Stacey as a result of the confrontation. (RT 327.)

According to the prosecution, the next night, Ava and Richard waited in Ava's car. When they saw Stacey, Richard shot her twice out of the passenger window. Stacey attempted to run away, but Richard chased her down, and shot her again before

---

[2]  Angelina originally testified that Mr. Juniel said he had "something in the back," but she later changed her story and said she could not remember if he said he had something. (RT 184-185.)

fleeing. (RT 72-74.)

Several eyewitnesses testified at trial. Richshilda Williams and her niece Ciara Baldwin testified that when they walked to the store to buy bread on the night of the 4th, they saw Ava and Richard sitting in their parked car. (RT 359-363, 547-554.) During a photo lineup, however, Williams had said that she was only 50% sure that Richard was the man she had seen. (RT 384, 1073-1074.)

Another witness, Seth June, testified that he heard two gunshots and then heard Stacey screaming and saw her running down the street. (RT 478-482.) June said he saw a man with a gun get out of the Acura and follow Stacey around the back of another house, and that he then heard another shot. (RT 482-494.) June was unable to identify either Richard or Ava. (RT 502-503, 510, 515.)

Wendy Jackson, who lived at the house where Stacey was found, testified that after hearing gunshots and a woman screaming, she saw a man follow the victim toward the backyard and then heard another shot. (RT 596-601.) She said Mr. Juniel looked similar to the man she had seen but was unable to identify Ms. McDonald. (RT 609, 616.) Natalie Alvarez also saw a man chase down the victim. (RT 775-792.) In court she identified Richard as the assailant, but in her earlier photo lineup, she had identified a different man. (RT 807-809.)

In addition to the witness testimony, the prosecution also relied on some physical evidence. Police found two shell casings at the scene, one near Stacey's body, and one on the street. (RT 447-449, 636-637, 704, 708.) Although police who searched the Acura originally found nothing, an evidence technician testified that she later found a third casing in the car. (RT 655, 928.) Ballistics tests matched the shell casings to a gun that was found in Richard and Ava's apartment. (RT 673-675, 967-

972, 1005-1025.)

Richard and Ava both took the stand in their own defense. Richard testified that he had nothing to do with the murder. According to Richard, he and Ava were home on the night of March 4th. (RT 1973-1975.) He said they went out to get food and were pulled over by police. (RT 1975-1976.) Both the prosecution and Ava introduced a variety of letters and tape recorded statements to impeach his testimony.

Ava's defense strategy was to place all of the blame on Mr. Juniel. Ava testified that she was with Richard in the car on the night of the 4th. (RT 1434-1435.) According to Ava, when Stacey approached the car, Richard shot her twice, then got out of the car and went after her. (RT 1436-1443.) She said that she had no intention of helping him kill Stacey. She said she was essentially forced to participate because Richard was a violent and abusive man. (RT 1460-1466.) Ava presented a large amount of evidence to show that Richard dominated and controlled her. She also presented an expert witness who testified about domestic violence and battered women's syndrome. (RT 1769-1836.)

The jury apparently believed neither Ava's testimony nor Richard's. After deliberating for several days, it found both of them guilty.

-8-

## ARGUMENT

### I.

### THE TRIAL COURT COMMITTED REVERSIBLE ERROR UNDER BOTH STATE AND FEDERAL LAW BY DENYING MR. JUNIEL'S MOTIONS TO SEVER THE TRIAL

#### A.   Procedural Background

Prior to trial, both parties moved for severance.[3] (CT 233-235, RT 7.) Ava's counsel indicated her intention to introduce "character evidence . . . which will be quite negative toward Mr. Juniel." (RT 7.) Ava's counsel made an offer of proof on the record: she said that she planned to introduce evidence of "threats, isolation, beatings, general psychological and physical abuse of Ms. McDonald by Mr. Juniel." (RT 8.) The district attorney opposed the motion to sever, arguing among other things, that Ava's proffered domestic abuse evidence was irrelevant to the charges and inadmissible. (CT 217-232, RT 8-10.)

The judge agreed with the district attorney that duress was not a defense to murder, and the judge therefore said that she would limit Ms. McDonald's attempt to introduce Mr. Juniel's prior bad acts. (RT 11-12.) She planned to largely "eliminate prejudicial testimony as to Mr. Juniel's activities which clearly should not come in as inappropriate character evidence." (RT 12.) As a result, the judge concluded that there was no need to sever the trial: "Given that ruling then the motion to sever is denied." (RT 12.)  The judge later reiterated her ruling: "I would not allow derogatory,

---

[3]   A reviewing court should determine first whether the trial court abused its discretion in denying the severance motion based on the facts available at the time of severance, and second whether failure to sever resulted in an unfair trial. ( See People v. Greenberger (1997) 58 Cal.App.4th 298, 343.) During trial, a defendant may renew a motion to sever, and the court should grant the motion if changed circumstances require a different ruling. (See People v. Box (2000) 23 Cal.4th 1153, 1196; People v. Ervin (2000) 22 Cal.4th 48, 68.)

pejorative or prejudicial evidence to be entered as it affects Mr. Juniel. . . . [A]t the present time I see no basis for a motion to sever." (RT 15.)

In an apparent violation of the court's pretrial evidentiary ruling, Ava's counsel argued during opening argument that Ava was "humiliated, she was threatened, she was struck, she was psychologically and physically abused by Richard Juniel." (RT 81.) She spoke at length about the nature of the abusive relationship and the variety of evidence that would be presented that Mr. Juniel was a perpetual abuser. (RT 81-88.) On the basis of Ava's opening argument, Mr. Juniel moved for a mistrial and renewed his severance motion, but the judge denied both. (RT 115-116.)

During Ava's direct examination, Ava's counsel repeatedly attempted to elicit testimony about Mr. Juniel's bad character and prior bad acts. (RT 1370, 1374, 1375, 1376, 1378, 1387.)[4]  The court sustained several of Mr. Juniel's objections to this testimony.  Ava's counsel then renewed her motion to sever on the basis that her inability to present character evidence had made it impossible to put on an adequate defense. (RT 1410-1411.) The district attorney again argued that the acts of domestic violence were irrelevant because duress is not a defense to murder. (RT 1411-1412.) The judge reiterated her prior ruling: "I am not going to allow this trial to be muddied with other alleged acts of Mr. Juniel's behavior.  And with regard—I previously considered this and I have denied the motion for a severance." (RT 1414.)

The next day, in a stunning reversal, the trial judge sua sponte announced her intention to alter her previous rulings.  Nearly a month after the trial began—after the prosecution had concluded its case-in-chief, and after Mr. Juniel had concluded the

---

[4]    In direct violation of the court's previous order, Ava also testified that Mr. Juniel had previously gone to jail.  (RT 1371-1372.)

-10-

primary presentation of his defense—the judge decided to allow Ava's evidence of Mr. Juniel's prior acts of domestic violence. (RT 1417-1418.) The judge ruled that to exclude such evidence would deny Ava's right to a fair trial.

The judge then considered Ava's offer of proof on eleven different prior acts of violence by Richard and ruled many of them admissible. (RT 1418-1427.) Ava's counsel again moved for a mistrial and severance because, due to the court's changed ruling, she did not have time to prepare her defense. (RT 1430-1431.) The judge denied the motion. (RT 1431.) Ava went on to present a variety of evidence related to Mr. Juniel's bad character and prior bad acts (a partial list is set out in section D.1. below).

Mr. Juniel again filed a motion for a dismissal or a mistrial and severance based on a violation of Evidence Code section 1101 and his federal constitutional right to a fair trial. (CT 347, RT 1685.) The judge denied the motion. (RT 1686.) The parties subsequently renewed the motions for severance several times, but the judge denied each request. (RT 1827-1828, RT 1840, CT 455, CT 476.)

### B.    Legal Landscape

With Penal Code section 1098, the legislature has expressed a preference for joint trials when codefendants' cases arise out of the same set of facts. (People v. Box (2000) 23 Cal. 4th 1153, 1195.) The trial court, however, retains discretion to order separate trials when a joint trial would result in unfair prejudice to one of the defendants. In People v. Massie (1967) 66 Cal. 2d 899, the Supreme Court set forth the standard for determining when a motion to sever should be granted:

> [T]he court should separate the trials of codefendants in the face of an
> incriminating confession, prejudicial association with codefendants,

likely confusion resulting from evidence on multiple counts, conflicting
defenses, or the possibility that at a separate trial a codefendant would
give exonerating testimony.

(Id. at pp. 916-917 (footnotes omitted.))

In addition to the factors set forth in Massie, California courts have also
recognized the potential for prejudice in joint trials when some evidence would be
admissible against one defendant but not the other. (See People v. Jackson (1996) 13
Cal. 4th 1164; 1207-1208; People v. Cummings (1993) 4 Cal. 4th 1233, 1288; People
v. Keenan (1988) 46 Cal. 3d 478, 501; People v. Ortiz (1978) 22 Cal. 3d 38, 47;
Calderon v. Superior Court (2002) 87 Cal. App. 4th 933, 939-941; People v. Gatlin
(1989) 209 Cal. App. 3d 31, 42.)

If there were ever a case where the defendants' motion for severance should
have been granted, it was this case. Mr. Juniel and Ava presented totally inconsistent
and antagonistic defenses: while Mr. Juniel claimed that he had nothing to do with the
crime, Ava claimed that she was with Mr. Juniel when he committed the crime. Ava's
defense was to shift responsibility *entirely* to Mr. Juniel. As part of her defense,
moreover, Ava introduced a raft of evidence of Mr. Juniel's bad character and prior bad
acts. This highly inflammatory evidence had only marginal (if any) legal relevance to
Ava's murder defense, and it would have been obviously inadmissible at a separate
trial.

The trial judge's denial of the motion to sever led to a long, sprawling, and
largely incoherent trial at which the defendants spent days attacking each other with a
variety of evidence that had little or nothing to do with the case. In the interests of
justice and judicial economy, the defendants' cases should have been tried separately.
The failure to grant separate trials deprived Mr. Juniel of his state and federal rights to

-12-

a fair trial.

### 1.    Antagonistic Defenses

In <u>People v. Massie</u>, the California Supreme Court stated clearly that "the court should separate the trials of codefendants in the face of . . . conflicting defenses." (<u>Massie, supra</u>, 66 Cal.2d at pp. 916-917.)  Federal courts too have recognized that "[t]he most common reason for severing a trial is where codefendants present mutually exclusive or irreconcilable defenses." ( <u>United States v. Vasquez-Velasco</u> (9th Cir. 1994) 15 F.3d 833, 846, citing <u>United States v. Rucker</u> (11th Cir. 1990) 915 F.2d 1511, 1513.)

Of course, the mere fact that defendants' strategies conflict in some respects does not in itself mandate severance.  It is frequently the case, for example, that both defendants admit involvement in the offense but try to shift primary responsibility onto the other. (<u>People v. Boyde</u> (1988) 46 Cal. 3d 212, 233; <u>People v. Turner</u> (1984) 37 Cal.3d 302, 312-313.)  In <u>Boyde</u>, for example, the California Supreme Court noted <u>United States v. Brady</u> (9th Cir. 1978) 579 F.2d 1121, a typical case where two defendants admitted participation in an assault but each attempted to show that the other inflicted the fatal blow.  In that sort of case, though the defenses may conflict, severance is not required. (<u>Boyde, supra</u>, 46 Cal.3d at 233.)

The California Supreme Court has suggested a much narrower class of cases where severance should be granted as a result of "antagonistic defenses." (<u>See People v. Hardy</u> (1992) 2 Cal. 4th 86, 168.)  "[T]o obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable . . . ." (<u>Ibid</u>., quoting <u>United States v. Davis</u> (1st Cir. 1980)

-13-

623 F.2d 188, 194-195.) In other words, "'mutual antagonism' only exists where the acceptance of one party's defense will preclude the acquittal of the other." ( Ibid., quoting United States v. Ziperstein (7th Cir. 1979) 601 F.2d 281, 285.)

This case thus easily fits in the narrow class of cases where truly antagonistic defenses should compel severance. This was a case where "one defendant present[ed] a defense that necessarily implicated another defendant." (Id. at p. 169.) This was a case where "one defendant claimed second defendant forced him to participate in crime." ( Ibid.) This was a case where "acceptance of one party's defense . . . preclude[d] the acquittal of the other." (Id. at p. 168.) The parties' defenses here were starkly antagonistic and wholly inconsistent.

This case is far different from the cases where California courts have held that partially conflicting defenses did not require severance. This was not a case where it was "undisputed that each appellant participated in the incident." ( Boyde, supra, 46 Cal.3d at p. 233; accord People v. Jackson (1996) 13 Cal.4th 1164, 1208; People v. Cummings (1993) 4 Cal.4th 1233, 1287.) This was not a case where the defenses were "not completely conflicting, because there [was] little disagreement about most of the events." (People v. Almaraz (1985) 173 Cal.App.3d 304, 315.)

This was not simply a case where one defendant merely gave some testimony that was "damaging to the other and thus helpful to the prosecution." (Turner, supra, 37 Cal.3d at p. 313.) Nor was this a case where the codefendant's attempt to shift guilt came only from the arguments of counsel. (People v. Pinholster (1992) 1 Cal. 4th 865, 933-934.) Rather, this was a case where a massive and "irreconcilable conflict [arose] between the two defendants." (People v. Graham (1969) 71 Cal.2d 303, 331.)

Moreover, in this case, unlike several of the leading cases where courts have

upheld joint trials despite conflicting defenses, the court did not employ a dual jury procedure to minimize prejudice to the defendants. ( Compare Jackson, supra, 13 Cal.4th at pp. 1207-1208; Cummings, supra, 4 Cal.4th at pp. 1287-1288.)

The California courts have taken a restricted view of when conflicting defenses should result in separate trials—the class of cases where severance must be granted is narrow. But a narrow class does not mean no class at all. If the principles of Massie, Hardy, and other cases have any meaning, they must mean that severance was required in this case.

### C.    Inadmissible Character and Bad Acts Evidence

Mr. Juniel received an unfair trial not just because Ava's defense strategy completely contradicted his own. Mr. Juniel was particularly prejudiced by the manner in which Ava presented her defense. Ava did not simply testify that Mr. Juniel committed the crime—in order to show that she was controlled by Mr. Juniel, she also testified that Mr. Juniel committed a variety of other deplorable acts. Ava (and other witnesses called in her defense) testified that Mr. Juniel was a violent and abusive man who had repeatedly beaten Ava and her child. The admission of this evidence made this joint trial particularly prejudicial.

### 1.    Evidence Presented

In order to support her defense, Ava introduced a variety of evidence against Mr. Juniel—evidence that would have been inadmissible at a separate trial. The sheer amount of it was staggering. It included:

-15-

(1)     Ava's testimony about a December incident where Mr. Juniel grabbed her and threw her into a closet. (RT 1461-1462.)

(2)     Ava's testimony about an incident where Mr. Juniel slapped her after she came home from a club. (RT 1463-1464, 1481-1485)

(3)     Atrina Jackson's testimony about the post-club incident where Mr. Juniel slapped Ava and where he later phoned Ms. Jackson and said "you ain't shit, dyke bitch." (RT 1894-1897.)

(4)     Tomaz Pickens's testimony that Mr. Juniel had punched him and thrown lit matches and bottles at him. (RT 2079-2080.)

(5)     Victor White's testimony that he had seen Mr. Juniel hit Ava several times. (RT 1888-1889.)

(6)     Ava's testimony about an incident where Mr. Juniel threw her into a window. (RT 1464-1465.)

(7)     Kelley Haynes's hearsay testimony that Ava had told her that Mr. Juniel had thrown her through a window. (RT 1877.)

(8)     Robyn Williams's hearsay testimony that Ava had told her that Mr. Juniel had hit her and shoved her head through a window. (RT 1883.)

(9)     Ayeshia Dubose's testimony that Mr. Juniel repeatedly beat and threatened Ava and her son and that there were "too many" incidents of abuse to even count. (RT 1917-1918.)

(10)    Ava's testimony that Mr. Juniel had previously threatened her by pointing a gun at her. (RT 1616-1619.)

(11)    Tomaz Pickens's testimony that he had seen Mr. Juniel with a gun. (RT 2080-2081.)

-16-

(12) Ava's other testimony that Mr. Juniel was abusive and controlling. (RT 1465-1466, 1733.)

(13) Ava's testimony about Mr. Juniel's infidelity. (RT 1374, 1434, 1480, 1527.)

(14) Ava's testimony that Mr. Juniel was sleeping with her sister Sia. (RT 1713-1714.)

(15) Ayeshia Dubose's testimony that Sia performed sexual favors on Mr. Juniel in exchange for drugs. (RT 1919-1920.)

(16) Ayeshia Dubose's testimony that Ava was having problems with Mr. Juniel because he was cheating on her. (RT 1915-1916.)

(17) Ava's testimony that Mr. Juniel would "jump on her." (RT 1375, 1380.)

(18) Ava's testimony that Mr. Juniel did not want her to stay close to her family or her girlfriends. (RT 1375-1376.)

(19) Ava's testimony about Mr. Juniel's anger when Larry Fields came to visit. (RT 1377-1378.)

(20) The stipulation regarding Larry Fields and the change in his relationship with Ava following Christmas. (RT 1836.)

(21) Ava's testimony that Mr. Juniel and her ex-husband were in a gang together. (RT 1501.)

(22) Ava's other testimony about Mr. Juniel's gang symbols. (RT 1643-1644, 1738-1739.)

(23) Kelley Haynes's testimony that Mr. Juniel was hitting Ava and not coming home at night. (RT 1876.)

(24) Ayeshia Dubose's testimony that Mr. Juniel had called and threatened

her and her family. (RT 1923, 1929-1934.)

(25)    Robyn Williams's testimony that Ava was afraid of Mr. Juniel and that he had threatened Ava. (RT 1882-1883.)

(26)    Trina Mayon's testimony that Ava grew more distant once Mr. Juniel returned from jail and that she could tell something was wrong with Ava. (RT 1905-1906, 1912-1913.)

(27)    Rita Ammons's testimony about the nature of Ava and Mr. Juniel's relationship, including her testimony that Mr. Juniel was abusive. (RT 1311-1313, 1365.)

(28)    Ava's expert witness Dr. Linda Barnard, whose testimony about Battered Women's Syndrome and domestic violence was intended to provide a foundation for concluding that Ava was abused and controlled by Mr. Juniel. (RT 1769-1824.)

Ava's entire defense was premised on the admission of this evidence. The closing argument presented by her counsel consisted almost entirely of an attempt to smear Richard.

> She told you and other witnesses told you and confirmed how violent he could be. He called and demanded that she leave work. He threatened her, he slapped her in the face... He threatened and frightened and terrified her own child. He threw lit matches at him. He hit him. And he cheated on her with younger women. Not only did he cheat, he threw it in her face. He came home, gave her the details of his sexual conquests. He brought pictures home of the women he had been with. He even had sex with her sister. (RT 2193. See also RT 2190-2196; 2204-2205.)

None of this sort of argument would have been proper at a separate trial.

-18-

If Ava and Mr. Juniel had separate trials, it is possible that Ava would have testified against him. But none of her testimony about his prior bad acts would have been admissible. And of the nine other witnesses whom she called in her defense—all of whom testified largely about Mr. Juniel's bad acts and bad character—not a single one offered testimony that would have been admissible if Mr. Juniel had been tried separately for the murder.

### 2.    Analysis

"'Other crimes' evidence which would not be admissible against an accused in his separate trial holds a well-understood potential for prejudice." (<u>Keenan</u>, <u>supra</u>, 46 Cal.3d at p. 501.) California courts have recognized that joint trials may be inherently prejudicial where the trial allows the jury to hear "evidence admissible against one but not against another." (<u>Gatlin</u>, <u>supra</u>, 209 Cal. App. 3d at p. 42.) For example, "[a]n abuse of discretion occurs when the failure to sever leads to the admission at one defendant's trial of incriminating extrajudicial statements by a joint defendant that would otherwise be inadmissible in a separate trial." (<u>Jackson</u>, <u>supra</u>, 13 Cal. 4th at 1207.)

Severance is not mandated simply because evidence pertaining to different defendants or different counts in a joint trial is cross-admissible. (<u>Keenan</u>, <u>supra</u>, 46 Cal.3d at p. 501.) But in such a case, the court must balance the "conceded prejudice" against the "benefits of joinder." (<u>People v. Smallwood</u> (1986) 42 Cal.3d 415, 426.) Where the prejudice of from this evidence is so great as to deny a defendant a fair trial, California courts have demanded severance.

In the typical situation, the prosecution at a joint trial introduces evidence

-19-

against codefendants that would not be admissible against the defendant in a separate

trial. In People v. Ortiz (1978) 22 Cal. 3d 38, for example, the defendant was tried for

robbery with three codefendants who were tried for the robbery and also a separate

narcotics charge not involving the defendant. The district attorney presented

"pervasive" and "dramatic" testimony in connection with the codefendants' narcotics

charge. (Id. at p. 47.) The Supreme Court found that the joint trial prejudiced the

defendant because the narcotics evidence, much of which "would have been

inadmissible in a separate trial of defendant," "implied defendant's association with the

illicit narcotics activity of the codefendants." ( Ibid.) It therefore reversed the

conviction. (Id. at p. 48.)

The Second District Court of Appeal faced a similar problem in   Calderon v.

Superior Court (2002) 87 Cal. App. 4th 933. In that case, defendant Calderon and

codefendant Rivera were tried together for murder. The trial court permitted

prosecution to join another murder against Rivera in the same trial. (See id. at pp. 935-

938.) Finding an abuse of discretion, the appellate court reversed.

The court found that none of the evidence regarding the other murder would

have been admissible against Calderon. ( Id. at pp. 939-940.) But although the

prosecution was prepared to stipulate that Calderon was not involved in the other

murder, the court held that the evidence had a potential to inflame the jury against

Calderon. (Id. at pp. 940-941.) The court held that there would be "undue prejudice

to Calderon in being forced to join Rivera as a codefendant," and it therefore ordered

separate trials. (Id. at p. 941.)

In many respects, the evidence presented at this trial—which would have been

inadmissible against Mr. Juniel at a separate trial—was even more prejudicial than the

-20-

evidence in <u>Ortiz</u> and <u>Calderon</u>. In those cases, the prosecution presented evidence of the codefendants' other acts. The courts found the joint trials to be unfairly prejudicial because of the possibility that the jury would "imply" that the defendant had involvement with those acts, or "associate" the defendants with the codefendants' bad acts.

In this case, by contrast, otherwise inadmissible evidence presented was not of his codefendant's bad acts—it was of *his own* bad acts. The evidence did not merely present the danger that Mr. Juniel would be "associated" with someone else's crimes, or that the jury would "imply" from his codefendants' wrongdoing that Mr. Juniel was guilty. In this case, the danger was much more direct—the otherwise inadmissible evidence was *offered for the very purpose of proving* that Mr. Juniel was a violent and abusive man.

In cases like <u>Ortiz</u> and <u>Calderon</u>, where the non-cross-admissible evidence had even less prejudicial value, appellate courts have found an abuse of discretion when the trial court failed to sever the trials. Never has a California court allowed a case like this—where one defendant's strategy consists entirely of admitting other acts evidence against her codefendant—to be tried jointly.

## D.    Judicial Economy

Ruling on a motion to sever involves a "highly individualized" balancing process. (<u>Keenan</u>, <u>supra</u>, 46 Cal. 3d at p. 501.) "[R]eviewing courts must analyze realistically the prejudice which flows from joinder in light of all the circumstances of the individual case." (<u>Smallwood</u>, <u>supra</u>, 42 Cal.3d at 425.) When ruling on a motion to sever, "the court must decide whether the realistic benefits from a consolidated trial

are outweighed by the likelihood of 'substantial' prejudice to defendant." (<u>Keenan</u>, <u>supra</u>, 46 Cal. 3d at p. 500.)  One of the primary benefits of a joint trial is judicial economy.  (<u>Id</u>. at p. 501.)

It is not only the potential for prejudice that requires "requires careful and individualized scrutiny"—"an individualized assessment of the benefits of joinder is also required." (<u>Smallwood</u>, <u>supra</u>, 42 Cal.3d at 426.)  The California Supreme Court has "refused to presume that these benefits [of joinder] would accrue in every case." (<u>Ibid</u>.)  In a case like this, where a joint trial involved the "conceded prejudice" resulting from the admission evidence that was not cross-admissible, the court must carefully weigh that conceded prejudice against the purported benefits of joinder. (<u>Ibid</u>.)

In this case, the benefits of joinder were minimal or nonexistent.  In fact, joinder here was largely counterproductive to the important goal of judicial economy.  It was precisely the court's decision to deny the motion to sever that led to this incredibly long and unwieldy trial.  The parties wasted days attacking each other's defenses.  In his cross-examination of Ava and in his testimony, Mr. Juniel was forced to spend a large amount of time responding to Ava's claims about his prior bad acts, his bad character, and their relationship.  None of that would have been necessary with separate trials, because none of the evidence would have been admissible against Mr. Juniel.

It would be laughable to assert that this joint trial produced great benefits of judicial economy. Not only was the joint trial woefully unfair—it was also enormously inefficient.

### E.    Federal Constitutional Violation

The United States Supreme Court has recognized that improper joinder violates the Constitution "if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." (United States v. Lane (1986) 474 U.S. 438, 446 n.8.) The danger of a Due Process violation is heightened when joinder "allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible." (Bean v. Calderon (9th Cir. 1998) 163 F.3d 1073, 1084, quoting United States v. Lewis (9th Cir. 1986) 787 F.2d 1318, 1322.)

The improper joinder in this case allowed Mr. Juniel's co-defendant to smear him with an endless barrage of character and "other acts" evidence. It allowed a massive amount of other crimes evidence to be admitted that otherwise would have been inadmissible. The error and the resulting prejudice were so great that Mr. Juniel's federal constitutional rights to a fair trial were violated.


### F.    Prejudice

As a violation of state law, the erroneous denial of a motion to sever is reviewed for prejudice under the standard of People v. Watson (1956) 46 Cal.2d 818. Thus, Mr. Juniel's conviction must be reversed if "it is reasonably probable that [he] would have obtained a more favorable verdict at a separate trial." ( Massie, supra, 66 Cal.2d at 923.) When improper joinder results in a violation of the federal constitution, the conviction must be reversed unless the court concludes "that it was harmless beyond a reasonable doubt." (Chapman v. California (1967) 386 U.S. 18, 24.)

Under Massie, the prejudice analysis from a denial of a motion to sever involves an assessment of "differences from the joint trial that would have occurred if the

defendant had been tried separately." (Massie, supra, 66 Cal.2d at 921.) In a case such as this, it is difficult to analyze prejudice because it is impossible to know what evidence would have been presented had Mr. Juniel been granted a separate trial. It is impossible to know if Ava would have testified against him or what she would have said. It is impossible to know if Mr. Juniel would have taken the stand or invoked his constitutional right to remain silent. Clearly, however, a separate trial for Mr. Juniel would have been vastly different than the joint trial that took place below.

At a minimum, the evidence of Mr. Juniel's prior bad acts and bad character would not have been admitted at a separate trial. That evidence, which constituted the bulk of Ava's defense, took up a large portion of the trial below. The jury heard again and again that Mr. Juniel abused Ava and others, including children. The jury heard again and again about Mr. Juniel's infidelity. The evidence was "highly inflammatory" and therefore extremely prejudicial. It would be absurd to assume that this evidence had no influence on the jury's verdict, especially given her lawyer's incendiary closing argument.

The trial court below attempted to instruct the jury that it should not consider the evidence of bad acts and bad character against Mr. Juniel. In the midst of Ava's testimony, the judge said to the jury:

> Ladies and gentlemen, before we proceed with the testimony of Ms. McDonald, I'm going to advise you concerning some of the testimony that you are about to hear. You are going to be hearing certain acts alleged by defendant McDonald concerning the acts of Mr. Juniel. You are advised that you may not consider these acts in any way concerning evidence against Mr. Juniel. The testimony concerning these acts is to be considered by you solely for the following limited purpose: for the proof relevant to the believability of defendant McDonald's testimony and the beliefs, perceptions and behavior of victims of domestic violence. They are in no way to be considered by you that defendant

-24-

Juniel is a person of bad character of that he has a disposition to commit crimes. (RT 1431.)

The judge's instructions were not terribly clear, and the explanation of the relevance of the evidence was confusing.

More importantly, the scope of the court's admonition was quite limited. The judge's instruction applied only to Ava's testimony. The judge never gave any similar instruction for Ava's other nine witnesses who testified to appellant's prior bad acts.

Though the court gave a short limiting instruction at the conclusion of the case, informing the jury that the plethora of evidence of appellant's criminality should not "be considered by you to prove the defendant Juniel is a bad person," such limiting instruction was simply insufficient to cure the error. Even clear limiting instructions are not always sufficient to protect a defendant's right to be tried without inadmissible evidence. (Bruton v. United States (1968) 391 U.S. 123, 137.) Massie itself recognized that "even a judge would face a formidable task in attempting to exclude from his consciousness" the evidence that was inadmissible against one co-defendant. (Id. at p. 923.) Even though "judges are better able than juries to limit their consideration of evidence to the purposes for which it is admissible," (People v. Charles (1967) 66 Cal. 2d 330, 338 n.12), the Supreme Court in Massie reversed the conviction of one co-defendant because it held that the trial judge in that case simply could not have ignored the evidence. (Massie, supra, 66 Cal.2d at 923-924.)

In this case it would be unreasonable to expect the jury to have excluded from its consciousness all of the highly inflammatory evidence of Mr. Juniel's bad acts and bad character. The limiting instruction did not cure the error, and the prejudice resulting from the trial court's failure to sever the trial demands reversal of Mr. Juniel's conviction. The prejudice was "so great as to deny" Mr. Juniel "his Fifth Amendment right to a fair trial." (Lane, supra, 474 U.S. at p. 446 n.8.) It would be impossible to maintain that the error was harmless beyond a reasonable doubt.

-25-

## II.

## THE TRIAL COURT COMMITTED ERROR UNDER EVIDENCE CODE SECTIONS 1101 AND 352 AND VIOLATED MR. JUNIEL'S FEDERAL DUE PROCESS RIGHTS BY ADMITTING EVIDENCE OF HIS PRIOR BAD ACTS AND BAD CHARACTER

### A. Error Under State Law

Even if it was proper to try Mr. Juniel and Ms. McDonald jointly, it was nonetheless prejudicial error to admit Ava's evidence of Mr. Juniel's bad acts and bad character. The law is clear that such evidence is inadmissible against a criminal defendant, and the law does not contain an exception for joint trials.

Evidence Code section 1101 provides one of the foundational rules of evidence law. It states that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code § 1101(a).)

Because of the importance of the principles underlying the rule of section 1101, any doubt regarding the admissibility of other acts evidence should be resolved in favor of excluding the evidence. (People v. Kelley (1967) 66 Cal. 2d 232, 239; Blackburn v. Superior Court (1993) 21 Cal. App. 4th 414, 430.) Evidence of a defendant's other bad acts or bad character is admitted "only with caution." (People v. Thompson (1988) 45 Cal. 3d 86, 109.)

The Code sets forth several exceptions to the general rule of section 1101. For instance, under subdivision (b), other acts evidence may be used to prove motive, opportunity, knowledge, or absence of mistake. Other acts evidence may also be

admitted pursuant to sections 1102, 1103, 1108, or 1109.[5] But none of those exceptions applied to this case. And to reiterate, the Code contains no "joint trial" exception.

Despite the clear mandate of the Evidence Code, the trial court below allowed the presentation of a massive amount of evidence of Mr. Juniel's prior bad acts and bad character. The court did not admit the evidence under any statutory exception, nor under any other rule derived from California case law. Instead, the court—after initially excluding the evidence—determined that *Ava's right* to due process mandated the admission of the evidence. (RT 1417.)

The court's vague ruling set forth no plausible legal foundation for the admission of the evidence. The evidence had no real relevance to Ava's defense. As the district attorney repeatedly argued, and as the trial court recognized, duress is not a defense to murder, and therefore Ava's claim that Mr. Juniel controlled her had no bearing on the charges against her. Indeed, even after allowing Ava to present her evidence, the trial judge still refused Ava's request to give CALJIC 4.40, which states that a person is not guilty of a crime when she is "acting under threats and menaces." (RT 2086-2087.)

But even assuming that the evidence had some marginal relevance to Ava's defense, that still did not provide a valid reason for the trial judge to abrogate the clear mandate of Evidence Code section 1101. "Evidence of uncharged offenses is so prejudicial that its admission requires extremely careful analysis. Since substantial prejudicial effect is inherent in such evidence, uncharged offenses are admissible only if they have substantial probative value." (People v. Balcom (1994) 7 Cal. 4th 414,

---

[5] Section 1109 allows the admission of a defendant's previous acts of domestic violence, but that exception only applies "in a criminal action in which the defendant is accused of an offense involving domestic violence." (Evid. Code § 1109(a)(1).)

422, alterations and quotation marks removed.)

Moreover, even if section 1101 did contain some exception relevant to this case, the evidence still should have been excluded under section 352. Even where proffered evidence is relevant to an issue other than propensity and thus fits within one of section 1101's exceptions, it must still be scrutinized in the light of "other policies limiting admission, such as those contained in Evidence Code section 352." ( Id. at p. 426, quoting Thompson, supra, 45 Cal.3d at p. 109.)

The evidence of Mr. Juniel's prior bad acts and bad character obviously created a substantial risk of undue prejudice to Mr. Juniel. It also created a "substantial danger . . . of confusing the issues." (Evid. Code § 352.) Although the charges in this case arose out of a tragic murder, the trial largely turned into an examination of Mr. Juniel's character and his relationship with Ms. McDonald. The trial judge's decision to admit all of this evidence disastrously confused and obscured the real issues that should have been presented to the jury. The decision was thus error under § 352.

### B. Due Process Clause Violation

The "underlying premise of our criminal justice system" is "that the defendant must be tried for what he did, not for who he is." (United States v. Mayans (9th Cir. 1994) 17 F.3d 1174, quoting United States v. Bradley (9th Cir. 1993) 5 F.3d 1317, 1320.) The use of "other acts" evidence to prove character and propensity is "contrary to firmly established principles of Anglo-American jurisprudence." ( McKinney v. Rees (9th Cir. 1993) 993 F.2d 1378, 1380.) The admission of irrelevant propensity evidence can render a trial fundamentally unfair and can render a conviction invalid under the Due Process Clause. (Id. at p. 1384-1386.)

For federal constitutional purposes, the question "is whether the admitted evidence of 'other acts' of the defendant was relevant to a fact of consequence, or was only evidence of character offered to show propensity." (Id. at p. 1381.) The disputed evidence here was not relevant to any fact of consequence as to Mr. Juniel's guilt. None of the evidence made the central disputed fact, Mr. Juniel's "identity as the murderer, more probable." (Id. at p. 1384.)

Like California Evidence Code section 1101, the federal Due Process Clause does not contain any "joint trial exception." It is generally acceptable to try defendants together, but a joint trial does not confer on the state a right to obtain a conviction based on prejudicial and irrelevant character evidence in violation of a defendant's constitutional rights. Even if the evidence was somehow relevant to Ava's case, it was unacceptable to put the evidence before the same jury that tried Mr. Juniel. In any case, as the district attorney argued throughout the trial below, the disputed evidence was not even relevant to any fact of consequence for a determination of Ava's guilt. Ava's various allegations against Richard—that he beat her, that he dealt drugs, that he was rude to her friends, that he slept with her sister—did not make it any more or less likely that she committed the charged crime.

The evidence allowed by the trial court in this case had no relevance to the jury's determination of Mr. Juniel's guilt. The sheer amount of the evidence, as well as its highly provocative and inflammatory nature, made it impossible for the jury to ignore. The trial court's error was so great that it violated not just the California Evidence Code but also the federal Due Process Clause.

## C. Prejudice

The prejudice analysis for the trial court's error under 1101 and 352 is substantially the same as the prejudice analysis for the trial court's failure to sever the trial. Little more need be added to the argument presented in section I.F. above. The error requires reversal under both the state law standard for reviewing error and the more stringent federal constitutional standard of Chapman v. California (1967) 386 U.S. 18.

But it is worth reiterating the California courts' long-standing recognition that "substantial prejudicial effect is inherent in such evidence" of bad acts and bad character. (Balcom, supra, 7 Cal.4th at 422; see also Thompson, supra, 27 Cal.3d at p. 318; People v. Sam (1969) 71 Cal.2d 194, 206; People v. Haston (1968) 69 Cal.2d 233, 246-247.)

The erroneously admitted evidence was inflammatory and highly prejudicial. Again, the limiting instruction was confusing and too narrow, and even if it had been clear, it would have been insufficient to cure the error. "Some types of evidence are so difficult to disregard completely or to consider for one purpose but ignore for another, that curative instructions are deemed incapable of overcoming the harm done by exposing a jury to such evidence." (Charles, supra, 66 Cal.2d at p. 338 n.12)

In this case, Ms. McDonald presented evidence that Mr. Juniel repeatedly abused his girlfriend and others, including children. She presented evidence of his infidelity, including evidence that he received sexual favors from her own sister in exchange for drugs. "One would have to be almost saintly not to be aroused by such evidence," (Calderon v. Superior Court (2002) 87 Cal. App. 4th 933, 941), especially given her lawyer's repeated emotional appeals that the jury *should* be aroused by the evidence. It is simply inconceivable that the jury could have put the evidence out of its mind when it considered Mr. Juniel's guilt. He is therefore entitled to a new trial.

## III.

# THE TRIAL COURT ERRED BY RULING THAT MR. JUNIEL HAD 'OPENED THE DOOR' TO A DETAILED ACCOUNT OF AN EARLIER INCIDENT WHERE MR. JUNIEL POINTED A GUN AT MS. MCDONALD

### A.    Background

Ava sought to introduce evidence regarding an incident where, according to Ava, Mr. Juniel had woken her up with a gun to her head and said that she was the enemy. (RT 1423.) The trial court initially excluded the testimony under section 352. (RT 1426.) Ava subsequently identified the gun which she said Mr. Juniel used to shoot Stacey. (RT 1438.)

During his cross-examination of Ava, Mr. Juniel questioned her about how she recognized the gun.  Mr. Juniel asked Ava if she had "ever seen that gun before that incident [i.e., the March 4 shooting] took place?" Ava responded that she had. (RT 1603.) Ava reiterated that she "had seen it before." (RT 1604.) Mr. Juniel then asked: "How many times had you seen that gun before?"  Ava gave a substantially nonresponsive answer to the question: "I seen it when you pulled it on me." (RT 1604.)

The district attorney then began his cross-examination by asking about the prior incident. (RT 1616-1617.) Mr. Juniel's objection to the testimony was overruled. (RT 1617.) Ava went on to describe the incident in some detail. (RT 1617-1619.)

Mr. Juniel subsequently renewed his objection and moved for a mistrial on the grounds that Ava's testimony had violated the judge's prior order excluding the evidence. (RT 1685.) The trial court ruled that Mr. Juniel had opened the door to the evidence about the prior gun incident. (RT 1685-1687.)

B.    **Analysis**

1.    **Evidence Code Section 356 and "Opening the Door"**

Otherwise inadmissible evidence may be made admissible if a party "opens the door" to the evidence. Questions of whether a party has opened the door are governed by Evidence Code section 356. (See People v. Claxton (1982) 612 Cal.App.3d 638, 660 ["It is this section of the Evidence Code that so often gives rise to counsel's statement, 'He opened the door.'"].) Section 356 states, in part, that "[w]hen part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party."

California courts have ruled, however, that section 356 "is indisputably subject to the qualification that the court may exclude those portions of the conversation not relevant to the items thereof which have been introduced." (People v. Williams (1975) 13 Cal. 3d 559, 565, quotation marks omitted; see also People v. Perry (1972) 7 Cal. 3d 756, 787; Benson v. Honda Motor Co. (1994) 26 Cal.App.4th 1337, 1350.) "The purpose of this section is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed." (People v. Arias (1996) 13 Cal.4th 92, 156.)

Evidence admitted under section 356 "must shed light on that which is already admitted [citation]; and it must be necessary to make the earlier conversation understood or to explain it [citations]." (People v. Gambos (1970) 5 Cal. App. 3d 187, 193.) In short, to be admissible under 356, evidence must explain, rebut, or clarify in some relevant way the evidence that has already been admitted by the party who opened the door.

Moreover, evidence that is put forth under section 356 on the grounds that

-32-

another party "opened the door" is still subject to the usual limitations of section 352. (See Benson, supra, 26 Cal.App.4th at p. 1350.)

### 2.    Mr. Juniel's Questioning and the Irrelevant and Prejudicial Response

The testimony of Ava elicited by the district attorney was not properly admissible under section 356, and Mr. Juniel did not "open the door" to that testimony. Mr. Juniel simply asked Ava how many times she had seen the gun before. Ava responded that she had seen it when he pulled it on her. (RT 1604.) Even if Mr. Juniel can in some way be held responsible for the nonresponsive portion of Ava's answer, her answer did not open the door to the district attorney's detailed questioning about the entire incident.

There was one relevant question at issue: whether Ava had seen the gun before, and therefore whether she had some background for identifying the gun used in the shooting. That was the sole question that Mr. Juniel sought to explore, and that was the sole question that was truly relevant to the case.

But the district attorney elicited—and the trial court allowed—testimony on a variety of matters that had *absolutely no bearing* on the relevant question. The district attorney asked when the earlier incident took place. (RT 1616.) He asked if the gun was loaded. (RT 1617.) He asked her to describe what happened, and Ava responded that she woke up to find him standing over her, and that Mr. Juniel had called her his enemy. (RT 1617.) He asked her how she felt about having the gun in the house, and Ava responded that she was terrified. (RT 1618.) None of this testimony shed any light on Ava's ability to identify the gun.

-33-

The testimony elicited by the district attorney had no bearing upon the testimony elicited by Mr. Juniel. (See People v. Breaux (1991) 1 Cal. 4th 281, 302.) It did not "shed light on" the evidence "already admitted," and it was not "necessary" to make the evidence understood. (Gambos, supra, 5 Cal.App.3d at p. 193.) The testimony was not needed to clear up "a misleading impression on the subjects addressed." (Arias, 13 Cal.4th at p. 156.) Nor was it needed to "contradict facts elicited" by Mr. Juniel. (People v. Hutton (1986) 187 Cal. App. 3d 934, 945.)

Moreover, Ava's testimony about the incident was still inadmissible under section 352. Recognizing the extreme and unfair prejudice of the evidence, the trial court had already excluded the testimony on 352 grounds. (RT 1426.) The testimony elicited by Mr. Juniel did not transform evidence about the earlier incident into relevant evidence. Still less did it import enough relevance to tip the 352 scales in favor of admission.

The trial court failed to explain how the testimony elicited by Mr. Juniel "opened the door" to all of the testimony elicited by the district attorney. It did not explain how the new evidence was relevant, much less how it was so relevant that it outweighed the conceded prejudice. Indeed, the trial court did not conduct any 352 analysis whatsoever. The trial court's ruling allowing for the admission Ava's testimony about the prior gun incident is manifestly erroneous.

Section 356 and the rule about "opening the door" was "never intended" to allow a party to "lug[] into the record of a case a mass of irrelevant and incompetent testimony which might have a tendency to militate seriously against the rights of the party against whom it was admitted." (Gambos, supra, 5 Cal.App.3d at p. 193, quoting People v. Mahach (1924) 65 Cal.App. 359, 382.) That is precisely what happened in

-34-

this case. All Mr. Juniel did was ask Ava how many times she had seen the gun before. His simple question did not open the floodgates to the admission of highly prejudicial and entirely irrelevant testimony that Mr. Juniel had woken Ava up with a gun pointed at her and called her the enemy.

## C.    Prejudice

Of all of the evidence of prior bad acts, the admission of the gun incident evidence was probably the most prejudicial and inflammatory. The jury was called to decide a straightforward question: whether Mr. Juniel had shot Stacey Alexander on July 4. In Ava's testimony, the jury heard that Mr. Juniel had previously woken up Ava, pointed the *same gun* at her, and threatened to kill her. It is hard to imagine that such testimony could have played no role in the jury's deliberation. If the testimony had been properly excluded, there is a reasonable probability that the jury would have reached a different result.

Moreover, even if the prejudice from this error is not alone sufficient to justify reversal, the court must consider the cumulative effect of this error combined with the other errors at trial. (See People v. Jones (2004) 30 Cal. 4th 1084, 1116-1117.) The admission of Ava's testimony about the earlier gun incident compounded the prejudice suffered by Mr. Juniel from the admission of all of the other evidence of bad acts and bad character. Absent these errors, there is a reasonable probability that the jury would have reached a different result.

## IV.

## THE TRIAL COURT ERRED BY ADMITTING EVIDENCE SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE WITHOUT CONDUCTING THE REQUISITE 402 HEARING

### A.    Background

Mr. Juniel took the stand in his own defense.  At the outset of her cross-examination of Mr. Juniel, Ava's lawyer Lorna Brown sought to impeach his testimony with a letter purportedly written by Mr. Juniel.  (RT 2037.)  Ms. Brown asked Mr. Juniel if he had given her the letter at the preliminary hearing, but Mr. Juniel said that he had not.  (RT 2037.)  Ms. Brown pressed on: "You presented me with this, Mr. Juniel, to tell me about how you were involved in this case and what really happened that night so that I could defend my client, right?" (RT 2038.)  Mr. Juniel again denied that he had given her the letter:

> No, I did not present that to you.  In fact I presented that to my lawyer and I had no idea that he would give you that.  That's not a statement. That was a note to my lawyer, and I fell that that abuses my rights of lawyer-client privileges.  I had no idea you would get or read that.  (RT 2038.)

To dispute Mr. Juniel's account, Ms. Brown then testified inappropriately and put forth her own recollection as evidence: "Mr. Juniel, you gave me a copy of that letter in municipal court." (RT 2038.)

Mr. Juniel again denied that he had given the letter to Ms. Brown.  He again asserted that the letter was a communication to his lawyer, and he again objected to Ms. Brown's attempt to use the privileged letter.  (RT 2038.)  The judge overruled the objection, offering only this puzzling and irrelevant response: "[Ms. Brown] has identified it and may read from it." (RT 2039.)

Ms. Brown went on to read several portions of the letter in open court. In the letter, Mr. Juniel stated that he was with a friend named Eric Hood on the night of the murder, that the two of them had gone for a drive around 11 p.m. in Ava's car, that Eric was a drug dealer who was owed money by Stacey, and that Eric had shot Stacey when he saw her. (RT 2039-2040.)

At the next recess, Ms. Brown sought to admit the Eric Hood letter into evidence. (RT 2091.) Mr. Juniel renewed his objection to Ms. Brown's use of the letter; he reiterated that the letter was a communication to his lawyer with notes of ideas for his defense, and that it was therefore protected by the attorney-client privilege. (RT 2091-2092.) Ms. Brown again claimed that Mr. Juniel had given her the letter directly, but Mr. Juniel denied that he had done so. (RT 2092.)

The judge issued another perplexing ruling on the subject. "The extent to which Mr. Juniel read from that statement[6] is in the record and that is part of the evidence. The remainder of it, Mr. Juniel's claim of attorney-client privilege, is sustained the and the [sic] document will not go in." (RT 2092.)

### B.    Analysis

The trial court's handling of the Eric Hood letter and Mr. Juniel's claim of privilege was entirely inadequate. The trial court simply failed to abide by the basic procedural requirements for assessing a claim of privilege. As a result, the court erroneously allowed for the admission of a highly prejudicial piece of potentially privileged evidence.

---

[6] In fact, Mr. Juniel did not read at all from the statement. Ms. Brown read the contents of the letter and asked Mr. Juniel questions based on her reading.

California law is perfectly clear that when a party makes a claim that a piece of evidence is privileged, the court must conduct a hearing outside the presence of the jury before admitting the evidence. "[W]hen there is a prima facie claim of attorney-client privilege, the trial judge must accord a full hearing, with oral argument, before ordering the revelation of client confidences to the other side . . . ." (Titmas v. Superior Court (2001) 87 Cal. App. 4th 738, 740.)  Because of the historical importance of the privilege and its "highly sensitive" nature, the failure to comply with this procedural requirement denies the holder of the privilege his "basic due process" rights.  (Ibid.)

Evidence Code section 914 states that claims of privilege should be heard in the same manner as other claims under sections 400 et seq.  Thus, the court should make a determination of any "preliminary fact" "upon the existence or nonexistence of which depends the admissibility or inadmissibility of evidence" including "the existence or nonexistence of a privilege." (Evid. Code. § 400.)  The evidence code also states that when a claim of attorney-client privilege is made, "the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish that the communication was not confidential." (Evid. Code § 917(a).)

California courts have not struggled to interpret these straightforward provisions.  "It is true, of course, that when evidence is proffered at a trial, the court must 'hear and determine' out of the presence of the jury the existence or nonexistence of the preliminary fact upon which its admissibility or inadmissibility depends including 'the existence or nonexistence of a privilege.'" (Carlton v. Superior Court (1968) 261 Cal. App. 2d 282, 292, citations omitted.)  "Evidence Code section 405 provides the procedural mechanism by which the sufficiency of a claim of privilege or

-38-

an exception thereto may be litigated." (<u>Fortes v. Municipal Court</u> (1980) 113 Cal.
App. 3d 704, 710, footnote omitted.)

In this case, however, the trial court utterly failed to employ the procedural
mechanism mandated by the Evidence Code. When confronted with the Eric Hood
letter, Mr. Juniel made "a prima facie claim of attorney-client privilege." (<u>Titmas,
supra,</u> 87 Cal. App. 4th at p. 740.) Ms. Brown disputed the existence of the privilege,
but the trial court failed to hold a hearing outside the presence of the jury to make the
required determination of the preliminary fact. Worse yet, the trial court allowed Ms.
Brown to offer evidence in front of the jury—it allowed a lawyer to testify, to make a
statement contradicting a witness's testimony and disputing his claim of privilege. (RT
2038.)

In effect, the trial court denied Mr. Juniel's claim of privilege without affording
Mr. Juniel any opportunity to establish the claim. The trial court thereby summarily
admitted into evidence potentially privileged material. The court denied Mr. Juniel the
rights and procedural protections that are clearly defined by statute. The court denied
Mr. Juniel that "basic due process" rights that protect the important privilege. (<u>Titmas,
supra,</u> 87 Cal. App. 4th at p. 740.)

Stranger still, the court subsequently seemed to accept that the letter *was* subject
to the privilege. Apparently accepting Mr. Juniel's claim that he had given the letter
to his own lawyer, the court sustained his claim of privilege and excluded the letter.
(RT 2092.) But at the same time—with absolutely no valid legal basis—the court ruled
that the portion of the letter already read would remain in evidence. (RT 2092.)

There is no conceivable explanation, let alone legal justification, for the trial
court's decision to allow Ms. Brown to read the contents of the letter for which Mr.

-39-

Juniel had made a claim of privilege. The court's failure to exclude the letter—at least subject to a 402 hearing for a determination of the applicability of the privilege—was manifestly erroneous.

The error was also a violation of federal constitutional law. The attorney-client privilege is a rule of state law, but the privilege also inheres Sixth Amendment's right to counsel and other federal constitutional provisions. (See Bittaker v. Woodford (9th Cir. 2003) 331 F.3d 715, 724 n.7.) The trial court's complete failure to take the basic procedural steps needs to protect the privilege resulted in a denial of Mr. Juniel's federal constitutional rights.

### C.     Prejudice

The Eric Hood letter was highly prejudicial. In the letter, Mr. Juniel apparently sketched the outline of a totally different defense than the one he presented at trial. He testified at trial that he had no connection with the shooting, but in the letter, he claimed that he was driving Ava's car with a man named Eric Hood when Mr. Hood shot Stacey.

Credibility was of course a central issue at the trial. Ms. McDonald and Mr. Juniel told radically inconsistent stories about what happened. An assessment of Mr. Juniel's credibility was obviously a central task for the jury in determining his guilt, and the Eric Hood letter was devastating to his credibility. Had the letter's contents not been admitted, there is a reasonable probability that the jury would have reached a different result.

The district attorney aggravated the prejudice by referring to the improper open court exchange in his closing argument and arguing that it proved that Mr. Juniel was

a liar.

> Who is Richard Juniel? He can look you in the eye and lie, just lie,
> "Never seen that gun before in my life." Just lie. He can look Lorna
> Brown in the eye and lie. That letter? "That letter was to my attorney.
> How did you get that?" That's outrageous. That's a lie. I know Lorna
> Brown. She is not lying. No way. He gave that to her. You know it.
> We all know it. He's up there lying. He can look you in the eye and just
> lie. (RT 2211.)

The district attorney's improper argument was based on evidence (if it could be called

that) that the jury never should have heard. If the court had handled the attorney-client

privilege claim properly, the jury never would have heard about the dispute between

Mr. Juniel and Ms. Brown, and the district attorney would have had no basis to make

such an argument.

And again, even if the prejudice from the admission of the Eric Hood is not

itself sufficient to justify reversal, the court must consider the cumulative effect of this

error combined with the other errors at trial. (See Jones, supra, 30 Cal. 4th at p. 1116-

1117.) The trial court's inexplicable failure to employ the procedural mechanism for

resolving the evidentiary dispute regarding the privilege was just one of many errors

at trial. The cumulative prejudice from the errors was massive; taken together, the

errors denied Mr. Juniel's right to a fair trial.

**V.**

**THE TRIAL COURT VIOLATED MR. JUNIEL'S CONSTITUTIONAL
RIGHTS BY FORCING HIM TO DECLARE IN ADVANCE WHETHER HE
WOULD TESTIFY IN HIS OWN DEFENSE**

**A.    Background**

Mr. Juniel presented his primary defense case before Ava presented her defense. After calling several witnesses, Mr. Juniel rested the case, but he advised the court that he might wish to reopen if he was able to locate additional witnesses. (RT 1309.) The trial judge indicated that she would allow him to reopen should he find his additional witnesses. (RT 1310.) Mr. Juniel did not testify during his initial presentation.

At the time that he rested, Mr. Juniel (like everyone else) was proceeding based on the trial court's earlier ruling that Ms. McDonald would not be able to present her proffered evidence of Mr. Juniel's prior bad acts and bad character. Subsequently, however, the trial court reversed course and radically altered the nature of the trial. (RT 1417-1418.) When the trial court decided to allow Ava's domestic violence evidence, it of course added a whole new set of evidence to which Mr. Juniel had to respond.

When the judge was later preparing jury instructions, she asked Mr. Juniel whether he was planning to testify. Mr. Juniel responded: "At this time I have not yet decided, your honor, and I cannot say whether or not right now." (RT 1837.) Frustrated, the judge replied that she wanted to know so she could finalize the jury instructions. (RT 1838.)

Most of Ava's witnesses had not yet testified at that point, and Mr. Juniel attempted to explain to the judge that he wanted to hear their testimony—and in particular, that he wanted to hear their domestic violence testimony—before deciding whether to take the stand. He said that he wanted to "wait and weigh out what the rest of the witnesses would testify to." (RT 1838.) He said that he understood that the

-42-

witnesses would testify about "information concerning domestic violence issues," but that he did not "know the level of knowledge that these witnesses have about what happened, or I don't know exactly what they" their testimony would be. (RT 1838.)

The trial judge then issued a veiled threat to Mr. Juniel: "I will remind you that you did rest and it is within my discretion to allow you to reopen." (RT 1839.) The judge thus implied that if she did not get a direct and certain answer, she might not allow Mr. Juniel to reopen his case and testify. She told Mr. Juniel to "give me a yes or a no." (RT 1839.) Mr. Juniel responded that he would testify. (RT 1839.)

### B.    Analysis

#### 1. The Requirements of *Brooks v. Tennessee*

In Brooks v. Tennessee (1972) 406 U.S. 605, the United States Supreme Court held that a criminal defendant cannot be forced to declare in advance whether he will testify. In Brooks, the Court invalidated a Tennessee statute that forced defendants to testify before other witnesses in their defense. The Supreme Court noted that "a defendant's choice to take the stand carries with it serious risks of impeachment and cross-examination," (id. at p. 609) and it held that a defendant may wait to make that choice until after he has heard the other evidence.

The Court recognized that a defendant will typically have "some idea" in advance about what evidence will be presented. (Ibid.) But the Court also recognized that a defendant cannot predict the weight and value of a witness's evidence until that witness actually takes the stand: witnesses may not "testify as expected," they "may collapse under skillful and persistent cross-examination," or they "may fail to impress the jury as honest and reliable witnesses." (Ibid.) "Because of these uncertainties," the Court ruled that a defendant may wait until actually hearing other witnesses' testimony

-43-

before making his decision. (<u>Id</u>. at p. 610.)

> The Supreme Court quoted a nineteenth century Mississippi case with approval.

> > It must often be a very serious question with the accused and his counsel whether he shall be placed upon the stand as a witness, and subjected to the hazard of cross-examination, a question that he is not required to decide until, upon a proper survey of all the case as developed by the state, and met by witnesses on his own behalf, he may intelligently weigh the advantages and disadvantages of his situation, and, thus advised, determine how to act. Whether he shall testify or not; if so, at what stage in the progress of his defense, are equally submitted to the free and unrestricted choice of one accused of crime, and are in the very nature of things beyond the control or direction of the presiding judge. Control as to either is coercion, and coercion is denial of freedom of action.

(<u>Id</u>. at p. 608, quoting <u>Bell v. State</u> (1889) 66 Miss. 192, 194, 5 So. 389, 389.)

The Supreme Court thus concluded that forcing a defendant to decide whether to testify before hearing other evidence violated both his Fifth Amendment right to remain silent and his due process rights. (<u>Id</u>. at p. 611-613.)

The trial judge's action below was a clear and direct violation of <u>Brooks</u>. The judge forced Mr. Juniel to declare whether he would testify before he had heard most of Ava's witnesses. Indeed, the violation here was even more clear than <u>Brooks</u>. In <u>Brooks</u>, the defendant had been forced to decide whether to testify before hearing *his own* witnesses; in this case, Mr. Juniel was forced to decide whether to testify before hearing his co-defendant's witnesses. Those witnesses were primarily offering testimony about Mr. Juniel's abuse—they were, in other words, essentially presenting evidence against Mr. Juniel, acting as functional equivalents of prosecution witnesses. Because they were not his own witnesses, Mr. Juniel had even less ability to predict the effect of their testimony and it was even more outrageous to force him to decide in advance whether to testify.

-44-

California court have followed the mandate of <u>Brooks</u>. A defendant has a right "able to make an informed decision as to whether or not to testify," and he cannot "make such an informed decision unless he could evaluate the other defense witnesses before deciding whether or not to testify." ( <u>People v. McDermand</u> (1984) 162 Cal.App.3d 770, 791; <u>see also</u> <u>People v. Coleman</u> (1975) 13 Cal.3d 867, 875-876; <u>Woods v. Superior Court</u> (1994) 25 Cal.App.4th 178, 186.)

In <u>People v. Cuccia</u> (2002) 97 Cal. App. 4th 785, 790, the court held that the defendant's "constitutional rights were violated because he was required to either testify out of order or rest his case when a scheduled defense witness could not be located." In that case, the appellate court held that the trial court had abused its discretion by giving the defendant an "ultimatum to testify or rest his case." (<u>Id</u>. at p. 792.) "[W]e conclude his waiver [of his Fifth Amendment rights] was coerced based on the trial court's threat to consider his case rested if he did not testify." (<u>Id</u>. at p. 791.) The trial judge's ultimatum in this case—that Mr. Juniel must either declare in advance whether he would testify or risk losing his ability to reopen his case—was similarly improper.

California courts have also held that, under <u>Brooks</u>, defendants cannot be forced to declare whether they will testify so that a court may reach a decision on other issues, such as a motion to quash. (<u>Nielsen v. Superior Court</u> (1997) 55 Cal.App.4th 1150, 1156.) By the same token, a trial court may not force the defendant to declare whether he will testify so that it may formulate jury instructions.

The trial court's error here was particularly egregious because Mr. Juniel was proceeding *in propria persona*. Courts generally have no duty to give any assistance to self-represented defendants, but that "general rule" is subject to the "exception" that a court must take action to safeguard a defendant's Fifth Amendment right against self-incrimination. (<u>People v. Jones</u> (1992) 2 Cal.App.4th 867, 873.) "Where the defendant

-45-

appears *in propria persona*, the duty of the court in protecting the defendant's privilege against self-incrimination is greater." (People v. Vargas (1987) 195 Cal.App.3d 1385, 1391.)

Far from fulfilling its duty to protect Mr. Juniel's constitutional right, the trial court here took action and burdened his right. The court issued an ultimatum that Mr. Juniel had to declare in advance whether he would testify, and it stated that Mr. Juniel risked losing his ability to reopen his case if he did not comply. The trial judge's action was entirely inconsistent with Brooks and subsequent cases.

## 2. Limitations on a trial judge's discretion

A trial judge has discretion to handle issues regarding trial management and scheduling. That general power includes some discretion to decide whether to allow a defendant to reopen his case. That discretion, moreover, is generally consistent with Brooks, did not curtail "the ordinary power of a trial judge to set the order of proof." (Brooks, supra, 406 U.S. at p. 613.) But that discretion is bounded, and the trial judge's action in this case was completely outside the ordinary bounds of a trial judge's discretion.

A reviewing court considers several factors in determining whether a trial court abused its discretion by denying a defense motion to reopen. The factors include: "(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence." (People v. Jones (2004) 30 Cal. 4th 1084, 1110, quoting People v. Funes (1994) 23 Cal.App.4th 1506, 1520.)

The trial judge in this case implied that she might preclude Mr. Juniel from reopening his case following Ava's defense. Such a ruling, however, would have been

-46-

a manifest abuse of discretion. A defendant's right to present a defense includes the right to respond to significant evidence presented against him. That is true regardless of whether the evidence is presented by the prosecution or by a co-defendant.

In <u>Cuccia</u>, the trial court refused to allow the defendant to present surrebuttal evidence. (<u>Cuccia</u>, <u>supra</u>, 97 Cal.App.4th at p. 792.) The appellate court ruled that the trial court's decision was a "patent abuse of discretion." (<u>Id.</u> at p. 795.) "[T]he trial court insisted on rigidly adhering to the trial schedule to the detriment of defendant's right to a fair trial." (<u>Ibid.</u>) Here too it would have been grossly unfair to deny Mr. Juniel an opportunity to present evidence, including his own testimony, to rebut Ava's evidence of his bad acts and bad character.

Such a ruling would have been particularly unfair given that the trial court had radically altered the nature of the case since he had rested. When Mr. Juniel presented his initial defense, and at the time he rested, he was acting in reliance on the trial court's earlier ruling and he was thus totally unaware that Ava would be able to present all of her domestic violence. Mr. Juniel had no idea that he would have to respond not just to the prosecution's evidence but also to all of Ava's evidence about his bad acts and bad character. After reversing its ruling on this matter and allowing Ava's evidence, it would have been absurd for the trial court to prevent Mr. Juniel from reopening his case so that he could reformulate his defense.

Put differently, Mr. Juniel's request to reopen his case to put on new evidence would have had nothing to do with his own lack of diligence; rather, it would have been a direct result of trial judge's reversal of her prior ruling. The evidence he sought to present would have been significant, in that it would have been his only chance to respond to Ava's domestic abuse evidence.

In short, the trial court would have been *required* in this case to allow Mr. Juniel to reopen his case following its own reversal on a major ruling and following the

-47-

presentation of Ms. McDonald's defense.  The trial judge's threat that she might preclude Mr. Juniel from reopening was not only an improper burden on his Fifth Amendment rights—it was also legally empty.

Nothing in the trial court's ordinary trial management discretion and power to set the order of proof would have allowed it to prevent Mr. Juniel from testifying in order to respond to all of the bad acts and bad character evidence presented against him. Nothing about the trial judge's handling of this matter was in accord with <u>Brooks</u> or any other applicable law, let alone common sense notions of fairness.

### C.    Prejudice

In <u>Brooks</u> itself, the state did not present any argument that the error was harmless, and the Supreme Court reversed the defendant's conviction. (<u>Brooks, supra</u>, 406 U.S. at p. 613.)  The Court did not rule explicitly whether harmless error review should apply to errors under <u>Brooks</u>.  The Supreme Court has subsequently stated, however, that a Brooks error that has the effect of keeping the defendant from testifying, or forcing him to give up his right not to testify, is a structural error which does not require a showing of prejudice. (<u>Bell v. Cone</u> (2002) 535 U.S. 685, 696 n.3.) Several lower federal courts have also held that <u>Brooks</u> errors are structural errors that require reversal without resort to any harmless error analysis. (<u>See</u> <u>United States v. White</u> (8th Cir. 2003) 341 F.3d 673, 677-678; <u>French v. Jones</u> (6th Cir. 2003) 332 F.3d 430, 436-437 & n.5; <u>Shillinger v. Haworth</u> (10th Cir. 1995) 70 F.3d 1132, 1141-1142.)

The approach of the federal courts may be the wisest, especially considering the difficulty in analyzing prejudice from a   <u>Brooks</u> error.  Unlike other errors, which typically result in the improper admission or exclusion of certain evidence, a <u>Brooks</u> error is less susceptible to harmless error analysis.  Where, as here, a defendant is improperly forced to declare in advance whether he will testify, there is no reasonably

clear or certain way to determine what effect the error had or what the outcome would have been in its absence.

In Cuccia, however, the Fourth District Court of Appeal held that a Brooks error is reviewed for prejudice under the usual Chapman v. California standard for analyzing federal constitutional violations. ( Cuccia, supra, 97 Cal.App.4th at p. 791.) If this court accepts the standard of Cuccia, it must overturn Mr. Juniel's conviction if "there is a reasonable possibility that the evidence complained of might have contributed to the conviction." ( Chapman v. California (1967) 386 U.S. 18, 23, quoting Fahy v. Connecticut (1963) 375 U.S. 85, 85.) The burden lies with the prosecution to prove beyond a reasonable doubt that the error did not contribute to the conviction. (Id. at p. 24.) "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (Ibid.)

If the court had not forced Mr. Juniel to declare whether he would testify, he might have decided (after hearing the other witnesses' testimony) not to take the stand. His decision to take the stand turned out to be enormously damaging to his case. One need only read the transcripts of the cross-examination by the district attorney and Ms. McDonald's counsel to realize just how damaging Mr. Juniel's decision was. (RT 1979-2076.)

Mr. Juniel's decision to testify enabled both the district attorney to present a variety of extremely damaging impeachment evidence. The district attorney was able to play a recorded conversation where Mr. Juniel admitted ownership of the gun. (RT 1990.) The district attorney was able ask other questions and admit evidence about Mr. Juniel's apparent attempts to influence witnesses. (RT 1994-1995, 1998, 2002-2005.) The district attorney was able to ask Mr. Juniel questions about statements that he could order a hit. (RT 2006.)

Because Mr. Juniel testified, the district attorney was able to play recorded

-49-

conversations where Mr. Juniel said "this shit was sloppy," and "I played this like an amateur," thus apparently admitting guilt and conceding that he had handled the matter poorly, leading to his arrest. (RT 2016, 2018.) The district attorney was able to play another recorded call where Mr. Juniel seemed to instruct Ava's sister to destroy evidence. (RT 2032-2034.) As a result of Mr. Juniel's taking the stand, the district attorney was thus able to admit a variety of otherwise inadmissible evidence, including other letters and recorded conversations.

Ms. McDonald's counsel similarly pounced on the opportunity to attack Mr. Juniel on the stand. She too was able to admit for impeachment purposes several letters where Mr. Juniel made various admissions, including one of the most damaging pieces of evidence in the entire trial: a letter where Mr. Juniel wrote to Ava "I had to do what I had to do and I did." (RT 2047.)

Because Mr. Juniel testified, Ava was also able to call her son Tomaz Pickens as a rebuttal witness. Tomaz testified that Mr. Juniel was mean, that he beat Ava, and that he had abused Tomaz by punching him and throwing objects such as bottles and lit matches at him. (RT 2078-2080.)

In short, Mr. Juniel's decision to take the stand led to the admission of an enormous amount of highly damaging evidence against him, most of which had not been admitted previously, that almost certainly contributed to the jury's verdict. If the trial court had not prematurely forced him to declare that he was taking the stand, he might have made a different choice. The trial court's Brooks error was not harmless beyond a reasonable doubt.

Even if the Brooks error alone is insufficient to require reversal of the conviction, this error must be viewed in combination with the other errors at trial. The cumulative effect of the errors was prejudicial and denied Mr. Juniel his right to a fair trial. (Compare Cuccia, supra, 97 Cal.App.4th at p. 795 [Brooks error combined with

exclusion of surrebuttal evidence caused prejudice requiring reversal].)

## VI.

## THE TRIAL COURT'S BELATED DECISION TO ADMIT MS. MCDONALD'S DOMESTIC ABUSE EVIDENCE AND ITS SUBSEQUENT LIMITATIONS ON MR. JUNIEL'S PRESENTATION OF EVIDENCE DENIED HIM HIS RIGHT TO DUE PROCESS AND HIS RIGHT TO PRESENT A DEFENSE

### A.    Background

As described above, the central evidentiary issue in this trial was whether Ms. McDonald was able to present evidence of Mr. Juniel's prior bad acts. On the grounds that Ava's proffered evidence was irrelevant to the case and prejudicial to Mr. Juniel, the judge initially excluded the evidence. (RT 12, 15, 1414.) The parties proceeded with their cases based on that ruling. But then—when the trial was over halfway completed, after the prosecution had completed its case-in-chief, and after Mr. Juniel had completed the initial presentation of his defense—the judge abruptly reversed course and allowed Ms. McDonald to present her domestic violence evidence. (RT 1417-1418.)

The trial court's ruling opened the trial up to a mass of new evidence. In no small part due to the trial court's change of heart, the trial ended up taking far longer than anticipated.

Over the course of the trial, the judge became increasingly frustrated with Mr. Juniel's efforts to represent himself; she blamed him entirely for the trial's extended duration. The judge admonished Mr. Juniel that he was taking too long. (RT 1240-1241.) At one point, the judge stated that "when we started this case I told the jury that we would be done with the case by September 4th or 5th." (RT 1583.) She expressed her frustration that she was "now going to have to tell them I was in error and it's going to be the end of next week." (RT 1583.)[7] As a result, she asked Mr. Juniel to speed up

---

[7] The judge later informed the jury of the extended schedule. (RT 1661.)

his cross-examination of Ms. McDonald. (RT 1583-1584.)

The judge subsequently admonished Mr. Juniel again—this time in front of the jury—to speed up his questioning. (RT 1756.) When Mr. Juniel attempted to explain that he was asking new questions, the judge interrupted him and said "Please don't argue with me, Mr. Juniel." (RT 1756.) After excusing the jury, the judge again expressed her frustration that Mr. Juniel would not bring his questioning to a close. (RT 1757-1758.) Mr. Juniel protested that the judge was rushing him and thus infringing on his right to a fair trial. (RT 1758.)

At the close of trial, Mr. Juniel again indicated that his right to a fair trial had been violated because he "was rushed through" by the judge. (RT 2095.) Mr. Juniel complained that he had not had sufficient time to rebut or explain the evidence put forth by the district attorney and by Ms. McDonald. (RT 2095.) He indicated that he wanted some chance to respond to the other parties' cross examination of him (which had been far longer than his direct narrative testimony) and the rebuttal witness. The judge agreed to let him take the stand, but allowed him only ten minutes. (RT 2095-2096.)

When it was Mr. Juniel's turn to present his closing argument, he indicated that he was not ready to proceed. (RT 2154.) He explained that he had not had time to respond to recently presented evidence and to prepare a strategy for his closing argument. (RT 2154.) The judge again responded with frustration, saying that Mr. Juniel had caused the delay in the trial and that he would not have any additional time:

> Mr. Juniel, I indicated I thought that we—I told you at the outset that we were going to argue Monday or Tuesday. It is now Wednesday afternoon. The reason we have gone this long is that basically it was your cross-examination of Ms. McDonald that caused the lengthy delay.
> I am going to order you to commence your argument and you are going to finish your argument this afternoon, sir. I will stay here until you're done. Given the fact that Mr. Golde has taken less than an hour, and I have instructed Ms. Brown to take less than an hour, I'm going to instruct you also to take one hour of argument. (RT 2154-2155.)

-53-

Enforcing her time limit, the judge interrupted Mr. Juniel during his closing argument and told him that he only had seven minutes left. (RT 2176.) When Mr. Juniel objected that he would not be able to finish by then, the court ordered him to conclude within the limits she had set. (RT 2176.) When his time was up, the court ordered him to finish his argument. (RT 2178-2179.) The next day, the court granted Mr. Juniel an additional eight minutes of time for oral argument.

Mr. Juniel subsequently filed a motion for a new trial on the grounds that he had inadequate time to prepare a defense, that he was denied the opportunity to respond to various evidence and address various issues, that he had inadequate time to prepare for and cross-examine adverse witnesses, and that he was rushed throughout the trial. (CT 453-454.) At a proceeding to argue the motion, Mr. Juniel again said that he had been unfairly rushed through various phases of the trial, including his cross-examinations and his closing argument. (CT 486-487.)

The judge again responded with frustration and exasperation:

> Excuse me? If I recall, you had Ava McDonald on the stand for two straight days. You're saying that I rushed you to finish that cross-examination, sir? . . . I'm sorry, Mr. Juniel, the record doesn't support that. I bent over backwards—two days of cross-examination of Ava McDonald was probably the longest cross-examination I have seen in 21 years on the bench. (RT 487.)

The judge denied his motion for a new trial.

## B.    Analysis

The Fifth, Sixth, and Fourteenth Amendments guarantee a criminal defendant the right to a fair trial, the right to due process, and the rights of notice of the charges against him. These rights include a requirement that the defendant be given a meaningful opportunity to prepare and present a defense. (Milton v. Morris (9th Cir. 1985) 767 F.2d 1443, 1446-1447; People v. Jenkins (2000) 22 Cal. 4th 900, 1000.)

-54-

### 1. The Trial Court's Mid-Trial Reversal

The Constitution requires that a criminal defendant must know in advance the basic nature of the charges and evidence against him so that he may prepare his defense. "No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal." (Cole v. Arkansas (1948) 333 U.S. 196, 201.) "The Sixth Amendment guarantees a criminal defendant a fundamental right to be clearly informed of the nature and cause of the charges in order to permit adequate preparation of a defense." (Sheppard v. Rees (9th Cir. 1980) 909 F.2d 1234, 1236.) A defendant may not be "ambushed" by new evidence or new theories of the case at trial. (Ibid.)

In this case, the trial court radically changed the nature of the trial and the evidence when it reversed course and decided that Ms. McDonald could present all of her domestic violence evidence. Until then, Mr. Juniel had been relying on the court's earlier ruling excluding the evidence. When the judge reversed course, Mr. Juniel suddenly had to plan a new strategy and prepare some response to all of the acts alleged by Ms. McDonald. That massive mid-trial shift made it impossible for Mr. Juniel to prepare and present an effective defense.

A criminal defendant must be informed in advance of the acts which will be used to "prove [the] case against him" so that he can have a "meaningful opportunity to prepare a defense to [those] specific acts." (People v. Diaz (1987) 195 Cal.App.3d 1375, 1383.) That is true regardless of whether those acts are presented by the prosecution or by a co-defendant with a conflicting defense. Because the judge only belatedly decided to allow all of Ms. McDonald's evidence of his bad acts, Mr. Juniel had no meaningful opportunity to prepare a defense to those acts.

## 2. Limitations on Mr. Juniel's Testimony

Given that the trial court had so dramatically altered the nature of the case and the scope of the evidence to which Mr. Juniel had to respond, it was particularly unfair when the court subsequently limited his ability to present evidence in response.

Near the end of trial, Mr. Juniel indicated that he had not had an opportunity to explain all of the evidence against him. Mr. Juniel said that he wanted to take the stand so that he could explain the evidence against him and respond to the extensive cross-examination to which he had been subjected by both the district attorney and Ms. McDonald's counsel.

The trial court agreed that Mr. Juniel should have such an opportunity, but limited him to only ten minutes. (RT 2095-2096.) The court did not explain or indicate any legal basis for the limitation. Its ruling limiting the testimony was sua sponte, not made in response to any objection or motion from opposing counsel.

Mr. Juniel sought to testify to respond to evidence and explain the testimony that had been elicited during cross-examination. In other words, with his testimony he sought to admit relevant, probative evidence. It is unclear why the court limited the amount of evidence he could admit. Evidence Code 352 allows a court to exclude otherwise admissible evidence if its admission would "necessitate undue consumption of time." Although there is no way to know from the record, it is possible that the court limited Mr. Juniel's testimony because it believed that more extensive testimony would necessitate an undue consumption of the court's time.

But even if that were a hypothetically valid basis, the trial court failed to comply with section 352 basic procedural requirements. "The record of a ruling based on Evidence Code section 352 'must affirmatively show that the trial judge did in fact weigh prejudice against probative value....'" (People v. Zapien (1993) 4 Cal. 4th 929, 960, quoting People v. Heishman (1988) 45 Cal.3d 147, 170.) A proper 352 exclusion

will only be upheld if the record shows that the trial court's decision was the product of "mature and careful reflection" and "deliberation." (People v. Frank (1985) 38 Cal. 3d 711, 731.) Obviously, the trial record includes no such showing.

The trial court here limited Mr. Juniel's testimony without even knowing precisely what he was planning to testify about. As a result, it "could not make an intelligent evaluation of any probative value of the [testimony], could not assess any prejudice it might pose, and therefore could not undertake the weighing of these factors required for an informed exercise of the discretion granted by section 352." (People v. Filson (1994) 22 Cal. App. 4th 1841, 1850, overruled on other grounds, People v. Martinez (1995) 11 Cal. 4th 434, 452.) It therefore could not be said that the court properly limited Mr. Juniel's testimony based on its discretion under section 352.

Moreover, even if the court had engaged in the deliberation required by section 352, it is hard to imagine how a decision substantially limiting Mr. Juniel's testimony could have been justified. Mr. Juniel sought to offer highly probative evidence that was necessary to his defense. He sought to respond to damaging evidence against him. He sought to respond to the absolutely devastating cross-examination that he had been subjected to by two experienced lawyers. The trial judge's arbitrary time limitation, and Mr. Juniel's resulting inability to make an effective response, made it impossible for him to present a defense.

A defendant's constitutional right to present a defense includes the right to present witnesses in his own defense. (United States v. Mack (9th Cir. 2004) 362 F.3d 597, 601-602.) It is true, of course, that the proper application of ordinary rules of evidence, including section 352, do not inappropriately infringe on a defendant's constitutional right to present a defense. (People v. Snow (2003) 30 Cal. 4th 43, 90.) But in this case, the judge's limitation was not based on a proper application of section 352. Indeed, it was not based on any legal reason at all.

-57-

### 3. Limitations on Mr. Juniel's Closing Argument

A criminal defendant has a constitutional right to present closing argument in his defense, subject to reasonable time limitations. (Herring v. New York (1975) 422 U.S. 853, 862; People v. Marshall (1996) 13 Cal. 4th 799, 854.) Given the complexity of the case and given the vast amount of evidence to which Mr. Juniel had to respond, the trial court's time limitations on Mr. Juniel's closing argument were unreasonable.

This was a long and complex trial. Mr. Juniel had to respond not only to the case presented by the prosecution but also to the defense presented by his adverse co-defendant. The prosecution presented seventeen witnesses and Ms. McDonald presented ten, most of whom mostly testified primarily about Mr. Juniel's bad acts and bad character. Mr. Juniel's closing argument was his only opportunity to explain this mass of evidence and to respond to the arguments of not one but two skilled lawyers who accused him.

The time limitation made it impossible for Mr. Juniel to "present [his] version[]" of the case as a whole," to "argue the inferences to be drawn from all the testimony," to "point out the weaknesses of [his] adversaries' positions," and to "marshal the evidence" in his support. ( Herring, supra, 422 U.S. at p. 862.) The limitation impermissibly infringed on his constitutional right to present a defense.


### 4. Conclusion

It was no doubt taxing for the trial judge to deal with Mr. Juniel as a self-represented defendant. The trial was long, unfocused, and confusing. The trial judge, obviously frustrated, seemed to blame Mr. Juniel for many of the problems. But regardless of the merits of the judge's view that Mr. Juniel was an annoying defendant and lawyer, a trial court "cannot eliminate important elements of a trial, no matter how vexed it becomes with a defendant's" conduct. (Mack, supra, 362 F.3d at p. 603.)

The trial courts rulings deprived Mr. Juniel of his constitutionally guaranteed opportunity to prepare and present a defense. Such an error is structural and requires reversal without resort to any harmless error analysis. (Ibid.; Conde v. Henry (9th Cir. 1999) 198 F.3d 734, 739.)

**VII.**

## THE TRIAL COURT VIOLATED STATE AND FEDERAL LAW BY REFUSING TO GIVE AN INSTRUCTION REGARDING THE LESSER INCLUDED OFFENSE OF MANSLAUGHTER

### A.    Failure to Instruct

Mr. Juniel requested instructions giving the jury the option of finding a lesser included offense of manslaughter, but the court refused to give them. (CT 336; RT 1262, 2089.)

Mr. Juniel was charged with murder in violation of section 187. Section 187(a) defines murder as "the unlawful killing of a human being . . . with malice aforethought." Section 192 defines manslaughter as "the unlawful killing of a human being without malice." In light of these definitions, manslaughter is a lesser included offense of murder. ( See, e.g., People v. Lasko (2000) 23 Cal. 4th 101, 108; In re McArtney (1966) 64 Cal.2d 830, 831; People v. Doolittle (1972) 23 Cal.App.3d 14, 19 n.3.)

Because manslaughter is a lesser included offense to murder, when a defendant is charged with murder, trial courts must instruct on a theory of manslaughter if it supported by the evidence. (See, e.g., People v. Flannel (1979) 25 Cal.3d 668, 681-683; People v. Mosher (1969) 1 Cal.3d 379, 390-391.)

A criminal defendant is entitled to instructions on a lesser included offense where "'there is evidence which, if accepted by the trier of fact, would absolve [the] defendant from guilt of the greater offense' but not the lesser." ( People v. Memro (1995) 11 Cal.4th 786, 871, quoting People v. Morrison (1964) 228 Cal.App.2d 707, 712.) Where there is "no evidence" that would support a finding of a lesser included offense, no instruction need be given. ( People v. Breverman (1998) 19 Cal.4th 142, 154.) But where there is some evidence sufficient to "raise[] a question as to whether all of the elements of the charged offense were present," the instruction must be given.

(Ibid.)

A court cannot refuse to give an instruction on a lesser included offense based on its own conclusion that the evidence does not merit belief. (Flannel, supra, 25 Cal.3d at p. 684-685.) "The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon. [Citations.] That is a question within the exclusive province of the jury." (People v. Carmen (1951) 36 Cal.2d 768, 773.) "Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused." (Flannel, supra, 25 Cal.3d at p. 685, quoting People v. Wilson (1967) 66 Cal.2d 749, 763.)

In this case, there was evidence from which the jury could have concluded that Mr. Juniel was guilty only of the lesser offense of manslaughter. The jury heard extensive evidence about the confrontation that led up to the shooting. The jury heard that, over the course of several days, there was a dispute involving several people that turned violent at times. (RT 167-186, 319-321, 1317-1319.)

Most importantly, the jury heard evidence about a dangerous confrontation between Ava, Mr. Juniel's girlfriend, and Stacey, the victim. After both Ava had threatened Angelina Bryant, Stacey approached Ava and threatened her outside her car. When Ava pulled out a baseball bat, Stacey pulled out a knife. (RT 189-190, 194-202, 261-279, 1396-1398.) A jury could have concluded that Ava and Richard killed Stacey out of passion and in response to that provocation.

This case is similar in many respects to People v. Barton (1995) 12 Cal. 4th 186. In that case, the defendant's daughter Andrea became involved in a contentious "road rage" incident with the eventual victim, Marco Sanchez. (Id. at p. 191.) Sanchez cut Andrea off, forcing her off the road, and then spit on his window. (Ibid.) Andrea was upset by what happened and told her father, and the two of them went looking for Sanchez. (Ibid.) When they found Sanchez, the defendant confronted him at his car,

yelled at him, and then shot him. (Id. at p. 191-192.) Even though the defendant in that case had opposed voluntary manslaughter instructions, the California Supreme Court held that the court was required to give them. (Id. at p. 202.)

The defendant in Barton killed because "his daughter Andrea had come to him, extremely upset, and told him that a man (later identified as victim Sanchez) had threatened her with serious injury by trying to run her car off the road, and that he had spat on the window of her car." (Ibid.) In this case, the jury could have concluded that Mr. Juniel killed Stacey he learned that Stacey had threatened his girlfriend with a knife.[8]

The jury also heard evidence of Mr. Juniel's own recorded statements explaining his reasons for the killing, such as "I'm here to protect, I'm here to defend no matter what the cost." (RT 1640.) From such statements, the jury could have concluded that Mr. Juniel shot Stacey in response to the provocation or out of an actual (even if unreasonable) belief that he needed to kill Stacey to prevent her from attacking or threatening Ava again with a knife.

### B.    Federal Law

The trial court's failure to instruct in imperfect self-defense not only violated state law, it violated federal law as well. The United States Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." (Apprendi v. New Jersey (2000) 530 U.S. 466, 477, quoting In re Winship (1970) 397 U.S. 358, 364.) Other than prior convictions, any factor or circumstance of the crime that increases

---

[8] Ava testified that she had not told Richard about the confrontation with Stacey, but she also testified that when Richard saw Stacey, he confronted her and asked her "what was that confrontation you had with you and my wife." (RT 1437.) Mr. Juniel testified that he had heard about the confrontation between Stacey and Ava. (RT 2030.)

punishment must be specifically submitted to the jury and found beyond a reasonable doubt. (Id. at p. 483-484, 489-90.)  When a trial court fails to give an instruction on a lesser included offense, that failure may violate the defendant's federal constitutional rights to trial by jury and due process of law.  (See People v. Lasko (2000) 23 Cal.4th 101, 113.)

Under state law, to obtain a murder conviction, "the burden is on the People to prove beyond a reasonable doubt each of the elements of murder and that the act which caused the death was not done in the heat of passion or upon a sudden quarrel or in the actual, even though unreasonable, belief in the necessity to defend against imminent peril to life or great bodily injury." (CALJIC 8.50.) Mr. Juniel's federal constitutional rights were violated because the trial court failed to give the required instruction and thus failed require the jury to find beyond a reasonable doubt that the killing was not done based on an actual but unreasonable belief in the necessity for self-defense.

### C.      Prejudice

The failure to instruct on a lesser included offense supported by the evidence is reviewed under the standard of People v. Watson, supra, 46 Cal.2d 818.  ( People v. Breverman, supra, 19 Cal.4th at p. 165.)  Such state law errors requires reversal whenever "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (Watson, supra, 46 Cal.2d at p. 837.)  When a trial court's failure to give an instruction allows the jury to reach a verdict without finding every necessary fact beyond a reasonable doubt, however, the standard of review is significantly higher.  In this situation, reversal is required unless the state can show the error was "was harmless beyond a reasonable doubt." (Chapman, supra, 386 U.S. at p. 24.)

Here, the trial court's failure requires reversal under either standard.  The jury

found that Mr. Juniel shot Stacey, and the jury had before it a large amount of evidence about the reason for the shooting. Indeed, most of the relevant evidence was presented by the prosecution: it was the prosecution's theory of the case that Mr. Juniel shot Stacey in response to the fight that Stacey had with Ava. The jury could have determined that the fight was sufficient provocation, or that Stacey's threat gave rise to an actual but unreasonable belief in a need for defense. The jury should at least have been given a chance to make such a determination.

If the jury had been properly instructed, it might have considered the evidence that Mr. Juniel shot Stacey based on sufficient provocation or an unreasonable belief in the need to defend Ava. On the record of this case, then, it is reasonably probable that the jury would have reached a more favorable result if it had received proper instructions on the lesser included offense of manslaughter. (See People v. Brown (1988) 46 Cal.3d 432, 471, n.1, [conc. opn. of Broussard, J.][noting that "[a] hung jury is a more favorable verdict" than a guilty verdict.].) In this situation, it follows that the state will be unable to carry its burden of proving beyond a reasonable doubt that the jury would have rejected a theory of imperfect self-defense. Reversal is required.

## VIII.
## THE TRIAL COURT VIOLATED STATE AND FEDERAL LAW BY REFUSING TO GIVE CALJIC 8.73

In addition to requesting instructions on the lesser included offense of manslaughter, Mr. Juniel also requested the court give an instruction patterned on CALJIC 8.73. (CT 336.) CALJI 8.73 embodies the principle that "the existence of provocation which is not 'adequate' to reduce the class of the offense may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation." (People v. Valentine (1946) 28 Cal. 2d 121, 132.) The instruction states:

> If the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation.

Thus, 8.73 instructs that even if provocation was insufficient to reduce murder to manslaughter, it may still be sufficient to reduce first-degree murder to second-degree murder.

For the same reasons that it was reversible error for the court to refuse to give manslaughter instructions, it was also error for the court to refuse to give CALJIC 8.73. Even assuming, arguendo, that there was not enough provocation to reduce the crime to manslaughter, there was enough evidence of provocation that the jury might have found the crime took place without premeditation.

The most important testimony in this regard came from Ava herself. Ava testified that, despite the previous altercation with Stacey, she and Richard did not plan to kill Stacey. In fact, she testified that she did not even know that he had a gun. (RT 1654.) She testified that Stacey approached the car, and that Richard asked Stacey about the confrontation. (RT 1437.) Ava testified that she was not paying close

-65-

attention to their conversation, but the gist of her testimony was that Richard and Stacey were having a conversation when Richard suddenly pulled out his gun and shot her. (RT 1437-1438.) She testified that Richard suddenly became angry and violent, pointing the gun at her after shooting Stacey. (RT 1549-1552.)

Based on Ava's testimony, the jury could have concluded that she and Mr. Juniel had no plan to kill Stacey. It could have concluded that Richard shot Stacey only after having an exchange of "heated words" with her—the sort of provocation "sufficient to raise a reasonable doubt in the minds of the jurors regarding whether the accused planned the killing in advance," even if insufficient to reduce the crime to manslaughter. (People v. Wickersham (1982) 32 Cal. 3d 307, 329.)

But despite the evidence from Ava's testimony, the judge refused to give the 8.73 instruction. As a result, the judge deprived Mr. Juniel of his right to have a complete set of instructions on an applicable lesser included offense. Based on the same legal framework described in Section VII above, the judge's ruling was a violation of both state law and Mr. Juniel's federal constitutional right to have a jury reach a properly instructed conclusion on every element of the charged offense. (See Apprendi, supra, 530 U.S. at p. 477, Lasko, supra, 23 Cal.4th at p. 113.)

Reversal is required under state law because there is a reasonable probability that, if properly instructed, the jury would have reached a verdict of second-degree rather than first-degree murder. A fortiori, reversal is also required under the more stringent standard for reviewing federal constitutional errors.

## IX.

## THE PROSECUTOR COMMITTED MISCONDUCT
## DURING ARGUMENT

### A.    Background

During closing argument, the prosecutor stated that he wanted to talk about "the issue of Mr. Juniel representing himself." (RT 2151.) He said that "it's very important that this is a fair trial. It's important to me, it's important to the court, it's important to you, it's important to the community." (RT 2151-2152.) He went on to state that "Mr. Levy is an extremely talented, experienced lawyer." (RT 2152.)

Mr. Juniel then objected to the prosecutor's argument, and the court initially sustained the objection. (RT 2152.) The prosecutor persisted: "The point I'm trying to make is that it is clear that in an effort to have a fair trial Mr. Juniel has been afforded an attorney for advice, an investigator to help him. I think you even probably saw [Ava's counsel] Ms. Brown helping him at times here." (RT 2152.) Mr. Juniel again objected, but the court this time overruled the objection. (RT 2152.)

The district attorney went on in an attempt to assure the jury that the trial had been fair. "I think that any juror needs to know things are fair, and they have been. I think that Judge Conger has been extremely fair to everybody here, and it makes it appropriate for you then to do your job . . . ." (RT 2152.)

Although the judge had already said that the district attorney should not comment on Mr. Juniel's decision to represent himself, the district attorney went on to say that they had no choice but to allow him to do so. (RT 2152-2153.) He stated that he knew Mr. Levy: "we all know each other, we were jovial, we get along, but that's because we know each other from cases in the past over the years." (RT 2153.)

Not finished commenting on Mr. Juniel's tactics, the district attorney then stated that he could have objected to some of Mr. Juniel's statements or questions, but did not

because he wanted to make sure Mr. Juniel received a fair trial. "I have sat here not objecting and have done the best I could to ensure that Mr. Juniel has the opportunity to ask his questions . . . and I could have objected some of the times but I didn't. I sat there and let it go." (RT 2153.) The prosecutor again assured the jury that it was a fair trial, so that the jury could feel confident about convicting.

The prosecutor later continued with a similar tactic, this time vouching for Ava's counsel and using the attorney-client privilege dispute as a means to attack Mr. Juniel's credibility.

> Who is Richard Juniel? He can look you in the eye and lie, just lie, "Never seen that gun before in my life." Just lie. He can look Lorna Brown in the eye and lie. That letter? "That letter was to my attorney. How did you get that?" That's outrageous. That's a lie. I know Lorna Brown. She is not lying. No way. He gave that to her. You know it. We all know it. He's up there lying. He can look you in the eye and just lie. (RT 2211.)

### B.    Analysis

A criminal defendant's right to a fair trial is guaranteed by the Fifth, Sixth, and Fourteenth Amendments. Improper remarks by a prosecutor violate these rights and constitute a denial of due process when they infect the trial with unfairness. (Darden v. Wainwright (1986) 477 U.S. 168, 181; People v. Earp (1999) 20 Cal. 4th 826, 858.) Even when improper argument is not so severe as to render a trial fundamentally unfair, it is nonetheless an error under state law for a prosecutor to employ deceptive or otherwise reprehensible methods in closing argument. (People v. Espinoza (1992) 3 Cal. 4th 806, 820.)

A prosecutor may not "vouch" for the credibility of a witness if the "vouching" is based on personal belief, personal knowledge, personal experience, or evidence outside the record. ( People v. Anderson (1990) 52 Cal. 3d 453, 479; People v. Edelbacher (1989) 47 Cal. 3d 983, 1030.) By same token, a prosecutor may not

"vouch" for the fairness of the trial. In this case, the district attorney's closing argument contained an extended monologue—over Mr. Juniel's objection—vouching for the fairness of the trial.

The prosecutor assured the jury that Mr. Juniel had received all of the help he needed. The prosecutor stated that Mr. Juniel had the assistance of a competent attorney and a defense investigator. (RT 2152.)⁹ None of these statements were based on evidence in the record. The prosecutor also inappropriately vouched for the personal fairness of Ava's counsel who spent the entire trial trying to shift all blame for the murder to appellant.

A prosecutor "may not state or assume facts in argument that are not in evidence." (People v. Cash (2003) 28 Cal. 4th 703, 732.) The prosecutor made factual claims about the fairness of the judge, the competence of Mr. Levy, and the fairness of the trial. None of these statements were based on "evidence adduced at trial." (People v. Bain (1971) 5 Cal. 3d 839, 848.) Rather, they were an attempt by the prosecutor to inform the jury that, based on his personal experience, Mr. Juniel had received a fair

---

⁹   Given Mr. Levy's performance in this case, the district attorney's remarks were especially inappropriate and misleading. While he was still counsel of record, Mr. Levy presented no opening argument to the jury, and he barely questioned the prosecution's first witness. (RT 80, 108-109.) It was at that point that Mr. Juniel decided to represent himself.

Mr. Levy stayed on the case as advisory counsel to Mr. Juniel, but at several points in the record it is clear that he did little to help Mr. Juniel. When the court was attempting to determine whether Mr. Levy had provided Mr. Juniel with all relevant discovery materials, Mr. Levy could not even state with certainty whether he himself had the materials—he apparently had not looked through them. (RT 139-140.) Mr. Levy later inexplicably failed to provide Mr. Juniel with other important materials. (RT 690-691, 753, 755-756; CT 479-480.) Mr. Levy failed to assist Mr. Juniel in his efforts to bring in witnesses. (RT 1165-1166, 1252-1253.) He erroneously told Mr. Juniel that it was the district attorney's duty to have witnesses brought in. (RT 1253-1254.)

Of course, the jury had access to none of this information. The jury only had the district attorney's assurance that Mr. Levy was an "extremely talented, experienced lawyer" who had provided Mr. Juniel with excellent assistance. (RT 2152.)

trial. The statements were precisely the sort creating "a substantial danger that the jury will view the comments as based on information other than evidence adduced at trial." (People v. Mincey (1992) 2 Cal. 4th 408, 447.)

The prosecutor also commented on Mr. Juniel's decision to represent himself and vouched for Mr. Levy's competence. The prosecutor sought to imply that it was no one's fault but Mr. Juniel's that he had made the mistake of self-representation. He said that Mr. Juniel had been supplied with an excellent lawyer, but they had no way to stop him from representing himself. In making this argument, he vouched for Mr. Levy as "an extremely talented, experienced lawyer." (RT 2152.) He explicitly appealed to his own knowledge of Mr. Levy, based on evidence outside the record, stating that they knew each other from other cases over the years. (RT 2153.)[10]

A prosecutor may not express a personal opinion in the defendant's guilt where the opinion appears to be based on evidence outside the record. ( Mincey, supra, 2 Cal.4th at 447; Bain, supra, 5 Cal.3d at 848.) A prosecutor also may not express a personal opinion in the fairness of the trial, the fairness of the judge, or the excellence of an appointed attorney. That is precisely what the district attorney did here.

Not content to vouch for the fairness of the trial and the judge and the competence of the appointed attorney, the district attorney went on to vouch for his own fairness and good character. Just as it is improper for a prosecutor to state that he avoids prosecuting innocent people (United States v. LaMorte (2d Cir. 1991) 950 F.2d 80, 83), it is also improper for a prosecutor to state that he avoids prosecuting people in unfair trials.

The district attorney also stated that he could have objected to many of Mr.

---

[10]  It is impermissible, for example, to cite evidence or argument from another trial. People v. Farmer (1989) 47 Cal. 3d 888, 922-923.) By implication, it is impermissible to cite personal experience with another lawyer gained from other trials.

Juniel's questions, but because he was so intent on ensuring a fair trial, he declined to do so. (RT 2152-2153.) The prosecutor thus implied that Mr. Juniel had elicited some inadmissible testimony and that Mr. Juniel's defense was based partly on inadmissible evidence. He also implied that Mr. Juniel had repeatedly violated the rules of evidence in his questioning. (Cf. United States v. Phillips (7th Cir. 1975) 527 F.2d 1021, 1022-1023 [conviction reversed based on misstatements of law by prosecutor in closing argument].) He implied that Mr. Juniel was breaking the rules while all of the other parties—including the district attorney—were being scrupulously fair.

In perhaps the most egregious statement, the prosecution vouched for Ms. Brown's veracity and used the attorney-client dispute to attack Mr. Juniel's credibility. (RT 2211.) The jury had no evidence properly before it regarding the incident. As the district attorney well knew, Ms. Brown never testified (nor could she have), so the jury had no qualified evidence before it that Mr. Juniel had given her the letter, and the district attorney had no evidentiary basis for his statement. It was completely inappropriate for the district attorney to rely on that incident—which the jury never should have seen—as part of the evidence against Mr. Juniel.

None of the prosecutor's remarks could properly "be seen as a fair comment on the state of the evidence." (People v. Valdez (2004) 32 Cal. 4th 73, 127.) Indeed, the remarks had nothing to do with the evidence at all.

### C.    Prejudice

The prosecutor's comments during closing argument violated both state and federal law. The misconduct constituted a denial of Mr. Juniel's federal due process rights because it "infected the trial with unfairness." ( Donnelly v. DeChristoforo (1974) 416 U.S. 637, 643.) The misconduct constituted a violation of state law because it involved the use of deceptive methods to persuade the jury. (Espinoza, supra, 3 Cal.

-71-

4th at 820.)

By improperly vouching for the fairness of the trial, the judge, and the district attorney himself, the district attorney attempted to ease its own burden and make it easier for the jury to convict. The district attorney's implication that Mr. Juniel had repeatedly violated the rules of evidence, while all other parties had gone out of their way to be fair, infected the trial with unfairness.

In addition, the district attorney's assertion that he could have objected to much of Mr. Juniel's evidence was insidious and deceptive, based on no specific examples and supported by no legal argument. The district attorney's attempt to show that he remained utterly magnanimous while Mr. Juniel repeated cheated was reprehensible.

The prejudicial error requires reversal under both state and federal law. Even if the error alone is insufficient to require reversal, the cumulative effect of this error combined with others surely does.

## PROOF OF SERVICE

Case: <u>People v. Richard Juniel, Jr.</u>

I declare that I am employed in the County of Alameda. I am over the age of eighteen years and not a party to this cause. My business address is P.O. Box 7639, Berkeley, California. Today, I served the foregoing APPELLANT'S OPENING BRIEF on all parties in this cause by placing a true copy thereof enclosed in a sealed envelope with postage fully prepaid, in the United States mail at Berkeley, CA, addressed as follows:

Office of Attorney General
455 Golden Gate Ave., #11000
San Francisco, CA 94102

FDAP
703 Harrison St.
San Francisco, CA 94102

Alameda County Superior Court
Alameda County Courthouse
1225 Fallon Street
Oakland, CA 94612

Alameda County District Attorney
900 Alameda County Courthouse
1225 Fallon Street
Oakland, CA 94612

Richard Juniel, Jr.
V18808
San Quentin State Prison
San Quentin, CA 94974

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 18, 2004, in Berkeley, California.

_____
Lawrence A. Gibbs