# EXHIBIT B

(Respondent's Brief)

ATTORNEY GENERAL--OFFICE COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION TWO

**THE PEOPLE OF THE STATE OF CALIFORNIA,**

Plaintiff and Respondent,

v.

**RICHARD JUNIEL, JR., et al.,**

Defendant and Appellant.

A105203

Alameda County Superior Court No. C145236
The Honorable Julie Conger, Judge

**RESPONDENT'S BRIEF**

FILED

MAY 18 2005

Court of Appeal - First App. Dist.
DIANA HERBERT
By_____
DEPUTY

AOB filed 2/14/05

DOCKETED
SAN FRANCISCO

MAY 20 2005

By L. CARAMANZANA
SF2004DA0340

BILL LOCKYER
Attorney General of the State of California

ROBERT R. ANDERSON
Chief Assistant Attorney General

GERALD A. ENGLER
Senior Assistant Attorney General

MICHELE J. SWANSON
Deputy Attorney General

JOAN KILLEEN
Deputy Attorney General
State Bar No. 111679

455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5968
Fax: (415) 703-1234

**Attorneys for Respondent**

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE CASE ................................................................. 1

STATEMENT OF FACTS ................................................................... 2

    Prosecution's Case ..................................................................... 2

        Events Leading Up To The Shooting ........................................ 2

        Witnesses To The Shooting ...................................................... 6

        Police Investigation ................................................................. 12

    Juniel's Defense Case ............................................................... 17

    McDonald's Defense Case .......................................................... 27

ARGUMENT .................................................................................. 44

  I.    **THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING APPELLANTS' MOTIONS TO SEVER** ...................................... 44

      A.  Background ...................................................... 44

      B.  Statutory Preference For Joint Trials ........................... 50

      C.  The Trial Court Did Not Abuse Its Discretion By Denying Severance ....................................... 52

          1.  Conflicting Defenses ................................... 53

          2.  Other Crimes Evidence ................................ 60

      D.  Neither Defendant Can Establish Prejudice From The Joinder ................................................... 65

i

**TABLE OF CONTENTS  (continued)**

Page

II.   THE TRIAL COURT DID NOT ABUSE ITS
      DISCRETION BY ADMITTING EVIDENCE
      OF OTHER MISCONDUCT                                        68

      A.  The Trial Court Did Not Admit Section 1101 Evidence
          Against Juniel                                        68

          1.  Background                                        68

          2.  The Trial Court Did Not Abuse Its Discretion By
              Admitting The Challenged Evidence                 70

      B.  Juniel Opened The Door To Evidence That He Pointed
          A Gun At McDonald                                     72

          1.  Background                                        72

          2.  The Trial Court Properly Found That Juniel Opened
              The Door To The Evidence                          73

      C.  McDonald Did Not Object To Evidence That She
          Threatened A Neighbor With A Baseball Bat             75

          1.  Background                                        75

          2.  The Trial Court Properly Admitted The Challenged
              Evidence                                          78

III.  THE TRIAL COURT DID NOT ERR BY
      ADMITTING EVIDENCE ALLEGEDLY
      SUBJECT TO THE ATTORNEY-CLIENT
      PRIVILEGE                                                 83

      A.  Background                                            83

      B.  The Trial Court's Admission Of The Letter's Contents
          Did Not Deny Juniel A Fair Trial                      85

**TABLE OF CONTENTS  (continued)**

Page

IV.   THE TRIAL COURT DID NOT VIOLATE
      JUNIEL'S CONSTITUTIONAL RIGHTS BY
      ASKING IF HE WAS GOING TO TESTIFY            88

      A.  Background                               88

      B.  The Trial Court Did Not "Force" Juniel To Declare In
          Advance Whether He Would Testify         90

V.    THE TRIAL COURT'S CONDUCT OF THE
      TRIAL DID NOT PREJUDICE JUNIEL               99

      A.  Trial Court's Evidentiary Rulings        99

      B.  Trial Court's Rulings And Comments During Trial   100

      C.  Trial Court's Rulings Regarding Closing Argument  104

VI.   THE PROSECUTOR DID NOT MISSTATE
      THE LAW ON AIDING AND ABETTING               109

      A.  McDonald Waived Her Claim of Prosecutorial
          Misconduct                               109

      B.  The Prosecutor's Argument Was Consistent With The
          Trial Court's Instructions On The Mental State Required
          For Aiding And Abetting                  110

VII.  THE TRIAL COURT PROPERLY
      INSTRUCTED THE JURY THAT DURESS
      WAS NOT A DEFENSE TO MURDER                  119

      A.  Background                               119

      B.  The Trial Court's Special Instruction Correctly Stated
          The Law That Duress Is Not A Defense To Murder   120

## TABLE OF CONTENTS (continued)

|  |  | Page |
|---|---|---|
| VIII. | THE TRIAL COURT PROPERLY DENIED INSTRUCTION ON VOLUNTARY MANSLAUGHTER AND PROVOCATION | 127 |
| | A. Background | 127 |
| | B. Applicable Law | 127 |
| | C. The Trial Court Properly Denied Instruction On Voluntary Manslaughter | 130 |
| | D. The Trial Court Properly Denied Instruction With CALJIC No. 8.73 | 135 |
| IX. | THE PROSECUTOR DID NOT COMMIT MISCONDUCT IN CLOSING ARGUMENT | 140 |
| | A. Background | 140 |
| | B. The Prosecutor Did Not Commit Misconduct | 142 |
| CONCLUSION | | 146 |

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Brooks v. Tennessee*
(1972) 406 U.S. 605 .......................................................... 91, 92

*Elsner v. Uveges*
(2004) 34 Cal.4th 915 ........................................................ 92

*Hicks v. United States*
(1893) 150 U.S. 442 .......................................................... 113

*People v. Alvarez*
(1996) 14 Cal.4th 155 ........................................................ 57, 58, 62, 70

*People v. Anderson*
(2002) 28 Cal.4th 767 ........................................................ 120, 122, 125, 126

*People v. Avena*
(1996) 13 Cal.4th 394 ........................................................ 128

*People v. Barton*
(1995) 12 Cal.4th 186 ........................................................ 128, 130, 132, 136

*People v. Beeman*
(1984) 35 Cal.3d 547 ......................................................... 112, 113

*People v. Bemore*
(2000) 22 Cal.4th 809 ........................................................ 142, 143

*People v. Blakeley*
(2000) 23 Cal.4th 82 ......................................................... 129, 130

*People v. Box*
(2000) 23 Cal.4th 1153 ....................................................... 50, 59, 63

*People v. Breverman*
(1998) 19 Cal.4th 142 ........................................................ 127

TABLE OF AUTHORITIES  (continued)

Page

*People v. Cash*
(2002) 28 Cal.4th 703                                    142, 143, 145

*People v. Cuccia*
(2002) 97 Cal.App.4th 785                                    92-94

*People v. Cummings*
(1993) 4 Cal.4th 1233                                          59

*People v. Felix*
(1999) 70 Cal.App.4th 426                                     82

*People v. Hardy*
(1992) 2 Cal.4th 86                                         51, 54

*People v. Hempstead*
(1983) 148 Cal.App.3d 949                                     81

*People v. Hill*
(1998) 17 Cal.4th 800                                     110, 142

*People v. Hurd*
(1970) 5 Cal.App.3d 865                                       81

*People v. Jaspar*
(2002) 98 Cal.App.4th 99                                    68, 71

*People v. Keenan*
(1988) 46 Cal.3d 478                    50, 53, 54, 57, 61, 62, 64, 65, 70

*People v. King*
(1991) 1 Cal.App.4th 288                                      124

*People v. Lasko*
(2000) 23 Cal.4th 101                                   128-130, 133

*People v. Lee*
(1994) 28 Cal.App.4th 1724                                136, 138

# TABLE OF AUTHORITIES  (continued)

**Page**

*People v. Marshall*
(1996) 13 Cal.4th 799                                        108

*People v. Massie*
(1967) 66 Cal.2d 899                                         51

*People v. McCoy*
(2001) 25 Cal.4th 1111                                       111

*People v. Mendoza*
(1998) 18 Cal.4th 1114                                       112

*People v. Michaels*
(2002) 28 Cal.4th 486                                     86, 115

*People v. Middleton*
(1997) 52 Cal.App.4th 19
disapproved on another ground in
*People v. Gonzalez*
(2003) 31 Cal.4th 745                                     136-138

*People v. Morganti*
(1996) 43 Cal.App.4th 643              50, 51, 54-56, 58, 59, 65

*People v. Pinholster*
(1992) 1 Cal.4th 865                          50, 51, 53, 59

*People v. Prettyman*
(1996) 14 Cal.4th 248                                        112

*People v. Rodrigues*
(1994) 8 Cal.4th 1060                          108, 114, 125

*People v. Saille*
(1991) 54 Cal.3d 1103                                        136

*People v. Saunders*
(1993) 5 Cal.4th 580                                      54, 79

## TABLE OF AUTHORITIES  (continued)

|  | Page |
|---|---|
| *People v. Snow*<br>(2003) 30 Cal.4th 43 | 104 |
| *People v. Son*<br>(2000) 79 Cal.App.4th 224 | 123, 124 |
| *People v. Turner*<br>(1984) 37 Cal.3d 302<br>overruled on another ground in<br>*People v. Anderson*<br>(1987) 43 Cal.3d 1104 | 50, 51, 54, 56, 59, 60, 62, 66 |
| *People v. Wagner*<br>(1975) 13 Cal.3d 612 | 80 |
| *People v. Watson*<br>(1956) 46 Cal.2d 818 | 72, 86 |
| *People v. Wharton*<br>(1991) 53 Cal.3d 522 | 74 |
| *People v. Wheeler*<br>(1973) 32 Cal.App.3d 455 | 51 |
| *People v. Whitler*<br>(1985) 171 Cal.App.3d 337 | 136 |
| *People v. Wickersham*<br>(1982) 32 Cal.3d 307<br>disapproved on other grounds in<br>*People v. Barton, supra*, 12 Cal.4th at p. 201 | 136 |
| *People v. Young*<br>(2005) 34 Cal.4th 1149 | 81 |
| *Strickland v. Washington*<br>(1984) 466 U.S. 668 | 79, 82 |

## TABLE OF AUTHORITIES  (continued)

**Page**

*Zafiro v. United States*
(1993) 506 U.S. 534                                51-53, 55, 60, 65


**Statutes**

Evidence Code
    § 352                                               72
    § 353, subd. (a)                                    79
    § 353, subd. (b)                                 72, 86
    § 356                                               73
    § 1101                                              77
    § 1102                                              80
    § 1107, subd. (a)                                   71

Penal Code
    § 26                                               121
    § 187                                                1
    § 1098                                              50
    § 12021, subd. (e)                                   1
    § 12022, subd. (a)(1)                                1
    § 12022.53, subds. (c)-(d)                           1
    § 12280, subd. (b)                                   1

Welfare and Institutions Code
    § 602                                               17

TABLE OF AUTHORITIES  (continued)

Page

**Other Authorities**

California Jury Instructions, Criminal
      No. 2.23.1                               70
      No. 2.40                                 77
      No. 2.42                              77, 81
      No. 2.50.1                            77
      No. 2.50.2                            77
      No. 3.00                              111
      No. 3.01                          111, 113
      No. 3.03                              111
      No. 3.31                              114
      No. 3.31.5                           114
      No. 4.40                        119, 120
      No. 8.20                114, 125, 134, 138
      No. 8.40                            127
      No. 8.42                            127
      No. 8.43                        127, 131
      No. 8.44                            127
      No. 8.50                        127, 134
      No. 8.51                            127
      No. 8.70                            126
      No. 8.73                127, 135, 136, 138
      No. 9.35.1                         49, 70

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION TWO

| | |
|---|---|
| **THE PEOPLE OF THE STATE OF CALIFORNIA,**<br><br>Plaintiff and Respondent,<br><br>v.<br><br>**RICHARD JUNIEL, JR., et al.,**<br><br>Defendant and Appellant. | A105203 |

## STATEMENT OF THE CASE

On May 30, 2003, the Alameda County District Attorney filed an information charging appellants Richard Juniel, Jr., and Ava Lynette McDonald with murder (Pen. Code, § 187, count one). The information further alleged as to appellant Juniel that he personally and intentionally discharged a firearm which proximately caused great bodily injury and death (Pen. Code, § 12022.53, subds. (c)-(d)), and as to appellant McDonald that she was armed with a firearm (Pen. Code, § 12022, subd. (a)(1)). In counts two and three, the information charged appellant Juniel with unlawful possession of a firearm (Pen. Code, § 12021, subd. (e)) and possession of an assault weapon (Pen. Code, § 12280, subd. (b)). (CT 160-162.)

Jury trial began on August 11, 2003. (CT 295.) The next day, the trial court granted appellant Juniel's motion to represent himself. (CT 299.) On September 25, 2003, the jury found both appellants guilty as charged. (CT 435-439.)

On December 15, 2003, the trial court sentenced appellant Juniel to a total term of 50 years eight months to life. (CT 470, 506-508.) He filed his notice of appeal the same day. (CT 468.)

On March 30, 2004, the trial court sentenced appellant McDonald to a total term of 25 years to life. (Aug. CT 128-131.)[1] She filed her notice of appeal the same day. (Aug. CT 132.)

## STATEMENT OF FACTS

### Prosecution's Case

#### Events Leading Up To The Shooting

Angelina Bryant lived at 761 54th Street in Oakland with her grandmother, Luella Smith, her uncle, David Smith, and four cousins. (RT 156, 163.) In March 2003, Bryant was 20 years old and seven and a half or eight months pregnant. (RT 161.) She had a maternal aunt, Cathy Rivers, who lived in Berkeley but visited the 54th Street house often. (RT 162-163.) Bryant also referred to Stacey Alexander as her aunt, although she was a close family friend. Alexander used to date David Smith, and still visited Bryant and her family regularly. (RT 163-164.)

Appellant Ava McDonald (McDonald), whom Bryant knew as "Peewee," lived two doors away, at 747 54th Street. (RT 157.) They knew each other as neighbors, but not friends. (RT 158.) Appellant Richard Juniel (Juniel) moved in with McDonald in December 2002. Bryant had seen him around, but did not know him. (RT 159-160.) Bryant knew Sia Bolden, McDonald's sister, with whom she sometimes worked. Bryant thought Bolden was about 30 years old and McDonald was about 33 years old. (RT 160-161, 178-179.)

---

1. Appellant McDonald did not include a transcript of the sentencing proceedings on appeal. In her brief, she states she was sentenced to 25 years to life on count one, and to a consecutive three-year term for the arming enhancement. (AOB at 2.) However, the Clerk's minutes and Abstract of Judgment indicate that the arming enhancement was stayed. (CT 128-130.)

2

In March 2003, Bryant and Bolden were no longer getting along, although Bryant was not sure why. (RT 164-165.) About 3:00 or 4:00 p.m. on March 3, Bryant was outside her house when Bolden's son walked by. Bryant had a friendly conversation with him, but then heard Bolden, who was also outside, yelling at her. Bryant walked over to Bolden's house to talk to her. (RT 165-170.) Bolden walked down her porch steps and pushed Bryant, causing her to fall against the railing. (RT 170-172.) Bryant grabbed Bolden and the two women started swinging at each other. (RT 173-174.) Luella Smith and Cathy Rivers came outside and intervened in the fight. (RT 175-176.) As Bryant left, Bolden said something to her, but Bryant did not feel threatened. (RT 177.)

When Bryant returned home about 6:00 that evening, she heard her grandmother on the telephone with Rita Ammons, McDonald and Bolden's mother. (RT 178-179.) Bryant took the phone from Smith and tried to tell Ammons what had happened. During the conversation, Bryant's phone accidentally became unplugged. (RT 179-181, 254.) Although Ammons thought Bryant had hung up on her, Bryant described the renewed conversation as a respectful one in which they resolved the situation. (RT 181, 256-257.) Afterward, Bryant walked to the corner store, where she saw Juniel. He said he had heard Bryant's family jumped Bolden. Bryant said she fought with Bolden. She did not feel threatened by Juniel's tone. (RT 183-184.) However, she thought it odd when he said he was not worried about anyone messing with him. (RT 184-185.)[2]

Late that evening, McDonald called and spoke to Bryant about what had happened. After Bryant told her about the fight, McDonald asked, "how many months is you," referring to Bryant's pregnancy. (RT 185.) When Bryant

---

2. On cross-examination, Bryant said that Juniel told her he was not worried because he had an "A-K in the back." (RT 303.)

3

said she was "seven months," McDonald responded, "Well, in two months your ass is mine," and hung up the phone. (RT 186.) At that point, McDonald had not said anything about Bryant "disrespecting" McDonald's mother. (RT 186-187, 257.)[3/]

Later, Stacey Alexander came over to Bryant's house and heard about the day's events. As Bryant and Alexander were talking on the front porch, McDonald drove up and parked by her house. (RT 188-190, 194.) Alexander went over to McDonald's car to talk to her about her threat to Bryant and the earlier fight with Bolden. (RT 195, 233.) After they had spoken briefly, Alexander came back toward Bryant's porch and McDonald went into her house. McDonald had told Alexander that her concern was not about Bryant's fight with Bolden, but about Bryant disrespecting McDonald's mother. (RT 196-198, 272-273.) McDonald came outside again, retrieved a baseball bat from the trunk of her car, and approached Alexander, as if to hit her with the bat. As she did so, McDonald said something to the effect that she had never backed down. (RT 198-200.) Alexander responded, "You got one time to swing that bat and I'm gonna deflate your big ass." Bryant did not see a weapon in Alexander's hand at the time, although she had heard a few years before that Alexander carried a knife. (RT 201, 266-267.) As McDonald began to swing the bat, a neighbor from across the street came over and pushed McDonald away. Bryant's grandmother came out and told Bryant and Alexander to go inside the house. (RT 202.) As they went inside, they could hear McDonald yelling to someone to get her "A-K" and that she was "about to pop this bitch." (RT 202-203, 278.) Alexander warned Bryant not to go anywhere alone and to be aware of her surroundings, but Bryant did not think Alexander felt fear for her own safety. (RT 203, 296-297.) Bryant had not seen

---

3.   Bryant later called Ammons to clear up any misunderstanding between them. (RT 206-207, 228-229.)

Juniel during her fight with Bolden or Alexander's fight with McDonald. (RT 233-234.)

The next afternoon, Cathy Rivers told Bryant she had seen McDonald, who apologized for threatening Bryant over what she thought was the disrespect to her mother. (RT 204-205.) McDonald also told Rivers, "Tell that bitch Stacey when I see her I'm gonna kill her." (RT 205.)

About 11:15 that night, Bryant heard two loud gunshots, followed soon after by a third gunshot. (RT 207-208.) She went down to 54th Street and Dover where several neighbors and police officers had gathered. When Bryant returned home she received a call from Bolden, who said, "Put all this stuff behind us. I think Stacey just got shot." (RT 208, 298.) Bryant ran back to 54th and Dover and talked to the officers there. Eventually she learned that Alexander had been killed. (RT 209-210.)

About 8:45 a.m. on July 15, 2003, shortly before the trial started, Juniel called Bryant at her home. When Bryant learned who it was, she hung up. (RT 210.)

Cathy Rivers testified that Alexander was like a member of her family. (RT 316.) She described Bolden also as being "like family." (RT 317.) On the afternoon of March 3, 2003, she heard Bryant's friend Jeanetta honking her horn. When Rivers went outside, she saw Bryant going over to Bolden's house, where the two women started fighting. (RT 318-319.) By the time Rivers ran over to Bolden's front porch, Jeanetta had separated them, although both women were still yelling and trying to get at each other. After Rivers pulled Bryant to Jeanetta's car, Bryant and Jeanetta left, and Rivers and her mother, who also had come outside, went home. (RT 319-321, 334-335.)

The next day, Rivers saw McDonald, who said she owed Bryant an apology because she had misunderstood the situation. McDonald also told Rivers that when she arrived home from work the night before, Alexander, who

was holding a knife, had come over to her car and yelled at her about Bryant. (RT 325-326.) McDonald said to Rivers, "When I see Stacey I'm gonna kill her," or "Tell Stacey I'm gonna kill her." McDonald, who said she had a weapon and just needed a "clip," was "really upset" at the time. Rivers told her that it would not be worth it and that she had too much to lose. She also said that Alexander was "high" and would later apologize. (RT 327, 349-350.) Rivers thought McDonald had accepted her advice when they ended the conversation. (RT 331, 343.) She did not take McDonald's threat toward Alexander seriously. (RT 344, 347-348.)

### Witnesses To The Shooting

Richshalda Williams lived at 670 54th Street, at the corner of 54th and Dover, with her sister and her niece, Ciara Baldwin. (RT 352-354.) She explained that Dover ran parallel to and in between Martin Luther King and Shattuck, which were each one block away. (RT 353.)

On March 4, 2003, Williams, her sister and her niece arrived home about 10:30 p.m. after attending Bible study. They wanted something to eat, so Williams and Baldwin walked around the corner to a store at 55th Street and Martin Luther King. (RT 354-357.) As they returned along Dover, they saw McDonald (who was driving) and Juniel drive up to the stop sign on 54th at Dover. (RT 358-363, 395-397, 549-551.) The car "drove up kind of fast and stopped really fast and just sat there." (RT 361.) The occupants kept looking at Williams and Baldwin as they approached the intersection. When they got closer, the car took off toward Martin Luther King. (RT 361-362, 365-366, 395-397, 550-551.) Williams and Baldwin knew McDonald and Juniel from the neighborhood and were familiar with McDonald's Acura Legend, which had "tweedy birds" in the front and back windows. (RT 362-364, 394, 424,

6

551-553.) It appeared that McDonald and Juniel might have been looking for someone because of the look they had given Williams and Baldwin. (RT 365.)

About 15 minutes after returning home, Williams heard two gunshots in front of her house. (RT 368, 394-395, 398-399, 403-404.) Baldwin told the police she heard two women arguing outside just before the gunshots. (RT 588.) At trial she described it as "jibber-jabber, like somebody just talking." (RT 589.) Williams and Baldwin ran into the kitchen to get away from the living room windows. (RT 368-369, 556.) As they looked out of the kitchen window, Williams could see McDonald's Acura Legend driving on 54th Street toward Martin Luther King. (RT 369, 397-401.) As she watched, the car backed up around the corner "real fast," so that it was on Dover, facing toward 55th Street. (RT 369, 397-400; see RT 557, 572-573.) At that point, Williams could see by the aid of a bright street light that Juniel was still in the passenger seat, and McDonald was driving. (RT 372-373, 397, 401, 403, 417.)[4] As the car went down Dover, Williams heard at least one more gunshot. Baldwin thought she heard two gunshots. (RT 369, 374-376, 378-379, 407-408, 417-418, 557.) When she looked out of a back window, Williams could see the car turn left at the corner of 55th and Dover. (RT 379, 415-416.) Williams and Baldwin did not see Alexander on the street and did not hear anyone screaming. (RT 377, 426, 430-431, 560.)

Although she saw police cars outside shortly after the shooting, Williams did not go outside or talk to the police because she was tired, nervous about the incident, and did not want to get involved. (RT 380-381.) A few

---

4. Baldwin testified that she recognized the car, but she could not see whether the two occupants were the same people she had seen earlier because she was standing behind her aunt at the window. (RT 558, 574.) She was able to see that the passenger side window was down. (RT 574.) When she spoke to a police officer on March 10, 2003, however, she said that they were the same individuals she had seen in the car before. (RT 558-559.)

7

days later, Williams spoke to Sergeant Brock, who was canvassing the neighbors. (RT 381.) Williams identified both McDonald and her car from a photo spread. (RT 382-384.) She was sure that she had seen McDonald's Acura that night. There were no other cars in the street at the time of the shooting. (RT 409-410.) When she circled Juniel's photo in a photo spread, Williams put "50 percent," because his hair was different in the photo, although "facial-wise," she was "a hundred percent sure." (RT 384; see RT 418-420, 423-424.) Although Juniel's head appeared to be partially covered with a hood the night of the shooting, she knew who he was. (RT 385-386, 402-403, 413, 416-417.) Williams had no doubt of her identification of McDonald and Juniel at the preliminary hearing and at trial. (RT 386-387.)

Baldwin viewed the same photo spreads on March 10, 2003, and identified McDonald and Juniel as the individuals she had seen in the car the night of the shooting. (RT 563-565.) Juniel's hair was short, but in "twisties" or "dreads" at the time. Baldwin guessed at one point that the shooter was five feet seven inches, because she was not really sure how tall he was. (RT 591.) In another interview she described "a male black 24 to 25 years old, short dreads, he is six feet, 190 pounds, kind of buffed." (RT 592.)

Seth June lived at 5410 Dover, next door to Richshalda Williams. He was outside on the front porch of his residence around 10:45 or 11:00 p.m. on March 4, 2003, when he heard two gunshots from the direction of 54th and Dover. (RT 476-479, 504.) Moments after the second shot, a woman stumbled into view on the sidewalk. (RT 479-480.) She was hunched over, holding her back where there appeared to be a stain, and moving as quickly as she could. She was screaming, "Help, they're trying to kill me," "They're shooting me." (RT 480.) June recognized the woman, whom he had seen before in the neighborhood. She did not come to his house, but kept walking up the street,

8

looking over her shoulder as she went. She appeared to be in fear for her life. (RT 480-481.) June described her movements as a "frantic hobble." (RT 487.)

June started down the steps, but Loul Abraha, an upstairs neighbor, held him back. As Abraha fumbled with her keys to get into the house, June saw a car from the neighborhood, which he had also seen driving around earlier that evening, stop in front of his house. The car had been driving very slowly, about two to five miles per hour, as it appeared to follow the injured woman, who was by then moving across the street. (RT 482-487, 505-506, 522-524.) June could see the passenger staring at him for several seconds. He could not clearly see the driver. (RT 485-486.) The driver gestured to the passenger, as if pointing up the street. The passenger looked up the street and looked back at June before the car started moving again. At that point, June could see the injured woman diagonally across the street in front of 5423 Dover. (RT 487, 525-527, 535-536.) The occupants of the car were very calm. June heard no yelling from within the car and saw no evidence of agitation. (RT 489-490, 525.)

The car drove slowly to the corner of 55th and Dover, where it pulled over and parked across the street, against the direction of traffic. The passenger, who was carrying what appeared to be a pistol, got out of the car and walked back toward the injured woman. She had started back in the other direction, then walked down the driveway of 5423 Dover as she continued to yell for help. (RT 488-491, 512, 532.) June saw the passenger jog down the driveway after her, carrying a gun at his side. (RT 491-493.)

June and Abraha managed to get inside their house at that point. June went upstairs and called the police as he ran to the window. (RT 491, 493-494.) There was a moment of silence before he heard a gunshot. (RT 494-495.) Five to ten seconds later, the passenger walked back down the driveway toward the street. June went down and opened his front door. The passenger,

9

who was holding something under his shirt, turned and looked at June, then jogged down Dover, turning the corner at 54th Street. The car at the other corner pulled out and appeared to turn left on 55th after the gunshot. (RT 495-498.)

June described the passenger as an African-American male, about six feet, 200 pounds, with short hair. It was possible he had something on his head, but June could not see it in the dark. The man was wearing dark pants and a shirt with some kind of coloring on it. (RT 499-500, 510.) June thought the driver of the car was African-American, but he could not anything more definitive. (RT 501-502.) In his brief statement to the police that night, June said he thought there had been two African-American men in the car. (RT 502.) June recognized Juniel and McDonald from the neighborhood, but he could not say whether they were the occupants of the car that night. (RT 502-503.) When he saw the car stopped in front of his house, he was viewing it from above, and could not see the occupants' features clearly. (RT 537-539.) He thought he had seen Juniel driving the car around the neighborhood earlier that day. (RT 514.) June wore glasses for his distance vision, which he had on that night. (RT 536-537.)

Natalie Alvarez lived in the upstairs duplex at 5408 Dover, above June. (RT 772-773.) About 11:00 p.m. on March 4, 2003, Alvarez heard two gunshots very near her house. (RT 773-775.) When she looked out of her upstairs window, Alvarez could see a woman walking hurriedly across the street from the corner of 54th Street and Dover. She was holding her back and frantically screaming for someone to help her. (RT 779-780, 817.) Alvarez saw the woman look over her shoulder at a dark car moving very slowly down the street. (RT 782-784.) When the woman saw the car approaching her near the corner of 55th Street, she turned and ran up the driveway of 5423 Dover. (RT 784-787.) As soon as the woman turned, the car stopped and a man got

10

out on the passenger side and went after her. (RT 787-789.) He appeared to be holding something under his shirt. (RT 827.) After the man walked down the driveway, Alvarez heard a gunshot. The man came out of the driveway and walked towards 54th and Dover, still holding something under his shirt. (RT 789, 878.) His demeanor was very calm and "sterile." (RT 792.) As he walked down Dover, he stared at Alvarez's house for several seconds. (RT 797, 879.) He was wearing a cap and a black sports jersey with an orange or red stripe on the arms. (RT 799, 877.)

In court, Alvarez identified Juniel as the man she had seen that night. (RT 799, 883.) She had not been able to identify him in a photo lineup, and instead had selected another individual as resembling the shooter. (RT 807-809, 884, 894.) She thought Juniel and the individual she selected had the same characteristics, as depicted in their photographs. (RT 894.) She had "no doubt" that Juniel was the shooter she had seen. (RT 918.)

Wendy Jackson lived in the upstairs duplex at 5423 Dover with her sister. Her aunt lived downstairs. (RT 593-594.) A little after 11:00 p.m. on March 4, Jackson heard two gunshots from the direction of 54th Street, followed by a woman crying for help and "screaming for her life." (RT 596-598, 622.) When Jackson looked out her upstairs window, she saw a woman going across her front lawn. (RT 598.) A black Lexus or Acura was stopped in the middle of the street near 55th and Dover. (RT 599, 623.) Moments later, Jackson saw a man with a big gun follow the woman up her driveway. (RT 599-601, 626-627.) Jackson lost sight of them when she went into another room. The woman continued to scream. She was begging for her life and pounding on the downstairs side door. Jackson then heard another gunshot, followed by silence. (RT 601-603.) When she looked down to her aunt's porch below, she could see the woman lying dead. (RT 605.) Jackson thought

11

the woman had been "executed." (RT 621.) She described the shooter's movements as "methodical," as if he did not have to hurry. (RT 625.)

Jackson later described the shooter as a black male in his 20's, about six feet, 180 to 190 pounds, wearing a black knit cap, black jacket, and black pants. (RT 606.) Jackson identified McDonald's car as the car she had seen in the street that night. (RT 607.) She could not identify McDonald as the driver of the car, but Juniel looked like the shooter she had seen. (RT 609.) She did not get a good look at his face, "because apparently he was dressed to do what he was doing." (RT 616.)

Stacey Alexander died of multiple gunshot wounds. One shot went through her head, another through her right forearm, and a third through her back, exiting through her abdomen. (RT 97-100, 108.) The gunshot wound to the head entered three inches above the left ear and traveled in a downward direction through the right cheek. (RT 97, 102.) Alexander could have moved after the gunshot to the back, but probably not after the gunshot to the head. (RT 106.) The wound to the back may or may not have been fatal, had the head wound not occurred. (RT 113-114.) Blood tests did not reveal the presence of alcohol or drugs. (RT 107, 112.)

### Police Investigation

At 11:17 p.m. on March 4, 2003, Officers Huppert and Bellusa responded to a report of a woman screaming and gunshots fired at 5413 Dover. (RT 440-443.) They found Alexander "slumped over" on the side porch of 5423 Dover. She had been shot in the head and was unresponsive. (RT 445-446.) Huppert found an expended 9 mm shell casing on the porch steps a few feet from Alexander's body. (RT 447-448, 463-464.) After paramedics moved Alexander to work on her, Huppert found a bullet in a pool of blood on the porch. (RT 452-453.) Another 9 mm shell casing was found in the street at the

northeast corner of 54th Street and Dover. (RT 636, 649.) An open folding knife was found in Alexander's jacket pocket. (RT 744-745, 765-766.)

Around midnight, Officer Olthoff responded to a radio dispatch regarding a possible suspect vehicle in the area. (RT 640, 644.)[5] Officers Olthoff, Jones and Anderson pulled the vehicle over after it turned onto 54th Street from Martin Luther King. (RT 641-643, 829, 832-833.) Olthoff and Jones identified Juniel and McDonald, who was driving, as the suspects removed from the vehicle. (RT 644-645, 834-835.) Juniel was wearing a red t-shirt and blue jeans. McDonald was wearing what appeared to be a nightshirt. (RT 834-835, 861.)

A field lineup was conducted after the car had been stopped, but the two individuals who viewed the suspects were unable to identify them. (RT 836-837, 1109.) McDonald's car was positively identified as the car that left the scene of the shooting, and was seized as evidence. (RT 646-647, 658, 838-841.)

Juniel and McDonald voluntarily agreed to go to the police station that night. (RT 841.) Juniel also volunteered to take a gunshot residue test, which was conducted at the scene of the vehicle stop. (RT 847-848, 862.)

On March 6, 2003, a police evidence technician processed McDonald's Acura and found an expended shell casing under the front passenger seat. (RT 923, 928-929.) The license plate of the car was 2MOV744. (RT 930-931.)

On Sunday, March 9, 2003, Sergeants Brock and Nolan canvassed the neighbors in the area where the shooting had occurred. (RT 1060-1061.) The next day, Richshalda Williams and Ciara Baldwin went down to the police

---

5. The suspect vehicle was described as a dark-colored Acura with chrome rims. (RT 847, 859.) Another witness, Jayshree Chander, had described the vehicle as black, possibly a Buick, with a partial license plate number of 744. (RT 1190.)

department. (RT 1062-1063.) Both women identified McDonald from a photo lineup. (RT 1070-1071, 1076.)   The photo used in Juniel's lineup had been taken on January 28, 2003. (RT 1072.)[6]   Williams initially selected Juniel's photo in the lineup, but said his complexion and hair appeared to be different in the photo.  She thought she could identify him better in person.  She was certain of her identification of the car.  (RT 1074-1075, 1145-1146, 1182.) Williams said that she had seen the same two people in the car after the gunshots that she had seen when coming back from the store.  (RT 1182.) Baldwin was certain of her identification of Juniel and of the car.  She said she had seen them in the car while walking with Williams and when they had looked out of the kitchen window after hearing gunshots.  (RT 1076-1078, 1182.)

On March 11, 2003, Sergeant Brock told McDonald and Juniel to come to the station to get McDonald's car, but they were arrested instead.  (RT 1072, 1078-1079.)  Early the next morning, officers executed a search warrant at their home.  (RT 669-671, 680, 691, 1080.)  They found a loaded Intratec 9 mm pistol and a magazine containing several rounds of ammunition hidden behind a bin in the kitchen pantry.  (RT 673-675, 971-972.)  The serial number on the weapon had been scratched off.  (RT 697, 975.)  They also found a blue sports jersey with orange and white markings.  (RT 1081-1082.)

Lansing Lee, a criminalist who specialized in firearms, had determined that the shell casings collected at the scene of the murder and from McDonald's car were fired by the same weapon.  (RT 987-988, 990, 1009.)  After the Intratec 9 mm pistol was recovered, Lee determined that it had fired the shell casings collected earlier, to the exclusion of all other firearms.  (RT 1012-1013, 1018-1025, 1033, 1042.)  He could not conclusively say that the pistol fired the

---

6. Juniel was described then as being six feet one inch and 232 pounds. (RT 1072.)

14

bullet collected at the murder scene, but he could say that the bullet had been fired by an Intratec 9 mm pistol manufactured within a day or two of the weapon found at the defendants' house. (RT 1024-1025.) The weapon was classified as an assault weapon under California law. (RT 1028.)

Based on a phone call that Juniel made to Sia Bolden, in which he asked whether the police had looked in various places and for various items, Sergeant Brock obtained a second warrant, which was executed on March 13, 2003. The officers did not find any items in the areas searched, but they collected a pair of tennis shoes he had mentioned, as well as some latex gloves and additional indicia of occupancy. (RT 1083-1088.)[7]

On May 2, 2003, Sergeant Brock executed a search warrant in Juniel's cell at the Santa Rita Jail. (RT 1090-1091.) He seized a discovery package that included police reports of the case. The reports contained the names, phone numbers, addresses, and personal information of witnesses, which by law should have been deleted before the reports were given to a defendant. (RT 1092, 1127.) Brock thought Juniel had obtained the discovery information from his former attorney. (RT 1093.) In Juniel's pocket, Brock found a list of all of the witnesses' names, birth dates, addresses, driver's licence numbers, occupations, telephone numbers, pager numbers, and work addresses. (RT 1096.) On cross-examination by Juniel, Brock explained that he searched his cell because a witness had received a threatening phone call from a man at the Santa Rita Jail who sounded like Juniel. Brock was looking for evidence that Juniel had access to discovery information listing the witnesses' names and other personal information. (RT 1126-1127, 1129, 1141-1144.)[8][9]

---

7. When Bolden had asked Juniel what to do about the items, he said, "Do what's right." (RT 1084.)

8. On redirect examination, the prosecution played People's Exhibit 25, a tape of the threatening phone call, to the jury. (RT 1184-1185.) The personal

Sergeant Brock had made arrangements to record calls that Juniel and McDonald made from jail. (RT 1089.) People's Exhibit 26, a tape recording of a phone call from Juniel to Sia Bolden on April 3, 2003, and People's Exhibit 28, a tape recording of a phone call from Juniel to Sia Bolden on March 15, 2003, were played for the jury. (RT 1099-1102.) People's Exhibit 29A, a tape recording of a phone call from McDonald to Sia Bolden and Ayeshia Dubose on March 22, 2003, was also played to the jury. (RT 1105-1106.)[10]

---

information concerning the witness that was mentioned in the phone call was in Juniel's possession in his jail cell. (RT 1185.) People's Exhibit 25A, a transcript of the call placed on April 26, 2003, has been made a part of the record on appeal, along with several other transcripts of taped phone calls. In the taped conversation, Juniel said, "You know we're uh, pretty heavy on snitches. Don't come to court." (People's Exh. 25A at 2.)

9. During the search of Juniel's cell, Sergeant Brock also found several letters to Juniel from "Lynette Juniel," with the words, "I love you," "Always thinking of you," and "Always," on them. (RT 1095.) McDonald's car was registered to Ava Lynette Roberts. Roberts was another name that McDonald used. (RT 949, 1176-1177.)

10. The transcripts of the three calls are contained in People's Exhibits 26A, 28A, and 29B, respectively.

In People's Exhibit 26, Juniel said, "It ain't nothing though, man. A mother fucker, that's a mother fucker's job. You feel me. I was there to provide. I was there to protect. I was there to defend no matter the cost. Whether the mother fucker was right or wrong. Mother fucker wasn't going to disrespect mine, you feel me? And I'm going to lay my life down for mine. (unintelligible) You got to take something with a kick stand, with a heel on it. . . ." (People's Exh. 26A at 2.)

In People's Exhibit 28, Juniel said: "I'm going to give her the okay to give me up, Sia, alright? But it's a certain way to do it. We've got to wait till a certain time in a certain way. She's going to have to testify against me and that's going to set her free, alright? I—just give me, give it a few weeks, Sia. We've got to go for a speedy trial and, and we got to wait till our preliminary, Sia."; "You know what I'm saying? I'm a grown ass man. Even though I did what I did and I took it upon myself to do what I, what the fuck I wanted to do. No . . . but that don't got shit to do with it. I knew right from wrong."; ". . . I'll take it like a man. You feel me? 'Cause I did what I had to do. I did what I

The prosecutor and Juniel stipulated that Juniel lived at 747 54th Street from December 3, 2002, until March 11, 2003. (RT 1192.) The same parties also stipulated that Juniel was adjudged a ward of the Juvenile Court within the meaning of Welfare and Institutions Code section 602 on June 13, 1994. (RT 1193.)

**Juniel's Defense Case**

A gunshot residue test of Juniel's hands taken at 1:10 a.m. on March 5, 2003, was negative. (RT 1196, 1202.) Gunshot residue does not generally remain on the hands for a long period of time. It can be removed by washing the hands, by rubbing them against objects, or by changing clothes. (RT 1202-1203, 1205-1206.) The absence of gunshot residue does not mean that the individual did not fire a weapon. (RT 1203, 1205-1207.)

During the second search of Juniel's home, Sergeant Nolan was looking for a box of bullets in Juniel's shoes. He learned about the bullets from Bolden, who told him that she had disposed of them. (RT 1233-1237, 1239, 1248-1249.)

Jayshree Chander, who lived on Dover street, heard gunshots and a woman screaming for help about 11:15 p.m. on March 4, 2003. (RT 1274-1275.) When she went out to her front porch, she could see a man running on the sidewalk across the street, but she could not see the woman. (RT 1275-1277.) She noted the man's body size and height, but could not see his face. (RT 1278, 1296.) She described him as "medium height and somewhat hefty," and said he was wearing a black football jersey with orange lettering and black jeans or pants. (RT 1282.) She also saw a car stopped in the street near the

---

did. You feel me? I did what I did. . . . You know? And I did what I did for, for, for who I wanted to do it for." (People's Exh. 28A at 2, 4, 7.)

Excerpts from People's Exhibit 29A are at page 40, footnote 27.

corner. She thought there were two occupants, a man and a woman, but she could not recall where they were sitting in relation to each other, and could not describe the man. Chander said the car initially was parked facing north on Dover, but she later saw it at the corner on 55th Street, facing east, before it turned and sped south on Dover. She was able to get a partial license plate number of 744. (RT 1279-1282, 1289-1292, 1298.) Chander did not see what happened to the man running on the sidewalk because she had gone inside to call 911. (RT 1281, 1283, 1295.)

Chander described the car to police as black, possibly an American model, although she was not sure of the make of the car. A few days later she gave the police a description of the man running, saying that he was of medium height, about five feet eight inches. (RT 1284, 1296.) She described the woman in the car as having curly hair and said the man in the car was heavyset, wearing a black knit cap and light-colored top. (RT 1284-1285.)[11]

Chander identified a car that the police had stopped as the car she saw on Dover. She was nervous, however, so she said she was 80 percent sure it was the same car. (RT 1286-1287.) She also saw a man wearing an orange shirt and blue pants standing by a police car; there were officers "everywhere," but they did not appear to be surrounding the man. He was about one hundred feet away, and she did not know if he had anything to do with "what was going

---

11. On cross-examination, Chander said she told the police she was not sure if there were two people in the car. (RT 1297-1299.) On redirect examination, Chander said she thought there were two people in the car and that someone was wearing a knit cap and someone was wearing a light colored top, but she was not sure who was wearing the clothing and where he or she was sitting. (RT 1300.)

on." (RT 1287, 1304.) She was not asked to identify anyone at the car stop. (RT 1287-1288, 1292, 1309.)[12]

During continued cross-examination by the prosecutor after a break, Chander said that, during the break, she told the prosecutor she was "pretty sure" Juniel was the man she had seen running down the street. (RT 1302.) When asked to explain how she could identify him when she had not seen his face, Chander testified, "Well, when I first arrived here this morning, when I saw the back of him, I recognized him—or I had a high degree of feeling that this is the man that I saw running down the street in terms of hair and body build and—yeah." (RT 1303; see RT 1307-1308.) She said the man she had seen running did not have a cap on. The man she had seen standing by a police car that night did not seem to be the same person; he appeared to be younger and thinner. (RT 1303-1304, 1306, 1308.)

Julia Jones met Juniel in December 2002 and went out with him several times. (RT 1845-1846, 1854-1858.) Juniel told Jones that he and McDonald were in a relationship together, which was not going well. At some point, McDonald called Jones and asked her not to call Juniel, but Jones told her that she intended to continue contacting him. (RT 1846-1848, 1854, 1867-1868.) When Jones called Juniel, she could hear McDonald yelling and arguing

---

12. Juniel misleadingly says that Chander "actually pointed out a bystander to police and told them it was the man she had seen running earlier." (AOB at 5.) The cited page, RT 1287, supports the opposite. Chander testified that she saw "one man by—standing by a police car. He had an orange shirt on with blue pants or something." (RT 1287.) (Juniel was wearing a red shirt and blue jeans. (RT 835.)) He was the only person she saw "other than the police." Chander was far away and could not tell if the man was handcuffed. (RT 1287.) Chander said she was just looking around, and had not been asked to identify anyone. (RT 1287-1288.)

Officer Jones, who was in charge of Juniel and McDonald at the car stop, testified that the two individuals brought to the field lineup were unable to identify Juniel. He did not specify who those individuals were (RT 837), and they were not identified elsewhere in the record.

in the background. (RT 1856.) McDonald and her sister continued to call Jones to tell her not to contact Juniel. (RT 1848-1850.) Both women said they had listened to cell phone messages Jones had left for Juniel. Jones explained that most of the messages were about money that Juniel owed her. McDonald and her sister told Jones she was wasting her time and that she would not get any money from him. They had been erasing the messages so that he would not hear them. (RT 1849-1850.) Jones testified that McDonald also threatened her, telling her that if she did not stop calling, McDonald would find out where she lived and cut her throat. (RT 1850-1851.) Specifically, McDonald told Jones, "Bitch, I'm gonna to [sic] find out where you fucking stay and I'm going to come to your motherfucking house and slash your throat." (RT 1865.) Jones thought the threats occurred in the middle of January 2003. (RT 1852.)

Sherrie Brown met Juniel about the middle of February 2003. (RT 1936.) At some point, Juniel spent a few days at Brown's house, when they went shopping and took photographs. (RT 1939-1942, 1952.) They bought the blue sports jersey found in Juniel's house. (RT 1943-1944.)

Juniel told Brown that he had a relationship with McDonald, but they were not going to stay together. (RT 1944, 1950.) McDonald called Brown several times after she and Juniel had been arrested, saying that Juniel told her to do so. McDonald told Brown that she was pregnant, but did not threaten her. (RT 1944-1946, 1954-1955.) Shortly before trial, McDonald called Brown and told her to cease writing to and accepting calls from Juniel. (RT 1947-1948.)

On cross-examination, Brown said that a woman had called her and told her what Juniel wanted her to testify about. Although the call frightened her, Brown said that she had not been threatened and that everything she said was true. (RT 1959-1962.)

Juniel, who was 21 years old, testified in his own defense. He met McDonald in 1996, when he was 14 years old. He told her that he was 22, but

20

she soon learned his real age. At the time, Juniel's mother lived in another state, and he lived with his father and grandfather "under very bad conditions." (RT 1963.) When Juniel was 15, he and McDonald began a romantic relationship. Juniel was sent to the California Youth Authority in 1999, and was released in December 2002. His relationship with McDonald continued during that period, although she was involved with other men, which caused some problems. (RT 1963-1964.)

After being released from the Youth Authority, Juniel moved in with McDonald. Within a few weeks, Juniel started seeing his old friends and talking to other women. He explained that he talked with women because he was upset that McDonald had cheated on him and he wanted to show her how it felt. Juniel denied that he was ever abusive toward McDonald in any way. Their problems resulted from his involvement with other women. (RT 1965-1966.) Near the end of December, Juniel was arrested for a misdemeanor violation. McDonald paid his bail, and later helped him fill out job applications. (RT 1966-1967.) They continued to have problems in their relationship because each suspected the other of infidelity, but they only argued, nothing more. Juniel felt very close to McDonald and loved her very much. (RT 1967-1970.)

On March 1, 2003, Juniel and McDonald had an argument. Juniel stayed with Sherrie Brown for a few days before returning to McDonald's home on the afternoon of March 4, 2003. (RT 1970.) When McDonald arrived home between 5:00 and 6:00 p.m., she and Juniel tried to reconcile and make plans for their future, but they continued to argue about where Juniel had been. At some point, perhaps as late as 10:00 or 11:00 p.m., McDonald drove off in her car. (RT 1971-1974.) When she returned about 20 minutes later, she had a bottle of alcohol. They went inside and continued talking. (RT 1974.) At some point there was a telephone call. Afterward, McDonald's sister, Sia

21

Bolden, put on her clothes and went outside, where they could see police cars. Juniel and McDonald ignored the commotion. (RT 1974-1975.)

About an hour after the phone call, Juniel and McDonald went out to get some food. On the way home, Juniel realized several police cars were following them. After they were pulled over, both he and McDonald were handcuffed while the police officers searched the car. (RT 1975-1976.) Juniel thought several witnesses were brought to identify him, but eventually he was released from the handcuffs. (RT 1976-1977.) Juniel voluntarily took a gunshot residue test, and both he and McDonald voluntarily went to the police station for an interview. (RT 1977-1978.) When they went to pick the car up on March 11, they were arrested. (RT 1978-1979.)

On cross-examination by the prosecutor, Juniel reiterated that he and McDonald were in love with each other and had been working out their problems the night of the shooting. (RT 1979-1980.) He said that McDonald lied when she said that he physically abused her. She also lied to other witnesses about his abuse. (RT 1980.)[13] Juniel lied to McDonald when he told her that he had sex with Bolden. (RT 1995-1996.) He denied that he ever hit or threatened McDonald's son, Tomaz. (RT 1985-1986.)

Juniel had never seen the gun found in McDonald's house and had never assaulted her with it. He denied that he told Bolden to get rid of the bullets in his shoes and denied that there were any bullets in the house. (RT 1988-1989, 2033-2034.) After the prosecutor played a portion of a tape-recorded phone call that Juniel made on March 13 from jail (People's Exh. 80), Juniel agreed that he had made a reference to "my gun." (RT 1990.)[14] His

---

13. McDonald testified and presented her defense case before Juniel testified.

14. Juniel said, "The only thing they got on anybody is me having that gun. . . . You see what I'm saying. And they can't, the coldest thing about it,

references to the gun were all made after he learned that the police found a gun and had made ballistics comparisons. (RT 1990-1991.) He denied that he knew anything about the gun before he learned about it from the police. (RT 1991-1994.)

Juniel admitted that he talked to Bolden about various witnesses' names and personal information. (RT 1995.) He denied that he had any plans to threaten witnesses. (RT 2002-2003, 2025-2026.) Juniel admitted making a statement heard on People's Exhibit 85, "My niggers is watching everybody, know who everybody is, got pictures of everybody." He claimed he was "just blowing off smoke" and was not serious. (RT 2026.)[15] He said a lot of things on the tapes that he did not remember and did not mean at the time. (RT 2027-2028.) Juniel did remember making a call in which he said that Bryant needed to change her story and deny that there was any fight involving her or Alexander. (RT 2028-2030.) He also remembered a call in which he said, "We

---

they can't match that gun with the gun that killed the female. That's just a regular old gun. You see what I'm saying. They can't tell if it ever killed nobody or nothing without the serial numbers or nothing. You see what I'm saying? All they know . . . Exactly. Exactly. It ain't like they found the, you know what I'm saying? So, look that's the only thing, the only thing man, the, the, the gun ain't shit. You feel me? I would, I would, I would do a five year felony probation for the gun. . . . That's nothing. You know what I'm saying. . . . It's mine, okay, I admit to that, you know what I'm saying . . . ." (People's Exh. 80A at 1.)

15. Juniel said, "My nigger's [sic] watching everything. Know who everybody is. Got pictures of everybody. My niggers know. My niggers know. And when I come to court on the 8th, I'm going to point mother fuckers out. I'm going to point mother fuckers out to my partners. You will see big light skinned yellow assed Merv back there and little V and all them niggers (unintelligible) and my partner Black ass (unintelligible). They're staying somewhere out there. You'll see them, you know, (unintelligible) mother fuckers, I'm going to point them mother fuckers out, man. The niggers (unintelligible) mother fucking bullshit, all that old shit. Yeah, OK." (People's Exh. 85A.)

23

need someone like Andrea to say they witnessed it but they don't remember who it was, never seen the person before, they know for sure it wasn't me." (RT 2032.)

Juniel admitted that he talked to McDonald about sticking by him during the court proceedings. He denied that he said anything about both of them doing "big time." (RT 1997.) After the prosecutor played a portion of a tape-recorded phone call that Juniel made from jail (People's Exh. 81), Juniel admitted making the statements on the tape, but said that there were portions deleted. (RT 1998.)[16] He also admitted that he was angry because he thought that McDonald and her family were abandoning him and blaming him for the murder. (RT 1998-1999.) He said on the tape that he would tell them "the real," which was, "If you want to know the truth, two of us are going to go down for murder." (RT 1999.)[17]

Juniel admitted that he wrote a letter to McDonald when they were in jail in which he said, "We in here on community tips. Hearsay. No evidence. Thanks to Ace, no gun trace. Just stay doing what you doing." He denied that

---

16. Juniel said, "If you know the real, then you know we both going to do big big time no matter who point the finger at who. I don't want it to come down to that." (People's Exh. 81A at 4.)

17. Juniel said, "I'll swallow that 25 blood. No matter if you say you know the real, huh, you don't want that to happen. You don't want that to happen 'cause two mother fuckers going to be facing 25 to life. Two mother fuckers, not one. One ain't going to get 2 or 3 years and one going to get 25. If you know the real, if you know the real, if that happened, if that real just happen to explode in the courtroom, there's going to be two motherfuckers with 25 to life. Two. Because there ain't no accessories jumping off. It ain't no none of this, it ain't no none of that. Both ya'all mother fuckers killed her. It don't matter who pulled the trigger. In fact, they saying she was the mind of the shit, if it wasn't for her she probably wouldn't be dead. That's how they thinking. How do you think them jury people going to think?" (People's Exh. 81A at 5.)

24

he got a file from the Ace Hardware store around the corner to file the serial numbers off the gun. (RT 2009-2010.)

After they were arrested, Juniel learned that McDonald was pregnant, which made him very happy. (RT 2010-2011.) He did not learn until August 2003, shortly before trial, that she was not pregnant. (RT 2012.)

Juniel said he had never seen or heard of Alexander. The prosecutor played People's Exhibit 82, a tape recording of a phone call Juniel made to Bolden and Myrita on March 15, when he was in jail. (RT 2015.) Juniel agreed that he said, "I didn't even know Stacey when I seen her." (RT 2015-2016.)[18] He denied that he was referring to the day of the shooting and claimed he did not know what he meant when he said someone had to point her out to him. (RT 2016-2017.) After listening to People's Exhibit 88, a tape recording of another phone call Juniel made from jail, he claimed not to know what he meant when he said he played something like an amateur, but he could beat it.

---

18. Juniel said, ". . . I didn't even know, I didn't even know Stacy [sic] when I seen her. I didn't know. So, somebody had to say something." (People's Exh. 82A at 1.) He also said, "Because when I seen Stacy [sic] I didn't know who the fuck she, I didn't know what, what, what. You feel me? So, somebody had to say something. You feel me? To point her out or something. . . . You know what I mean? It, it, it is like this though. You feel me? I'm a grown-ass man. Ain't nobody had no overpower influence on me. Ain't nobody had none of that on me. You feel me? I, I did what the fuck I wanted to do on my own accord." (Id. at p. 2.)

(RT 2018.)[19] He denied that he tried to communicate with McDonald so they could get their stories together. (RT 2023-2024.)

On cross-examination by McDonald, Juniel testified that he did not abuse McDonald or her son, although he disciplined the boy on occasion. (RT 2036-2037.) A statement he made in a letter to McDonald regarding putting his hands on her did not refer to domestic violence. (RT 2057-2058.) Juniel denied that he threatened McDonald after they were arrested. (RT 2066-2068.) He said that they both did what they wanted and neither of them held power over the other. (RT 2070.)

Juniel admitted writing a letter to his attorney before the preliminary hearing, in which he blamed the shooting on someone named Eric Hood. In the letter he said that he and Hood were driving in McDonald's car when Hood asked to get out. Hood, who had a gun, shot a woman twice. Juniel followed the woman slowly in the car to see if she was hurt. When he asked Hood why he shot the woman, Hood said she was a dope fiend who owed him money. On March 7, 2003, Hood asked Juniel to hold his gun. (RT 2037-2040.) At trial, Juniel said he made up the name of Eric Hood and the whole letter was a lie. (RT 2040.)

Juniel also admitted writing a letter to McDonald, which she never received, in which he offered to take the blame for the shooting by providing a statement to the police that would exonerate her. The statement was to the

---

19. Juniel said, "I, I should have played it. I should have played my cards. Man, I just, I, I should have played the cards. I did that like an amateur man. I, I, I, you live and you learn though. Fuck it I mean. Goddamn, I played that like a smooth amateur man, I was supposed to, I was supposed to handle them on the spot right then, right then. Then just take that mother fucker to the lake and just phoosh, you feel me. I was supposed to handle that like a true artist, man. I did that like an amateur. I, you know what man, mother fucker live and learn though. Motherfucker live and learn. I can beat it though blood, I swear to God, look . . . ." (People's Exh. 88A at 1.)

effect that he shot Alexander because she stole drugs from him and that McDonald was not involved. Juniel said the story was a lie, but he wanted McDonald to be free because he loved her and thought she was carrying their baby. (RT 2058-2061.)

Juniel testified in rebuttal to explain that none of the tape recorded phone calls or letters showed that he threatened McDonald. He also testified that everything he had done or said in the case was to protect McDonald because he loved her, even if that meant taking the blame for something he did not do. (RT 2096-2099.)

**McDonald's Defense Case**

Rita Ammons, McDonald's mother, met Juniel on a "couple of occasions." (RT 1311.) McDonald did not talk to her about their relationship, other than to say he was her boyfriend. (RT 1311, 1313.) After Juniel moved in with McDonald, Ammons did not see or talk to McDonald as frequently as before. (RT 1311-1313.)

Ammons knew Angelina Bryant and Luella Smith because they attended the same church. Ammons met Stacey Alexander on one occasion. (RT 1314.) She was aware that there was an ongoing dispute between Bryant and her youngest daughter, Sia Bolden. (RT 1315.) On March 3, 2003, Bolden called Ammons to tell her that Smith hit her during an altercation between Bolden and Bryant. Bolden also told Ammons that she had threatened Bryant, saying, "I told you I didn't want to fight you. Wait till you have that baby." (RT 1316.) When Ammons called Smith to find out why she hit Bolden, Smith said that Bolden was going to hit Bryant in the stomach. (RT 1317-1318, 1360.) During the conversation, Bryant took the phone and tried to tell her about the fight, but Ammons was not interested in talking to her. (RT 1318-1319, 1360-1361.) Ammons told McDonald about the incident when she

27

called, after which McDonald called Bryant. Bryant later called Ammons and asked why McDonald was mad at her. She apologized for any disrespect to Ammons and asked that Ammons clear up the matter with McDonald. Ammons talked to McDonald, after which McDonald offered to apologize to Bryant. (RT 1319-1321.)

Ammons also learned from McDonald about her altercation with Alexander. (RT 1321.) After Ammons talked to Cathy Rivers about the altercation, Ammons thought there was nothing to it. (RT 1323.) When Ammons tried to talk to McDonald after Alexander's death, she seemed "funny." (RT 1339.)

On cross-examination, Ammons said that McDonald called her on March 3 and asked if Bryant had disrespected her. Ammons thought McDonald might have threatened Bryant because of McDonald's suspicions. (RT 1346-1348.)

Shortly after McDonald's arrest, Bolden moved into a drug rehabilitation program. (RT 1362-1363.) When asked where Bolden was living at the time of trial, Ammons claimed not to know, although she spoke to her daughter regularly. Ammons knew that the District Attorney's Office wanted to talk to Bolden, but she did not contact them when she saw Bolden or spoke to her. (RT 1350-1354.)

In 1998, when McDonald lived on 7th Avenue in Oakland, she had a dispute with a neighbor over a parking space. Ammons could not recall the details and was not sure if Ammons threatened the neighbor with a baseball bat, although she was aware that the neighbor had called the police and reported the incident involving McDonald. (RT 1336-1339.)

McDonald testified in her own defense. She admitted that she had been convicted of welfare fraud in 2000 because she was working while collecting welfare payments for over a year. She was still on probation when

28

arrested for Alexander's murder. (RT 1381-1384.) She also admitted having a dispute with a neighbor in September 1998, when she lived on 7th Avenue. (RT 1390, 1640-1642.) McDonald explained, "She would always nitpick with me. She would stand on my porch when my son would be outside in the swimming pool, she would stand in the swimming pooling pool [*sic*]. She would do little things like that. This one particular day she was nitpicking. She was standing in the swimming pool. She came on the porch. She was in front of the house. She said she was not leaving off the porch unless I came outside and talked with her, so I pulled a bat on her." (RT 1391.) McDonald pulled the bat to scare the woman, who was unarmed, and get her off the porch. The police were called, but no charges were filed. (RT 1391, 1640-1642.)

McDonald first met Juniel in 1996 or 1997.[20] (RT 1371.) They developed a romantic relationship, which continued while Juniel was in the Youth Authority from July 1999 to December 2002, when they wrote and called each other on a daily basis. (RT 1372-1373, 1471-1472.) Juniel moved in with McDonald on December 3, 2002. At the time, Bolden, her two children, and McDonald's son were also living in the apartment. (RT 1369.) McDonald had been working as a nurse assistant at two different jobs to pay the rent and support her household, but lost one of the jobs that December. (RT 1367-1371.) McDonald drove an Acura Legend with the license plate 2MOV744. She had "tweedy bird" decorations in the front and back of the car. (RT 1405.)

Soon after Juniel moved in with McDonald, their relationship began to deteriorate. He stayed out late, went out with other women, and came home with "monkey bites" on his neck. (RT 1974.) Juniel objected to her continued contact with her family because he said they were using her. (RT 1975.) Juniel

---

20. McDonald was married at the time, but was separated from her husband because he had tried to kill her. They divorced in 2001. (RT 1469-1470, 1502.)

also objected to her socializing with her friends. (RT 1376-1378.)[21] McDonald asked Juniel to move out a few times, although she was still in love with him. (RT 1378.)[22] She began looking for another apartment, and told friends and family members that she wanted to separate from Juniel. (RT 1379-1380.) She did not provide many details of their relationship, explaining, "Because I waited for him to come home, and he started jumping on me and I didn't want nobody to know." (RT 1380.)

At some point after Juniel moved in, McDonald thought she was pregnant. Juniel was happy about the news, but McDonald was not. (RT 1384-1385.) After she was arrested, she found out she was not pregnant. She did not tell Juniel, however, because she thought he would "do the right thing and tell the truth." (RT 1385.) She explained that she was "innocent" and thought that if Juniel believed she was pregnant, he would help her. She wrote him love letters while in jail, saying she "was still in love with him." (RT 1386.)

McDonald was not involved in the conflict between Bolden and Bryant. She knew Alexander, but not well. Alexander and Bolden sometimes used drugs together. (RT 1388-1389.) McDonald had never had an argument with Alexander before March 3, 2003. (RT 1390.) That day, her sister called and told her about the fight with Bryant.[23] Her mother also called and they

---

21. The parties stipulated that one of her friends, Larry Fields, used to see McDonald regularly when she would braid his hair at her home. Around Christmas in 2002, Fields visited McDonald, who sat him at a desk and would not allow him access to the rest of the house. She was angry at the time. After that incident, her attitude changed, she had bags under her eyes, and she did not maintain her hair. Fields did not have his hair braided again because he was uncomfortable and the house was not clean. (RT 1836.)

22. On cross-examination, she said they were engaged to be married. (RT 1476.)

23. Bolden also told Juniel about the fight when he came home to change his clothes. (RT 1504.)

talked briefly. (RT 1393.) McDonald admitted that she called Bryant, talked to her about "disrespecting" Ammons, and then threatened to get her after Bryant had her baby. (RT 1394-1395.) McDonald said she "just assumed" Bryant had said something to her mother so she threatened her. After she talked to her mother again and learned that Bryant had not "disrespected" her, McDonald thought she should apologize to Bryant. She was busy at work, however, and "never got around to it." (RT 1395.)

When she arrived home that night, shortly after 11:15 p.m., Alexander approached her car and knocked on the window, yelling at her to get out. (RT 1395-1396.) McDonald thought Alexander was "high on drugs or something," so she hesitated to get out of the car. Alexander started kicking the car and waving a knife around. (RT 1397.) Alexander apparently gave up waiting for McDonald to get out of the car and walked back toward Bryant's house. As she did so, McDonald got a bat out of the trunk of her car. (RT 1398.) She approached Alexander with the bat and said that Bryant had disrespected her mother. (RT 1523-1524.) Her intention was to assault Alexander with the bat in order to protect herself. (RT 1524-1525.) McDonald admitted that there was no longer an urgent need for self-protection after Alexander walked away. She also admitted that she could have called the police on her cell phone in the car. (RT 1525.) Instead, she followed Alexander and challenged her. (RT 1526.) As McDonald followed Alexander with the bat, a neighbor intervened in the confrontation, putting an end to it. (RT 1399.) McDonald claimed that she was afraid of Alexander and denied that she threatened her. (RT 1400.) She also denied saying anything to Juniel about the confrontation with Alexander. (RT 1401-1402.)

The next day, McDonald saw Cathy Rivers and asked her to tell Bryant that she apologized. (RT 1402.) McDonald told Rivers about the

31

incident with Alexander. McDonald testified that she did not threaten to kill Alexander, and thought the incident was finished. (RT 1403.)

Later that day, McDonald looked at apartments with her cousin in Hayward. (RT 1406.) When McDonald was visiting with her aunt and cousin that evening, she learned that Juniel had been trying to reach her. She called Juniel, then went home. (RT 1408-1409.) When she got home, she and Juniel began arguing over another woman. McDonald wanted to drive off in her car, but Juniel got in with her. They drove to a nearby liquor store and bought some liquor. Juniel apologized for being away the past few days. (RT 1434-1436.)

As they returned home, they saw Alexander cross in front of the car at the corner of 54th Street and Dover. McDonald was not paying attention to her, but Juniel started to talk to her. (RT 1436-1437.)[24] Despite McDonald's claim that she had not said anything to Juniel about her confrontation with Alexander, Juniel asked Alexander about the confrontation she had with his "wife." Alexander said, "Nothing, right, Peewee?" McDonald "just shook her head" and did not say anything. (RT 1437.) She was tired and wanted to go home and have her drink. (RT 1437-1438.)

As McDonald drove through the intersection, Juniel pulled out a gun and shot Alexander twice. (RT 1438, 1551.) McDonald did not know that Juniel had the gun in the car, although she agreed it was a large gun. She said he wore baggy clothing. (RT 1438-1439.) McDonald was "terrified" when Juniel fired the weapon. She said, "Rich pulled the gun on me and he said either I'm with him or against him." (RT 1440.) He said he was "doing this for us." (RT 1551.) He told her to turn the car around and she complied. As she drove down Dover, she thought he was going to shoot her, although she also

---

24. On cross-examination, McDonald said she was not sure if Juniel knew Alexander. (RT 1521-1522.) She later said he did know Alexander because he sold her some drugs. (RT 1538-1539.)

testified that "nothing" was happening in the car. (RT 1440-1441.) At some point, Juniel told her to stop and he got out, but she could not see where he went. (RT 1441-1442, 1559.) She did not see anyone or hear any screams at the time. (RT 1562.) She drove to the corner and stopped because she was shaking so much. She had a drink of liquor and then heard another shot, after which she saw Juniel running toward 54th Street. She stayed at the corner for a few more minutes before driving home. (RT 1442-1443, 1564-1566.)

When McDonald arrived home, Juniel was on the porch yelling at her to go inside. (RT 1443, 1576.) At his request, she ran him a bath. She put on her night clothes, then began drinking and taking pills because she was still shaking. After Juniel's bath, they got into bed. (RT 1444.) After they were in bed, Juniel said he was hungry so McDonald drove him to a nearby Jack-in-the-Box. (RT 1444-1445.) On the way home, they were stopped by the police. (RT 1445-1446.) Just before McDonald pulled over, Juniel told her that he loved her. (RT 1460.) McDonald later told Detective Brock that she and Juniel had been at home arguing, and that her car was not involved in a shooting. (RT 1449, 1591-1592, 1598.) She denied that she had a recent confrontation with Alexander. (RT 1602.)

After March 4, Juniel did not want McDonald to go anywhere by herself or to talk to family members and friends on the phone. (RT 1450-1452.) McDonald did not attempt to call the police while she was at work because she was afraid for herself and her family. (RT 1452.) When she went to the police station to pick up her car on March 11, McDonald adhered to the story that she and Juniel had been arguing the night of the murder. (RT 1453-1454.) She said she did everything Juniel told her to do because he had threatened her son and she was afraid of him. (RT 1454, 1457.)

Near the end of her direct examination, McDonald described several incidents involving Juniel's behavior toward her. Once in December he called

33

her at work and said she had to come home or he would tear up her belongings. (RT 1460-1461.) When McDonald arrived home, Juniel grabbed her and threw her into her bedroom closet. He was angry and said she was playing with him. She did not know what had caused Juniel's behavior. (RT 1462.) On another occasion, McDonald went to a club with friends against Juniel's wishes. When she got home, her friend asked Juniel to help her out of the car because she had had too much to drink. When he got her out of the car, Juniel slapped her face, causing a mark by her eye. (RT 1463-1464.) Another time, Juniel was yelling at McDonald about some numbers in her cell phone. He slapped her face, and she hit him back. Juniel pushed McDonald against the window, causing it to break. (RT 1464-1465.)[25] On another occasion, McDonald was talking to a man from the neighborhood and ignoring Juniel. He walked up and slapped McDonald in the face and told her not to "disrespect" him. (RT 1465.) During the time that Juniel lived with her before the murder, he was "mean" and "bossy" and "wanted everything done his way." (RT 1466.)

On cross-examination by Juniel, McDonald admitted that Juniel had never had any conflict with Alexander and had never said anything about harming her. (RT 1542-1543.) He did not abuse or threaten McDonald on March 4, 2003, before they saw Alexander. (RT 1543.) When Juniel asked McDonald why he would have shot Alexander, she said, "Because you're crazy." (RT 1552.) McDonald denied that she and Juniel had gone anywhere together that night before the trip to the store that ended in the shooting. (RT 1554-1555.) After the shooting, they did not discuss the incident. Juniel did not tell McDonald what to say to the police. (RT 1591-1593.) Once they were at the police station and placed in separate rooms, McDonald could hear Juniel

---

25. On redirect examination, McDonald said that her son got a hammer and tried to intervene in the confrontation, but Juniel jumped in his face, at which point McDonald jumped between them and stopped Juniel. (RT 1733-1734.)

banging on the wall and yelling at her to not say anything. (RT 1593.) McDonald had seen Juniel's gun once before the shooting, when he "pulled it" on her. (RT 1603-1604.)

On cross-examination by the prosecutor, McDonald elaborated on the incident, saying that Juniel woke her up while holding the gun and said that she was "his enemy." McDonald told him he was "tripping," and asked him to get the gun out of her face. (RT 1617.) Juniel put the gun on the bed while he talked to her. (RT 1617-1618.) McDonald said she was "terrified" that the gun was in the house and asked Juniel to get rid of it. She assumed he had done so. (RT 1618-1619.) McDonald agreed the gun was an assault weapon and that a street name for an assault weapon was an "A-K." (RT 1620.)

McDonald said she believed Juniel intentionally shot Alexander and that he intended to kill her. She admitted that she was with him before, during, and after the shooting, and that she loved him at the time. (RT 1615.) She also admitted that she continued to write him love letters after she was incarcerated. (RT 1615-1616.)[26] McDonald was 12 years older than Juniel. (RT 1615.)

As to the March 3 incident, McDonald got her information from other sources because she was not present during the fight between Bryant and her sister. Juniel also did not know about the details because he was away during that period of time. (RT 1621.) McDonald admitted that she "assumed" Bryant disrespected her mother because "that's the type of person Angel is." (RT 1622.) She decided to call Bryant and confront her rather than find out from her mother what had actually happened. (RT 1622-1623.) When McDonald spoke to Bryant, she threatened her without even asking if Bryant had disrespected her mother. McDonald explained, "Because all that had happened

---

26. McDonald later testified that she had learned Juniel had sex with her sister, as well as with other women. Despite everything he had done, McDonald still loved him and thought he would change. (RT 1713-1714.)

with her and my sister and her telling me her side of the story, I just—the way she was talking on the phone I just assumed." (RT 1624.) McDonald "figured after a few months after she had her baby I was going to beat her butt," meaning beat her with her fists. She was serious when she told Bryant, "'In two months that ass is mine.'" (RT 1625.) McDonald "had no plan" and never thought about how Bryant might react to her threat. (RT 1626-1627.) She thought that beating up Bryant was an appropriate response to Bryant's presumed disrespect because her mother was a Christian and had never bothered anyone. (RT 1629-1630.) McDonald acknowledged that she was 33 years old and Bryant was 20 years old at the time. (RT 1627.) McDonald claimed she never discussed the incident with Juniel and did not know that he had confronted Bryant in the store until they were in court. (RT 1627-1628.)

McDonald had never had a confrontation with Alexander before. When Alexander tapped on her window that night, McDonald knew that she was asking why McDonald had threatened Bryant. At trial, McDonald denied that she had started anything, claiming it was Bryant's fault for getting Alexander involved. She did not convey an apology to Alexander, although she had already learned that Bryant had not disrespected her mother. (RT 1631-1632.) After Alexander walked back toward Bryant's house, McDonald got her bat and went after her, choosing to escalate the incident instead of going into her own home. (RT 1633-1635.) McDonald admitted that she was angry and wanted to fight with Alexander. (RT 1635-1636.) She planned to hit Alexander with the bat, possibly in the head, although she acknowledged that she could have killed Alexander by doing so. (RT 1636-1637.) She was yelling at Alexander to "come on," to get her to fight. (RT 1637-1638.) She denied that she threatened to get the "A-K." She thought Juniel had gotten rid of it. (RT 1638-1639.) She also denied telling Cathy Rivers the next day that

36

she was going to kill Alexander, although she said Rivers's testimony was true in all other respects. (RT 1645-1647.)

McDonald answered "Yes and no," when asked if she knew Juniel would protect her if he had to. (RT 1639.) She did not know if she believed Juniel's words, played on one of the tapes, when he said, "I'm here to protect, I'm here to defend no matter what the cost." (RT 1640.)

McDonald had total control of her car and did not let Juniel drive it. (RT 1649-1650.) On the night of March 4, when they drove to the store together, Juniel was wearing a dark blue mesh sports jersey with orange writing on it, under which he wore a dark blue t-shirt. He was wearing a cap, but not a jacket. His hair was in "dreads," but they were "twisted up." McDonald wore blue jeans and a white t-shirt. (RT 1650-1653.) The gun Juniel carried was heavy, with a magazine 10 to 12 inches long, yet McDonald said she did not know he was carrying a gun when he came out of the house to go to the store. (RT 1653-1655.)

After returning from the store about 11:00 p.m., they stopped at the intersection of 54th Street and Dover. McDonald did not see Williams and Baldwin walking on the sidewalk. (RT 1655-1656.) Juniel was apologizing for staying out, and McDonald was crying. McDonald admitted they were stopped at the intersection for a few minutes. (RT 1656-1657.) She also admitted that Williams correctly identified them in the car. (RT 1657-1658.) However, she said it was on that occasion that Juniel pulled out the gun and shot Alexander, not 10 or 15 minutes later. (RT 1659.) She then said that they stayed at the intersection for 10 to 15 minutes before Juniel shot Alexander. (RT 1660, 1690-1691.)

Juniel had not asked McDonald how she wanted to handle it, and they had not driven around looking for Alexander. He just shot Alexander, who happened to be walking by, without warning and without any prior discussion

37

between them as to the events of the previous day. (RT 1691-1693.) McDonald was not afraid of Alexander just before she was shot. She knew Alexander had been hit after the first two shots. She heard Alexander screaming for her life but did not see her running away. (RT 1692-1694.) When McDonald backed up and drove down Dover at Juniel's direction, she knew he intended to follow Alexander and kill her. (RT 1694.) She denied that she agreed to help Juniel kill Alexander, claiming she was forced to do so. (RT 1694-1695.) She also denied that she saw or heard Alexander after the initial shots. (RT 1696.) She drove slowly down Dover because she was shaking, not because she was looking for Alexander. She may have stopped in front of Seth June's house, but she was not sure. There was no gesturing in the car at the time. She and Juniel did not talk to each other, except when Juniel told her to stop. (RT 1697-1699.) When Juniel got out of the car, McDonald knew he was going to kill Alexander. She did not say or do anything to try to stop him, claiming she could not. (RT 1700.) They each went home on their own without any prior discussion. (RT 1701-1702.) McDonald maintained that they did not discuss the shooting before, during, or after it happened. (RT 1703.) She never asked Juniel why he shot Alexander. (RT 1767.)

McDonald thought she was pregnant in late February or early March. She did not remember when she told Juniel about it. (RT 1647.) She did not take a home pregnancy test to check her suspicions. She found out she was not pregnant in mid-March, when she took a pregnancy test in jail, but she did not tell Juniel of the test results. (RT 1648-1649.) In a tape-recorded phone call from jail, McDonald was laughing about being pregnant and lying to Juniel about it. (RT 1707.)

McDonald admitted that it was possible to talk to an inmate in jail through a call waiting system with a person outside. She said "Maybe, yes," when asked if she had talked to Juniel through her sister while both were in jail.

(RT 1707.) She recalled that her sister relayed messages from Juniel through such a call, but denied that he told her not to change their story. (RT 1708.) McDonald denied that she tried to manipulate Juniel when they were in jail, but admitted that she told him she would stand by him and that she wrote him many love letters. (RT 1717-1719, 1759-1761.) She said she was still in love with him, although she was still lying to him about her pregnancy. (RT 1720.) After reading a letter she had written to Juniel, in which she complained about his ongoing relationship with another woman, McDonald admitted that she wanted answers from him and thought she could get them by lying about her pregnancy. (RT 1720-1722.) Juniel wrote McDonald many letters, in which he told her he loved her "all the time." (RT 1766.)

On redirect examination, McDonald said that although she knew Juniel was going to kill Alexander, she did not intend to help him kill her, she did not want to kill her, and they did not plan to kill her. (RT 1728, 1765-1766.) On recross-examination, McDonald said that she chose to help Juniel kill Alexander because if she did not, she would have been killed. (RT 1763.)

Linda Barnard was a marriage and family therapist who specialized in treating trauma survivors, including those of domestic violence. She had never spoken with McDonald or Juniel, and had not seen any police reports or witness statements relating to their case. She expressed no opinion regarding the existence or non-existence of domestic violence involving McDonald and Juniel. (RT 1770, 1809.)

Barnard defined domestic violence as "verbal, physical, sexual or emotional abuse that occurs between two people who are in an intimate relationship." A battered woman was one who experienced any of those forms of abuse by an intimate partner on one or more occasions. (RT 1778-1779.) Barnard thought all women were affected by domestic violence, either directly or indirectly. About 50 percent of women were physically assaulted by an

39

intimate partner at some point in their lives. Although some men were victims of domestic violence, about 95 percent of the victims were women. (RT 1781-1783.) Children were almost always affected in some way by domestic violence in the home. (RT 1801-1802.)

Barnard believed that domestic violence was caused by a need for power and control on the part of the batterer. (RT 1783-1784.) Various mechanisms used by batterers to exert power and control included isolation, emotional abuse, economic abuse, sexual abuse, threats involving children, threats of harm, subordination, and intimidation. (RT 1784-1787.) Victims of domestic violence frequently exhibit similar characteristics, which included fear, depression, anxiety, low self-esteem, hypervigilance, nightmares, flashbacks, a sense of helplessness, flat affect, and piecemeal memory. (RT 1788-1791.) Domestic violence often occurred in cycles of tension-building, violence, and contrition, repeated throughout a relationship. (RT 1792-1793.) Sometimes victims deny or minimize the level of violence, or are reluctant to testify. (RT 1794-1797.)

On cross-examination by the prosecutor, People's Exhibit 29A, a tape-recorded phone call from jail between McDonald and a friend, was played for the witness. (RT 1823-1824.) Barnard was not sure if the tape was relevant to whether the alleged victim was being controlled by her abuser. "What it sounds to me is like two sisters talking smack, is what it sounds like to me." (RT 1824.)[27]

---

27. In the March 22, 2003, taped phone call between McDonald and a friend, the friend said, "[Juniel] told me that it, he said, 'You know Ava's pregnant? She about 7 weeks.'" McDonald, laughing, said, "'cause I told him that lie. You know why I told him that, right? . . . Yeah, with his dumb ass. Shit, hell no, I ain't having no mother fucking kid by that stupid fuck (unintelligible) feel sympathy for me and tell the fucking truth but he don't give a fuck. Mother fucker talk, talking, you know, you should have it in there. (Laughs.) I'm laughing to keep from crying but ain't a goddamned thing funny.

McDonald presented the testimony of several witnesses to bolster her claim of abuse. Kelley Haynes said that McDonald visited her in Hayward on March 4, 2003. McDonald submitted various job applications in the area and watched a movie with Haynes. (RT 1871-1873.) They did not look for apartments for McDonald, but "talked about it." (RT 1873.) McDonald told Haynes that she had written a letter to Juniel and given him "a three-day notice and that he needed to leave and she was tired of his crap." McDonald gave Juniel Haynes's cell phone number because her own phone had been turned off. (RT 1874.) Later that evening, after learning that Juniel had called, McDonald went home. (RT 1876.) During their visit, McDonald told Haynes that Juniel was "putting his hands on her," they were fighting, he did not come home at night, and she was tired of it. (RT 1876.) McDonald also told her that Juniel "threw her through a window." Haynes "couldn't believe it because I've never known her to take any crap from any man. But she told me that she loved him so much that she was willing to deal with anything that he offered her. And I knew that she loved him because she put up with all that crap that he did to her." (RT 1877.)

Robyn Williams, Haynes's mother, said that McDonald was upset that night. (RT 1882.) McDonald told her that she was afraid of Juniel because he threatened her. She also said that he hit her and shoved her head through a window. (RT 1883.) She talked about moving to another city as soon as possible. (RT 1884.) McDonald went home soon after receiving a phone call from Juniel. (RT 1885.)

Victor White, Sia Bolden's son, lived with McDonald and his mother. (RT 1888.) He testified that Juniel "never hit [McDonald] but he pushed her

---

. . . He's stupid. He's stupid. Uh-uh. By the time I, by the time I go back to court on the 8th, I'll be done had a miscarriage. (Laughs.)" (People's Ex. 29B at 1-2.)

out the way" on more than one occasion. They fought a lot, and sometimes McDonald cried during their arguments. (RT 1889.)

McDonald's friend, Artrina Jackson, worked with her as a nurse assistant. She had been convicted of welfare fraud and had been in "trouble" for petty theft and fighting while drunk, for which she was on probation. (RT 1891-1893.) When they returned home from a club one night, Juniel was waiting outside for McDonald. He threatened to "beat [her] ass" and slapped her when she got out of the car. When Jackson called the house later, Juniel cursed at her. (RT 1896-1897.) Jackson and McDonald had gone to clubs without Juniel on at least two prior occasions. (RT 1903.)

Trina Mayon, also a nurse assistant, had been friends with McDonald for several years, but she did not see her or talk to her as much after Juniel moved in. (RT 1905-1906.) McDonald asked Mayon for help in finding a new apartment so she could get away from Juniel, but Mayon did not find one until after McDonald had been arrested. (RT 1906-1907.)

Ayeshia Dubose had been convicted of petty theft. (RT 1913.) She worked as a nurse assistant and had been friends with McDonald for several years. (RT 1914.) McDonald used to call Dubose on a daily basis and talk to her about Juniel's cheating. She also said she was afraid of Juniel because he hit her and threatened her and her son. (RT 1916-1917, 1920.) Once McDonald said that Juniel hit her face because she had a man's number in her cell phone. (RT 1917.) McDonald called on numerous occasions when she was upset about Juniel, and talked about getting an apartment on her own. Dubose told her of an available apartment in Richmond. (RT 1918, 1922.)

Juniel called Dubose from jail when he wanted her to forward mail to McDonald. (RT 1914-1915, 1920.) At some point, Juniel told her that Bolden had performed sexual favors for him in exchange for drugs. (RT 1919-1920.)

42

Shortly before her testimony, Dubose received a phone call from a woman who identified herself as "Richard's people." She told Dubose that "snitches get dealt with." (RT 1923.) When Dubose listened to a tape of the phone call, she heard Juniel giving her number to the woman who called. (RT 1929.) Dubose received a total of five calls to her home, with at least one caller telling her not to come to court. (RT 1930-1934.) People's Exhibit 79, a tape of the phone calls, was played for the jury. (RT 1932.)

Tomaz Pickens, McDonald's son, said that Juniel was mean to him and his cousin Victor, as well as to his mother. (RT 2078-2079.) Once he saw Juniel hit his mother and throw a cell phone at her. When Pickens tried to intervene with a hammer, Juniel punched him in the stomach. (RT 2079.) At other times, Juniel threw lit matches and bottles at Pickens and his cousin. (RT 2080.) Pickens saw Juniel's gun when Juniel displayed it to family members after buying bullets for it. (RT 2080-2081.)

## ARGUMENT

### I.

## THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING APPELLANTS' MOTIONS TO SEVER

Before trial, Juniel and McDonald sought severance of their cases. They renewed their request for severance at times during the trial. On appeal, both appellants claim the trial court erred by denying their motions (Juniel, Arg. I; McDonald, Arg. III). The record shows that the trial court did not abuse its discretion by denying the severance motions, nor were appellants prejudiced by the court's ruling.

### A.  Background

On July 29, 2003, Juniel moved to sever his trial from McDonald because she intended "to present evidence of domestic violence and abuse suffered by Ms. McDonald and her 10 year old son at the hands of the defendant, Richard Juniel." (CT 233.) On the same day, the prosecution filed an opposition to Juniel's motion. (CT 217.) At a hearing on the issue, McDonald joined in Juniel's motion, arguing that her domestic violence evidence might be limited by court rulings if she were tried with Juniel. (RT 7.) McDonald admitted that she was the driver of the car on the night of the murder, but she contended she was forced to participate because of threats and physical intimidation. She wanted to present evidence of her relationship with Juniel to support her claim. (RT 8.) The prosecutor argued that duress was not a defense to murder, so that the only relevance of the evidence was with respect to McDonald's state of mind and credibility after the crime, when she lied to the police about her involvement. Beyond the minimal evidence needed to make

44

such a showing, any domestic violence evidence would be irrelevant and cumulative. (RT 9-10.)

The court denied the severance motion, stating,

With regard to the issue of whether or not this is a I-didn't-know-what-was-going-on or a duress defense to the murder itself, I believe you are presenting the concept that the defendant McDonald was present at the time but knew nothing of what was going to happen, and I concur with Mr. Golde [the prosecutor] that duress does not come into play in this as a defense to the murder.

To the extent that her state of mind is relevant concerning her later subsequent failure to report to the police, to cooperate with the police and her misstatements to the police, her claim is that it was out of fear of the defendant, there will be adequate opportunity to explain this fear by her testimony, if she wishes to testify, that he held a gun to her head, and I would intend to limit the introduction of any prior bad acts and advise the jury that this is not to be considered against Mr. Levy's [Juniel's counsel] client but rather to explain the state of mind of your client.

I do wish to eliminate from the jury any mention of his prior status at—was it CYA? I do not see that as being relevant. To the extent that the children were threatened and to the extent that she was afraid of that, she may testify to her fear, but the exact details of this should not come in, but her fear can be bolstered by, as you indicated, her sister is going to testify that she was looking for another place to live, am I correct?

. . . .

Any of that evidence is clearly admissible as to her state of mind, but to the extent that I wish to eliminate prejudicial testimony as to Mr. Juniel's activities which clearly should not come in as inappropriate character evidence, I will attempt to do so and am going to do this as we go along and limit that information.

Given that ruling then the motion to sever is denied.

(RT 11-12.) The court later added,

With certain limitations then to be imposed upon the defense presented by Ms. Brown [McDonald's counsel] and her client to the extent that it would not—I would not allow derogatory, pejorative or prejudicial evidence to be entered as it affects Mr. Juniel, and it has been my decision to go along and see what comes out from the defense and make rulings as we go along concerning the admissibility

45

of certain evidence whether or not it is relevant and weighing the probative value vs. the prejudicial keeping in mind of course the objections that you have made, Mr. Levy, and keeping in mind the relevance issue. But at the present time I see no basis for a motion to sever.

(RT 15.)

During McDonald's brief opening statement, her counsel reviewed some of the evidence she intended to present to show that McDonald was humiliated, threatened, and psychologically and physically abused by Juniel. She argued that McDonald did not aid and abet him in the murder, although she admitted to driving the car at the time of the shooting. (RT 80-88.) Juniel's counsel did not give an opening statement. (RT 80.)

After the first witness, pathologist Thomas Rogers, had testified, Juniel's counsel moved for a mistrial and severance based on McDonald's counsel's "character assassination" of Juniel. (RT 115-116.) The court stated, "I did in fact deny the previous motion for a severance on the same grounds and I will iterate [*sic*] my ruling, on that and the motion is denied." (RT 116.) Juniel then stated that he did not feel he was being adequately represented. "The defense is not effective and the strategy has failed." (RT 116.) He asked to be relieved of his counsel and to represent himself. (RT 116-117.) After discussing the motions with Juniel, the court stated that it would address them the next morning. (RT 121-122.)

The prosecutor then raised his own objection to McDonald's opening statement, arguing that the domestic violence evidence was only relevant to explain what happened after McDonald was arrested and was irrelevant unless McDonald testified. He asked that McDonald not be permitted to present any evidence of domestic violence unless and until she testified. The court stated,

> Ms. Brown, I tend to concur with what Mr. Golde says and that is why I stopped you and requested that you cease from arguing your case. Because, as you are aware, all the evidence concerning

46

domestic violence I ruled goes solely to the state of mind of Ms. McDonald as to why she did not divorce herself from the facts of the case, and the duress and the domestic violence is not a defense to the actual homicide. I mentioned that—and I thought I made that clear and your opening statement was—could be interpreted as not following my ruling.

(RT 122.) McDonald's counsel then stated that her client would be testifying. (RT 123.)

The next morning, after reviewing the issues involved in Juniel's self-representation, the court granted his motion to relieve his counsel and represent himself. The court requested that Mr. Levy remain as advisory counsel. (RT 124-141.) The court also permitted Juniel to make an opening statement. (RT 148-155.)

The first witness in McDonald's case was her mother, Rita Ammons, who did not testify about domestic violence. However, on cross-examination, Juniel asked whether Ammons knew if McDonald had been involved in an abusive relationship. (RT 1356-1357.) Ammons said she only learned about her daughter's relationship after she was incarcerated, although she had been concerned before that time. (RT 1357-1360.)

During McDonald's direct examination, the trial court sustained Juniel's objections when McDonald's counsel attempted to elicit specific instances of misconduct by Juniel. (RT 1375-1376, 1387.) McDonald's counsel renewed her motion for severance, arguing that she was unable to adequately present her defense as to McDonald's state of mind. (RT 1410-1411.) During a discussion on the issue, the court commented, "We need not go into specific acts of violence on the part of Mr. Juniel to establish that state of mind. She's testified for an hour and a half concerning it." (RT 1413.) The court said it was "not going to allow this trial to be muddied with other alleged acts of Mr. Juniel's behavior." (RT 1414.) The court denied the motion for severance. (RT 1416.)

47

The next morning, the court announced a change regarding its previous ruling on prior acts of violence.

Over the evening I did some research and I wish to put on the record my theory on the following: Ms. Brown has requested that she be allowed to portray prior acts of violence upon Ms. McDonald performed by Mr. Juniel to support her theory that Ms. McDonald—to support the testimony of the battered women's syndrome expert concerning the actions of Ms. McDonald as well as it goes to Ms. McDonald's credibility.

My research and my theories have confirmed the fact that to deny her the right to put on some of these acts would be a denial of due process to Ms. Brown and Ms. McDonald. However, in light of my previous rulings concerning limitations I would propose that we have—and in fact I'm requesting at the present time—that we have an in limine offer of proof from Ms. McDonald to the extent to which she wishes to testify to some of these acts, and I will make a question-by-question ruling as to the admissibility of them, keeping in mind Mr. Juniel's rights not to have inflammatory prejudicial bad acts brought before the jury.

I, also, Mr. Juniel, you may have noticed, prepared an instruction to the effect that they are not to be considered in any way as evidence of your bad character and I would pinpoint that instruction . . . 9.35.1. And it says, "Evidence has been presented to you concerning battered women's syndrome. This evidence and the acts alleged by defendant McDonald may not be considered by you to prove that defendant Juniel is a person of bad character or that he has a disposition to commit crimes."

What I would intend to do is if I admit these—any of these acts I would initially inform the jury that they are not to be considered for any reason other than to support the—evidence relevant to the testimony—credibility of defendant McDonald and also to support the testimony of the battered women's syndrome expert concerning the beliefs, perceptions or behaviors of victims of domestic violence.

(RT 1417-1418.) The court heard McDonald's offer of proof with respect to 11 specific acts. (RT 1418-1426.) The court determined that it would admit testimony with respect to six of the incidents, while excluding prejudicial, inflammatory, or irrelevant evidence. (RT 1426-1427, 1430.)

McDonald's counsel renewed her motion for severance and asked for a mistrial. She argued that she could not put on an adequate defense in light of the court's ruling. (RT 1430-1431.) The court denied the motion, stating it would be "permitting numerous acts to support your client's contention that she is a battered wife and also to support the testimony of your expert on battered women's syndrome." (RT 1431.)

Before McDonald resumed her direct testimony, the court instructed the jury as follows:

> Ladies and gentlemen, before we proceed with the testimony of Ms. McDonald, I'm going to advise you concerning some of the testimony that you are about to hear. You are going to be hearing certain acts alleged by defendant McDonald concerning the acts of Mr. Juniel. You are advised that you may not consider these acts in any way concerning evidence against Mr. Juniel. The testimony concerning these acts is to be considered by you solely for the following limited purpose: for the proof relevant to the believability of defendant McDonald's testimony and the beliefs, perceptions and behavior of victims of domestic violence. They are in no way to be considered by you that defendant Juniel is a person of bad character or that he has a disposition to commit crimes.

(RT 1431.) The court reiterated the limited nature of the testimony during the trial. (See, e.g., RT 1883, 1917.) The court also gave a substantially similar instruction, CALJIC No. 9.35.1, during final instructions. (RT 2121; see CT 408.)

Near the close of McDonald's direct testimony, McDonald related the incidents that the court had permitted. (RT 1460-1465.) During Juniel's cross-examination of McDonald, which lasted two days, Juniel asked numerous questions of McDonald concerning his alleged abusive behavior. (RT 1476 et

49

seq.) McDonald presented the testimony of other witnesses to support her claim of abuse, as set forth in the Statement of Facts.[28]

## B.   Statutory Preference For Joint Trials

Under Penal Code section 1098, when two or more defendants are jointly charged they must be tried jointly unless the court orders separate trials. (Pen. Code, § 1098; *People v. Box* (2000) 23 Cal.4th 1153, 1195; *People v. Pinholster* (1992) 1 Cal.4th 865, 932.) "A 'classic' case for joint trial is presented when defendants are charged with common crimes involving common events and victims." (*People v. Keenan* (1988) 46 Cal.3d 478, 499-500; see *People v. Pinholster, supra,* 1 Cal.4th at p. 932; *People v. Turner* (1984) 37 Cal.3d 302, 312, overruled on another ground in *People v. Anderson* (1987) 43 Cal.3d 1104, 1149; *People v. Morganti* (1996) 43 Cal.App.4th 643, 672.)

"In light of this legislative preference for joinder, separate trials are usually ordered only in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." (*People v. Box, supra,* 23 Cal.4th at p. 1195 (internal quotation marks omitted); see *People v. Pinholster, supra,* 1 Cal.4th at p. 932; *People v. Keenan, supra,* 46 Cal.3d at p. 500; *People v. Turner, supra,* 37 Cal.3d at p. 312.)

"A trial court's ruling on a severance motion is reviewed for abuse of discretion on the basis of the facts known to the court at the time of the ruling."

---

28.   McDonald renewed her motion for severance when the court indicated it would not permit the testimony of Tomaz Pickens. (RT 1827-1828.) Pickens later testified as a rebuttal witness. (RT 2076.) Juniel sought to exclude the testimony of Victor White, arguing that he had been coached by his grandmother. The trial court denied the request. (RT 1840.)

(*People v. Box, supra,* 23 Cal.4th at p. 1195; see *People v. Hardy* (1992) 2 Cal.4th 86, 167; *People v. Morganti, supra,* 43 Cal.App.4th at p. 672.) If the trial court erroneously denied severance, reversal is required only if there is a reasonable probability that the defendant would have obtained a more favorable result at a separate trial. (*People v. Massie* (1967) 66 Cal.2d 899, 923-924; *People v. Morganti, supra,* 43 Cal.App.4th at p. 675; *People v. Wheeler* (1973) 32 Cal.App.3d 455, 461.) If the reviewing court finds that the trial court did not abuse its discretion when denying severance, it "may nevertheless reverse a conviction where, because of the consolidation, a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law." (*People v. Turner, supra,* 37 Cal.3d at p. 313; see *People v. Pinholster, supra,* 1 Cal.4th at p. 933; *People v. Morganti, supra,* 43 Cal.App.4th at p. 672.)

Federal law is in accord. "There is a preference in the federal system for joint trials of defendants who are indicted together." (*Zafiro v. United States* (1993) 506 U.S. 534, 537.) "Joint trials 'play a vital role in the criminal justice system.' [Citation.] They promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.' [Citation.]" (*Ibid.*) Like California, the federal system permits severance where joinder could prejudice the defendant. (*Id.* at p. 538.)

The *Zafiro* court observed that "the Courts of Appeals frequently have expressed the view that 'mutually antagonistic' or 'irreconcilable' defenses may be so prejudicial in some circumstances as to mandate severance," although few cases had actually been reversed for failure to grant severance on that ground. (*Ibid.*) The court declined to adopt a bright-line rule that severance was mandated whenever codefendants had conflicting defenses. "Mutually antagonistic defenses are not prejudicial *per se*." (*Ibid.*) Instead, the court stated that district courts should grant severance "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the

51

defendants, or prevent the jury from making a reliable judgment about guilt or innocence." (*Id*. at p. 539.)

> Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. [Citation.] Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. [Citation.] Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. [Citation.] The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here. When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but, as we indicated in *Richardson v. Marsh* [(1987) 481 U.S. 200], less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice. [Citation.]

(*Zafiro v. United States, supra,* 506 U.S. at p. 539.) The court further observed, "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." (*Id*. at p. 540.) The *Zafiro* court reviewed the trial court's severance ruling for abuse of discretion. (*Id*. at p. 541.)

## C.  The Trial Court Did Not Abuse Its Discretion By Denying Severance

Under the state and federal statutory preference for joint trials, this was a "classic" case for joinder. Juniel and McDonald were both charged with the murder of Stacey Alexander. Juniel's additional charges for possession of the assault weapon were connected to the murder and involved the same

52

evidence. The evidence of their involvement in the murder was the same, and was not prejudicially stronger against one defendant than the other. No extrajudicial confessions implicating the other defendant were admitted, nor was exonerating testimony excluded. No evidence was admitted only against one defendant, which could not have been admitted against the other defendant. In sum, the charges and evidence were so intertwined as to both defendants that severance would have put an undue burden on scarce judicial resources, and neither defendant demonstrated the kind of substantial prejudice that would have justified such an expenditure. (See *Zafiro v. United States, supra,* 506 U.S. at pp. 537-538; *People v. Pinholster, supra,* 1 Cal.4th at p. 933; *People v. Keenan, supra,* 46 Cal.3d at p. 501.)

Nevertheless, Juniel and McDonald argue that the trial court abused its discretion by denying their severance motions. Juniel argues that the trial court should have granted his motion for severance because he and McDonald presented conflicting defenses, and because evidence of domestic violence was admitted against him. McDonald argues that Juniel introduced other crimes evidence against her, that he cross-examined her at length, and that she was prevented from introducing additional evidence of domestic violence. Relevant case law does not support their claims.

## 1.    Conflicting Defenses

Initially, we submit that Juniel has waived his claim that the trial court erred by denying his severance motion on grounds that he and McDonald presented conflicting defenses. As the record shows, both parties were concerned exclusively with how much, if any, evidence of domestic violence could be introduced in the case. Even though McDonald stated before trial that her defense would be that she drove the car at the time of the murder, but that she lacked the requisite intent to commit murder, Juniel never sought severance

53

on grounds that they had conflicting defenses. Indeed, at no time during the lengthy hearings on this issue did either defendant argue that their conflicting defenses warranted severance. Accordingly, any argument that severance should have been granted on grounds of conflicting defenses has been waived. (*People v. Saunders* (1993) 5 Cal.4th 580, 589-590.) In any event, such an argument is not supported by relevant authority.

"[A] joint trial is not unfair simply because the codefendants 'have antagonistic defenses and one defendant gives testimony that is damaging to the other and thus helpful to the prosecution. [Citations.]' [Citation.] If the likelihood of antagonistic testimony alone required separate trials, they 'would appear to be mandatory in almost every case.' [Citation.]" (*People v. Keenan, supra,* 46 Cal.3d at p. 500; see *People v. Hardy, supra,* 2 Cal.4th at p. 168; *People v. Turner, supra*, 37 Cal.3d at pp. 312-313.) Moreover, "'[a]lthough several California decisions have stated that the existence of conflicting defenses may compel severance of codefendants' trials, *none has found an abuse of discretion or reversed a conviction on this basis.*' [Citation.]" (*People v. Hardy, supra,* 2 Cal.4th at p. 168 (original italics).)

In *People v. Morganti, supra,* 43 Cal.App.4th at p. 674, this Court discussed what constituted an antagonistic defense. It noted that in *People v. Hardy, supra,* the court had looked to the federal court's construction of the term and found,

> Thus, [a]ntagonistic defenses do not *per se* require severance, even if the defendants are hostile or attempt to cast the blame on each other. [Citation.] Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that the defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty. [Citations.] Stated another way, mutual antagonism only exists where the acceptance of one party's defense will preclude the acquittal of the other. [Citations.]

(*People v. Morganti, supra,* 43 Cal.App.4th at p. 674 (internal quotation marks omitted), quoting *People v. Hardy, supra,* 2 Cal.4th at p. 168.)

This Court concluded, "[a]lthough *Hardy* contains a rather cursory summary of the holdings of a few federal cases, we do not interpret *Hardy* as adopting those holdings or as intending to provide a definitive definition of an antagonistic defense which *requires* severance." (*People v. Morganti, supra,* 43 Cal.App.4th at p. 674 (original italics.)[29/] "More important, *Hardy* recognizes that the existence of conflicting or antagonistic defenses does not compel separate trials." (*Ibid.*) Neither antagonistic defenses nor one defendant's implication of the other amounts, by itself, to unfair prejudice. (*Ibid.*) That different defendants have conflicting versions of what took place, or the extent to which they participated, is a reason *for* rather than *against* joinder. If one is lying, it is easier for the truth to be determined if they are tried together. (*Ibid.*) Moreover, the *Hardy* court found the trial court had not abused its discretion by denying the severance motion of three defendants who each denied culpability and focused blame on the others. (*Id.* at p. 675.)

This Court's analysis was correct. The year after *Hardy* was decided, the United States Supreme Court specifically rejected adoption of a rule that mutually antagonistic defenses (as described in *Hardy)* were prejudicial *per se* and required severance of defendants. (*Zafiro v. United States, supra,* 506 U.S. at p. 538.) Instead, the court stated that severance should only be granted if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable determination of guilt or innocence. Such a risk might occur when evidence of wrongdoing is admitted against one defendant that would not be admissible

---

29.    The Court also found the passage quoted from *Hardy* to be confusing and inconsistent. (*People v. Morganti, supra,* 43 Cal.App.4th at p. 674, fn. 26.)

against the other, but could lead to the other defendant's conviction, when evidence of a confession is admitted by a non-testifying defendant that implicated a codefendant, or when exculpatory evidence is excluded that would have been available in a separate trial. (*Id.* at p. 539.) As stated above, none of these risk factors are present here.

Juniel relies on a definition of mutually antagonistic or conflicting defenses (as stated in *Hardy*'s interpretation of federal law) that has expressly been rejected by the United States Supreme Court. As explained in *People v. Morganti, supra,* there is no fixed definition of conflicting defenses that requires severance. Moreover, several California cases that addressed severance arguments like Juniel's uniformly rejected them.

In *People v. Turner, supra,* 37 Cal.3d 302, Turner and Souza were jointly charged with offenses culminating in murder. Turner did not testify. Souza testified that he backed out of a plan to burglarize a house. When he returned, Turner had already shot the victims. Souza helped him take the victims' property. (*Id.* at pp. 309-310.) Souza testified that "he did as he was ordered because Turner was pointing the gun at him and behaving very strangely . . . ." Souza further testified that Turner admitted the shootings to him. Souza asked Turner to take responsibility for the killings. Souza was aware that Turner told a detective that he "was going to take the blame for both killings to take Souza off the hook." (*Id.* at p. 310.)

The California Supreme Court rejected Turner's claim that severance should have been granted. Turner had contended "that the testimony offered by Souza conflicted with his defense and was gravely prejudicial to him in that it 'supplemented' what, but for Souza's testimony, was a case based merely on circumstantial evidence." (*Id.* at p. 312.) The court found no abuse of discretion in the denial of severance where, "at the time of the motion to consolidate, the court was faced with two men charged with murders under

56

circumstances in which all the events surrounding the crimes and ultimate arrests involved them jointly." (*Id*. at p. 313.) The court also found "that no denial of a fair trial results from the mere fact that two defendants who are jointly tried have antagonistic defenses and one defendant gives testimony that is damaging to the other and thus helpful to the prosecution." (*Ibid*.)

In *People v. Keenan, supra,* 46 Cal.3d 478, Keenan and Kelly were jointly charged with offenses culminating in murder. Kelly testified in his own defense. He admitted participation in the murder and said Keenan was the actual killer. Kelly said he participated because he wanted to obtain money and because he was afraid of Keenan. Although Keenan had never directly threatened Kelly, Kelly was present the day before the murder when Keenan beat up and abducted a mutual acquaintance. Keenan made a statement about the acquaintance, which Kelly inferred meant that Keenan had killed him. The incident convinced Kelly that Keenan was violent and that he might be "next" if he did not go along with the robbery on the following day. The acquaintance, who survived being shot and left for dead, testified for Kelly in support of his claim. (*Id*. at pp. 493-494, 499.)

The California Supreme Court rejected Keenan's argument that severance should have been granted because he and Kelly presented antagonistic defenses and the introduction of the unrelated shooting incident was prejudicial. (*Id*. at pp. 500-503.) "[T]he trial court could properly conclude that the benefits of joinder outweighed any potential prejudice to defendant arising from Kelly's 'duress' defense." (*Id*. at p. 502.)

In *People v. Alvarez* (1996) 14 Cal.4th 155, Alvarez and Ross were jointly charged with offenses culminating in murder. Alvarez asked Ross to drive him to a shopping center, where he directed her to an automatic teller machine. Alvarez got out and accosted a man withdrawing money. After stabbing him, Alvarez got back in the car and the two escaped. Ross later

denied any knowledge to the police. The stabbing victim died a few days later. (*Id.* at pp. 178-179.) Alvarez, testifying in his own defense, said he was elsewhere at the time of the murder and that he was a victim of mistaken identity. (*Id.* at pp. 179-180.) Ross, who also testified in her own defense and introduced other evidence, did not deny that Alvarez had robbed and murdered the victim. "[R]ather, she denied she had possessed the requisite mental state—she said she did not even suspect what he had evidently intended, but had accompanied him out of fear." (*Id.* at p. 180.) Other evidence was introduced regarding Alvarez's crime spree before and after the murder, which included rape, robbery, and car theft. (*Id.* at pp. 177-180.)

Before trial, both defendants moved for severance, arguing their defenses would be conflicting. Alvarez said his defense would be alibi and misidentification, while Ross's would be lack of the requisite mental state. (*Id.* at p. 189.) The California Supreme Court rejected Alvarez's claim that the trial court abused its discretion by denying his severance motion.

> We find no such abuse here. Under Penal Code section 1098, a trial court *must* order a joint trial as the "rule" and *may* order separate trials only as an "exception." [Citation.] The superior court not unreasonably conformed to the rule and avoided the exception. Its conclusion—that separation was not required even if there had been a sufficient showing that defendant and Ross would present conflicting defenses and might each attempt to shift responsibility to the other—anticipated *People v. Cummings* (1993) 4 Cal.4th 1233, 1287, in which we held to that very effect. (Cf. *Zafiro v. United States* (1993) 506 U.S. 534, 538 [decided under Fed. Rules Crim. Proc., rules 8(b) and 14, 18 U.S.C., which are similar to Pen. Code, § 1098: declining "to adopt a bright-line rule, mandating severance whenever codefendants have conflicting defenses."].)

(*People v. Alvarez, supra,* 14 Cal.4th at p. 190 (original italics, footnote omitted.)

In *People v. Morganti, supra,* 43 Cal.App.4th 643, Morganti and Paterson were jointly charged with murder. Paterson made a statement to the

58

police, implicating himself and Morganti. He did not testify at trial. The portion of his statement implicating Morganti was not offered by the prosecution. (*Id.* at pp. 652-653.) Morganti testified and denied any involvement in the murder. (*Id.* at pp. 654-655.) Morganti made numerous motions for severance on grounds that he and Paterson had conflicting defenses, which the trial court denied. (*Id.* at p. 671 & fn. 24.)

This Court rejected Morganti's claim that the trial court abused its discretion by denying severance, despite his contention that he and Paterson had conflicting and antagonistic defenses. (*Id.* at pp. 671-672.) Morganti also argued that the joinder violated his right to due process because Paterson's counsel argued there was "no doubt" that Morganti committed the crime, that Paterson had knowledge of the murder, that he was guilty as an accessory, and that he lied to protect Morganti. (*Id.* at pp. 672-673.) Relying on the facts of *People v. Turner, supra,* 37 Cal.3d 302, the Court rejected Morganti's due process claim. (*People v. Morganti, supra*, 43 Cal.App.4th at p. 673.)

Juniel fails to address, let alone distinguish, these cases. As they establish, antagonistic or conflicting defenses do not mandate severance. On the contrary, the courts found the statutory preference for joinder, and the benefits that flow from joinder, outweighed the defendants' claims of prejudice. Juniel points to no case in which the court found that severance was required based solely on conflicting defenses, nor can he. (*People v. Pinholster, supra,* 1 Cal.4th at p. 933 ["we have made it clear that a defendant's natural tendency to shift blame onto a codefendant is not in itself a sufficient ground for severance"].) Moreover, "this was not a case in which only one defendant could be guilty. . . . Here the prosecution theory was that both defendants participated in, and were guilty of, the murder." (*People v. Box, supra,* 23 Cal.4th at p. 1197, quoting *People v. Cummings* (1993) 4 Cal.4th 1233, 1287.) Accordingly, Juniel's contention that the trial court abused its discretion by

59

denying severance on this ground (which he never argued below in any event) is without merit.

## 2.    Other Crimes Evidence

Both Juniel and McDonald argue that severance should have been granted because other crimes evidence was presented by one defendant against the other. Juniel contends that McDonald presented irrelevant and prejudicial evidence of domestic violence against him. McDonald contends that Juniel presented other crimes evidence against her, namely, the incident in which she threatened a neighbor with a baseball bat, and that she was prevented from presenting additional evidence of domestic violence.

As noted above, severance may be warranted where evidence of other crimes is admitted only against one defendant, which potentially could be used to convict another defendant as to whom the evidence would be inadmissible in a separate trial. (See *Zafiro v. United States, supra,* 506 U.S. at p. 539; see also *People v. Turner, supra,* 37 Cal.3d at p. 312 [discussing prejudicial association with codefendants as ground for severance].) This is not the case here. Rather, the other crimes evidence could only have affected the defendant who committed the alleged offenses. That is, the domestic violence evidence was admitted against Juniel, and could not have been used to convict McDonald. On the contrary, it was she who urged admission of the evidence. Similarly, evidence that McDonald threatened a neighbor with a baseball bat could not have been used to convict Juniel. It was he who sought to admit the evidence against McDonald.

Here, by contrast, both defendants contend that severance should have been granted because they introduced other crimes evidence against each other, which resulted in prejudice, and that such evidence would not have been

60

admissible against them in their own separate trials. Neither defendant cites
pertinent authority in support of their claim.

In *People v. Keenan, supra,* 46 Cal.3d at p. 500, the court stated that
Keenan's severance argument included an argument regarding other crimes
evidence.

> Defendant urges, however, that Kelly did not simply seek to
> exculpate himself by laying blame on defendant. Rather, his
> "antagonistic defense" of duress or menace allowed him to present
> prejudicial evidence and argument of *uncharged conduct by
> defendant,* which would not have been admissible against defendant
> in a separate trial. Assuming this is a valid ground for distinguishing
> the reasoning of *Turner, supra,* we nonetheless conclude the trial
> court acted within its discretion in denying the severance motion.

(*Ibid.* (original italics).) Reviewing the factors applicable to severance of
counts, the court rejected the claim that admission of the other crimes evidence
warranted severance. (*Id.* at pp. 500-501.)

> We assume arguendo, as defendant suggests, that the Stevenson
> shooting, and certain other evidence presented by Kelly which
> suggested defendant's violent nature, would have been inadmissible
> in his separate guilt trial for the Opel murder. Defendant urges that,
> apart from its usefulness to Kelly, such evidence merely suggested
> defendant's criminal propensity and did not go directly to such issues
> as identity or intent. [Citations.]
>
> "Other crimes" evidence which would not be admissible against
> an accused in his separate trial holds a well-understood potential for
> prejudice. However, the likelihood of its admission in an otherwise
> proper joint trial does not alone justify severance. ([*People v.*]
> *Smallwood* [(1986) 42 Cal.3d 415,] 429.) Further, we are persuaded,
> severance was not required in this case on grounds that such evidence
> was potentially "inflammatory."
>
> Here, we conclude, any potential prejudice from the disputed
> evidence was minimal, since it was unlikely to alter the verdict by
> unfairly bolstering an otherwise weak case. At the time the motions
> to sever were decided, the clearly admissible evidence that defendant
> was guilty of all the charges against him was already very strong.

(*Id.* at p. 501 (footnote omitted).)

Juniel does not address *Keenan*, nor does he acknowledge the other cases in which a duress defense was based on the facts of the crime, as well as other acts committed by the codefendant. (See, e.g., *People v. Alvarez, supra,* 14 Cal.4th 155; *People v. Turner, supra,* 37 Cal.3d 302.) Significantly, in *Keenan* the court found that admission of evidence that Keenan shot, and apparently intended to kill, another victim the day before the murder did not require severance on grounds that such evidence was potentially inflammatory. (*People v. Keenan, supra,* 46 Cal.3d at p. 501.) Evidence that Juniel committed several acts of domestic violence does not approach the potential prejudice of an attempted murder committed the day before the charged crime.

Juniel purports to list the other crimes evidence admitted against him in an effort to show prejudice. (AOB at 15-18, listing 28 items.) Several of the items involve Juniel's infidelity, which were not included in the evidence he attempted to exclude, and most of which he admitted in any event. (See, e.g., items 13, 14, 15, 16, 18, 20, and 26.) Several of the items misstate the record. (See, e.g., items 5, 9, 24, and 27.)[30] Some of the evidence was cumulative hearsay. (See, e.g., items 7, 8, 23, and 25.) The expert witness on battered women's syndrome did not testify to any bad acts on Juniel's part. (See item 28.) McDonald's gratuitous comments that Juniel was in a gang and sported

---

30. Victor White testified that he saw Juniel push McDonald out of the way, but he "never hit her." (RT 1889.) Ayeshia Dubose testified that McDonald *called* her when she was upset about Juniel "too many" times to count. (RT 1918.) McDonald discussed Juniel's infidelity, as well as other aspects of their relationship, including that he threatened her "a few times" and "hit her before." (RT 1916-1917.) (This evidence also contradicts McDonald's claim that she was "cut off" from her family and friends.) Dubose did not testify that Juniel called and threatened her and her family, although someone apparently called on his behalf several times. (RT 1923, 1929-1934.) Rita Ammons testified that she learned Juniel was abusive toward McDonald after McDonald was incarcerated. McDonald did not tell her of any abuse when she and Juniel lived together, and Ammons did not testify to seeing any abuse. (RT 1357-1358, 1364.)

  
gang symbols was uncorroborated by any other evidence and was not addressed by the parties. (See items 21 and 22.)[31/] In sum, while Juniel misleadingly characterizes the other crimes evidence admitted against him, the actual evidence admitted (see Statement of Facts, *supra*) pales next to a prior attempted murder in terms of its inflammatory nature.

McDonald's claim that other crimes evidence was admitted against her, thus warranting severance, also fails. The evidence that she threatened a neighbor with a baseball bat did not present potential prejudice warranting severance. In fact, the incident was never even mentioned during the discussions on severance, and thus could not have been considered by the trial court when making its discretionary ruling. (See *People v. Box, supra,* 23 Cal.4th at p. 1195 [court's ruling on severance motion reviewed for abuse of discretion based on facts known at the time].)[32/]

McDonald's claim that she was prevented from presenting even more evidence of domestic violence because of the joinder, and that severance should have been granted so that she could have presented such evidence at a separate trial, is without merit. As the trial court observed, McDonald had presented ample evidence of her fear, which was limited to the issue of her mental state at the time of the crime and her credibility. Moreover, that evidence likely was far more tangible in the presence of Juniel, rather than in his absence.

Further, neither defendant addresses the overwhelming evidence admitted against them, a review of which establishes that the other crimes

---

31. The trial court had ruled any reference to gangs was inadmissible. (RT 1427.)

32. McDonald also cannot show that the evidence would not have been admitted at a separate trial. As we discuss in Argument II, the evidence was admitted in rebuttal to Ammons's testimony concerning McDonald's alleged peaceful nature, and as impeachment of McDonald.

evidence could not have had the effect of unfairly bolstering an otherwise weak case. (See *People v. Keenan, supra,* 46 Cal.3d at pp. 500-502.)

Richshalda Williams and Ciara Baldwin identified McDonald and Juniel as the occupants of the car they saw shortly before and at the time of the shooting. Natalie Alvarez identified Juniel as the man she had seen follow Alexander down a driveway, after which she heard a gunshot. Wendy Jackson identified McDonald's car and thought Juniel looked like the shooter she had seen. Jayshree Chander identified McDonald's car and thought Juniel was the man she had seen running away after the shooting. Shell casings collected at the scene of the crime and from McDonald's car matched the gun found in their residence. The gun also matched the description given by several witnesses. A bullet found at the scene could only have come from the same model gun made within a day or two of the gun seized.

Juniel and McDonald both made references to having an "A-K" shortly before the murder. McDonald twice threatened to kill Stacey Alexander in the 24-hour period preceding the murder, on one occasion yelling she would get her "A-K." She admitted that she wanted to hurt Alexander when she confronted her the night before and would have hit her with her baseball bat if a neighbor had not interfered. She also admitted that she knew Juniel was going to kill Alexander when she drove him down the street, and that she did nothing to stop him. Juniel told Angelina Bryant that he was not worried about the earlier argument between Sia Bolden and Bryant because he had an "A-K in the back." In several phone calls made from jail after the murder, Juniel repeatedly stated, "I did it," and made other incriminating statements, including admitting ownership of the gun. Recorded phone calls also showed that he attempted to intimidate witnesses and manipulate the evidence. In sum, the evidence against both defendants, almost all of which was known before trial, was so overwhelming that "any potential prejudice from the disputed evidence

was minimal, since it was unlikely to alter the verdict by unfairly bolstering an otherwise weak case." (*People v. Keenan, supra,* 46 Cal.3d at p. 501.)

Neither Juniel nor McDonald can cite evidence that, at the time the trial court made its ruling on severance, should have been found so prejudicial as to warrant severance of their trials. (See *People v. Keenan, supra,* 46 Cal.3d at p. 501.) Accordingly, the trial court did not abuse its discretion by denying severance on this ground. (*Ibid.*)

## D.  Neither Defendant Can Establish Prejudice From The Joinder

Even if the trial court had abused its discretion by denying severance, relief could not be granted unless the defendants showed that it was reasonably probable they would have obtained a more favorable verdict at separate trials. (*People v. Morganti, supra,* 43 Cal.App.4th at p. 675.) In light of the evidence of defendants' guilt outlined above, which neither defendant challenges, it is not reasonably probable they would have obtained a more favorable result even if *all* of the challenged evidence had been excluded.

Further, the court's instructions that attorney statements were not evidence (RT 2101), that evidence admitted against one defendant could not be considered against the other (RT 2105), that evidence of a statement of one defendant could not be considered against the other (*ibid.*), that the prosecution had the burden of proving beyond a reasonable doubt the charges against each defendant (RT 2114), that the jury must decide separately whether each defendant was guilty or not guilty (RT 2123-2124), and that evidence of battered women's syndrome and domestic violence had been admitted only for a limited purpose, namely, "the beliefs, perception or behavior of victims of domestic violence or proof relevant to the believability of defendant McDonald's testimony" (RT 2121), "sufficed to cure any possibility of prejudice." (*Zafiro v. United States, supra,* 506 U.S. at p. 541.)

65

For the same reasons, neither defendant can show that a gross unfairness occurred such as to deprive the defendant of a fair trial and due process of law. (*People v. Turner, supra,* 37 Cal.3d at p. 313.)

Again ignoring the evidence, Juniel focuses on the timing of the admission of the domestic violence evidence, claiming it was unanticipated. However, the record shows that at least some evidence of domestic violence was anticipated from the beginning of the trial, particularly after McDonald said she would testify. In fact, the trial court specifically stated that it would make rulings concerning such evidence "as we go along." (RT 15.) During McDonald's testimony, the court agreed that McDonald could describe specific acts of violence as relevant to her claim of fear.

McDonald confined her direct testimony to brief descriptions of the six incidents the trial court had permitted, including three incidents in which Juniel slapped her face, one in which he threw her into a closet, and one in which he pushed her against a window, breaking it. (See RT 1426-1427; Statement of Facts.) When Juniel cross-examined McDonald, however, he elicited many more details of those acts, as well as others. (RT 1476 et seq.) In fact, he cross-examined her for two days in an effort to challenge her credibility. He cannot complain on appeal about the amount of evidence presented for which he was largely responsible.

Both defendants complain that the trial was overly long and unwieldy. They ignore the fact that they were both charged with first degree murder, a very serious crime. The prosecution presented numerous witnesses to support the charges. Both defendants presented a defense in which they testified. Indeed, it was their own testimony that consumed most of the defense cases. Although both defendants presented additional witnesses, these were, for the most part, fairly brief. The record does not support their claim that the trial "spiraled out of control" or was inefficient. Rather, the record shows that the

trial court was careful, particularly with respect to Juniel, who was representing himself, to permit the defendants to present their defenses.

The fact that both defendants, even at the time of trial, were much more obsessed about their own relationship than about the murder with which they were charged cannot be laid at the trial court's door. While that obsession, and callousness toward the victim, could not have helped their defenses, it did not result from improper joinder, but from the nature of the defendants themselves. Moreover, it was their own choice to air their relationship at length and in detail before the jury. Their convictions, however, were based on the overwhelming evidence against them.

Nothing in this record supports a claim of gross unfairness or violation of due process. Accordingly, their claims that the trial court erred by denying severance should be rejected.

## II.

## THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY ADMITTING EVIDENCE OF OTHER MISCONDUCT

Both defendants contend that evidence was improperly admitted under Evidence Code section 1101. Juniel challenges the domestic violence evidence as a general matter (Juniel, Arg. II). He also contends the trial court erred by allowing evidence that he threatened McDonald with a gun (Juniel, Arg. III). McDonald argues that the trial court erred by allowing evidence that she threatened a neighbor with a baseball bat (McDonald, Arg. IV). The record does not support the defendants' contentions, particularly since none of the evidence was admitted under section 1101.

### A.  The Trial Court Did Not Admit Section 1101 Evidence Against Juniel

#### 1.  Background

Much of the procedural information relating to this claim was set forth in the preceding argument. The court made clear its position that prejudicial character evidence would not be admitted against Juniel and that any evidence of prior bad acts would be limited to the issues of McDonald's state of mind and credibility. (E.g., RT 11-12, 15, 122.) The only evidence the prosecution sought to admit under section 1101 was Juniel's juvenile adjudications for brandishing a firearm and making terrorist threats. (CT 188-193; RT 23, 36-37.) The trial court excluded the evidence, finding its prejudicial effect outweighed its probative value. (RT 42.)

Both before and after the court ruled on the specific acts of domestic violence to which McDonald would be permitted to testify, the court stated it would give a limiting instruction pursuant to *People v. Jaspar* (2002) 98 Cal.App.4th 99 regarding battered women's syndrome and acts of domestic

68