violence. (RT 1414, 1417-1418.)  Thereafter, the court instructed the jury during McDonald's testimony (RT 1431), as well as the testimony of her witnesses (RT 1883, 1917), that evidence of prior acts of Juniel were to be considered only with respect to McDonald's believability and state of mind, and not to show he was a person of bad character or had a disposition to commit crimes.

Later, during a discussion on the limitations the court had placed on Victor White's testimony, the court specifically stated it had excluded White's proffered testimony that Juniel pointed a gun at him because it showed a prior bad act of Juniel, it was unrelated to McDonald's state of mind, and it was prejudicial and cumulative.  The court noted that nothing in McDonald's proffer had indicated McDonald's presence or knowledge regarding the disputed testimony. (RT 1924-1926.) McDonald's counsel responded, "This could have been testified to by Ms. McDonald. As you recall, your honor, you would not allow her to testify under 1101 as to Mr. Juniel." (RT 1926.) The court replied, "That's right, I didn't.  It's under 352 I'm excluding it.  It's prejudicial to Mr. Juniel, and given the massive amount of testimony that you've elicited  so far concerning the state of mind of Ms. McDonald, I think that prejudice outweighed the probative." (*Ibid.*)

The court subsequently instructed the jury regarding evidence of other acts or conduct:

> Certain evidence was admitted for a limited purpose. At the time this evidence was admitted you were instructed that it could not be considered by you for any purpose other than the limited purpose for which it was admitted. Do not consider this evidence for any purpose except the limited purpose for which it was admitted.

(RT 2105 [CALJIC No. 2.09].)

> Evidence has been introduced for the purpose of showing that a witness engaged in past criminal conduct amounting to a misdemeanor. This evidence may be considered by you only for the

purpose of determining the believability of that witness. The fact that a witness engaged in past criminal conduct amounting to a misdemeanor, if it is established, does not necessarily destroy or impair a witness's believability. It is one of the circumstances that you may take into consideration in weighing the testimony of that witness.

(RT 2108-2109 [CALJIC No. 2.23.1].)

Evidence has been presented to you concerning battered women's syndrome. This evidence and the acts alleged by defendant McDonald may not be considered by you to prove that defendant Juniel is a person of bad character or that he has a disposition to commit crimes. You should consider this evidence for certain limited purposes only, namely, the beliefs, perception or behavior of victims of domestic violence or proof relevant to the believability of defendant McDonald's testimony.

(RT 2121 [CALJIC No. 9.35.1].)

### 2. The Trial Court Did Not Abuse Its Discretion By Admitting The Challenged Evidence

As the record establishes, the trial court did not admit evidence under section 1101 against Juniel. The domestic violence evidence was admitted for the limited purpose of showing McDonald's believability and her state of mind. Her believability was obviously at issue, since she testified in her defense. Her state of mind also was in issue, since she was charged with premeditated and deliberate murder. As a defense, McDonald argued that she was present at the scene of the murder, that she aided Juniel, but that she lacked the requisite intent. In the cases in which a similar defense was presented, the courts admitted evidence of other acts by the codefendant to support the claim of duress. (See, e.g., *People v. Alvarez, supra,* 14 Cal.4th at p. 180; *People v. Keenan, supra,* 46 Cal.3d at pp. 493-494.) Here, too, the trial court properly

admitted evidence to support McDonald's claim that she complied with Juniel's directions at the time of the murder out of fear.

The evidence was also relevant with respect to the expert testimony on battered women's syndrome, which was admissible under section 1107, and to which Juniel did not object. Absent some basis for the expert's opinion, the opinion evidence would have been irrelevant. (See Evid. Code, § 1107, subd. (a); *People v. Jaspar, supra,* 98 Cal.App.4th at p. 107.)[33] Where an allegedly battered woman contends the abuse affected her state of mind, the evidence of abuse is relevant to her credibility. (See *Jaspar, supra,* 98 Cal.App.4th at p. 107.) It is also relevant to whether the alleged victim of abuse acted reasonably. (See *id.* at pp. 107-109.) Here, it was relevant to McDonald's claim that she feared for her own life, based on Juniel's prior violence, and so went along with the murder, although she had no prior plan to do so. Since Juniel did not object to the expert opinion evidence, he should not be heard to complain about evidence that provided a basis for the testimony.

Juniel fails to establish that the evidence of domestic violence was admitted under section 1101. He also fails to establish that the evidence was improperly admitted for the limited purpose of showing McDonald's believability and state of mind.

In any event, he could not show prejudice even if he could have shown error. As explained in Argument I, the evidence of Juniel's guilt was overwhelming. Not only did ballistics and eyewitness evidence establish his guilt, he repeatedly admitted, "I did it." Further, the trial court repeatedly

---

33. Evidence Code section 1107, subdivision (a) provides: "In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge."

instructed the jury, both during and after presentation of the evidence, that evidence of Juniel's prior acts had been admitted for a limited purpose. In light of the overwhelming evidence of his guilt, and the instructions given here, Juniel cannot show a reasonable probability of a more favorable result had the evidence not been admitted. (Evid. Code, § 353, subd. (b); *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## B.  Juniel Opened The Door To Evidence That He Pointed A Gun At McDonald

Juniel also contends the trial court erred by permitting evidence that he woke McDonald up with a gun to her head, saying that she was the enemy. The record shows that Juniel opened the door to this evidence.

### 1.  Background

When McDonald made her proffer of specific incidents of domestic violence, the court ruled that the incident when Juniel put a gun to her head and called her the enemy would be excluded under Evidence Code section 352. (RT 1426.) During his cross-examination of McDonald, however, Juniel asked her, "And had you ever seen that gun before that incident took place?" (RT 1603.) McDonald replied, "Yes." (*Ibid.*) Juniel asked, "Isn't it true, Ms. McDonald, that yesterday you said you had never saw that gun until that time?" (RT 1604.) When McDonald replied, "I seen it before," Juniel asked her how many times she had seen the gun. She said, "I seen it when you pulled it on me." (*Ibid.*) On cross-examination by the prosecutor, McDonald elaborated, saying that Juniel woke her up while holding the gun and said that she was his enemy. She could not tell if the gun was loaded. (RT 1616-1617.) McDonald told him he was "tripping" and asked him "to get it out of my face." (RT 1617.) Juniel set the gun on the bed while he talked to her. (RT 1617-1618.)

McDonald was "terrified" that the gun was in the house and asked Juniel to get rid of it. (RT 1618-1619.)

During a break, Juniel asked for a mistrial and severance based on the admission of evidence of the gun incident. (RT 1685.) The court responded,

> I understand that, and Mr. Juniel, I made careful notes during the testimony, and I will point out to you, sir, that I agree with you that certain elements of the matters that I ruled inadmissible were in fact brought out but they were brought out in response to your questioning. So it was your questioning which elicited the testimony that I had previously ordered not gone into, namely I recall very carefully stating I would not allow—or would exclude the evidence of the time that you threatened her and that [she] woke up with a gun to her head and she was the enemy. I made a specific in limine pretestimony ruling that that was not admissible. That testimony came out when you yourself asked her concerning the weapon and if she had seen that before. When you open it up by asking the question, you have allowed her answer to come in and it was your questioning that brought up the testimony.

(RT 1685.) Juniel argued that McDonald's counsel had broached the issue, but the court explained that he was mistaken. The court denied his motion. (RT 1686-1687.)

### 2.    The Trial Court Properly Found That Juniel Opened The Door To The Evidence

Juniel does not specifically object to the evidence elicited by him, i.e., that McDonald saw the gun when he "pulled it" on her. Rather, he objects to the further evidence elicited by the prosecutor, contending that it was inadmissible under Evidence Code section 356. He also argues that he was merely attempting to elicit the basis for McDonald's identification of the gun. The record does not support his claim.

Evidence Code section 356 provides:

> Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be

73

inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence.

Under that section, evidence regarding the prior incident in which Juniel "pulled" the gun on McDonald was plainly admissible. (See *People v. Wharton* (1991) 53 Cal.3d 522, 592-593 [under section 356, prosecutor could present evidence of entire conversation to rebut inference suggested by defendant regarding evidence that he elicited].) The prosecutor was entitled to elicit further evidence regarding the incident to show what McDonald meant when she said Juniel pulled the gun on her. That evidence was no more inflammatory that the evidence that Juniel elicited himself. More likely, McDonald's testimony that she told Juniel he was "tripping" and to get the gun out of her face substantially minimized any prejudicial impact, particularly since other evidence showed both defendants had made references to their "A-K."

Aside from section 356, the evidence was relevant to McDonald's credibility. Contrary to Juniel's claim, he was not trying to establish the basis for McDonald's identification of the gun. Rather, he was attempting to impeach her by questioning her prior testimony that she had never seen the gun before the murder. The prosecutor, in turn, was able to show that McDonald had seen the gun before, as she claimed. Since Juniel had opened the door to this incident by trying to impeach McDonald, he cannot be heard to complain when the prosecutor elicited further evidence to rebut the attempted impeachment.

Further, Juniel could not establish prejudice, even if he could have established the evidence was improperly admitted. He does not challenge the evidence he elicited—that he pulled the gun on McDonald. He cannot show that the additional details elicited by the prosecutor were so inflammatory as to

74

require reversal, particularly since McDonald said nothing to indicate that he had actually threatened her with the gun.[34/] In light of the evidence that Juniel elicited concerning the incident, as well as testimony that he displayed his gun in front of family members, the additional evidence regarding the incident with McDonald would have been cumulative, rather than prejudicial.

Moreover, the overwhelming evidence against Juniel on the murder charge shows that any prejudicial effect from the gun incident would have been minimal. He cannot show a reasonable probability of a more favorable result had the gun incident been excluded.

## C.  McDonald Did Not Object To Evidence That She Threatened A Neighbor With A Baseball Bat

McDonald contends that evidence of the prior incident in which she threatened a neighbor with a baseball bat was inadmissible under section 1101. The record shows that the incident was not admitted under that section. Rather, it was proper rebuttal and impeachment evidence. Moreover, as McDonald appears to acknowledge, she did not object to the evidence.

### 1.  Background

Rita Ammons, McDonald's mother, testified that, unlike her daughter Sia Bolden, McDonald did not have a short temper. "She'll take a lot before she gets mad. She always had too much to lose." (RT 1328.) She worked hard and "did not put herself in situations." (*Ibid.*) Ammons also testified that before Juniel moved in with her, McDonald had regularly attended church, worked hard, and supported her family, that she was close to McDonald, and

---

34. Contrary to Juniel's claim that McDonald testified he threatened to kill her when he woke her up with the gun (AOB at 35), the record shows no such thing. (RT 1603-1604, 1616-1619.)

that McDonald took her to buy groceries and helped out in other ways. (RT 1311-1313, 1328, 1331-1332.)

On cross-examination, Juniel questioned Ammons about the extent of her knowledge of McDonald's activities and relationships. (RT 1329-1337.) Juniel then asked, "Isn't it true that a neighbor called the police and made a complaint against Ms. McDonald, while you were present, that Ms. McDonald had in fact pulled a bat on her in 1998?" (RT 1337.) Ammons said she had been told about the incident, but was not present. (*Ibid.*) She added, "The way [I] remember it is it was over a parking place, and tempers had been flaring for a long time, things were going on there. . . ." (RT 1338.) When Juniel continued to question Ammons about her recollection of the incident, Ammons replied, "It's been so long. Let me just say you're bringing this up, and it sounds familiar but I can't put it all together, so I can't remember. . . ." (*Ibid.*) Juniel asked, "Do you recall that the police was called because there had been a complaint filed against Ava because she had in fact threatened to pull a bat on someone?" (*Ibid.*) At that point McDonald's counsel objected, saying, "We've got testimony going on here." (*Ibid.*) The court sustained the objection and told Juniel to rephrase the question. (*Ibid.*) McDonald's counsel did not object to the few additional questions that Juniel asked about the incident, nor did she ever object on grounds it was inadmissible character evidence. (RT 1339.)

On direct examination of McDonald, her counsel asked about the incident when she lived on 7th Avenue and had a dispute with her neighbor. (RT 1390.) McDonald described the situation, stating that her neighbor "would always nitpick" with her. (RT 1391.) One day, the neighbor would not leave her porch unless McDonald came out to talk to her, "so I pulled a bat on her." (*Ibid.*) McDonald said she "just did it to scare her, to get her off the porch." (*Ibid.*) The police were called, but no charges were filed. (*Ibid.*)

During the prosecutor's cross-examination, he asked additional details about the incident. (RT 1640-1642.) McDonald agreed that she was angry at the neighbor because she would not leave her porch so she pulled out a bat, despite the fact that the neighbor was unarmed. (RT 1641-1642.) McDonald's counsel did not object to the prosecutor's questions. On redirect examination, McDonald testified that she never swung the bat or hit her neighbor with it. (RT 1735.)

During a discussion on jury instructions, the prosecutor suggested that CALJIC Nos. 2.40 and 2.42 should be given with respect to the evidence of McDonald's character. He noted that the issue had been broached by Ammons, who talked about character in general, that she had been cross-examined on it, and that McDonald had been examined on direct and cross about the issue. (RT 1678-1679.) The court agreed, and stated that CALJIC Nos. 2.50.1 and 2.50.2 should also be given. The prosecutor pointed out those instructions were for Evidence Code section 1101 and that the "evidence was not introduced to [sic] pursuant to 1101." (RT 1679.) When the court mentioned the incident with the bat, the prosecutor stated, "Right, but 1101 is typically admitted to show things like knowledge, intent, common plan and scheme, and it is not for character, so I think 2.50 specifically says this is not character evidence. But here it is character evidence. . . ." (Ibid.) McDonald's counsel thought "other crimes" instructions were inapplicable. (RT 1680.) The prosecutor agreed, stating, "Here we actually are offering this as character evidence. Ms. Ammons said she is peaceful and not violent, and we presented she has some bad character." (RT 1681.) The court clarified that the "bad incident is impeachment of the good character evidence." (Ibid.) The court concluded, "And I agree with you it's not being admitted under 1101. I've already given an 1101-type instruction into the battered women's syndrome concerning Mr. Juniel's bad acts, so I think

that 2.40 and 2.42 will be—should be given and I will generate it." (*Ibid.*)
McDonald's counsel did not object.

The court later instructed the jury with CALJIC Nos. 2.40 and 2.42:

Evidence has been received for the purpose of showing the good character of a defendant for those traits ordinarily involved in the commission of a crime such as that charged in this case. Good character for the traits involved in the commission of a crime charged may be sufficient by itself to raise a reasonable doubt as to the guilt of the defendant. It may be reasoned that a person of good character as to such traits would not be likely to commit the crime of which the defendant is charged.

If the defendant's character as to certain traits has not been discussed among those who know her, you may infer from the absence of this discussion that her character in those respects is good. However, evidence of good character for certain traits may be refuted or rebutted by evidence of bad character for the same traits. Any conflict in the evidence of defendant's character and the weight to be given to that evidence is for you to decide.

Where on cross-examination a witness is asked if he or she has heard of reports of certain conduct of a defendant inconsistent with the traits of good character to which the witness has testified, these questions and the witness's answers to them may be considered only for the purpose of determining the weight to be given to the opinion of the witness as to his or her testimony as to the good reputation or character of the defendant. These questions and answers are not evidence the reports are true, and you must not assume from them that the defendant did in fact conduct herself inconsistently with those traits of character.

(RT 2109-2110; see CT 380-381.)

## 2. The Trial Court Properly Admitted The Challenged Evidence

McDonald contends that admission of evidence that she threatened a neighbor with a baseball bat was not proper rebuttal evidence to her mother's testimony concerning her good character. The record does not support her claim.

To begin with, McDonald never objected to the evidence she now challenges, and thus has waived the claim. (Evid. Code, § 353, subd. (a); *People v. Saunders, supra,* 5 Cal.4th at pp. 589-590.) Not only did she not object at the time the evidence was first introduced during cross-examination of Ammons, McDonald testified about the incident during her own direct examination, providing a far more damaging picture of her actions. She also acceded to instructions concerning the evidence. Accordingly, McDonald's acquiescence in presentation of the evidence waives her claim.[35]

McDonald asks this Court to review the issue under a claim of ineffective assistance of counsel should it find she waived the issue by failing to object. She can show neither deficient performance nor prejudice.

A convicted defendant's claim that she was denied the effective assistance of counsel has two components: 1) that counsel's performance was deficient; and 2) that the deficient performance prejudiced the defense. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) In conducting its inquiry, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (*Id.* at p. 690.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Id.* at p. 697.) To show deficient performance, the defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the

---

35. McDonald contends she raised the claim in a motion for new trial. (AOB at 48-49.) The reporter's transcript pages to which she refers are not part of the record on appeal that was provided to respondent. The argument also does not appear in McDonald's written motion for new trial. (Aug. CT 115-120.) In any event, even if McDonald did raise the issue in a motion for new trial, it was obviously too late. An objection to or motion to exclude or strike evidence must be timely made. (Evid. Code, § 353, subd. (a).) Plainly, waiting until after the jury reaches its verdict is inadequate to preserve the claim.

Sixth Amendment." (*Id.* at p. 687.) To show prejudice, the defendant must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Ibid.*)

Contrary to McDonald's claim, the record shows that her mother had testified to her good character for peacefulness and nonviolence, and that she was not prone to anger or arguments with others. Juniel questioned this testimony, asking if Ammons was aware that McDonald had a prior altercation with a neighbor that involved a baseball bat. Ammons agreed that McDonald had such an altercation, although she could not recall the details. In her own testimony, McDonald described the incident in detail, explaining that the neighbor was harassing her.

As McDonald's counsel evidently realized at the time Juniel questioned Ammons, the evidence was admissible to rebut McDonald's alleged character trait for nonviolence, whether that character trait was introduced by reputation or opinion evidence. Evidence Code section 1102 provides:

> In a criminal action, evidence of the defendant's character or a trait of his character in the form of an opinion *or* evidence of his reputation is not made inadmissible by Section 1101 if such evidence is:
> (a) Offered by the defendant to prove his conduct in conformity with such character or trait of character.
> (b) Offered by the prosecution to rebut evidence adduced by the defendant under subdivision (a).

(Italics added.)

As a general rule, evidence of specific acts of the accused are inadmissible to prove his or her disposition to commit such acts, even if the defendant has opened the issue by introducing evidence of his good character. (*People v. Wagner* (1975) 13 Cal.3d 612, 619.) Nevertheless,

> The above rule, precluding the admission into evidence of specific acts of conduct to show defendant's bad moral character must, of course, be distinguished from the cross-examination of a

*reputation witness.* When a defense witness, other than the defendant himself, has testified to the reputation of the accused, the prosecution may inquire of the witness whether he has heard of acts or conduct by the defendant inconsistent with the witness' testimony. [Citations.] In asking such questions, the prosecutor must act in good faith and with the belief that the acts or conduct specified actually took place. [Citations.]   The rationale allowing the prosecution to ask such questions (in a "have you heard" form) is that they test the witness' knowledge of the defendant's reputation. [Citations.]  This rationale obviously does not apply to situations in which defendant himself is the witness. . . .

(*Ibid.* (original italics); see *People v. Young* (2005) 34 Cal.4th 1149, 1186; *People v. Hempstead* (1983) 148 Cal.App.3d 949, 953-954.)

The same rule is true if the character evidence is introduced by way of opinion testimony, rather than reputation testimony. "'In many instances, the opinion of a personal acquaintance will necessarily be based upon a mixture of personal knowledge or observation of the defendant and a knowledge of his reputation in the community.'" (*People v. Hempstead, supra,* 148 Cal.App.3d at p. 954, quoting *People v. Hurd* (1970) 5 Cal.App.3d 865, 879-880.) "When, as here, a witness is called to express an opinion as to the good character of the defendant, the prosecution must have the opportunity to let the jury test the validity of the opinion or the weight to be given to it by asking whether the holder of the opinion has knowledge of events or acts which have indisputably occurred." (*People v. Hempstead, supra,* 148 Cal.App.3d at p. 954.)  When such cross-examination of a good-character witness is permitted,  instruction with CALJIC No. 2.42 is appropriate. (*Ibid.*)

Here, the evidence of McDonald's conflict with her neighbor was relevant to rebut her mother's opinion evidence of her good character. Accordingly, her counsel's performance was not deficient based on her failure to object to the evidence, regardless of whether Juniel should have sought its admission beforehand.

McDonald's reliance on *People v. Felix* (1999) 70 Cal.App.4th 426 for a contrary rule is unavailing. In addition to addressing reputation testimony, the court stated, "Lay opinion testimony is admissible under section 1102 when it is based on the witness's personal observation of the defendant's course of behavior." (*Id.* at p. 430.) Thus, the opinion testimony of the witness who had personally observed the defendant ingest heroin was proper, but not that of the witness who had not observed the defendant's conduct. (*Ibid.*) The court also found error because the trial court allowed the prosecution to introduce independent proof of the defendant's prior conviction. (*Id.* at pp. 431-432.) The court nevertheless found the trial court's error harmless, because the prosecutor could ask the defense character witnesses if they had heard about the defendant's conviction. (*Id.* at pp. 432-433.) The court's holdings support, rather than undermine, admission of the evidence here.

Moreover, any error in admission of the baseball bat incident was plainly harmless. The evidence of McDonald's guilt with regard to Alexander's murder was overwhelming. Accordingly, she cannot show a reasonable probability of a more favorable result even if counsel had objected and the trial court had excluded the challenged opinion testimony. (See *Strickland v. Washington, supra,* 466 U.S. at p. 694; *People v. Felix, supra,* 70 Cal.App.4th at pp. 432-433.)

## III.

## THE TRIAL COURT DID NOT ERR BY ADMITTING EVIDENCE ALLEGEDLY SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE

Juniel contends the trial court erred by admitting evidence subject to the attorney-client privilege (Juniel, Arg. IV). Specifically, he contends that the contents of a letter he wrote to his former counsel, Gary Sherrer, should not have been admitted when he was cross-examined by McDonald's counsel. The record does not support his claim.

### A. Background

During McDonald's counsel's cross-examination of Juniel, she asked if he had given her a statement at the preliminary hearing regarding his involvement in the case. (RT 2037.) Juniel denied that he had done so. (*Ibid.*) Counsel showed him a letter dated April 23, 2003, and Juniel agreed that the handwriting was his. (RT 2037-2038.) However, he denied he had given it to McDonald's counsel.

> No, I did not present that to you. In fact I presented that to my lawyer and I had no idea that he would give you that. That's not a statement. That was a note to my lawyer, and I feel that that abuses my rights of lawyer-client privileges. I had no idea you would get that or read that.

(RT 2038.) When counsel stated he had given her the letter in Municipal Court, Juniel denied it. When counsel attempted to address the contents of the letter, Juniel objected on grounds that his lawyer had given the letter to her, and that he did not find out about it until "after the fact." (*Ibid.*) The court stated, "She has identified it and may read from it." (RT 2039.)

Counsel then read from the letter, while questioning Juniel about its contents. In the letter, Juniel stated that he was with Eric Hood the night of the

murder, that Juniel was driving McDonald's car, that Hood asked him to stop, after which Hood got out of the car and shot a woman twice. When Juniel asked Hood why he shot the woman, he said that she was a dope fiend and owed him money. Hood gave Juniel the gun to hold for him. (RT 2039-2040.) Juniel said he made up the name of Eric Hood and that the whole letter was a lie. (RT 2040.)

During a discussion on the admission of exhibits, Juniel objected to the letter on grounds that it violated his attorney-client privilege. (RT 2091.) He asserted it was a confidential communication that he had given to his former counsel, Gary Sherrer. He found out that McDonald's counsel had a copy of the letter from his investigator, Michael Rosenblum. (RT 2091-2092.) McDonald's counsel stated she obtained a copy of the letter during the preliminary hearing "because there were numerous copies." (RT 2092.) She said that both Juniel's investigator and his former counsel were aware that she had the letter. (*Ibid.*) Juniel disputed counsel's representation, stating that he did not give a copy of the letter to her. (*Ibid.*) The court ruled, "The extent to which Mr. Juniel read from that statement is in the record and that is part of the evidence. The remainder of it, Mr. Juniel's claim of attorney-client privilege, is sustained the [*sic*] and the document will not go in." (*Ibid.*)

The next day, the court addressed the issue again:

> Mr. Juniel, you said you wanted to put something on the record outside the presence of the jury. Before we do that there's one matter I do wish to put on and this is with regard to defendant McDonald's exhibit K which Ms. Brown had requested to be fully admitted. I want to state for the record that Ms. Brown has presented her allegation and her contention that Mr. Juniel handed this item to her. Mr. Juniel said that he did not hand it to Ms. Brown and that in fact it was either the investigator or his previous attorney Mr. Sherrer who distributed this document to Ms. Brown.
>
> In any event, I do not wish to make any kind of finding that Mr. Juniel's testimony is correct or that Ms. Brown's contention is correct. I am excluding the document solely on the following basis: Number

1, Mr. Juniel has made a claim of attorney-client privilege. Number 2, Ms. Brown was able to cross-examine Mr. Juniel and put in elements of this document and the testimony concerning those elements is part of the record. Number 3, I find that this exhibit may be cumulative in that numerous other letters written by Mr. Juniel were in fact put in by Ms. Brown to impeach certain statements he has made. And 4, under 352 I find that the prejudice to Mr. Juniel outweighs the probative value therein. For those reasons I am excluding this.

I did not wish in any way to make an absolute determination that the attorney-client privilege had been adequately supported by the evidence. It was solely the claim, the potential claim of attorney-client privilege under which I was proceeding.

(RT 2181-2182.)

## B. The Trial Court's Admission Of The Letter's Contents Did Not Deny Juniel A Fair Trial

Juniel contends that admission of the letter's contents without a hearing to assess whether it was privileged denied him a fair trial. The record does not support his claim.

The record shows that Juniel was aware well before trial, and perhaps as early as the preliminary hearing, that McDonald's counsel had a copy of the letter he had given to Sherrer. Yet, neither through his own counsel nor while representing himself did Juniel ever seek to retrieve the letter on grounds that McDonald's counsel's possession of the letter violated his attorney-client privilege. Instead, the issue did not arise until counsel attempted to cross-examine him with it at trial. Since Juniel knew "after the fact" that his former counsel had given the letter to McDonald's counsel, his contention that he had established a prima facie claim of attorney-client privilege when the letter was discussed at trial is unpersuasive. Juniel is saying essentially that his former counsel had violated the privilege, that Juniel knew he had done so, but that

85

neither successive counsel nor Juniel himself made any effort to rectify the violation.

The record thus does not support a finding that the trial court should have held a mid-trial hearing on Juniel's claim of privilege. Moreover, in light of Juniel's admission that he knew former counsel had disclosed the letter, as the trial court later found, it is not reasonably probable the court would have found it privileged even if it had held a hearing on the issue.

In any event, even if the trial court should have held a hearing on the question whether the letter was privileged, and even if it had ruled that McDonald's counsel could not inquire into the contents of the letter, Juniel could not show a reasonable probability that he would have obtained a more favorable result had the evidence been excluded. (Evid. Code, § 353, subd. (b); *People v. Watson, supra,* 46 Cal.2d at p. 836.)

As shown above, the evidence presented by the prosecution, which Juniel does not challenge, overwhelmingly showed his guilt of Alexander's murder. The additional evidence presented during his cross-examination could not have had the prejudicial impact of which he complains. In particular, Juniel's claim that the letter undermined his credibility because it showed a different line of defense than that presented at trial is wholly unpersuasive in light of his numerous statements in phone calls from jail that he "did it," that he was there to "protect and defend," and that he was facing 25 years to life in prison. If anything undermined his trial defense, it was his own admissions, made repeatedly and clearly. As to the prosecutor's argument that Juniel was a liar, that too was amply demonstrated by Juniel's many conflicting statements, made both in and out of court. The additional evidence that he told yet another story could not have had the prejudicial impact he accords it. (Cf. *People v. Michaels* (2002) 28 Cal.4th 486, 537-538 [erroneous admission of capital

86

murder defendant's privileged note to counsel, which showed defendant was aware of his own violent impulses, found harmless].)

**IV.**

**THE TRIAL COURT DID NOT VIOLATE JUNIEL'S CONSTITUTIONAL RIGHTS BY ASKING IF HE WAS GOING TO TESTIFY**

Juniel contends that the trial court violated his constitutional rights by asking him to declare whether he would testify in his own defense (Juniel, Arg. V). The record does not support his claim.

## A.  Background

Juniel presented his defense case before McDonald's defense case. When he rested, however, he did so with the court's agreement that if he was able to locate his additional defense witnesses, the court would allow him to reopen. (RT 1309-1310.)

Near the close of trial, when the court and parties were discussing jury instructions, the court asked Juniel's advisory counsel if Juniel was going to testfiy, but said it did not need an answer at that time. (RT 1684.) Near the close of testimony on the following day, the court indicated its concern that McDonald would not have her remaining witnesses available until the next day, which was anticipated to be the last day of testimony, and that they were in danger of losing some of the jurors. The court also stated that it did not know whether Juniel was going to testify. (RT 1804-1805.) Juniel said he did not intend to testify, although he had some additional witnesses to present after McDonald finished her defense case. (RT 1805.)

At the end of the day, when reviewing instructions again, the court said to Juniel, "You indicated to me you do not intend to take the stand. You do not intend to testify, correct?" (RT 1837.) Juniel replied, "At this time I have not yet decided, your honor, and I cannot say whether or not right now—I can say right now that I have not informed the court I would not or not [*sic*]

88

testify." (*Ibid.*) The court said that Juniel had changed what he said earlier, and that it could not finalize the instructions until Juniel decided what he was going to do. (RT 1837-1838.) Juniel then said he could not finalize instructions until he heard the remaining witnesses, because he might want additional or different instructions. (RT 1838.) When the court asked what additional instructions he might want, Juniel said he had "no idea." (*Ibid.*) The court and Juniel continued to discuss what additional instructions Juniel might want after hearing McDonald's remaining witnesses. (RT 1838-1839.)[36] The court then stated,

> Mr. Juniel, I will remind you that you did rest and it is within my discretion to allow you to reopen. Now you have the substance of their testimony. All I'm asking you, sir, is could you give me a yes or a no so that I can adequately frame the instructions, get them to the printer and we don't waste three hours of time on the printer printing the instructions. That's all I'm asking you. If you say yes, you are, then I'm going to put certain elements in. If you say you're not going to testify, then I'm going to take certain elements out. If you say yes, you are going to testify, then I am going to delete instruction 2.60 and 2.61, which is the instruction which says that you have a right to remain silent. That's what—that is what my question is about. If you say no, then I'm going to put it in if you so request, but I have to frame these instructions.

(RT 1839.) At that point, Juniel said he would testify. (*Ibid.*)

The next day, after McDonald presented her remaining witnesses and Juniel presented two additional witnesses, Juniel began his own testimony. (RT 1963.) The following day he continued his testimony. (RT 2015.) Tomaz Pickens, McDonald's son, testified as a rebuttal witness for McDonald. (RT 2076; see RT 2013-2014 [court ruled that Pickens could testify in rebuttal after

---

36. Contrary to Juniel's representation on appeal (AOB at 42-43), he did not indicate that he was weighing whether to *testify* based on McDonald's witnesses' testimony. Rather, he was weighing what additional instructions he might want. (RT 1838-1839.)

Juniel said he never hit him].)  When Juniel objected that he had been rushed and did not have a chance to explain all of the evidence, the court permitted him to present a brief rebuttal.  (RT 2095; see RT 2096-2099.)

## B.    The Trial Court Did Not "Force" Juniel To Declare In Advance Whether He Would Testify

Juniel attempts to portray the issue here as one in which the trial court "forced" him to declare in advance of McDonald's defense case whether he would testify.  He claims that he was entitled to hear that case before making his decision.  His argument misconstrues the record.

As set forth above, when the trial court asked Juniel whether he would testify, it was at the end of the day before the last scheduled day of testimony. The court wanted to finalize the instructions for the printer, having anticipated they would be needed the next day. As the parties were well aware by that time, McDonald's remaining witnesses would be presenting only brief testimony. Further, as the court pointed out to Juniel, he already knew the substance of that testimony, not only through the witness statements, but through the extensive discussions of the parties and court on the issues. Thus, unless Juniel testified, the court could safely assume the evidence would be concluded the next day, and that it would have to instruct the jury.[37]

Juniel's claim that he did not know the substance of McDonald's defense case, and thus did not know whether or not he should testify, is simply incorrect. McDonald had already testified at length, including Juniel's two days of cross-examination. Her expert on domestic violence also had testified. The remaining brief witnesses would add little to the defense case. Thus, whether

---

37.  The court instructed the jury before the parties gave their closing arguments.  (RT 2099-2126.)

Juniel would respond to McDonald's testimony did not depend on the additional witnesses she planned to present.

Juniel's claim that the trial court should have looked after his constitutional rights because he was representing himself is equally without merit. Juniel was represented by advisory counsel throughout his trial. If he had any questions on the issue, he could have consulted counsel, but did not. Moreover, Juniel never said that he was unprepared to make the decision regarding whether to testify or that he felt pressured into making the decision. His discussion with the court concerned the instructions that would be given, which he thought might change depending on the witnesses' testimony. He never said that he had to wait until he heard their testimony before deciding whether to take the stand. In any event, having heard the remaining testimony the next day, Juniel could have decided he would not testify after all. His decision to testify was plainly voluntary. He wanted to present his own version of events, both in response to the prosecution's case as well as in response to McDonald's defense.

Juniel's reliance on *Brooks v. Tennessee* (1972) 406 U.S. 605 is unavailing. In that case, the Supreme Court struck down a Tennessee statute that required a defendant to testify before any other defense witness, or not at all, on grounds that it violated a defendant's right to remain silent at trial, as well as his right to due process. (*Id.* at pp. 611-613.) In reaching its decision, the court stated, "By requiring the accused and his lawyer to make that choice without an opportunity to evaluate the actual worth of their evidence, the statute restricts the defense—particularly counsel—in the planning of its case." (*Id.* at p. 612.)

No such restriction applied here. The trial court had granted Juniel extensive leeway in the conduct of his case. For example, although he presented his defense case first, and had rested, the court stated it would permit

91

him to reopen if he could locate the additional defense witnesses he was seeking. At that point, Juniel did not give any indication that he intended to testify. It was not until near the close of McDonald's defense case, and the close of trial, that the court indicated it needed to know the schedule of witnesses for the last day, and whether Juniel would testify. Although Juniel claims he was "forced" into a premature decision, this case is wholly unlike the situation in which a defendant is forced to testify first in his defense case, or not at all, when he has had no opportunity to hear his own witnesses. As our own Supreme Court has recently stated, "The holding of a case is coextensive with its particular facts." (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 933.)

Moreover, in *Brooks*, the defendant did not take the stand because the trial court refused to permit him to delay his testimony until after the other defense witnesses had testified. (*Brooks v. Tennessee, supra*, 406 U.S. at p. 606.) The state statute requiring his testimony first thus unconstitutionally restricted the defendant's right to remain silent. (*Id.* at pp. 609-610.) "The rule, in other words, 'cuts down on the privilege (to remain silent) by making its assertion costly.' [Citation.]" (*Id.* at p. 611.) Here, by contrast, Juniel did not have to initially decide whether or not he would take the stand. He waited until he had heard nearly all of his own and McDonald's defense cases before deciding to testify. Unlike the defendant in *Brooks*, Juniel was able to put off his testimony "until its value [could] be realistically assessed." (*Id.* at p. 610.)

Juniel's reliance on *People v. Cuccia* (2002) 97 Cal.App.4th 785 is also unavailing. In that case, the trial court required the defendant to testify out of order, or rest his case, when another defense witness was unavailable. The court also made the defendant decide whether to take the stand in the presence of the jury, reminding him that he had said before that he was going to testify. The defendant completed his testimony the next day, after the remaining witnesses had been called. The trial court rejected the defense motion for a

mistrial on grounds that the court erred by asking in front of the jury whether the defendant still planned to testify. (*Id.* at p. 791.)

The reviewing court found the circumstances were not analogous to those in *Brooks v. Tennessee*, because in *Brooks* the defendant did not testify. "Nonetheless, we conclude [defendant's] waiver [of his privilege against self-incrimination] was coerced based on the trial court's threat to consider his case rested if he did not testify." (*People v. Cuccia, supra,* 97 Cal.App.4th at p. 791.) Applying the federal harmless error test, the court concluded that the error, standing alone, was harmless beyond a reasonable doubt. (*Id.* at pp. 791-792.) Although the defendant later said he probably would not have testified had he been able to make his decision after hearing his remaining witnesses, the court stated, "from this alone, we cannot conclude the outcome of the trial would have been different." (*Id.* at p. 792.) The court noted that the defendant's testimony was the only evidence offered regarding some aspects of the case. (*Ibid.*) "In sum, his testimony was necessary to defend against some elements of the charges against him." (*Ibid.*)

The court further found that the trial court's ultimatum to the defendant to testify or rest his case constituted an abuse of discretion, where a brief continuance would have allowed the defendant to present his other witnesses before deciding whether to testify. "However, . . . even in the absence of the error, it is not reasonably probable defendant would have obtained a more favorable verdict." (*Ibid.*)

The trial court also had permitted the prosecutor to reopen his case and offer rebuttal evidence in the middle of closing argument, but declined to permit the defendant to develop and present surrebuttal evidence. (*Id.* at pp. 792-794.) The reviewing court again found error, and again found that, standing alone, the error did not require reversal. (*Id.* at pp. 794-795.) However, the court found that the combination of the infringement on the

defendant's right to remain silent and the refusal to allow him to present surrebuttal evidence warranted reversal. "Under the facts here, there is a reasonable probability the jury would have reached a verdict more favorable to defendant in the absence of both errors." (*Id.* at p. 795.)

In the instant case, the trial court did not threaten to force Juniel to rest unless he decided whether to testify. He had already rested, but the court was going to permit him to present additional witnesses he had since located. The issue was whether he would testify as well. The trial court did not raise the issue in front of the jury, nor tell the jury that he had previously taken a position on whether he would testify. The trial court also did not permit the prosecution to present rebuttal evidence, but preclude Juniel from presenting surrebuttal. After Tomaz Pickens's brief rebuttal testimony, the trial court permitted Juniel to present his own rebuttal testimony. In short, the situation here is wholly unlike that of *Cuccia.*

Moreover, the *Cuccia* court found that the infringement on the defendant's right to remain silent was harmless beyond a reasonable doubt, and that the trial court's ultimatum regarding the decision whether to testify was harmless under the state harmless error standard.[38] Under either harmless error standard, Juniel could not show prejudice, even assuming he could have shown error.[39]

---

38. In *People v. Cuccia, supra,* 97 Cal.App.4th at p. 791, the court cited *Arizona v. Fulminante* (1991) 499 U.S. 279, 309-311, as authority for applying the federal harmless error test to the infringement of a defendant's constitutional right to testify and right against self-incrimination.

39. Juniel argues that the trial court would have abused its discretion if it had denied him permission to reopen his case. Since the trial court was going to allow him to reopen to present his additional witnesses in any event, his contention appears misplaced.

Juniel contends that if the court "had not forced [him] to declare whether he would testify, he might have decided (after hearing the other witnesses' testimony) not to take the stand," and that his decision to testify "turned out to be enormously damaging to his case." (AOB at 49.) However, he also contends that "it would have been grossly unfair to deny [him] an opportunity to present evidence, including his own testimony, to rebut Ava's evidence of his bad acts and bad character," and that "it would have been absurd for the trial court to prevent [him] from reopening his case so that he could reformulate his defense." (AOB at 47.) The latter contentions more accurately reflect Juniel's desire to testify, and thus the lack of prejudice with respect to when he made his decision to testify.

Moreover, Juniel had represented himself. In doing so, he had alluded to his defense throughout the trial, through the questioning of witnesses and comments to the court and jury. Only his own testimony, however, could be considered by the jury in determining his guilt. As in *Cuccia*, only Juniel could address certain aspects of the case and only he could defend against some elements of the charges against him, such as his possession of the gun, and whether he participated in a deliberate, premeditated murder. Also, only Juniel could respond to McDonald's contention that he had abused her and forced her to participate in the murder. Juniel presented a far different picture of his relationship with her, one which was also consistent with her repeated expressions of love for him, and which, if believed by the jury, would have substantially lessened any negative impact from the domestic violence evidence she had presented.

Juniel's contention that damaging testimony was admitted because he decided to testify, and was then impeached, does not accurately reflect the record. In particular, the prosecution had already played in its case-in-chief a tape-recorded phone call that Juniel made from jail to a witness on April 26,

95

2003, in which he made threatening statements (People's Exh. 25), a tape-recorded phone call that Juniel made from jail to a relative of McDonald's named Mela on April 3, 2003 (People's Exh. 26), and a tape-recorded phone call that Juniel made from jail to Sia Bolden on March 15, 2003 (People's Exh. 28). (RT 1184-1185, 1099-1102.) Those tape-recorded statements contained much of the information that was later repeated during the course of Juniel's cross-examination. Accordingly, his complaint that damaging evidence was admitted against him only because he testified (AOB at 49-50) is not supported by the record.

For example, Juniel told Bolden, "I'm going to give her the okay to give me up, Sia, alright? . . . She's going to have to testify against me and that's going to set her free, alright?" He said he would "do life" for McDonald. (People's Exh. 28A at 2.) As to the gun found in their house, he said, "The ballistics on the gun is a dead issue. They're not going to be able to match the gun with nothing that got to do with the homicide, so you won't hear nothing about that gun inside the court." (*Id*. at p. 4.) He added, "I'm a grown ass man. Even though I did what I did and I took it upon myself to do what I, what the fuck I wanted to do. No . . . but that don't got shit to do with it. I knew right from wrong." (*Ibid*.) On the evidence again, "They didn't find nothing in the car. . . . They don't have a potential witness. ¶ . . . [T]hey don't have nothing on us. . . . ¶ . . . They didn't find no fingerprints nowhere." (*Id*. at pp. 5-6.) "But, if it all fails, I'm taking everything." (*Id*. at p. 7.) "And if they've got the upper hand, if they got the, they, they got the stronger muscle, okay. Okay, I'll take it. I'll take it like a man. You feel me? 'Cause I did what I had to do. I did what I did. You feel me? I did what I did. ¶ . . . And I did what I did for, for, for who I wanted to do it for." (*Ibid*.) Later he said, "The shit was sloppy," but added again, "I did what the fuck I wanted to do on my own accord." (*Id*. at p. 10.) He also commented on the witnesses, saying, "And why all of a

sudden this motherfucker that looked out the window stepping up after a week?"; "Why them motherfucking white people that was standing outside in the middle of the street when the shit was happening couldn't identify me the same night?" (*Id*. at p. 13.) Juniel concluded, "Let's fight for a few weeks. If shit ain't looking no good in three to five weeks, I'm taking this shit. Get ready to go." (*Id*. at p. 14.)

In the April 3, 2003, conversation, Juniel said, "I was there to provide. I was there to protect. I was there to defend no matter the cost. Whether the mother fucker was right or wrong. Motherfucker wasn't going to disrespect mine, you feel me? And I'm going to lay my life down for mine." (People's Exh. 26A at p. 2.) He was fully prepared to go to jail for his actions. (See *id*. at p. 3.)

Although Juniel contends that evidence was admitted during his cross-examination that "apparently admitt[ed] guilt" (AOB at 50), it was merely cumulative to the evidence already admitted in the prosecution's case. In addition, some of the tapes played during Juniel's cross-examination were excerpts from the March 15, 2003, conversation with Bolden. (See People's Exhs. 81A, 82A.)

Juniel complains that the prosecution played a tape recording in which he instructed Bolden to destroy evidence. Sergeant Brock had already testified regarding that phone call in the prosecution's case, including Juniel's suggestion that Bolden get rid of incriminating evidence. (RT 1083-1088.) The prosecution had also played the tape recording in which Juniel tried to intimidate a witness. (RT 1184-1185; see People's Exh. 25A.)

Juniel claims that McDonald's counsel also attacked him and presented damaging evidence, yet it was no more damaging than the statements already presented by the prosecution. For example, his claim that counsel

presented a letter in which he admitted to McDonald, "I had to do what I had to do and I did," simply echoes his own statements to Bolden.

It is frequently the case that defendants who testify open themselves to damaging impeachment evidence, and this case was no exception. A defendant must weigh the risks of testifying and presenting his case against the risks of not testifying and depriving the jury of the witness who might best be able to explain the events at issue. Juniel had listened to the evidence in the lengthy trial, including both the prosecution's case-in-chief and most of his own and McDonald's witnesses. The record shows that he made the decision to testify freely and voluntarily, having decided that his own testimony was necessary to complete his defense, despite the risks involved. Notably, much of the damaging evidence against him had already been admitted, and he may well have felt that only his own testimony could blunt that evidence. The record does not support a finding that he was prematurely "forced" to make a decision whether to testify.

Juniel has failed to show that the trial court's actions unfairly infringed his right to remain silent. Even if he could have made such a showing, any error was harmless beyond a reasonable doubt. Accordingly, his claim should be rejected.

**V.**

**THE TRIAL COURT'S CONDUCT OF THE TRIAL
DID NOT PREJUDICE JUNIEL**

Juniel contends that the trial court made rulings that denied him his right to due process and his right to present a defense. (Juniel, Arg. VI.)  The record does not support his claim.

### A.    Trial Court's Evidentiary Rulings

Juniel repeats his contentions regarding the trial court's rulings on McDonald's domestic violence evidence, which have been set out below. Contrary to his contention, the court did not permit "a mass of new evidence." As already stated, the parties knew from the outset that McDonald would argue she was forced to participate in the murder, and that Juniel had abused her.  The trial court ruled that it would permit some of the evidence McDonald wanted to present on the limited issue of her credibility and mental state, but not all of it.  McDonald's testimony concerning specific acts of misconduct consumed only a few pages of trial transcript. (RT 1460-1466.) The additional witnesses that McDonald presented on the issue accounted for less than a day of testimony, much of which corroborated McDonald's statements, but did not expand the evidence.  Juniel cross-examined McDonald for two days, a substantial portion of which addressed the domestic violence evidence, and their relationship in general.  He cross-examined her additional witnesses only briefly, if at all.  Accordingly, not only does the record show that the trial court did not permit "a mass of new evidence," nor "all of [McDonald's] domestic violence evidence" (AOB at 52, 55), it shows that Juniel's decision to focus on

99

the evidence in his cross-examination of McDonald, which drew out even more information, was a choice he made as part of his trial tactics.[40/]

Moreover, Juniel asked McDonald's mother whether she was aware that McDonald was in an abusive relationship with him. (RT 1356-1357.) He thus raised the issue before McDonald even testified. Since the question of his relationship with McDonald was an issue from the outset, in light of McDonald's claim of duress, Juniel cannot now complain that the trial court's later, more specific rulings precluded him from presenting an effective defense.

## B.    Trial Court's Rulings And Comments During Trial

Juniel also claims that the trial court blamed him for the length of the trial. He cites one incident near the beginning of his defense case, but it does not support his contention. While Juniel was examining Sergeant Nolan, he said he was not familiar with what had been marked as evidence. (RT 1239.) The court took a recess so that Juniel could review the evidence log and request exhibits from the clerk. (RT 1240.) After the recess, Juniel said he had not had an opportunity to review the exhibits. When the court said that much of what he was presenting had already been gone over in Nolan's previous testimony for the prosecution, Juniel said he had not had an adequate opportunity to inquire regarding the exhibits. (RT 1240-1241.) The court suggested, "If you can focus your questions and specifically on what you're attempting to get to and then we can help you find that exhibit. I'd like to have Sergeant Nolan complete his testimony—" (RT 1241.) When Juniel identified the area he was interested in (concerning the second search of his house), the court said he had

---

40. Juniel did not view all of the testimony at trial in the same light he views it on appeal. For example, he said to the court during a recess, "I don't have a problem with Thomas's [*sic* (Tomaz Pickens)] testifying" in rebuttal. (RT 2013.)

asked about it several times. Juniel responded that he had not got an answer. (*Ibid.*) The court reiterated that Juniel had asked the question at least three times, and that it had been answered. The court stated, "Proceed and let us conclude his testimony." (*Ibid.*) Juniel continued to question Nolan about both searches of his residence. Contrary to Juniel's representation, the court did not admonish him "that he was taking too long" (AOB at 52), but instead made an effort to help him focus his testimony on the areas in which he was interested, rather than repeating the testimony already presented.

Juniel next cites an incident during his cross-examination of McDonald. During a recess on September 11, 2003, the court stated,

> Mr. Juniel, before I bring the jury down I wanted to talk to you briefly. As you are aware, when we started this case I told the jury that we would be done with the case by September 4th or 5th. Then last week I told them I thought the case would be submitted to them by the end of this week. I am now going to have to tell them I was in error and it's going to be the end of next week.
>
> I have noticed—you have had Ms. McDonald on cross-examination for over six hours now and it's been over a day and a half. You have heard the term brevity is the soul of wit? You've heard that term? That applies to brevity is also the soul of witnesses so that you would see if you could go to areas that have not yet been covered and see if you can draw your cross-examination to a close, I am certain that you would be well served before the jury. Will you agree to do that?

(RT 1583-1584.) Juniel agreed that he would. (RT 1584.)

Later, the court apologized to the jury when informing them that the trial would take longer than anticipated, stating that it had miscalculated the timing. (RT 1661.) The court polled the jurors on their availability in the coming weeks, but decided not to release anyone at that time. (RT 1661-1662.) The court in no way suggested that the length of the trial was anyone's fault.

During Juniel's recross-examination of McDonald, the prosecutor objected to a question as asked and answered. (RT 1756.) When the court

sustained the objection, Juniel said, "Your honor, I haven't asked the degree of running." (*Ibid.*) (He had asked McDonald if he was "running very fast or kind of jogging speed" after the murder. (RT 1755.)) The court responded, "You did on your initial cross-examination, sir. You don't get to repeat—" (RT 1756.) When Juniel objected, the court explained, "Mr. Juniel, you don't get to ask the same questions you asked on cross again on recross. It's not a repeat." (*Ibid.*) When Juniel continued to press the point, the court said, "Please don't argue with me, Mr. Juniel." (*Ibid.*) After a few more questions, Juniel brought out several exhibits that had not been revealed to the other parties. (RT 1757.) The court stated it would take the lunch recess early and review the exhibits. (*Ibid.*) Outside the presence of the jury, the court stated,

> Mr. Juniel, if you have any additional documents that you are planning to use, please show them to opposing counsel and to the district attorney at this time.
>
> Secondly, Mr. Juniel, I want to assure myself that the—this witness is completed within a reasonable period of time. How much more cross-examination—recross-examination do you have, sir?

(*Ibid.*) Juniel responded that he felt it was a violation of his constitutional right to a fair trial that the court was "rushing" him. (RT 1757-1758.) The court replied,

> Sir, I asked you a question. You may make that objection when I finally do cut you off, if and when I do. I asked you a question as to how much longer you have. I would point out, sir, that you had this witness on the stand already for over a day on cross-examination, you have now had an additional 45 minutes on recross, far exceeding Mr. Golde's cross-examination and exceeding the direct.
>
> Now could you answer my question as to the amount—

(RT 1758.) Juniel said he just needed to address his exhibits. (*Ibid.*)

Again contrary to Juniel's representation, the court did not tell him in front of the jury "to speed up his questioning" (AOB at 53), nor otherwise "rush" him in his recross-examination. The court simply wanted to know how

much longer he might be, which was a legitimate concern in managing the trial, as well as scheduling the remaining witnesses. (See RT 1758 [scheduling expert witness].) The court specifically stated it was not going to "cut [Juniel] off," at least not at that time.

Juniel next points to an exchange near the close of the trial. The parties had reviewed the final jury instructions for mistakes and objections, as well as the remaining exhibits to be admitted. (RT 2087-2095.) Juniel then stated,

> I would like to say that I don't feel that I was given an adequate right to a fair trial. I feel that this whole thing was rushed through, and I'm sure that counsel as well as prosecution feels that way as well because there were certain points and things that I was not able to explain as a matter of fact, as my rebuttal. I have not been given an opportunity of that, I don't feel. I don't feel I have been given an opportunity to explain a lot of the evidence which I should have had the opportunity—

(RT 2095.) The court stated that Juniel could have 10 minutes to present whatever rebuttal he wished. Juniel did not object to the time limitation. (*Ibid.*)

Juniel had not previously asked to present redirect, additional or rebuttal evidence, either at the close of the cross-examination of his own testimony or at the conclusion of McDonald's rebuttal evidence. (RT 2076, 2086.)[41] He did not ask to present rebuttal evidence until immediately before the trial court was going to instruct the jury. The court thus allowed the evidentiary portion of the case to be reopened when it allowed Juniel to testify again. Consequently, Juniel's claim on appeal that he was not permitted adequate time for rebuttal is without merit. His contention that he should have been entitled to respond to the parties' cross-examination of him was not raised below in a timely fashion. The court was not obligated to reopen to permit

---

41. Juniel testified as his own last defense witness, after which Tomaz Pickens testified briefly in rebuttal for McDonald.

reexamination of the case at length. Since Juniel did not object to the time limitation, or identify any evidence or points that he felt he needed to present in further detail, he cannot now complain that he was prevented from adequately presenting his case. Moreover, when Juniel did testify in rebuttal, he addressed matters that had been presented in the prosecution's case, such as the tape-recorded phone calls. (RT 2096-2098.) He could have addressed those calls more thoroughly in his direct examination, had he chosen to do so. He also had an opportunity to address them in his closing argument, and did so. (RT 2185-2186.)

Juniel's claim that he was prevented from presenting his defense is not supported by the record. He cites no authority for the proposition that his right to present a defense means that the trial court must permit the presentation of defense evidence without restriction. On the contrary, "Application of the ordinary rules of evidence, such as Evidence Code section 352, generally does not deprive the defendant of the opportunity to present a defense . . . ." (*People v. Snow* (2003) 30 Cal.4th 43, 90.) Here, moreover, Juniel did not specify below (indeed, did not object), nor does he specify on appeal what additional evidence he would have presented or responded to, and how his inability to present or respond to evidence prejudiced his defense. His vague and conclusory assertions that he would have offered probative evidence, and would have responded to the cross-examination to which he had been "subjected" (AOB at 57), does not establish harm, particularly in light of the actual record.

## C.  Trial Court's Rulings Regarding Closing Argument

After the prosecutor presented his closing argument, Juniel told the court,

> I would like to put on the record I am not ready to proceed at this time. I feel that based on the evidence presented newly today as well

104

> as new testimony from witnesses I have not been given adequate time
> to prepare exactly the strategy for my defense. However, over my
> objection to giving my closing argument today I will for the
> convenience of the court start my closing argument. I'm going to
> need more time than today.

(RT 2154.)[42/]  The court responded,

> Mr. Juniel, I indicated I thought that we—I told you at the outset
> that we were going to argue Monday or Tuesday. It is now
> Wednesday afternoon. The reason we have gone this long is that
> basically it was your cross-examination of Ms. McDonald that caused
> the lengthy delay.
> I am going to order you to commence your argument and you are
> going to finish your argument this afternoon, sir. I will stay here until
> you're done. Given the fact that Mr. Golde has taken less than an
> hour, and I have instructed Ms. Brown to take less than an hour, I'm
> going to instruct you also to take one hour of argument.

(RT 2154-2155.)

The court subsequently told Juniel when he had seven minutes left.
(RT 2176.) When Juniel said he did not think he would finish in seven
minutes, the court stated, "I'm asking you to please conclude during the time
limitations that I have set on everyone who's in this case." (*Ibid.*) When Juniel
had gone over his time, the court asked him to reach his conclusion. (RT
2178.)

The next morning, Juniel stated that he understood the court had a
limited amount of time, but he asked for 10 more minutes to address some
important issues and reach his conclusion. (RT 2182.) The court gave Juniel
an additional eight minutes of argument. (RT 2183-2184.)

After trial, Juniel filed numerous motions, including one which argued
that he had been rushed in his preparation of the case and his closing argument.

---

42. Only Juniel and Pickens testified that day.

(CT 453-454.) At the sentencing hearing, Juniel raised other claims regarding his alleged inability to prepare. The trial court denied his various motions.

> With regard to the issue of the opening statement, it was your decision to ask to relieve Mr. Levy as counsel, to represent yourself and to give the opening statement. I granted all three of your motions, and the mere fact that you are now claiming that you were not prepared was something that you took into consideration at the time that you gave the opening statement and requested to be able to do it, and that again is not a grounds for a dismissal or a denial—or granting of a new trial.

(CT 474.) Regarding discovery, the court noted,

> Mr. Juniel, Number 1, you never once indicated to the court that you had any discovery problems in terms of getting—either getting the reports belatedly or not having the reports at all. This is the first that I have heard of this issue. And Mr. Levy had indicated to me to his knowledge there were no reports that you did not have at the time that the witness was testifying. If you had needed time, and so asked me, I would have given you the extra times to review the reports. But the reports, if I recall, were not that extensive and would not take several hours to absorb.
>
> . . . .
>
> But, Mr. Juniel, your motion here claims a violation of your rights to a fair trial based upon my actions of not giving you adequate time or ample opportunity to prepare. And based upon that allegation I am examining my recollection, and I don't recall any time I denied your request to give time to prepare or time to look over the discovery, or even never [sic] was I notified that you had just recently received discovery.
>
> So if you're claiming that there was a violation of your rights based upon my actions, I do not find that my actions in any way support your claim in that I was never notified that you had these problems until just now.

(CT 480-481.)

Juniel persisted in his claims that he had not been provided adequate discovery, and further argued that he had been rushed to complete his cross-examinations and closing argument. The court responded, "Excuse me? If I

recall, you had Ava McDonald on the stand for two straight days. You're saying that I rushed you to finish that cross-examination, sir?" (CT 487.) When Juniel said that court had rushed him to finish "a lot of cross-examination," the court replied, "I'm sorry, Mr. Juniel, the record doesn't support that. I bent over backwards—two days of cross-examination of Ava McDonald was probably the longest cross-examination I have seen in 21 years on the bench." (*Ibid.*) After Juniel continued to argue that he had been denied discovery, the prosecutor stated, "I really think Mr. Juniel is, for lack of a better expression, playing the game to inject some error into the record where there is none." (RT 489.) The court found no evidence to support Juniel's contentions, stating that the prosecutor and Juniel's advisory counsel had provided full discovery to him. (*Ibid.*) It found no merit to any of Juniel's numerous contentions.

Juniel's claim that he was not given adequate time to prepare his case and closing argument are not supported by the record. As the court noted in addressing Juniel's various post-trial motions, and as the record shows, the court had "bent over backwards" in accommodating Juniel and ensuring that he had the discovery he needed, the witnesses he needed (many of whom the prosecutor produced for him), and the time he needed to prepare his case. The scheduling of the case was discussed on a regular basis, including when the final witnesses would be presented, instructions would be given, and closing arguments presented. As the court noted when it was time for Juniel to present his closing argument, he had had ample notice that he would be expected to argue that day.

Juniel's contention that he was given insufficient time to argue also is without merit.

> It is firmly established that a criminal defendant has a constitutional right to have counsel present closing argument to the trier of fact. [Citations.] Nonetheless, it is equally settled that a judge

107

> in a criminal case "must be and is given great latitude in controlling
> the duration and limiting the scope of closing summations."
> [Citations.] The trial judge has broad discretion to limit counsel to a
> reasonable time and to terminate argument when continuation would
> be repetitive or redundant. [Citation.]

(*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1184; see *People v. Marshall*
(1996) 13 Cal.4th 799, 854-855.) The trial court's ruling is reviewed for an
abuse of discretion. (*People v. Marshall, supra,* 13 Cal.4th at p. 855; *People v.
Rodrigues, supra,* 8 Cal.4th at p. 1184.)

Juniel can show no abuse of discretion here. By the time the evidence
had concluded, the pressure of time had become a significant issue. In fact, the
court had to excuse one of the jurors immediately before deliberations began
because of a previously scheduled vacation. (RT 2224-2226.) Of the three
alternates, one was not going to be available in the near future. (RT 2226.) The
court also wanted to conclude closing arguments because the prosecutor had a
scheduled airline reservation for later on the day of final arguments, which had
already been postponed once, and which the court had found would be
financially prohibitive to reschedule. (RT 2182-2183.)

Moreover, Juniel was given more time to argue that either
McDonald's counsel or the prosecutor. His closing argument shows that he
reviewed the testimony of the witnesses, particularly the prosecution witnesses,
in great detail, pointing out what he believed to be the weaknesses and
inconsistencies in the prosecution's case. He does not identify any specific
aspect of the case to which he was not able to respond or explain how
additional argument would have assisted his case. Accordingly, he fails to
show that the trial court abused its discretion by setting time limitations on all
of the parties within which to present closing argument.

# VI.

## THE PROSECUTOR DID NOT MISSTATE THE LAW ON AIDING AND ABETTING

McDonald argues that the prosecutor misstated the law on the mental state required for aiding and abetting, and that the trial court's instructions on the issue were inadequate to cure the harm (McDonald, Arg. I). McDonald did not object to the prosecutor's closing argument, and so has waived any claim of prosecutorial misconduct. She also did not question the trial court's instructions on aiding and abetting, request additional or clarifying instructions, or otherwise make known any concern that the jury may have misunderstood the requirements on aiding and abetting. Accordingly, her claim is without merit. In any event, the record shows that the prosecutor did not misstate the law and that the trial court properly instructed the jury.

### A.    McDonald Waived Her Claim of Prosecutorial Misconduct

McDonald claims the prosecutor misstated the law on aiding and abetting during his closing argument and thus committed misconduct. (AOB at 19.) Her failure to object to the prosecutor's alleged misstatements waives her claim.

> The applicable federal and state standards regarding prosecutorial misconduct are well established. A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process. [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. [Citations.]

109

(*People v. Hill* (1998) 17 Cal.4th 800, 819 (internal quotation marks omitted).)
The defendant need not show that the prosecutor acted in bad faith. (*Id.* at p.
822.) However, a failure to object generally waives the claim on appeal.

> As a general rule a defendant may not complain on appeal of
> prosecutorial misconduct unless in a timely fashion—and on the same
> ground—the defendant made an assignment of misconduct and
> requested that the jury be admonished to disregard the impropriety.
> [Citations.] The foregoing, however, is only the general rule. A
> defendant will be excused from the necessity of either a timely
> objection and/or a request for admonition if either would be futile.
> [Citations.] In addition, failure to request the jury be admonished
> does not forfeit the issue for appeal if an admonition would not have
> cured the harm caused by the misconduct. [Citations.] Finally, the
> absence of a request for a curative admonition does not forfeit the
> issue for appeal if the court immediately overrules an objection to
> alleged prosecutorial misconduct [and as a consequence] the
> defendant has no opportunity to make such a request. [Citations.]

(*Id.* at pp. 820-821 (internal quotation marks omitted).)

McDonald does not acknowledge her failure to object to the
prosecutor's closing argument, nor does she argue that any objection and
request for admonition would have been futile or could not have cured the
alleged harm. If McDonald's counsel had believed that the prosecutor was
misstating the law, she could have objected and asked the court to give the jury
an admonition. Counsel's failure to do so suggests she saw nothing
objectionable in the prosecutor's closing argument. Accordingly, McDonald's
prosecutorial misconduct claim has been waived. In any event, the prosecutor
did not misstate the law and thus did not commit misconduct.

**B.  The Prosecutor's Argument Was Consistent With The Trial
Court's Instructions On The Mental State Required For Aiding
And Abetting**

McDonald contends that the prosecutor misstated the law on aiding
and abetting by arguing that she did not have to share Juniel's specific intent to

commit murder. The record shows that the trial court properly instructed the jury on aiding and abetting, and that the prosecutor's closing argument was consistent with those instructions. Accordingly, McDonald's claim fails.

The trial court instructed the jury on aiding and abetting as follows:

> As to defendant McDonald, a person aids and abets the commission of a crime when he or she, 1, with knowledge of the unlawful purpose of the perpetrator, 2, with the intent of committing or encouraging or facilitating the commission of the crime and 3, by act or advice aids, promotes, encourages or instigates the commission of the crime.
>
> A person who aids and abets the commission of a crime need not be present at the scene of the crime. Mere presence at the scene of a crime which does not itself assist the commission of a crime does not amount to aiding and abetting.
>
> Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.

(RT 2116 [CALJIC No. 3.01]; see CT 394.)

> Before the commission of the crime charged in count 1 an aider and abettor may withdraw from participation in that crime and thus avoid responsibility for that crime by doing two things: first, she must notify the other principals known to her of her intention to withdraw from the commission of that crime; second, she must do everything in her power to prevent its commission.

(RT 2116 [CALJIC No. 3.03]; see CT 395.) The court also instructed that an aider and abettor and one who directly commits the crime are both principals in the crime and equally guilty. (RT 2115-2116 [CALJIC No. 3.00]; see CT 393.) The jury was given a series of instructions regarding the mental state required for murder. (RT 2117-2119; see CT 397-401.)

An aider and abettor's "guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116 (original italics).) The court explained,

We have described the mental state required of an aider and abettor as "different from the mental state necessary for conviction as the actual perpetrator." [Citation.] The difference, however, does not mean that the mental state of an aider and abettor is less culpable than that of the actual perpetrator. On the contrary, outside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator. "To prove that a defendant is an accomplice . . . the prosecution must show that the defendant acted 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' ([*People v. Beeman* (1984) 35 Cal.3d 547,] 560, italics in original.) When the offense charged is a specific intent crime, the accomplice must 'share the specific intent of the perpetrator'; this occurs when the accomplice 'knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.' (*Ibid.*)" (*People v. Prettyman* [(1996) 14 Cal.4th 248,] 259.) What this means here, when the charged offense and the intended offense—murder or attempted murder—are the same, i.e., when guilt does not depend on the natural and probable consequences doctrine, is that the aider and abettor must know and share the murderous intent of the actual perpetrator.

(*People v. McCoy, supra*, 25 Cal.4th at pp. 1117-1118 (footnote omitted); see *People v. Mendoza* (1998) 18 Cal.4th 1114, 1122-1123 [discussing aiding and abetting principles in context of natural and probable consequences doctrine]; *People v. Prettyman* (1996) 14 Cal.4th 248, 259-260 [same].)

The instructions given here, in particular, CALJIC No. 3.01, correctly informed the jury of the requirements for finding aiding and abetting liability. The jury was told that it must find McDonald, "with knowledge of the unlawful purpose of the perpetrator," and "with the intent or purpose of committing or encouraging or facilitating the commission of the crime," by "act or advice aid[ed], promote[d], encourage[d] or instigate[d] the commission of the crime." (See *People v. Beeman* (1984) 35 Cal.3d 547, 560 ["Thus, we conclude that the weight of authority and sound law require proof that an aider and abettor act with knowledge of the criminal purpose of the perpetrator *and* with an intent

112

or purpose either of committing, or of encouraging or facilitating commission of, the offense." (Original italics.)].)

McDonald's claim that the instructions, while correct, inadequately informed the jury of the mental state required when a specific intent crime is charged is without merit. Although "the aider and abettor must share the specific intent of the perpetrator" when the offense charged is a specific intent crime (*id.* at p. 560), that concept is embodied in CALJIC No. 3.01.

> "[A]n aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." (*People v. Beeman*, 35 Cal.3d 547, 560, 199 Cal.Rptr. 60, 68, 674 P.2d 1318, 1326 (1984).)
>
> Consequently, it would appear that no specific intent instruction would be required for an aider and abettor to a specific intent crime so long as CALJIC No. 3.01 is given.

(Use Note to CALJIC No. 3.01.)

The Use Note to CALJIC No. 3.01 is correct. After explaining that an aider and abettor must share the specific intent of the perpetrator, the *Beeman* court stated,

> We suggest that an appropriate instruction should inform the jury that a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.

(*People v. Beeman, supra,* 35 Cal.3d at p. 561.) Since CALJIC No. 3.01 tracks the language of *People v. Beeman,* upon which she relies, McDonald cannot complain that the instruction inadequately informed the jury of the requirements for aiding and abetting liability.[43]

---

43. McDonald also relies on *Hicks v. United States* (1893) 150 U.S. 442 (AOB at 21-22), cited in *People v. Beeman, supra,* 35 Cal.3d at 559. Her

Further, if she believed that the instruction needed modification or clarification, she was obligated to request it. (*People v. Rodrigues, supra,* 8 Cal.4th at p. 1142.) Her failure to do so waives her claim that the instructions might have been misunderstood. (*Id.* at pp. 1142-1143.) Moreover, the instructions as a whole properly guided the jury's consideration of the evidence. (*Ibid.* [instruction with CALJIC No. 8.20 on elements of willful, deliberate, and premeditated murder adequately expressed need for joint operation of act and intent, even if CALJIC No. 3.31 (on concurrence of act and specific intent) could have caused confusion in the circumstances, as defendant alleged].) Here, the trial court instructed with CALJIC No. 8.20, in addition to several other instructions on the mental state requirements, including CALJIC No. 3.31.5. (See CT 397-401; RT 2117-2219.) Since McDonald did not request modification or clarification of the instructions below, and since she offers no suggestion on appeal regarding how the instructions might have been modified, her claim of instructional inadequacy is without merit.[44]

McDonald nevertheless contends that the instructions might have been misconstrued in light of the prosecutor's closing argument. The record does not support her claim.

McDonald cites a passage in the prosecutor's argument (AOB at 15), in which the prosecutor was discussing McDonald's claim of duress:

> You have heard the instruction that a threat is no defense to a charge of murder. I don't believe the evidence in any way supports the testimony from Ms. McDonald that she was threatened. I think if you look at this evidence, at the people who witnessed all the stuff from beginning to end, that she was a willing, anxious participant. She is the one who made these threats, she is the one that was in this

---

reliance is unavailing in light of the post-*Beeman* version of CALJIC No. 3.01 given here.

44. The court also instructed on the theory of lying in wait. (CT 402; RT 2119-2120.) McDonald does not challenge the adequacy of that instruction.

114

fight, she is the one that's been in these fights before. She was driving that car, she is the one that drove slowly, she is the one that stopped in front of Seth June's house and had that little interaction.

But let me just tell you that the threat or that menace is no defense to the charge of murder. It is no defense to the charge of murder whether or not you're an aider and abettor or the actual killer.

It may be relevant—it's important to hear the evidence, it was relevant to know whether she was able to premeditate or—whether it's first or second degree, you're guilty of murder. You can't say "I aided or abetted to kill because someone made me." Why? Why do we have that law? I cross-examined Ava about this a little bit. Because you can't choose someone else's life over your own. It may be relevant in some other form, sentencing or something else, but you cannot choose your life over somebody else's. That is the law and you are bound to follow that law.

She, according to her testimony, knew Juniel was going to kill, knew that she was helping, intentionally aided and abetted, intentionally helped. That means she is an aider and abettor and that means she is guilty of murder. She cannot say, "I helped and I knew," that is, "I helped, because I was afraid I was going to get killed." Even if you take that as true, that is not a defense to murder.

(RT 2142-2143.)

McDonald focuses on the last paragraph in arguing that the prosecutor misstated the law on the mental state required for aiding and abetting. In context, the prosecutor was discussing McDonald's defense that she helped Juniel, but only because she was forced to. The prosecutor was not suggesting that McDonald need only have a general intent to help Juniel commit some criminal act, as opposed to a specific intent to commit murder, as she contends.

In the context in which the prosecutor made his comments, moreover, they correctly stated the law. "*Awareness* of the direct perpetrator's purpose is critical for the alleged aider and abettor to be culpable for that perpetrator's act." (*People v. Mendoza, supra*, 18 Cal.4th at p. 1129 (original italics).) In *Mendoza*, one of the defendants attempted to show that he lacked awareness of the perpetrator's acts because he was intoxicated. The court concluded, "Anyone, including a drunk person, who knowingly and intentionally aids and

abets a criminal act is guilty. Intoxication is relevant only to show the person did *not* act knowingly and intentionally." (*Id*. at p. 1130 (original italics).) In other words, "If, for whatever reason, Valdez did not, in fact, understand that Valencia intended to shoot, and therefore did not intentionally aid that shooting, he is not criminally liable for it." (*Ibid*.)

Here, McDonald admitted that she was *aware* that Juniel was going to kill Alexander. She also admitted that she drove the car, then stopped to let Juniel out, at his direction. Accordingly, as the prosecutor argued, she "knew that she was helping" and "intentionally aided and abetted."[45]

In her own closing argument, McDonald's counsel responded to the prosecutor's argument:

> But the crime of aiding and abetting is not quite as simple as the D.A. would have you believe. First, aiding and abetting is separate from the charge of murder. You cannot find [McDonald] guilty of murder unless you find that she aided and abetted Richard Juniel in committing this crime.
>
> First of all, you cannot find her guilty of aiding and abetting unless there is proof beyond a reasonable doubt that she acted with the knowledge of the unlawful purpose of the perpetrator. That means that she knew what Richard Juniel was going to do, that he was going to kill Stacey Alexander. They had planned. They were going to do this.

(RT 2200.) Counsel reviewed the evidence that she contended showed McDonald did not have knowledge of Juniel's plans. (RT 2200-2204.) She continued her argument,

> There is reasonable doubt as to whether or not Ms. McDonald had knowledge of what he was going to do. That's the first element that had to be proven to you beyond a reasonable doubt. The second element that had to be proven to you is that she intended to help him, she had a purpose of committing or encouraging or facilitating the commission of this crime. And even if you believe that Ms.

---

45. As shown more fully in Argument VII, the prosecutor's analysis correctly reflected the law.

McDonald had knowledge of what Mr. Juniel was going to do—and
you saw her pushed into that admission by Mr. Golde—she said after
he fired that shot she kind of knew he was going to go after Stacey
and kill her. But that is not enough. The instruction that tells you that
mere knowledge that a crime is going to be committed is not enough.
You've got to prove intent.

And the instruction also tells you right here mere knowledge that
a crime is being committed and the failure to prevent it does not
amount to aiding and abetting. She had to intend of her own free will
to voluntarily and intentionally help him commit that murder. She
had to have the required mental state to aid and abet. Intent requires
free will and choice, the choice to assist. She didn't have that choice.
She did exactly what he told her to do, drive down the street. . . .

(RT 2204.)  In his rebuttal closing argument, the prosecutor disputed
McDonald's claim that she did not have the requisite intent, and argued that she
had the intent to facilitate the murder.

It is clear, it is clear and Ava testified that she knew he was going
to kill. She admitted it actually in her testimony; if you take her
testimony word for word she confessed to murder. She admitted the
murder in her testimony. She admitted she knew he was going to kill.
She said she was surprised by the first shot but she knew when she
drove that Richard was going to kill. She had the knowledge. She
had the intent to help. We obviously know she helped. She did aid
him. She helped. She drove the car, he caught up with her. So Ms.
Brown is focusing on number 2, the intent. But the intent says the
intent of committing or encouraging or facilitating. Intent to facilitate.
That was her intent.

She had a choice. It's not a good choice. And—but the fact she
had a choice and the fact she had a choice tells you even more
strongly that she had the intent because she was faced with—I don't
buy this testimony—if you believe her testimony "I'm going to be
killed or Stacey has to get killed. So I'm going to help kill Stacey."
"I hate to be in a situation but my intent, my specific intent is to go
kill Stacey." That's what she said. And it's obvious, and the law says
you can't trade one life for another. So she admitted every single
element of the crime.

So where are we now? Where are we left today after two months
of this trial? A heartfelt, meaningful sympathy defense from day one.
Feel sorry for her. The law is a little rough, it's [a] little unfair. What
would you do if you were faced with that choice?

117

. . . .

> So I think you need to consider it all. It is clear here there is no doubt here that she is an aider and abettor. There is no doubt based on her testimony she is an aider and abettor. If you look at all the other testimony, she is a voluntary, happy participant in this crime, and she did start it. . . .

(RT 2217-2218.)

In light of her own counsel's argument, McDonald cannot claim that the jury would have misunderstood the requirements of aiding and abetting liability based on the prosecutor's earlier remarks. Moreover, the prosecutor noted that defense counsel had focused on the requirement of intent. He argued in rebuttal that McDonald had the specific intent to kill. Accordingly, the jury could not have misunderstood the requirement, and the parties' dispute on the issue, regarding whether McDonald harbored the requisite intent.

As the closing arguments show, both parties argued their interpretation of the facts to the jury, which had been correctly instructed on the law. Moreover, the court had also instructed, "If anything concerning the law as said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions." (RT 2100.) McDonald fails to show error, either in the court's instruction or the prosecutor's argument. Accordingly, her claim should be rejected.

## VII.

## THE TRIAL COURT PROPERLY INSTRUCTED THE JURY THAT DURESS WAS NOT A DEFENSE TO MURDER

McDonald contends that the trial court's special instruction that duress was not a defense to murder undermined her defense (McDonald, Arg. II). The court's instruction was correct.

### A.  Background

During a discussion on jury instructions, the prosecutor stated that he objected to instruction with CALJIC No. 4.40, which McDonald had requested.[46] The court agreed:

> I have researched this extensively.  You cited *People v. Son*, which I read, but my feeling on this, Ms. Brown, is that Penal Code 26 reads specifically that this is—duress is not a defense in the crime of murder, and it does not specify or make any exception for the theory of liability under which the prosecutor is proceeding, so I do not feel that duress is going to be allowed to be used in this case. That can be over your objection.

(RT 1674.)  The prosecutor then asked that the defense not be permitted to argue that duress was a defense to murder or to aiding and abetting murder. The court again agreed. "I think the law is clear on it.  If duress is not a defense

---

46.  CALJIC No. 4.40 provides:

A person is not guilty of a crime [other than _____ ] when [he] [she] engages in conduct, otherwise criminal, when acting under threats and menaces under the following circumstances:

1.  Where the threats and menaces are such that they would cause a reasonable person to fear that [his] [her] life would be in immediate danger if [he] [she] did not engage in the conduct charged, and

2.  If this person then actually believed that [his] [her] life was so endangered.

This rule does not apply to threats, menaces, and fear of future danger to [his] [her] life[,] [nor does it apply to the crime[s] of _____ ].

to murder, it cannot be argued to be a defense to murder." (RT 1675.) After further discussion, the court agreed with the prosecutor that McDonald could argue the theory of duress with respect to whether she deliberated and premeditated, but not with respect to whether she aided and abetted. The court asked the prosecutor to draft a special instruction that duress was not a defense to murder. (RT 1676-1678.)

Before the court instructed the jury, McDonald again asked it to give CALJIC No. 4.40. The court again declined. (RT 2086.) McDonald objected to the special instruction that the prosecutor drafted with respect to duress, but she did not suggest any modification to the instruction. (RT 2089.) The trial court subsequently instructed the jury:

> In the crime of murder it is no defense that the defendant McDonald acted under threats or menace sufficient to show that she had reasonable cause to believe and did believe that her life would be in danger if she refused.

(RT 2121; see CT 407.)

## B.   The Trial Court's Special Instruction Correctly Stated The Law That Duress Is Not A Defense To Murder

McDonald contends that the trial court's special instruction undermined her defense. To the extent that duress was not legally available as a defense to murder, however, she cannot complain. To the extent that duress could negate the requirements of first degree murder, i.e., whether she premeditated and deliberated, McDonald was obligated to request modification or clarification of the special instruction, but did not do so. Moreover, the other instructions informed the jury of the requirements for finding first degree murder. Accordingly, McDonald's claims of error are without merit.

In *People v. Anderson* (2002) 28 Cal.4th 767, the Supreme Court addressed the question whether duress could be a defense to murder. The court

observed that at common law, duress was not a defense to killing an innocent person. "'Stemming from antiquity, the nearly "unbroken tradition" of Anglo-American common law is that duress never excuses murder, that the person threatened with his own demise "ought rather to die himself, than escape by the murder of an innocent."' [Citation.]" (*Id.* at p. 772.) Although duress could be a defense to other crimes, "'When the defendant commits murder under duress, the resulting harm—i.e. the death of an innocent person—is at least as great as the threatened harm—i.e. the death of the defendant.' [Citation.]" (*Ibid.*) The court added,

> [W]hen confronted with an apparent kill-an-innocent-person-or-be-killed situation, a person can always choose to resist. As a practical matter, death will rarely, if ever, inevitably result from a choice not to kill. The law should require people to choose to resist rather than kill an innocent person.

(*Ibid.*) The court reviewed the conflicting authorities on the question of whether duress could be a defense to murder in California. It concluded that Penal Code section 26 excluded "all murder from the duress defense." (*Id.* at p. 775.) With respect to murders committed by more than one person, the court elaborated further,

> A person can always choose to resist rather than kill an innocent person. The law must encourage, even require, everyone to seek an alternative to killing. Crimes are often committed by more than one person; the criminal law must also, perhaps especially, deter those crimes. California today is tormented by gang violence. If duress is recognized as a defense to the killing of innocents, then a street or prison gang need only create an internal reign of terror and murder can be justified, at least by the actual killer. Persons who know they can claim duress will be more likely to follow a gang order to kill instead of resisting than would those who know they must face the consequences of their acts. *Accepting the duress defense for any form of murder would thus encourage killing.* Absent a stronger indication than the language of section 26, we do not believe the Legislature intended to remove the sanctions of the criminal law from the killing of an innocent even under duress.

(*Id.* at pp. 777-778 (italics added).)

The court next considered whether evidence of duress could nevertheless be relevant.

> Although duress is not an affirmative defense to murder, the circumstances of duress would certainly be relevant to whether the evidence establishes the elements of implied malice murder. The reasons a person acted in a certain way, including threats of death, are highly relevant to whether the person acted with a conscious or wanton disregard for human life. [Citation.] This is not due to a special doctrine of duress but to the requirements of implied malice murder.

(*Id.* at pp. 779-780.)[47] Similarly, in response to the defendant's argument that duress could at least negate premeditation and deliberation, thus resulting in second degree murder, the court stated,

> We agree that a killing under duress, like any killing, may or may not be premeditated, depending on the circumstances. If a person obeys an order to kill without reflection, the jury might find no premeditation and thus convict of second degree murder. As with implied malice murder, this circumstance is not due to a special doctrine of duress but to the legal requirements of first degree murder. The trial court instructed the jury on the requirements for first degree murder. It specifically instructed that a killing "upon a sudden heat of passion or *other condition precluding the idea of deliberation*" would not be premeditated first degree murder. (Italics added.) Here, the jury found premeditation. In some other case, it might not. It is for the jury to decide. But, unless and until the Legislature decides otherwise, a malicious, premeditated killing, even under duress, is first degree murder.

(*Id.* at p. 784.)

---

47. The court noted the example given in the dissenting opinion, in which an innocent person is forced at gunpoint by fleeing robbers to drive recklessly, causing a fatal accident. (*People v. Anderson, supra,* 28 Cal.4th at p. 779.)

The court further concluded that duress could not reduce murder to manslaughter. (*Id.* at pp. 781-784.) In discussing the unreasonable self-defense form of voluntary manslaughter, the court stated,

> A killing in self-defense is lawful, but a killing of an innocent person under duress is unlawful. In contrast to a person killing in imperfect self-defense, a person who kills an innocent believing it necessary to save the killer's own life intends to kill unlawfully, not lawfully. Nothing in the statutes negates malice in that situation. Recognizing killing under duress as manslaughter would create a new form of manslaughter, which is for the Legislature, not courts, to do.

(*Id.* at p. 783.) *Anderson* thus precludes duress as a defense to murder, and precludes the use of duress as mitigation of the mental state required for murder.[48]

In *People v. Son* (2000) 79 Cal.App.4th 224, the court likewise held that duress was not a defense to murder. (*Id.* at p. 234 ["Specifically, although recognizing honest and *reasonable* duress as a complete defense to some crimes, the Legislature has determined that such 'perfect' duress does not warrant absolving a defendant from culpability for murder." (Original italics.)].) The court also concluded that "imperfect" duress was not a defense. "Similarly, we find no authority actually holding that the doctrine of 'imperfect' duress exists under California law so as to mitigate a murder charge to voluntary manslaughter by negating malice." (*Id.* at pp. 234-235.) The court declined to recognize such a doctrine. (*Id.* at p. 237.)

The *Son* court next considered whether "imperfect" duress could negate the specific intent to aid and abet a murder.

---

48. In a final point, the court observed that duress could, in effect, provide a defense to murder on a felony-murder theory by negating the underlying felony. That is, if the jury found the defendant not guilty of the underlying felony due to duress, the defendant could not be guilty of felony murder based on that felony. (*People v. Anderson, supra*, 28 Cal.4th at p. 784.) Felony murder is not at issue here.

Moreover, we also determine that Son's asserted imperfect duress did not operate to negate the element of specific intent necessary for his murder convictions to the extent Son's culpability was based on his having aided and abetted Smann in the homicides. As discussed, California law has rejected application of the doctrine of imperfect duress to negate a crime's element of specific intent.

(*Id.* at p. 238.) The court explained,

One who acts under an honest but unreasonable belief in duress faces an agonizing choice: the defendant simultaneously genuinely perceives the need to defend himself and understands that he can negate the threat to himself only be performing a specific unlawful act against an *innocent third party*. To protect himself, the defendant must both specifically intend to perform the unlawful act and act on that specific intent. There is no inconsistency here but a concurrence of act and intent. The existence of intent is not negated by the legal fiction of transferring it to the aggressor.

(*Ibid.*, quoting *People v. King* (1991) 1 Cal.App.4th 288, 298-299.) The court concluded that the defendant's "asserted imperfect duress did not negate the specific intent necessary for imposing culpability on Son for having aided and abetted Smann in the killings." (*People v. Son, supra,* 79 Cal.App.4th at p. 240.)

As the above authorities establish, neither duress nor imperfect duress is a defense to murder, whether under a direct perpetrator theory or an aiding and abetting theory. Further, neither doctrine can reduce murder to voluntary manslaughter by negating malice. The trial court's special instruction that duress was not a defense to murder was correct. Consequently, McDonald was not deprived of having the jury consider her defense because, to the extent she sought to use duress as a defense to murder, it was unavailable as a matter of law.

McDonald nevertheless complains that the trial court failed to instruct the jury, consistently with *People v. Anderson, supra*, that duress could negate premeditation and deliberation. Again she is incorrect.

124

To begin with, if McDonald thought the special instruction required clarification or modification, she was obligated to request it. (*People v. Rodrigues, supra,* 8 Cal.4th at p. 1142.) McDonald was certainly aware of *Anderson*'s holding at the time of trial. (See RT 1676.) However, when the court reviewed the final instructions, she simply objected to the special instruction, rather than requesting modification. Accordingly, she should not now complain that the instruction was inadequate.

In any event, the Supreme Court in *Anderson* explained that the fact that duress could negate premeditation and deliberation was "not due to a special doctrine of duress but to the legal requirements of first degree murder." (*People v. Anderson, supra,* 28 Cal.4th at p. 784.) The court pointed out that the instruction on premeditation and deliberation (CALJIC No. 8.20) specifically informed the jury that a killing "'upon a sudden heat of passion or *other condition precluding the idea of deliberation'* would not be premeditated first degree murder." (*Anderson, supra,* 28 Cal.4th at p. 784 (original italics).) Here, too, the jury was instructed in the language of CALJIC No. 8.20. (RT 2118-2119; see CT 401.) That instruction informed the jury of the prerequisites of finding premeditation and deliberation and that, if the jury found a "condition precluding the idea of deliberation," it would not be murder of the first degree. Under *Anderson*, no other instruction was required to inform the jury regarding its consideration of evidence of duress.

Moreover, the jury was also instructed immediately following the special instruction on duress that it could consider evidence concerning battered women's syndrome with respect to McDonald's beliefs, perception, or behavior, and as relevant to her credibility. (RT 2121; see CT 408.) That instruction, together with the other instructions regarding first and second degree murder (RT 2118-2121; see CT 401-406), adequately informed the jury of its consideration of McDonald's duress evidence.

125

In particular, CALJIC No. 8.70 instructed the jury, "If you should find the defendant guilty of murder, you must determine and state in your verdict whether you find the murder to be of the first or second degree." (RT 2120-2121; see CT 405.) Thus, while duress was not a defense to murder, as the court had instructed, the jury still had to determine, having concluded McDonald was guilty of murder, whether it was in the first or second degree. At that point, her evidence of duress was relevant and could be considered by the jury in making its determination. Nothing in the instructions precluded the jury from considering the defense evidence on that issue. Accordingly, McDonald's claim that the trial court's instructions prevented the jury from considering her defense is not supported by the record.[49]

The jury was correctly and fully instructed on all of the requirements of finding McDonald guilty of murder on an aiding and abetting theory. The jury was also instructed that it must find the charges proven beyond a reasonable doubt. (RT 2113-2114; CT 390-391.) The jury not only found McDonald guilty of murder, it found her guilty of premeditated and deliberate murder. Accordingly, it rejected her claim that she committed murder under duress. McDonald's claim that the trial court's special duress instruction infringed her constitutional rights is unsupported by the law and facts.

---

49. McDonald argues at length that she had a constitutional right to present a defense. (AOB at 28-34.) She did present her defense to the extent permitted by *People v. Anderson, supra,* 28 Cal.4th 767. It is unclear what further defense she is talking about, or how the trial court's instructions prevented her from presenting that defense. McDonald does not challenge *Anderson*'s holding that duress is not a defense to murder. McDonald later appears to suggest that the trial court should have given a pinpoint instruction on her defense. (AOB at 37.) However, she never asked for a pinpoint instruction.

## VIII.

## THE TRIAL COURT PROPERLY DENIED INSTRUCTION ON VOLUNTARY MANSLAUGHTER AND PROVOCATION

Both Juniel and McDonald argue that the trial court should have instructed on voluntary manslaughter (Juniel, Arg. VII, McDonald, Arg. V), and on provocation as relevant to reduce the murder to second degree (Juniel, Arg. VIII, McDonald, Arg. V). The trial court properly instructed the jury on the murder charge, and properly denied instruction on the lesser offenses.

### A. Background

During an early discussion on jury instructions, Juniel requested instructions on voluntary manslaughter (CALJIC Nos. 8.40, 8.42, 8.43, 8.44, 8.50, 8.51) and on evidence of provocation as it bore on the degree of murder (CALJIC No. 8.73). The court stated that it was not inclined to give the instructions, but would reconsider if sufficient evidence was presented to support them. (RT 1262.) In a subsequent discussion the court reiterated that it did not see sufficient evidence to warrant voluntary manslaughter instructions. (RT 1683-1684.) In the final discussion before instruction of the jury, the court stated it had found the voluntary manslaughter instructions inapplicable, particularly in light of Juniel's testimony. (RT 2089.) Neither Juniel nor McDonald raised the issue of instruction with CALJIC No. 8.73.

### B. Applicable Law

The trial court's obligation to instruct on the general principles of law relevant to the issues raised by the evidence includes "giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present." (*People v. Breverman*

127

(1998) 19 Cal.4th 142, 154.) "The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given." (*Ibid.*) However, instruction on lesser included offenses is required only if there is substantial evidence to support the lesser charge. (*Id.* at p. 162; see *People v. Avena* (1996) 13 Cal.4th 394, 424.)

> [T]he existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury. [Citations.] "Substantial evidence" in this context is "'evidence from which a jury composed of reasonable [persons] could . . . conclude[]'" that the lesser offense, but not the greater, was committed. [Citations.]
>
> In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury. [Citations.] Moreover, as we have noted, the sua sponte duty to instruct on lesser included offenses, unlike the duty to instruct on mere defenses, arises even against the defendant's wishes, and regardless of the trial theories or tactics the defendant has actually pursued. Hence, substantial evidence to support instructions on a lesser included offense may exist even in the face of inconsistencies presented by the defense itself.

(*People v. Breverman, supra,* 19 Cal.4th at pp. 162-163 (original italics; footnote omitted); see *People v. Barton* (1995) 12 Cal.4th 186, 201 & fn. 8 [substantial evidence is evidence that a reasonable jury could find persuasive, not evidence that is minimal and insubstantial].)

"[F]ailure to instruct sua sponte on a lesser included offense in a noncapital case is, at most, an error of California law alone, and is thus subject only to state standards of reversibility." (*People v. Breverman, supra,* 19 Cal.4th at p. 165; see *People v. Lasko* (2000) 23 Cal.4th 101, 111.) Thus, a conviction of the charged offense may be reversed for failure to instruct on a lesser offense only if there is a reasonable probability, in light of the entire

record, that the defendant would have obtained a more favorable outcome had the error not occurred. (*People v. Blakeley* (2000) 23 Cal.4th 82, 93; *People v. Lasko, supra*, 23 Cal.4th at p. 111; *People v. Breverman, supra*, 19 Cal.4th at p. 165.) The state standard "requires a *reasonable* probability, not a mere *theoretical* possibility, that the instructional error affected the outcome of the trial." (*People v. Blakeley, supra*, 23 Cal.4th at p. 94.) The state harmless error standard applies because "the United States Supreme Court has expressly refrained from recognizing a federal constitutional right to instructions on lesser included offenses in noncapital cases." (*People v. Breverman, supra*, 19 Cal.4th at p. 165.) After a thorough discussion on the issue, the California Supreme Court stated,

> Accordingly, we affirm that the rule requiring sua sponte instructions on all lesser necessarily included offenses supported by the evidence derives exclusively from California law. In light of the United States Supreme Court's careful disclaimers, and its tendency to interpret related federal rules, both constitutional and nonconstitutional, in a narrow way, we decline to do what the high court has expressly not done—to hold that such an instructional rule is required in noncapital cases by the federal Constitution.

(*Id.* at p. 169 (footnote omitted).)[50]

---

50. Juniel cites *People v. Lasko, supra*, 23 Cal.4th at p. 113, for the proposition that failure to instruct on a lesser included offense may violate the defendant's federal constitutional rights to trial by jury and due process. (AOB at 63.) In fact, the *Lasko* court was responding to the defendant's reliance on the *dissenting opinion* in *People v. Breverman, supra*. While the *Lasko* court stated, in response to the dissenting view in *Breverman*, that the error complained of did not violate the defendant's constitutional rights to trial by jury or due process (*People v. Lasko, supra*, 23 Cal.4th at p. 113), it did not purport, especially without any discussion on the matter, to overrule *Breverman*'s holding that failure to instruct on lesser included offenses was error of state law only.

## C. The Trial Court Properly Denied Instruction On Voluntary Manslaughter

Both Juniel and McDonald contend the trial court should have instructed on voluntary manslaughter. McDonald relies on Juniel's argument and presents no argument of her own. Juniel argues that there was sufficient evidence of a heat-of-passion killing or an unreasonable-self-defense killing to warrant voluntary manslaughter instructions. The record does not support his claim.

> Manslaughter is "the unlawful killing of a human being without malice." ([Pen. Code,] § 192.) A defendant lacks malice and is guilty of voluntary manslaughter in "limited, explicitly defined circumstances: either when the defendant acts in a 'sudden quarrel or heat of passion' (§ 192, subd. (a)), or when the defendant kills in 'unreasonable self-defense'—the unreasonable but good faith belief in having to act in self-defense [citations]." [Citation.]

(*People v. Lasko, supra,* 23 Cal.4th at p. 108; *People v. Blakeley, supra,* 23 Cal.4th at pp. 87-88.)

> "An intentional, unlawful homicide is 'upon a sudden quarrel or heat of passion' (§ 192(a)), and is thus voluntary manslaughter (*ibid.*), if the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an '"ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than judgment."'" (*People v. Breverman, supra,* 19 Cal.4th [at p.] 163.) No specific type of provocation is required, and "the passion aroused need not be anger or rage, but can be any '"[v]iolent, intense, high-wrought or enthusiastic emotion"'" [citations] *other than revenge* [citation]." (*Ibid.*)

(*People v. Lasko, supra,* 23 Cal.4th at p. 108 (italics added).) Unreasonable self-defense arises when a defendant unreasonably fears the imminent infliction of death or great bodily injury. (*People v. Barton, supra,* 12 Cal.4th at pp. 199-200.)

The record does not contain substantial evidence that either defendant was guilty only of the lesser offense of voluntary manslaughter. The evidence showed that McDonald and Alexander had a confrontation approximately 24 hours before the murder. Evidence also showed that both women were armed. McDonald conceded that she followed the retreating Alexander, intending to hit her with a baseball bat. She would have done so had a neighbor not interfered. The next day, she threatened to kill Alexander, yet Cathy Rivers, who heard the threat, did not take it seriously. Immediately before the first shots, McDonald testified that she did not speak to Alexander, but silently agreed with Alexander's statement to the effect that the argument between them was over. Ciara Baldwin heard what she described as "jibber-jabber, like somebody just talking," before the first shot. Only McDonald witnessed the actual shooting. She said that Juniel shot Alexander unexpectedly and without provocation. He then followed her behind a house and shot her again. Juniel testified that he was at home at the time of the murder, and was not involved in either of the fights on the previous day.

The foregoing evidence was insufficient to show that either defendant acted upon a sudden quarrel or heat of passion, i.e., provocation sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. The fight between McDonald and Alexander had occurred 24 hours earlier. The evidence did not show that any provocation arising from that fight continued until the night of the shooting. On the contrary, McDonald expressly testified that it did not.

CALJIC No. 8.43, which Juniel had requested, would have instructed the jury:

> To reduce a killing upon a sudden quarrel or heat of passion from murder to voluntary manslaughter, the killing must have occurred while the slayer was acting under the *direct and immediate influence* of the quarrel or heat of passion. Where the influence of the sudden quarrel or heat of passion has ceased to obscure the mind of the

131

accused, and sufficient time has elapsed for angry passion to end and for reason to control [his] [her] conduct, it will no longer excuse express or implied malice, and reduce the killing to voluntary manslaughter. *The question, as to whether the cooling period has elapsed and reason has returned, is not measured by the standard of the accused, but the duration of the cooling period is the time it would take the average or ordinarily reasonable person to have cooled the passion, and for that person's reason to have returned.*

(Italics added.)

The evidence shows that the cooling period was more than adequate, and that an ordinary person of average disposition would not have felt such "violent, intense, high-wrought or enthusiastic emotion" from the earlier fight as to commit murder the next night, particularly in light of the absence of evidence that any provocation had continued until that time. Cathy Rivers testified that she told McDonald early on the day of the shooting that Alexander was "high" and would later apologize. Rivers thought McDonald had accepted her advice to drop the matter; she did not take McDonald's threat toward Alexander seriously. Indeed, none of the participants or witnesses to the earlier disputes anticipated any action would be taken, including Sia Bolden, who voiced surprise and concern after the shooting.

Juniel's reliance on *People v. Barton, supra,* 12 Cal.4th 186 is unavailing. In that case, the defendant shot a man with whom he had just argued. The incident began when the victim honked his horn at the defendant's 20-year-old daughter, then cut in front of her, causing her to swerve to the side of the road; the victim then spat on her window. The daughter immediately went to defendant's office and told him what had happened. They went to look for the victim's car and found it in a nearby shopping center. When they located the victim in a store, a lengthy and heated argument ensued. When the victim left the store, the defendant followed him to another store and then to his car. Witnesses saw the defendant pointing a gun at the victim and telling him

132

to drop the knife or he would shoot. Some witnesses saw the victim make an abrupt movement, after which the defendant fired a single shot. The defendant argued the shooting was an accident, and that the victim swung at him with what looked like a knife. (*Id.* at pp. 191-193.) The record thus contained substantial evidence from which a jury could reasonably conclude that the defendant was guilty of manslaughter rather than murder. (*Id.* at p. 202.)[51] Notably, the fight between the defendant and victim had begun shortly before the shooting, and was still ongoing, indeed was escalating, when the fatal shot was fired.

Here, by contrast, the fight between McDonald and Alexander did not escalate to a homicide, but instead had cooled. McDonald insisted the fight was over and that Juniel shot Alexander without any notice to her. Juniel said he was not even there. The other witnesses saw the aftermath of the initial shooting. No evidence showed that a fight immediately preceded the shooting, let alone one sufficient to arouse the passions of an ordinary person to the extent that a killing resulted. Although the evidence suggested that Alexander may have been killed for revenge, that motive was unavailable as a matter of law to reduce the killing to manslaughter. (*People v. Lasko, supra,* 23 Cal.4th at p. 108.) Accordingly, the trial court properly found that there was insufficient evidence to warrant instruction on the heat-of-passion form of voluntary manslaughter.

The trial court also correctly determined there was no substantial evidence in support of instruction on the unreasonable self-defense form of voluntary manslaughter. Juniel cites only to a statement from one of his tape-

---

51. Juniel misleadingly selects one sentence (AOB at 62) from the court's review of the many factors that, together, warranted instruction on voluntary manslaughter. (See *People v. Barton, supra,* 12 Cal.4th at p. 202 [listing substantial evidence that warranted the instruction].) His truncation of the law does not aid his cause.

recorded conversations that he was there "to protect," and "to defend no matter the cost." (AOB at 62.) Juniel teases out of this statement a claim that he might have believed it necessary to protect McDonald from Alexander (as opposed to exhibiting some perverse level of machismo). Aside from the complete absence of evidence from either defendant that this was the case, and the complete absence of any other evidence in the record to support a claim that McDonald, who had chased Alexander with a bat, felt threatened or feared another confrontation, the record shows that no reasonable juror could have concluded that either defendant felt fear, unreasonable or otherwise, of *the imminent infliction of death or great bodily injury*. The evidence showed that Juniel, without provocation, shot Alexander in the back, and that he then methodically pursued her, with McDonald's help, before finding and executing her. No evidence, let alone substantial evidence, supported instruction on an unreasonable self-defense theory.

For the same reasons, Juniel's claim that the trial court should have given CALJIC No. 8.50 is without merit. That instruction, which distinguishes murder and manslaughter, is given only when the jury is instructed on voluntary manslaughter as a lesser included offense. Since the jury was not so instructed, CALJIC No. 8.50 was unnecessary.

Even if Juniel and McDonald could have shown that they were entitled to instructions on voluntary manslaughter, there is no reasonable probability that they would have obtained a more favorable outcome in the absence of the error. The jury convicted both defendants of premeditated and deliberate murder. To so find, the jury had to determine that the premeditation and deliberation was formed upon preexisting reflection and "not under a sudden heat of passion or other condition precluding the idea of deliberation." (RT 2118-2119 [CALJIC No. 8.20]; see CT 401.) The jury's verdicts show that it rejected the defense evidence and found that both defendants

134

premeditated and deliberated the murders, not that they killed in the heat of passion or any other condition that might have mitigated first degree murder. In light of the overwhelming evidence against both defendants, they cannot show the requisite prejudice.

### D.  The Trial Court Properly Denied Instruction With CALJIC No. 8.73

Juniel and McDonald's contention that the trial court should have given CALJIC No. 8.73 is equally without merit. That instruction provides:

> If the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation.

Juniel initially requested instruction with CALJIC No. 8.73. (RT 1262; see CT 336.) McDonald did not include the instruction on her proposed list of instructions. (CT 75-77.) After Juniel's early request, upon which the court voiced skepticism, neither party ever mentioned the instruction again. Accordingly, they abandoned any request for instruction with CALJIC No. 8.73. In any event, there was no substantial evidence to warrant the instruction.

> "A defendant may still defend against a charge of homicide by presenting evidence of mental disease or defect sufficient to raise a reasonable doubt that he or she in fact had the requisite mental state at the time of the offense. [Citation.] However, when a defendant presents evidence to attempt to negate or rebut the prosecution's proof of an element of the offense, a defendant is not presenting a special defense invoking *sua sponte* instructional duties. While a court may well have a duty to give a 'pinpoint' instruction relating such evidence to the elements of the offense and to the jury's duty to acquit if the evidence produces a reasonable doubt, such 'pinpoint' instructions are not required to be given *sua sponte* and must be given only upon request. [Citations.]"

135

(*People v. Saille* (1991) 54 Cal.3d 1103, 1117, quoting *People v. Whitler* (1985) 171 Cal.App.3d 337, 342-343.) The defendant thus has a duty to request an instruction that relates evidence affecting his mental state to an element of the crime, such as premeditation and deliberation. Such a pinpoint instruction does not involve a "general principle of law" requiring sua sponte instruction by the trial court. (*People v. Saille, supra,* 54 Cal.3d at p. 1120; see *People v. Barton, supra,* 12 Cal.4th at p. 197.)

This Court has held that instruction in the language of CALJIC No. 8.73 is a pinpont instruction. (*People v. Middleton* (1997) 52 Cal.App.4th 19, 32-33, disapproved on another ground in *People v. Gonzalez* (2003) 31 Cal.4th 745, 752, fn. 3; accord *People v. Lee* (1994) 28 Cal.App.4th 1724, 1734.) While Juniel initially requested CALJIC No. 8.73, he never argued the matter, and never referred to the instruction in subsequent discussions on jury instructions. McDonald never requested the instruction at all, and never argued the matter. Neither defendant presented any evidence to support a defense to the premeditation and deliberation element of first degree murder on grounds of provocation. Juniel said he was not present, and McDonald said she did not willingly assist Juniel. She expressly denied there was any provocation on Alexander's part. Accordingly, although Juniel expressed early interest in the instruction, he later abandoned that theory by failing to request the instruction in subsequent discussions, by failing to argue in any way that it was warranted, and by failing to present any evidence to support it.

Even if Juniel had not abandoned his initial request, and McDonald had not waived the issue by failing to request the instruction at all, the trial court would have been justified in refusing to give CALJIC No. 8.73. Under *People v. Wickersham* (1982) 32 Cal.3d 307, disapproved on other grounds in *People v. Barton, supra,* 12 Cal.4th at p. 201, an instruction that provocation can reduce a murder from first to second degree may be warranted "where the

evidence of provocation would justify a jury determination that the accused had formed the intent to kill as a direct response to the provocation and had acted immediately . . . ." (*Id.* at p. 329.) Thus, evidence that heated words were exchanged or a physical struggle took place between the victim and attacker before the fatality may be sufficient to raise a reasonable doubt regarding whether the attacker planned to kill in advance. (*Ibid.*)

Here, there was no evidence of a physical struggle and no evidence that heated words were exchanged immediately before the shooting. At most, the evidence showed, according to McDonald, that Juniel had a brief conversation with Alexander before pulling out a gun and shooting her in the back. McDonald did not testify that Juniel argued with Alexander. Rather, she testified she was shocked that he shot her. Moreover, other witnesses testified that Juniel and McDonald, after the initial shooting, methodically and slowly followed Alexander in the car, that Juniel jogged after her in an unhurried manner, and that he shot her, execution style, in the head. Since the evidence did not show any provocation, let alone provocation that resulted in an immediate response to kill, without premeditation and deliberation, the instruction was not warranted.

Further, the pinpoint instruction that both defendants now claim was required was inconsistent with their defenses. As noted, Juniel claimed absence from the scene, and McDonald claimed duress. The relationship between provocation and deliberate intent requires a determination of the defendant's subjective mental state. (*People v. Middleton, supra*, 52 Cal.App.4th at p. 32.) Since neither defendant presented any evidence that their subjective mental state was affected by provocation, the instruction lacked substantial evidentiary support.

137

In any event, even if the trial court should have instructed with CALJIC No. 8.73, neither defendant can show prejudice. The jury was instructed with CALJIC No. 8.20, which provided in part,

> If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill which was the result of deliberation and premeditation so that it must have been formed upon preexisting reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree.

(RT 2118-2119; cf. *People v. Middleton, supra,* 52 Cal.App.4th at p. 29.) That instruction adequately informed the jury that it could consider "heat of passion" or "other condition precluding the idea of deliberation" to find that the defendants did not premeditate and deliberate the murder.

Moreover, since instructions on manslaughter were not given, the language of CALJIC No. 8.20 was potentially much broader than that of CALJIC No. 8.73, which addressed provocation in terms that compared it to the provocation required to reduce the crime to manslaughter. That is, the jury was not restricted with regard to the evidence it could consider to mitigate premeditation and deliberation. For that matter, it is unclear how CALJIC No. 8.73 would be understood in the absence of any instruction on manslaughter, given the comparison in the instruction between provocation that is, or is not, sufficient to establish manslaughter. While instruction with CALJIC No. 8.73 may be proper, upon request, in some cases in which voluntary manslaughter instructions are also given,[52] it is not clear that instruction with CALJIC No. 8.73 is proper in the absence of any instruction on manslaughter, particularly where CALJIC No. 8.20 is given.

---

52. In *People v. Middleton, supra,* 52 Cal.App.4th at p. 28, and *People v. Lee, supra,* 28 Cal.App.4th at p. 1732, the jurors had been given voluntary manslaughter instructions, but had not been given CALJIC No. 8.73.

The record shows that instruction with CALJIC No. 8.73 would not have been warranted even if the defendants had properly requested it. Further, in light of the instructions given on first and second degree murder, and the overwhelming evidence of guilt, neither defendant can show prejudice based on the absence of a pinpoint instruction that conflicted with their defenses.

## IX.

## THE PROSECUTOR DID NOT COMMIT MISCONDUCT IN CLOSING ARGUMENT

Juniel contends the prosecutor committed misconduct in closing argument (Juniel, Arg. IX). The record does not support his claim.

### A. Background

Near the close of his argument, the prosecutor stated,

> There's one other thing I want to talk about and that is the issue of Mr. Juniel representing himself. It's very important that this is a fair trial. It's important to me, it's important to the court, it's important to you, it's important to the community. It's serious. This is important. And I'm not making light of this. Mr. Levy is an extremely talented, experienced lawyer—

(RT 2151-2152.) At that point, the trial court sustained Juniel's objection on relevance grounds. (RT 2152.) When the prosecutor said he wanted to briefly "go into this," the court responded, "You may go into that area, but I don't think you should talk about Mr. Levy and the reasons therein that Mr. Juniel chose to represent himself." (*Ibid.*) The prosecutor continued,

> The point I'm trying to make is that it is clear that in an effort to have a fair trial Mr. Juniel has been afforded an attorney for advice, an investigator to help him. I think you even probably saw Ms. Brown helping him at times here—

(*Ibid.*) When Juniel objected, the court overruled his objection. (*Ibid.*) The prosecutor finished his argument, stating:

> So it's important that you know that that occurs, and I think that any juror needs to know things are fair, and they have been. I think that Judge Conger has been extremely fair to everybody here, and it makes it appropriate for you then to do your job, not have to worry that something here is not appropriate. If a person wants to represent themselves they have the constitutional right to do so. You cannot deny that. If they are competent—psychologically competent—you

cannot deny that right. It is a constitutional right. If you deny it the case would be reversed. While it may not be good or may be good or whatever, that's irrelevant. You have to understand that they have a constitutional right to represent themselves.

That being said, you need to make your decision based on the evidence. But if you saw what went on here and you saw that Mr. Levy—and we all know each other, we were jovial, we get along, but that's because we know each other from cases in the past over the years. So we are passionate about what we believe and we are passionate about our jobs, but it doesn't mean we feel differently about the facts of the case. It's important for you to know this has been fair to all parties. So when you go up there and deliberate you will know that that's the case.

I have sat here not objecting and have done the best I could to ensure that Mr. Juniel has the opportunity to ask his questions in whatever fashion he wants so that he can get out what he's trying to get out, and I could have objected some of the times but I didn't. I sat there and let it go. It's important that you know that so that now that it's time to deliberate you know it's been fair.

Now it's that time. It is now time for justice. This is not about a little divorce court here, it's not about their relationship. This is about justice for Stacey, it is about justice for Stacey's family, all the witnesses who put themselves on the line in this community, called 911, gave their names, came forward to testify for the community. There can be no doubt in this case that these defendants killed, they intentionally killed, they premeditated, deliberated and laid in wait.

(RT 2152-2154.)

In his rebuttal closing argument, the prosecutor briefly referred to McDonald's counsel when talking about Juniel's credibility.

Who is Richard Juniel? He can look you in the eye and lie, just lie, "never seen that gun before in my life." Just lie. He can look Lorna Brown in the eye and lie. That letter? "That was a letter to my attorney. How did you get that?" That's outrageous. That is a lie. I know Lorna Brown. She is not lying. No way. He gave that to her. You know it. We all know it. He's up there lying. He can look you in the eye and just lie.

(RT 2211.)

141

## B.    The Prosecutor Did Not Commit Misconduct

Juniel objected to the prosecutor's initial argument, but did not thereafter object.    Accordingly, to the extent he complains about the prosecutor's closing argument after his first two objections, and the court's admonition, his claim is waived. (*People v. Hill, supra,* 17 Cal.4th at pp. 820-821; see *People v. Bemore* (2000) 22 Cal.4th 809, 845-846.) Since the court had admonished the jury once, Juniel cannot complain that an objection and request for admonition would have been futile.  Although the court overruled his second objection, nothing in the court's ruling (particularly given the innocuous argument the prosecutor had just made), suggested the court would not admonish the jury if the prosecutor made improper comments. Consequently, Juniel's claim regarding prosecutorial misconduct has, for the most part, been waived.

In any event, the prosecutor did not commit misconduct in his closing argument.  Juniel seeks to put an entirely negative spin on the prosecutor's remarks, claiming that the prosecutor was unnecessarily discussing whether the trial was fair, was vouching for defense counsel and advisory counsel, was praising himself for failure to object, and was commenting on Juniel's decision to represent himself.  In context, however, including the context of the entire trial, the remarks were neither improper nor even negative.

It is misconduct for a prosecutor in argument to impugn the integrity of defense counsel and to state or assume facts that are not in evidence. (*People v. Cash* (2002) 28 Cal.4th 703, 732; see *People v. Bemore, supra,* 22 Cal.4th at p. 846.)  Nevertheless, counsel is accorded "great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence.    [Citation.]    Such latitude precludes opposing counsel from complaining on appeal that the opponent's reasoning is faulty or the conclusions are illogical." (*People v. Cash, supra,* 28 Cal.4th at p. 732 (internal

quotation marks omitted); see *People v. Bemore, supra,* 22 Cal.4th at p. 846.)
To prevail on a prosecutorial misconduct claim, the court asks "whether there
is a reasonable likelihood that the jury construed or applied any of the
complained-of remarks in an objectionable fashion. [Citations.]" (*People v.
Cash, supra,* 28 Cal.4th at p. 733 (internal quotation marks omitted).)

Juniel decided to represent himself after the first witness had
testified.[53] The jury may have been surprised and concerned to see a defendant
representing himself in the face of such serious charges. During the
presentation of his case, and particularly during his cross-examination of
McDonald and her witnesses, Juniel sometimes seemed to stray from the
pertinent issues. For example, he cross-examined McDonald at length about
details of their relationship that had little, if any, bearing on the few domestic
violence incidents to which she had testified, and no bearing on the murder.
Juniel at times complained to the judge in front of the jury or made speaking
objections. While the record does not support defendants' claims that the trial
became unwieldy, Juniel's self-representation did present issues that would not
have arisen had he been represented by counsel. For example, he needed
assistance from advisory counsel in presenting evidence to witnesses and to the
jury, in communicating with the judge at the bench, and similar matters.

In context, therefore, the prosecutor's closing remarks simply sought
to assure the jury that, notwithstanding his decision to represent himself, and the
difficulties that may have entailed, Juniel's trial was fair. The prosecutor

---

53. Although wholly lacking any basis in the record, Juniel attacks his
advisory counsel, Mr. Levy, for failure to make an opening argument (Levy said
he would not make an opening argument "at this time" (RT 80)), for "barely"
questioning the first witness (the pathologist), and for being unhelpful in
providing discovery. (AOB at 69, fn. 9.) Aside from the blatant
misrepresentation of the record, which we do not address here since no
ineffective assistance of counsel claim has, or can be, raised, Juniel's allegations
have no bearing on his purported claim of prosecutorial misconduct.

assured the jury that Juniel had the constitutional right to represent himself, and that his decision to do so did not mean that his defense was curtailed in any way. The prosecutor's statement that he did not object to some questions was not meant to insinuate that Juniel presented inadmissible evidence, but simply to point out that, although Juniel may have dwelt on tangential matters at times, it was important to let him present the case as he wished, rather than to make every conceivable objection. Nothing in the prosecutor's remarks remotely insinuated that Juniel had "repeatedly violated the rules of evidence in his questioning." (AOB at 71.)

Juniel complains that the prosecutor "vouched" for defense and advisory counsel, claiming that a prosecutor cannot vouch for the credibility of witnesses. Since neither attorney was a witness, their credibility was not in issue. Moreover, the prosecutor's remarks, in context, did not address counsels' credibility in any event. Similarly, Juniel complains that the prosecutor relied on evidence outside the record—his own experience and knowledge—in complimenting counsel. Again, however, counsels' performance was not at issue in the case, so the prosecutor's alleged reliance on evidence outside the record had no bearing on the guilt or innocence of the defendants with respect to the murder charge. The prosecutor did not "assume facts" not in the record with respect to any issue before the jury. He merely sought to tell the jury that Juniel's self-representation did not deny him a fair trial. Nothing in the prosecutor's argument added facts outside the record or otherwise improperly addressed the evidence before the jury. Contrary to Juniel's claim, the prosecutor did not employ "deceptive or reprehensible methods" to persuade the jury of Juniel's guilt.

Moreover, even if Juniel could have shown that the prosecutor's remarks were inappropriate, he cannot show there is a reasonable likelihood that the jury construed or applied the challenged remarks in an objectionable

144

fashion. The trial court instructed the jury that counsels' arguments were not evidence. (RT 2100-2101; see *People v. Cash, supra*, 28 Cal.4th at p. 734 ["Even if we were to assume there was some impropriety in the prosecutor's argument, it was cured when the trial court instructed the jury with the standard admonition that argument is not evidence."].) The evidence on the murder charges was overwhelming, and it was upon that evidence that the prosecutor focused. As with his other arguments, Juniel misrepresents the record and injects his claim with unsubstantiated hyperbole. This claim, like the others, is without merit.

## CONCLUSION

Accordingly, respondent respectfully requests that the judgment be affirmed.

Dated: May 18, 2005

Respectfully submitted,

BILL LOCKYER
Attorney General of the State of California

ROBERT R. ANDERSON
Chief Assistant Attorney General

GERALD A. ENGLER
Senior Assistant Attorney General

MICHELE J. SWANSON
Deputy Attorney General

*Joan Killeen*

JOAN KILLEEN
Deputy Attorney General

Attorneys for Respondent

JK/jk/lls
SF2004DA0340
c:\dat\Killeen\junielrb.wpd

## CERTIFICATE OF COMPLIANCE

I certify that the attached RESPONDENT'S BRIEF uses a 13 point Times New Roman font and contains 46682 words.

Dated: May 18, 2005

Respectfully submitted,

BILL LOCKYER
Attorney General of the State of
California

JOAN KILLEEN
Deputy Attorney General

Attorneys for Respondent

## DECLARATION OF SERVICE

Case Name: **People v. Richard Juniel, Jr., et al**                    No.: **A105203**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the Bar of this Court at which member's direction this service is made. I am 18 years of age or older and not a party to the within entitled cause; I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On **May 18, 2005,** I placed the attached **RESPONDENT'S BRIEF** in the internal mail collection system at the Office of the Attorney General, 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102, for deposit in the United States Postal Service that same day in the ordinary course of business, in a sealed envelope, postage thereon fully prepaid, addressed as follows:

Janice M. Lagerlof                              Honorable Thomas Orloff
Attorney at Law                                 District Attorney
3929 24th Street                                1225 Fallon Street, Room 900
San Francisco, CA 94114                         Oakland, CA 94612
(attorney for McDonald)

                                                Clerk of the Superior Court
Lawrence A. Gibbs                               1225 Fallon Street, Room 107
P. O. Box 7639                                  Oakland, CA 94612
Berkeley, CA 94707
(attorney for Juniel)

First District Appellate Project
730 Harrison Street, Suite 201
San Francisco, CA 94107

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **May 18, 2005,** at San Francisco, California.

| | |
|---|---|
| L. SORENSEN | _L. Sorensen_ |
| Typed Name | Signature |