# EXHIBIT D

(Petition for Review)

IN THE SUPREME COURT OF CALIFORNIA

**PEOPLE OF THE STATE OF**            )
**CALIFORNIA,**                       )        No. S1_____
                                      )
    Plaintiff and Respondent,        )
    v.                               )
                                      )
**RICHARD JUNIEL, Jr.,**              )
                                      )
    Defendant and Appellant.         )
_____  )

DOCKETED
SAN FRANCISCO
MAR 2 7 2006
By____D. VELASCO____
No. _____

First District Court of Appeal No. A105203
Alameda County Superior Court No. C145236A
Honorable Julie Conger, Judge

## PETITION FOR REVIEW

LAWRENCE A. GIBBS (No. 98866)
P.O. Box 7639
Berkeley, California 94707
Tel: (510) 525-6847

Attorney for Appellant
Richard Juniel
By Appointment of the Court of Appeal

# TABLE OF CONTENTS

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT

I.    THE TRIAL COURT COMMITTED REVERSIBLE ERROR UNDER
      BOTH STATE AND FEDERAL LAW BY DENYING MR. JUNIEL'S
      MOTIONS TO SEVER THE TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.   THE TRIAL COURT VIOLATED MR. JUNIEL'S CONSTITUTIONAL
      RIGHTS BY FORCING HIM TO DECLARE IN ADVANCE WHETHER
      HE WOULD TESTIFY IN HIS OWN DEFENSE . . . . . . . . . . . . . . . . 25

III.  THE PROSECUTOR COMMITTED MISCONDUCT DURING
      ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

APPENDIX:   Opinion of the Court Of Appeal, filed, 2006.

## TABLE OF AUTHORITIES

### FEDERAL CASES

Bean v. Calderon (9th Cir. 1998) 163 F.3d 1073 20

Bell v. Cone (2002) 535 U.S. 685     27

Brooks v. Tennessee (1972) 406 U.S. at p. 613     25, 27

Bruton v. United States (1968) 391 U.S. 123     22

Chapman v. California (1967) 386 U.S. 18     21

Darden v. Wainwright (1986) 477 U.S. 168     29

Donnelly v. DeChristoforo (1974) 416 U.S. 637     33

French v. Jones (6th Cir. 2003) 332 F.3d 430     27

Shillinger v. Haworth (10th Cir. 1995) 70 F.3d 1132     27

United States v. Davis (1st Cir. 1980) 623 F.2d 188     13

United States v. LaMorte (2d Cir. 1991) 950 F.2d 80     32

United States v. Phillips (7th Cir. 1975) 527 F.2d 1021     32

United States v. Vasquez-Velasco (9th Cir. 1994) 15 F.3d 833 13

United States v. White (8th Cir. 2003) 341 F.3d 673     27

United States v. Ziperstein (7th Cir. 1979) 601 F.2d 281     14

### STATE CASES

Calderon v. Superior Court (2002) 87 Cal. App. 4th 933     12, 19

People v. Cummings (1993) 4 Cal. 4th 1233     12, 14, 15

People v. Gatlin (1989) 209 Cal. App. 3d 31     12, 18

People v. Jackson (1996) 13 Cal. 4th at 1207     12, 14, 15, 18

People v. Massie (1967) 66 Cal. 2d 899     12, 13, 20, 21, 22

People v. Almaraz (1985) 173 Cal. App. 3d 304     14

People v. Anderson (1990) 52 Cal. 3d 453     30

People v. Box (2000) 23 Cal. 4th 1153 — 11

People v. Cash (2003) 28 Cal. 4th 703 — 30

People v. Coleman (1975) 13 Cal. 3d 867 — 26

People v. Earp (1999) 20 Cal. 4th 826 — 29

People v. Farmer (1989) 47 Cal. 3d 888 — 30, 31

People v. Graham (1969) 71 Cal. 2d 303 — 14

People v. McDermand (1984) 162 Cal. App. 3d 770 — 26

People v. Ortiz (1978) 22 Cal. 3d 38 — 12, 19

People v. Pinholster (1992) 1 Cal. 4th 865 — 14

People v. Smallwood (1986) 42 Cal. 3d 415 — 19

People v. Valdez (2004) 32 Cal. 4th 73 — 32

People v. Watson (1956) 46 Cal. 2d 818 — 20

Woods v. Superior Court (1994) 25 Cal. App. 4th 178 — 26

## PETITION FOR REVIEW

TO THE HONORABLE RONALD M. GEORGE, CHIEF JUSTICE
AND HONORABLE ASSOCIATE JUSTICES OF THE SUPREME
COURT OF CALIFORNIA:

Pursuant to Rule 28, California Rules of Court, appellant Richard Juniel
petitions for review of the decision of the Court of Appeal for the First Appellate
District, filed February 16, 2006, affirming a judgment of conviction. A copy of that
opinion is attached hereto as an Appendix.

Review is necessary to settle an important questions of law pertaining
to criminal trials, including severance of trials, when it is appropriate to force a
defendant to declare in advance whether he would testify in his own defense, and
whether the prosecutorial misconduct in closing argument is prejudicial.

## ISSUES PRESENTED FOR REVIEW

1.    Whether the trial court violated appellant's right to due process and
a fair trial denying petitioner's motions to sever the trial?

2.    Whether the trial court violated appellant's federal constitutional
rights by forcing to declare in advance whether the would testify in his
own defense?

3,    Whether the prosecutor violated petitioner's right to due process and
a fair trial by misconduct in his closing argument?

1

## PROCEDURAL BACKGROUND

On May 30, 2003, the Alameda County district attorney filed an information against appellant Richard Juniel and co-defendant Ava McDonald, charging them with murder in violation of Penal Code section 187. (CT 160.) The murder count added a special allegation that Mr. Juniel used a firearm in violation of section 12022.53(d). (CT 161.) Mr. Juniel was also charged with unlawful firearm possession in violation of section 12021(e) and possession of an assault weapon in violation of section 12280(b). (CT 161-162.) Mr. Juniel pled not guilty. (CT 163.)

Trial began on August 11, 2003. (CT 295, RT 57.) The jury began its deliberations on September 18. (CT 355.) On September 25, the jury found both Mr. Juniel and co-defendant McDonald guilty as charged. (CT 435-439.) Mr. Juniel was sentenced on December 15, 2003. (CT 469.) The court imposed a sentence of 25 years to life for the first degree murder conviction, a consecutive term of 25 years to life for the 12022.53 enhancement, an additional consecutive term of 8 months for the unlawful firearm possession count, and a concurrent term of 8 months for the assault weapon count. (CT 508.) Mr. Juniel filed a timely notice of appeal on December 15. (CT 468).

On February 16, 2006, the court of appeal filed an opinion affirming the conviction. (*See* Appendix).

2

## STATEMENT OF FACTS

Stacey Alexander was killed in Oakland on the night of March 4, 2002. She died of three gunshot wounds to the head, arm, and back. (RT 97-98, 108.) Police received several calls immediately after the shooting and officers arrived at the scene quickly. (RT 441-442, 456, 633-634, 701-702, 1050-1051.) They found Stacey's body slumped over on the back porch of the house at 5423 Dover Avenue. (RT 444-447, 1052.)

Shortly after they arrived, police received reports from several witnesses who had observed some of the events surrounding the shooting. The witnesses gave varying and somewhat inconsistent accounts of the assailant or assailants and the car that had been used in the shooting. Witness Jayshree Chander, for example, told police that after she heard gunshots and a woman screaming, she saw a man running fast on the sidewalk, and then she also saw a man and a woman sitting in a car. (RT 1277-1279, 1283-1285.) She described the car as an American model, possibly a Buick. (RT 1284.) Another witness said that he had seen two black males in the car used in the shooting. (RT 502.) One witness described the car as an Acura or Lexus. (RT 599.)[1]

Although they received a somewhat confusing mix of information from witnesses, police soon pulled over appellant Richard Juniel and co-defendant Ava McDonald, who were driving in Ava's Acura sedan. (RT 640-642, 831-832.) Ava

---

[1]    At a pretrial hearing, Officer Brock testified that the car had been described as a dark colored Lexus or Acura. (Pretrial RT 49.)

3

was driving the car and Richard rode in the passenger seat. (RT 644-645, 832-835.) Ava and Richard made no attempt to flee or resist. (RT 644, 854.)

Police brought witnesses to the spot where they pulled the Acura over and conducted a field lineup. Again, the witnesses were unable to provide much clear information. Witness Chander told police that she was 80% sure that the Acura was the car she had seen earlier. (RT 838, 1286.) As a result, the police seized the car as evidence. (RT 838-839, 1054-1055.)

But Chandler was unable to identify Mr. Juniel or Ms. McDonald as the people she had seen; in fact, Ms. Chander actually pointed out a bystander to police and told them it was the man she had seen running earlier. (RT 1287.) Nor was any other witness able to identify Mr. Juniel and Ms. McDonald as the assailants they had seen commit the killing. (RT 837, 846-847, 861, 1109, 1224.)   Apparently due to the confused witness accounts, the police did not arrest Richard and Ava. Police informed them, however, that if they wanted to get their car back, they had to come down to the station. (RT 1978.) Richard and Ava therefore agreed to accompany police to the station house. (RT 1056-1057, 1447, 1978.) They were released in the morning. (RT 1450.)

During the subsequent investigation, police became more convinced that Mr. Juniel and Ms. McDonald had committed the crime. One week after the shooting, police called them and told them to come down to the station to get the Acura back. (RT 1077-1078, 1452-1453, 1978.) When Richard and Ava arrived, they were arrested and charged with Stacey's murder. (RT 1079, 1121.)

4

The prosecution's theory of the case was that Richard and Ava had killed Stacey as a result of an ongoing dispute between various friends and family members. (RT 67-74.) The dispute apparently started as a result of a strained relationship between Angelina Bryant and Sia, Ava's sister. Angelina testified that she was unsure how the bad feelings had come about between her and Sia. (RT 164-165, 236-240, 1388-1389.)

On March 3, Angelina and Sia met on the street where they got in an argument that escalated into a physical confrontation. (RT 167-173.) Several other people got involved, including Angelina's grandmother Luella Smith, who struck Sia. (RT 175, 319-321.) That night, Rita Ammons, Ava and Sia's mother, called Luella Smith to try to resolve the confrontation. (RT 1317.) At one point, Angelina took the phone away from Luella; she and Rita argued over the phone. (RT 179-181, 1318-1319.)

According to Angelina, she saw Mr. Juniel that night at a liquor store. He did not seem upset, but he said that he had heard about her confrontation with Sia. (RT 184.)[2] Later that night, Angelina received a call from Ava. (RT 185.) Ava was apparently upset that Angelina had disrespected her mother, and she told Angelina that once Angelina completed her pregnancy, "your ass is mine." (RT 186, 1348, 1394.)

---

[2] Angelina originally testified that Mr. Juniel said he had "something in the back," but she later changed her story and said she could not remember if he said he had something. (RT 184-185.)

5

Angelina told her friend Stacey Alexander about the dispute. (RT 188.) When Ava later drove up in her car, Stacey confronted Ava. (RT 189-190, 194-197.) Ava pulled a baseball bat out of her trunk, and Stacey pulled out a knife. (RT 198-202, 261-279, 1396-1398.) A neighbor broke up the fight, but before going inside, Angelina said she heard Ava threaten to get a gun and "pop" Stacey. (RT 202.) Angelina's aunt, Cathy Rivers, also testified that Ava threatened to kill Stacey as a result of the confrontation. (RT 327.)

According to the prosecution, the next night, Ava and Richard waited in Ava's car. When they saw Stacey, Richard shot her twice out of the passenger window. Stacey attempted to run away, but Richard chased her down, and shot her again before fleeing. (RT 72-74.)

Several eyewitnesses testified at trial. Richshilda Williams and her niece Ciara Baldwin testified that when they walked to the store to buy bread on the night of the 4th, they saw Ava and Richard sitting in their parked car. (RT 359-363, 547-554.) During a photo lineup, however, Williams had said that she was only 50% sure that Richard was the man she had seen. (RT 384, 1073-1074.)

Another witness, Seth June, testified that he heard two gunshots and then heard Stacey screaming and saw her running down the street. (RT 478-482.) June said he saw a man with a gun get out of the Acura and follow Stacey around the back of another house, and that he then heard another shot. (RT 482-494.) June was unable to identify either Richard or Ava. (RT 502-503, 510, 515.)

Wendy Jackson, who lived at the house where Stacey was found, testified that

6

after hearing gunshots and a woman screaming, she saw a man follow the victim toward the backyard and then heard another shot. (RT 596-601.) She said Mr. Juniel looked similar to the man she had seen but was unable to identify Ms. McDonald. (RT 609, 616.) Natalie Alvarez also saw a man chase down the victim. (RT 775-792.) In court she identified Richard as the assailant, but in her earlier photo lineup, she had identified a different man. (RT 807-809.)

Although police who searched the Acura originally found nothing, an evidence technician testified that she later found a third casing in the car. (RT 655, 928.) Ballistics tests matched the shell casings to a gun that was found in Richard and Ava's apartment. (RT 673-675, 967-972, 1005-1025.)

Richard and Ava both took the stand in their own defense. Richard testified that he had nothing to do with the murder. According to Richard, he and Ava were home on the night of March 4th. (RT 1973-1975.) He said they went out to get food and were pulled over by police. (RT 1975-1976.) Both the prosecution and Ava introduced a variety of letters and tape recorded statements to impeach his testimony.

Ava's defense strategy was to place all of the blame on Mr. Juniel. Ava testified that she was with Richard in the car on the night of the 4th. (RT 1434-1435.) According to Ava, when Stacey approached the car, Richard shot her twice, then got out of the car and went after her. (RT 1436-1443.) She said that she had no intention of helping him kill Stacey. She said she was essentially forced to participate because Richard was a violent and abusive man. (RT 1460-1466.) Ava

presented a large amount of evidence to show that Richard dominated and controlled her. She also presented an expert witness who testified about domestic violence and battered women's syndrome. (RT 1769-1836.)

The jury apparently believed neither Ava's testimony nor Richard's. After deliberating for several days, it found both of them guilty.

**I.**

## THE TRIAL COURT COMMITTED REVERSIBLE ERROR UNDER BOTH STATE AND FEDERAL LAW BY DENYING MR. JUNIEL'S MOTIONS TO SEVER THE TRIAL

### A.    Procedural Background

Prior to trial, both parties moved for severance. (CT 233-235, RT 7.) Ava's counsel indicated her intention to introduce "character evidence . . . which will be quite negative toward Mr. Juniel." (RT 7.) Ava's counsel made an offer of proof on the record: she said that she planned to introduce evidence of "threats, isolation, beatings, general psychological and physical abuse of Ms. McDonald by Mr. Juniel." (RT 8.) The district attorney opposed the motion to sever, arguing among other things, that Ava's proffered domestic abuse evidence was irrelevant to the charges and inadmissible. (CT 217-232, RT 8-10.)

The judge agreed with the district attorney that duress was not a defense to murder, and the judge therefore said that she would limit Ms. McDonald's attempt to introduce Mr. Juniel's prior bad acts. (RT 11-12.) She planned to largely "eliminate prejudicial testimony as to Mr. Juniel's activities which clearly should not come in as inappropriate character evidence." (RT 12.) As a result, the judge concluded that there was no need to sever the trial: "Given that ruling then the motion to sever is denied." (RT 12.) The judge later reiterated her ruling: "I would not allow derogatory, pejorative or prejudicial evidence to be entered as it affects Mr. Juniel. . . . [A]t the present time I see no basis for a motion to sever." (RT 15.)

In an apparent violation of the court's pretrial evidentiary ruling, Ava's

9

counsel argued during opening argument that Ava was "humiliated, she was threatened, she was struck, she was psychologically and physically abused by Richard Juniel." (RT 81.) She spoke at length about the nature of the abusive relationship and the variety of evidence that would be presented that Mr. Juniel was a perpetual abuser. (RT 81-88.) On the basis of Ava's opening argument, Mr. Juniel moved for a mistrial and renewed his severance motion, but the judge denied both. (RT 115-116.)

During Ava's direct examination, Ava's counsel repeatedly attempted to elicit testimony about Mr. Juniel's bad character and prior bad acts. (RT 1370, 1374, 1375, 1376, 1378, 1387.)[3] The court sustained several of Mr. Juniel's objections to this testimony. Ava's counsel then renewed her motion to sever on the basis that her inability to present character evidence had made it impossible to put on an adequate defense. (RT 1410-1411.) The district attorney again argued that the acts of domestic violence were irrelevant because duress is not a defense to murder. (RT 1411-1412.) The judge reiterated her prior ruling: "I am not going to allow this trial to be muddied with other alleged acts of Mr. Juniel's behavior. And with regard—I previously considered this and I have denied the motion for a severance." (RT 1414.)

The next day, in a stunning reversal, the trial judge sua sponte announced her intention to alter her previous rulings. Nearly a month after the trial began—after

---

[3]    In direct violation of the court's previous order, Ava also testified that Mr. Juniel had previously gone to jail. (RT 1371-1372.)

the prosecution had concluded its case-in-chief, and after Mr. Juniel had concluded the primary presentation of his defense—the judge decided to allow Ava's evidence of Mr. Juniel's prior acts of domestic violence. (RT 1417-1418.) The judge ruled that to exclude such evidence would deny Ava's right to a fair trial.

The judge then considered Ava's offer of proof on eleven different prior acts of violence by Richard and ruled many of them admissible. (RT 1418-1427.) Ava's counsel again moved for a mistrial and severance because, due to the court's changed ruling, she did not have time to prepare her defense. (RT 1430-1431.) The judge denied the motion. (RT 1431.) Ava went on to present a variety of evidence related to Mr. Juniel's bad character and prior bad acts (a partial list is set out in section D.1. below).

Mr. Juniel again filed a motion for a dismissal or a mistrial and severance based on a violation of Evidence Code section 1101 and his federal constitutional right to a fair trial. (CT 347, RT 1685.) The judge denied the motion. (RT 1686.) The parties subsequently renewed the motions for severance several times, but the judge denied each request. (RT 1827-1828, RT 1840, CT 455, CT 476.)

### B.    Legal Landscape

With Penal Code section 1098, the legislature has expressed a preference for joint trials when codefendants' cases arise out of the same set of facts. (People v. Box (2000) 23 Cal. 4th 1153, 1195.) The trial court, however, retains discretion to order separate trials when a joint trial would result in unfair prejudice to one of the

defendants. In People v. Massie (1967) 66 Cal. 2d 899, the Supreme Court set forth the standard for determining when a motion to sever should be granted:

> [T]he court should separate the trials of codefendants in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.

(Id. at pp. 916-917 (footnotes omitted.))

In addition to the factors set forth in Massie, California courts have also recognized the potential for prejudice in joint trials when some evidence would be admissible against one defendant but not the other. (See People v. Jackson (1996) 13 Cal. 4th 1164; 1207-1208; People v. Cummings (1993) 4 Cal. 4th 1233, 1288; People v. Keenan (1988) 46 Cal. 3d 478, 501; People v. Ortiz (1978) 22 Cal. 3d 38, 47; Calderon v. Superior Court (2002) 87 Cal. App. 4th 933, 939-941; People v. Gatlin (1989) 209 Cal. App. 3d 31, 42.)

**C. Analysis**

If there were ever a case where the defendants' motion for severance should have been granted, it was this case. Mr. Juniel and Ava presented totally inconsistent and antagonistic defenses: while Mr. Juniel claimed that he had nothing to do with the crime, Ava claimed that she was with Mr. Juniel when he committed the crime. Ava's defense was to shift responsibility *entirely* to Mr. Juniel. As part of her defense, moreover, Ava introduced a raft of evidence of Mr. Juniel's bad character and prior bad acts. This highly inflammatory evidence had only marginal (if any) legal relevance to Ava's murder defense, and it would have been obviously

12

inadmissible at a separate trial.

The trial judge's denial of the motion to sever led to a long, sprawling, and largely incoherent trial at which the defendants spent days attacking each other with a variety of evidence that had little or nothing to do with the case. In the interests of justice and judicial economy, the defendants' cases should have been tried separately. The failure to grant separate trials deprived Mr. Juniel of his state and federal rights to a fair trial.

### 1.    Antagonistic Defenses

In People v. Massie, the California Supreme Court stated clearly that "the court should separate the trials of codefendants in the face of . . . conflicting defenses." (Massie, supra, 66 Cal.2d at pp. 916-917.) Federal courts too have recognized that "[t]he most common reason for severing a trial is where codefendants present mutually exclusive or irreconcilable defenses." (United States v. Vasquez-Velasco (9th Cir. 1994) 15 F.3d 833, 846, citing United States v. Rucker (11th Cir. 1990) 915 F.2d 1511, 1513.)

The California Supreme Court has suggested a much narrower class of cases where severance should be granted as a result of "antagonistic defenses." ( See People v. Hardy (1992) 2 Cal. 4th 86, 168.) "[T]o obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable . . . ." ( Ibid., quoting United States v. Davis (1st Cir. 1980) 623 F.2d 188, 194-195.) In other words, "'mutual antagonism' only exists where the acceptance of one party's defense will preclude the acquittal of the

13

other." (Ibid., quoting United States v. Ziperstein (7th Cir. 1979) 601 F.2d 281, 285.)

This case thus easily fits in the narrow class of cases where truly antagonistic defenses should compel severance. This was a case where "one defendant present[ed] a defense that necessarily implicated another defendant." (Id. at p. 169.) This was a case where "one defendant claimed second defendant forced him to participate in crime." (Ibid.) This was a case where "acceptance of one party's defense . . . preclude[d] the acquittal of the other." (Id. at p. 168.) The parties' defenses here were starkly antagonistic and wholly inconsistent.

This case is far different from the cases where California courts have held that partially conflicting defenses did not require severance. This was not a case where it was "undisputed that each appellant participated in the incident." (Boyde, supra, 46 Cal.3d at p. 233; accord People v. Jackson (1996) 13 Cal.4th 1164, 1208; People v. Cummings (1993) 4 Cal.4th 1233, 1287.) This was not a case where the defenses were "not completely conflicting, because there [was] little disagreement about most of the events." (People v. Almaraz (1985) 173 Cal.App.3d 304, 315.)

This was not simply a case where one defendant merely gave some testimony that was "damaging to the other and thus helpful to the prosecution." (Turner, supra, 37 Cal.3d at p. 313.) Nor was this a case where the codefendant's attempt to shift guilt came only from the arguments of counsel. (People v. Pinholster (1992) 1 Cal. 4th 865, 933-934.) Rather, this was a case where a massive and "irreconcilable conflict [arose] between the two defendants." (People v. Graham (1969) 71 Cal.2d

14

303, 331.) Moreover, in this case, unlike several of the leading cases where courts have upheld joint trials despite conflicting defenses, the court did not employ a dual jury procedure to minimize prejudice to the defendants. (Compare Jackson, supra, 13 Cal.4th at pp. 1207-1208; Cummings, supra, 4 Cal.4th at pp. 1287-1288.)

The California courts have taken a restricted view of when conflicting defenses should result in separate trials—the class of cases where severance must be granted is narrow. But a narrow class does not mean no class at all. If the principles of Massie, Hardy, and other cases have any meaning, they must mean that severance was required in this case.

### 2.    Inadmissible Character and Bad Acts Evidence

Mr. Juniel received an unfair trial not just because Ava's defense strategy completely contradicted his own. Mr. Juniel was particularly prejudiced by the manner in which Ava presented her defense. Ava did not simply testify that Mr. Juniel committed the crime—in order to show that she was controlled by Mr. Juniel, she also testified that Mr. Juniel committed a variety of other deplorable acts. Ava (and other witnesses called in her defense) testified that Mr. Juniel was a violent and abusive man who had repeatedly beaten Ava and her child. The admission of this evidence made this joint trial particularly prejudicial.

#### a.    Evidence Presented

In order to support her defense, Ava introduced a variety of evidence against Mr. Juniel—evidence that would have been inadmissible at a separate trial. The sheer amount of it was staggering. It included:

15

(1)    Ava's testimony about a December incident where Mr. Juniel grabbed
       her and threw her into a closet. (RT 1461-1462.)

(2)    Ava's testimony about an incident where Mr. Juniel slapped her after
       she came home from a club. (RT 1463-1464, 1481-1485)

(3)    Atrina Jackson's testimony about the post-club incident where Mr.
       Juniel slapped Ava and where he later phoned Ms. Jackson and said
       "you ain't shit, dyke bitch." (RT 1894-1897.)

(4)    Tomaz Pickens's testimony that Mr. Juniel had punched him and
       thrown lit matches and bottles at him. (RT 2079-2080.)

(5)    Victor White's testimony that he had seen Mr. Juniel hit Ava several
       times. (RT 1888-1889.)

(6)    Ava's testimony about an incident where Mr. Juniel threw her into a
       window. (RT 1464-1465.)

(7)    Kelley Haynes's hearsay testimony that Ava had told her that Mr.
       Juniel had thrown her through a window. (RT 1877.)

(8)    Robyn Williams's hearsay testimony that Ava had told her that Mr.
       Juniel had hit her and shoved her head through a window. (RT 1883.)

(9)    Ayeshia Dubose's testimony that Mr. Juniel repeatedly beat and
       threatened Ava and her son and that there were "too many" incidents
       of abuse to even count. (RT 1917-1918.)

(10)   Ava's testimony that Mr. Juniel had previously threatened her by
       pointing a gun at her. (RT 1616-1619.)

(11)   Tomaz Pickens's testimony that he had seen Mr. Juniel with a gun.
       (RT 2080-2081.)

(12)   Ava's other testimony that Mr. Juniel was abusive and controlling.
       (RT 1465-1466, 1733.)

(13)   Ava's testimony about Mr. Juniel's infidelity. (RT 1374, 1434, 1480,
       1527.)

(14)   Ava's testimony that Mr. Juniel was sleeping with her sister Sia. (RT

16

1713-1714.)

(15)    Ayeshia Dubose's testimony that Sia performed sexual favors on Mr. Juniel in exchange for drugs. (RT 1919-1920.)

(16)    Ayeshia Dubose's testimony that Ava was having problems with Mr. Juniel because he was cheating on her. (RT 1915-1916.)

(17)    Ava's testimony that Mr. Juniel would "jump on her." (RT 1375, 1380.)

(18)    Ava's testimony that Mr. Juniel did not want her to stay close to her family or her girlfriends. (RT 1375-1376.)

(19)    Ava's testimony about Mr. Juniel's anger when Larry Fields came to visit. (RT 1377-1378.)

(20)    The stipulation regarding Larry Fields and the change in his relationship with Ava following Christmas. (RT 1836.)

(21)    Ava's testimony that Mr. Juniel and her ex-husband were in a gang together. (RT 1501.)

(22)    Ava's other testimony about Mr. Juniel's gang symbols. (RT 1643-1644, 1738-1739.)

(23)    Kelley Haynes's testimony that Mr. Juniel was hitting Ava and not coming home at night. (RT 1876.)

(24)    Ayeshia Dubose's testimony that Mr. Juniel had called and threatened her and her family. (RT 1923, 1929-1934.)

(25)    Robyn Williams's testimony that Ava was afraid of Mr. Juniel and that he had threatened Ava. (RT 1882-1883.)

(26)    Trina Mayon's testimony that Ava grew more distant once Mr. Juniel returned from jail and that she could tell something was wrong with Ava. (RT 1905-1906, 1912-1913.)

(27)    Rita Ammons's testimony about the nature of Ava and Mr. Juniel's relationship, including her testimony that Mr. Juniel was abusive. (RT 1311-1313, 1365.)

17

(28) Ava's expert witness Dr. Linda Barnard, whose testimony about Battered Women's Syndrome and domestic violence was intended to provide a foundation for concluding that Ava was abused and controlled by Mr. Juniel. (RT 1769-1824.)

Ava's entire defense was premised on the admission of this evidence. See also RT 2190-2196; 2204-2205.) None of this evidence or argument would have been proper at a separate trial.

If Ava and Mr. Juniel had separate trials, it is possible that Ava would have testified against him. But none of her testimony about his prior bad acts would have been admissible. And of the nine other witnesses whom she called in her defense—all of whom testified largely about Mr. Juniel's bad acts and bad character—not a single one offered testimony that would have been admissible if Mr. Juniel had been tried separately for the murder.

### b. Analysis

"'Other crimes' evidence which would not be admissible against an accused in his separate trial holds a well-understood potential for prejudice." ( Keenan, supra, 46 Cal.3d at p. 501.) California courts have recognized that joint trials may be inherently prejudicial where the trial allows the jury to hear "evidence admissible against one but not against another." (Gatlin, supra, 209 Cal. App. 3d at p. 42.) For example, "[a]n abuse of discretion occurs when the failure to sever leads to the admission at one defendant's trial of incriminating extrajudicial statements by a joint defendant that would otherwise be inadmissible in a separate trial." (Jackson, supra, 13 Cal. 4th at 1207.)

18

Severance is not mandated simply because evidence pertaining to different defendants or different counts in a joint trial is cross-admissible. (Keenan, supra, 46 Cal.3d at p. 501.)  But in such a case, the court must balance the "conceded prejudice" against the "benefits of joinder." (People v. Smallwood (1986) 42 Cal.3d 415, 426.)  Where the prejudice of from this evidence is so great as to deny a defendant a fair trial, California courts have demanded severance.

In the typical situation, the prosecution at a joint trial introduces evidence against codefendants that would not be admissible against the defendant in a separate trial.  In People v. Ortiz (1978) 22 Cal. 3d 38, for example, the defendant was tried for robbery with three codefendants who were tried for the robbery and also a separate narcotics charge not involving the defendant.  The district attorney presented "pervasive" and "dramatic" testimony in connection with the codefendants' narcotics charge. (Id. at p. 47.)  The Supreme Court found that the joint trial prejudiced the defendant because the narcotics evidence, much of which "would have been inadmissible in a separate trial of defendant," "implied defendant's association with the illicit narcotics activity of the codefendants. Ibid.) It therefore reversed the conviction. ( Id. at p. 48.  See also Calderon v. Superior Court (2002) 87 Cal. App. 4th 933.)

In cases like Ortiz and Calderon, where the non-cross-admissible evidence had even less prejudicial value, appellate courts have found an abuse of discretion when the trial court failed to sever the trials.  Never has a California court allowed a case like this—where one defendant's strategy consists entirely of admitting other

19

acts evidence against her codefendant—to be tried jointly.

### C.    Federal Constitutional Violation

The United States Supreme Court has recognized that improper joinder violates the Constitution "if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." (United States v. Lane (1986) 474 U.S. 438, 446 n.8.) The danger of a Due Process violation is heightened when joinder "allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible." (Bean v. Calderon (9th Cir. 1998) 163 F.3d 1073, 1084, quoting United States v. Lewis (9th Cir. 1986) 787 F.2d 1318, 1322.)

The improper joinder in this case allowed Mr. Juniel's co-defendant to smear him with an endless barrage of character and "other acts" evidence. It allowed a massive amount of other crimes evidence to be admitted that otherwise would have been inadmissible. The error and the resulting prejudice were so great that Mr. Juniel's federal constitutional rights to a fair trial were violated.

### D.    Prejudice

As a violation of state law, the erroneous denial of a motion to sever is reviewed for prejudice under the standard of People v. Watson (1956) 46 Cal.2d 818. Thus, Mr. Juniel's conviction must be reversed if "it is reasonably probable that [he] would have obtained a more favorable verdict at a separate trial." (Massie,

supra, 66 Cal.2d at 923.) When improper joinder results in a violation of the federal constitution, the conviction must be reversed unless the court concludes "that it was harmless beyond a reasonable doubt." (Chapman v. California (1967) 386 U.S. 18, 24.)

Under Massie, the prejudice analysis from a denial of a motion to sever involves an assessment of "differences from the joint trial that would have occurred if the defendant had been tried separately." (Massie, supra, 66 Cal.2d at 921.) In a case such as this, it is difficult to analyze prejudice because it is impossible to know what evidence would have been presented had Mr. Juniel been granted a separate trial. It is impossible to know if Ava would have testified against him or what she would have said. It is impossible to know if Mr. Juniel would have taken the stand or invoked his constitutional right to remain silent. Clearly, however, a separate trial for Mr. Juniel would have been vastly different than the joint trial that took place below.

At a minimum, the evidence of Mr. Juniel's prior bad acts and bad character would not have been admitted at a separate trial. That evidence, which constituted the bulk of Ava's defense, took up a large portion of the trial below. The jury heard again and again that Mr. Juniel abused Ava and others, including children. The jury heard again and again about Mr. Juniel's infidelity. The evidence was "highly inflammatory" and therefore extremely prejudicial. It would be absurd to assume that this evidence had no influence on the jury's verdict, especially given her lawyer's incendiary closing argument.

21

The trial court below attempted to instruct the jury that it should not consider the evidence of bad acts and bad character against Mr. Juniel. (RT 1431.) But the scope of the court's admonition was quite limited. The judge's instruction applied only to Ava's testimony. The judge never gave any similar instruction for Ava's other nine witnesses who testified to appellant's prior bad acts. Though the court gave a short limiting instruction at the conclusion of the case, informing the jury that the plethora of evidence of appellant's criminality should not "be considered by you to prove the defendant Juniel is a bad person," such limiting instruction was simply insufficient to cure the error. Even clear limiting instructions are not always sufficient to protect a defendant's right to be tried without inadmissible evidence. (Bruton v. United States (1968) 391 U.S. 123, 137.) Massie itself recognized that "even a judge would face a formidable task in attempting to exclude from his consciousness" the evidence that was inadmissible against one co-defendant. (Id. at p. 923.)    Even though "judges are better able than juries to limit their consideration of evidence to the purposes for which it is admissible," ( People v. Charles (1967) 66 Cal. 2d 330, 338 n.12), the Supreme Court in Massie reversed the conviction of one co-defendant because it held that the trial judge in that case simply could not have ignored the evidence. (Massie, supra, 66 Cal.2d at 923-924.)

In this case it would be unreasonable to expect the jury to have excluded from its consciousness all of the highly inflammatory evidence of Mr. Juniel's bad acts and bad character. The limiting instruction did not cure the error, and the prejudice resulting from the trial court's failure to sever the trial demands reversal of Mr.

22

Juniel's conviction. The prejudice was "so great as to deny" Mr. Juniel "his Fifth Amendment right to a fair trial." (Lane, supra, 474 U.S. at p. 446 n.8.) It would be impossible to maintain that the error was harmless beyond a reasonable doubt.

23

## II.

## THE TRIAL COURT VIOLATED MR. JUNIEL'S CONSTITUTIONAL RIGHTS BY FORCING HIM TO DECLARE IN ADVANCE WHETHER HE WOULD TESTIFY IN HIS OWN DEFENSE

### A.   Background

Mr. Juniel presented his primary defense case before Ava presented her defense. After calling several witnesses, Mr. Juniel rested the case, but he advised the court that he might wish to reopen if he was able to locate additional witnesses. (RT 1309.) The trial judge indicated that she would allow him to reopen should he find his additional witnesses. (RT 1310.) Mr. Juniel did not testify during his initial presentation.

At the time that he rested, Mr. Juniel (like everyone else) was proceeding based on the trial court's earlier ruling that Ms. McDonald would not be able to present her proffered evidence of Mr. Juniel's prior bad acts and bad character. Subsequently, however, the trial court reversed course and radically altered the nature of the trial. (RT 1417-1418.) When the trial court decided to allow Ava's domestic violence evidence, it of course added a whole new set of evidence to which Mr. Juniel had to respond.

When the judge was later preparing jury instructions, she asked Mr. Juniel whether he was planning to testify. Mr. Juniel responded: "At this time I have not yet decided, your honor, and I cannot say whether or not right now." (RT 1837.) Frustrated, the judge replied that she wanted to know so she could finalize the jury instructions. (RT 1838.)

Most of Ava's witnesses had not yet testified at that point, and Mr. Juniel attempted to explain to the judge that he wanted to hear their testimony—and in particular, that he wanted to hear their domestic violence testimony—before deciding whether to take the stand. He said that he wanted to "wait and weigh out

24

what the rest of the witnesses would testify to." (RT 1838.) He said that he understood that the witnesses would testify about "information concerning domestic violence issues," but that he did not "know the level of knowledge that these witnesses have about what happened, or I don't know exactly what they" their testimony would be. (RT 1838.)  The trial judge then issued a veiled threat to Mr. Juniel: "I will remind you that you did rest and it is within my discretion to allow you to reopen." (RT 1839.) The judge thus implied that if she did not get a direct and certain answer, she might not allow Mr. Juniel to reopen his case and testify. She told Mr. Juniel to "give me a yes or a no." (RT 1839.) Mr. Juniel responded that he would testify. (RT 1839.)

### B.    Analysis

#### 1. The Requirements of *Brooks v. Tennessee*

In Brooks v. Tennessee (1972) 406 U.S. 605, the United States Supreme Court held that a criminal defendant cannot be forced to declare in advance whether he will testify. In Brooks, the Court invalidated a Tennessee statute that forced defendants to testify before other witnesses in their defense. The Supreme Court noted that "a defendant's choice to take the stand carries with it serious risks of impeachment and cross-examination," (id. at p. 609) and it held that a defendant may wait to make that choice until after he has heard the other evidence.

The Court recognized that a defendant will typically have "some idea" in advance about what evidence will be presented. ( Ibid.) But the Court also recognized that a defendant cannot predict the weight and value of a witness's evidence until that witness actually takes the stand:  witnesses may not "testify as expected," they "may collapse under skillful and persistent cross-examination," or they "may fail to impress the jury as honest and reliable witnesses." (        Ibid.)

"Because of these uncertainties," the Court ruled that a defendant may wait until actually hearing other witnesses' testimony before making his decision. (Id. at p. 610.) The Supreme Court thus concluded that forcing a defendant to decide whether to testify before hearing other evidence violated both his Fifth Amendment right to remain silent and his due process rights. (Id. at p. 611-613.)

The trial judge's action below was a clear and direct violation of Brooks. The judge forced Mr. Juniel to declare whether he would testify before he had heard most of Ava's witnesses. Indeed, the violation here was even more clear than Brooks. In Brooks, the defendant had been forced to decide whether to testify before hearing *his own* witnesses; in this case, Mr. Juniel was forced to decide whether to testify before hearing his co-defendant's witnesses. Those witnesses were primarily offering testimony about Mr. Juniel's abuse—they were, in other words, essentially presenting evidence against Mr. Juniel, acting as functional equivalents of prosecution witnesses. Because they were not his own witnesses, Mr. Juniel had even less ability to predict the effect of their testimony and it was even more outrageous to force him to decide in advance whether to testify.

California courts have followed the mandate of Brooks. A defendant has a right "able to make an informed decision as to whether or not to testify," and he cannot "make such an informed decision unless he could evaluate the other defense witnesses before deciding whether or not to testify." (People v. McDermand (1984) 162 Cal.App.3d 770, 791; see also People v. Coleman (1975) 13 Cal.3d 867, 875-876; Woods v. Superior Court (1994) 25 Cal.App.4th 178, 186.)

The trial judge's action was entirely inconsistent with Brooks and subsequent cases.

### C.    Prejudice

In Brooks itself, the state did not present any argument that the error was

26

harmless, and the Supreme Court reversed the defendant's conviction. (Brooks, supra, 406 U.S. at p. 613.) The Court did not rule explicitly whether harmless error review should apply to errors under Brooks. The Supreme Court has subsequently stated, however, that a Brooks error that has the effect of keeping the defendant from testifying, or forcing him to give up his right not to testify, is a structural error which does not require a showing of prejudice. (Bell v. Cone (2002) 535 U.S. 685, 696 n.3.) Several lower federal courts have also held that Brooks errors are structural errors that require reversal without resort to any harmless error analysis. (    See United States v. White (8th Cir. 2003) 341 F.3d 673, 677-678; French v. Jones (6th Cir. 2003) 332 F.3d 430, 436-437 & n.5; Shillinger v. Haworth (10th Cir. 1995) 70 F.3d 1132, 1141-1142.)

The error is structural and requires reversal.

## III.

## THE PROSECUTOR COMMITTED MISCONDUCT
## DURING ARGUMENT

### A.    Background

During closing argument, the prosecutor stated that he wanted to talk about "the issue of Mr. Juniel representing himself." (RT 2151.) He said that "it's very important that this is a fair trial. It's important to me, it's important to the court, it's important to you, it's important to the community." (RT 2151-2152.) He went on to state that "Mr. Levy is an extremely talented, experienced lawyer." (RT 2152.)

Mr. Juniel then objected to the prosecutor's argument, and the court initially sustained the objection. (RT 2152.) The prosecutor persisted: "The point I'm trying to make is that it is clear that in an effort to have a fair trial Mr. Juniel has been afforded an attorney for advice, an investigator to help him. I think you even probably saw [Ava's counsel] Ms. Brown helping him at times here." (RT 2152.) Mr. Juniel again objected, but the court this time overruled the objection. (RT 2152.)

The district attorney went on in an attempt to assure the jury that the trial had been fair. "I think that any juror needs to know things are fair, and they have been. I think that Judge Conger has been extremely fair to everybody here, and it makes it appropriate for you then to do your job . . . ." (RT 2152.)

Although the judge had already said that the district attorney should not comment on Mr. Juniel's decision to represent himself, the district attorney went on to say that they had no choice but to allow him to do so. (RT 2152-2153.) He stated that he knew Mr. Levy: "we all know each other, we were jovial, we get along, but that's because we know each other from cases in the past over the years." (RT 2153.)    Not finished commenting on Mr. Juniel's tactics, the district attorney

28

then stated that he could have objected to some of Mr. Juniel's statements or questions, but did not because he wanted to make sure Mr. Juniel received a fair trial. "I have sat here not objecting and have done the best I could to ensure that Mr. Juniel has the opportunity to ask his questions . . . and I could have objected some of the times but I didn't. I sat there and let it go." (RT 2153.) The prosecutor again assured the jury that it was a fair trial, so that the jury could feel confident about convicting.

The prosecutor later continued with a similar tactic, this time vouching for Ava's counsel and using the attorney-client privilege dispute as a means to attack Mr. Juniel's credibility.

> Who is Richard Juniel? He can look you in the eye and lie, just lie, "Never seen that gun before in my life." Just lie. He can look Lorna Brown in the eye and lie. That letter? "That letter was to my attorney. How did you get that?" That's outrageous. That's a lie. I know Lorna Brown. She is not lying. No way. He gave that to her. You know it. We all know it. He's up there lying. He can look you in the eye and just lie. (RT 2211.)

### B.    Analysis

A criminal defendant's right to a fair trial is guaranteed by the Fifth, Sixth, and Fourteenth Amendments. Improper remarks by a prosecutor violate these rights and constitute a denial of due process when they infect the trial with unfairness. (Darden v. Wainwright (1986) 477 U.S. 168, 181; People v. Earp (1999) 20 Cal. 4th 826, 858.) Even when improper argument is not so severe as to render a trial fundamentally unfair, it is nonetheless an error under state law for a prosecutor to employ deceptive or otherwise reprehensible methods in closing argument. (People v. Espinoza (1992) 3 Cal. 4th 806, 820.)

A prosecutor may not "vouch" for the credibility of a witness if the "vouching" is based on personal belief, personal knowledge, personal experience,

29

or evidence outside the record. (People v. Anderson (1990) 52 Cal. 3d 453, 479; People v. Edelbacher (1989) 47 Cal. 3d 983, 1030.) By same token, a prosecutor may not "vouch" for the fairness of the trial. In this case, the district attorney's closing argument contained an extended monologue—over Mr. Juniel's objection—vouching for the fairness of the trial.

The prosecutor assured the jury that Mr. Juniel had received all of the help he needed. The prosecutor stated that Mr. Juniel had the assistance of a competent attorney and a defense investigator. (RT 2152.)[4] None of these statements were based on evidence in the record. The prosecutor also inappropriately vouched for the personal fairness of Ava's counsel who spent the entire trial trying to shift all blame for the murder to appellant.

A prosecutor "may not state or assume facts in argument that are not in evidence." (People v. Cash (2003) 28 Cal. 4th 703, 732.) The prosecutor made factual claims about the fairness of the judge, the competence of Mr. Levy, and the fairness of the trial. None of these statements were based on "evidence adduced at

---

[4]  Given Mr. Levy's performance in this case, the district attorney's remarks were especially inappropriate and misleading. While he was still counsel of record, Mr. Levy presented no opening argument to the jury, and he barely questioned the prosecution's first witness. (RT 80, 108-109.) It was at that point that Mr. Juniel decided to represent himself.

Mr. Levy stayed on the case as advisory counsel to Mr. Juniel, but at several points in the record it is clear that he did little to help Mr. Juniel. When the court was attempting to determine whether Mr. Levy had provided Mr. Juniel with all relevant discovery materials, Mr. Levy could not even state with certainty whether he himself had the materials—he apparently had not looked through them. (RT 139-140.) Mr. Levy later inexplicably failed to provide Mr. Juniel with other important materials. (RT 690-691, 753, 755-756; CT 479-480.) Mr. Levy failed to assist Mr. Juniel in his efforts to bring in witnesses. (RT 1165-1166, 1252-1253.) He erroneously told Mr. Juniel that it was the district attorney's duty to have witnesses brought in. (RT 1253-1254.)

Of course, the jury had access to none of this information. The jury only had the district attorney's assurance that Mr. Levy was an "extremely talented, experienced lawyer" who had provided Mr. Juniel with excellent assistance. (RT 2152.)

trial." (People v. Bain (1971) 5 Cal. 3d 839, 848.) Rather, they were an attempt by the prosecutor to inform the jury that, based on his personal experience, Mr. Juniel had received a fair trial. The statements were precisely the sort creating "a substantial danger that the jury will view the comments as based on information other than evidence adduced at trial." ( People v. Mincey (1992) 2 Cal. 4th 408, 447.)

The prosecutor also commented on Mr. Juniel's decision to represent himself and vouched for Mr. Levy's competence. The prosecutor sought to imply that it was no one's fault but Mr. Juniel's that he had made the mistake of self-representation. He said that Mr. Juniel had been supplied with an excellent lawyer, but they had no way to stop him from representing himself. In making this argument, he vouched for Mr. Levy as "an extremely talented, experienced lawyer." (RT 2152.) He explicitly appealed to his own knowledge of Mr. Levy, based on evidence outside the record, stating that they knew each other from other cases over the years. (RT 2153.)[5]

A prosecutor may not express a personal opinion in the defendant's guilt where the opinion appears to be based on evidence outside the record. ( Mincey, supra, 2 Cal.4th at 447; Bain, supra, 5 Cal.3d at 848.) A prosecutor also may not express a personal opinion in the fairness of the trial, the fairness of the judge, or the excellence of an appointed attorney. That is precisely what the district attorney did here.

Not content to vouch for the fairness of the trial and the judge and the competence of the appointed attorney, the district attorney went on to vouch for his

---

[5]  It is impermissible, for example, to cite evidence or argument from another trial. (People v. Farmer (1989) 47 Cal. 3d 888, 922-923.) By implication, it is impermissible to cite personal experience with another lawyer gained from other trials.

own fairness and good character. Just as it is improper for a prosecutor to state that he avoids prosecuting innocent people (United States v. LaMorte (2d Cir. 1991) 950 F.2d 80, 83), it is also improper for a prosecutor to state that he avoids prosecuting people in unfair trials.

The district attorney also stated that he could have objected to many of Mr. Juniel's questions, but because he was so intent on ensuring a fair trial, he declined to do so. (RT 2152-2153.) The prosecutor thus implied that Mr. Juniel had elicited some inadmissible testimony and that Mr. Juniel's defense was based partly on inadmissible evidence. He also implied that Mr. Juniel had repeatedly violated the rules of evidence in his questioning. (Cf. United States v. Phillips (7th Cir. 1975) 527 F.2d 1021, 1022-1023 [conviction reversed based on misstatements of law by prosecutor in closing argument].) He implied that Mr. Juniel was breaking the rules while all of the other parties—including the district attorney—were being scrupulously fair.

In perhaps the most egregious statement, the prosecution vouched for Ms. Brown's veracity and used the attorney-client dispute to attack Mr. Juniel's credibility. (RT 2211.) The jury had no evidence properly before it regarding the incident. As the district attorney well knew, Ms. Brown never testified (nor could she have), so the jury had no qualified evidence before it that Mr. Juniel had given her the letter, and the district attorney had no evidentiary basis for his statement. It was completely inappropriate for the district attorney to rely on that incident—which the jury never should have seen—as part of the evidence against Mr. Juniel.

None of the prosecutor's remarks could properly "be seen as a fair comment on the state of the evidence." ( People v. Valdez (2004) 32 Cal. 4th 73, 127.) Indeed, the remarks had nothing to do with the evidence at all.

## C.    Prejudice

The prosecutor's comments during closing argument violated both state and federal law. The misconduct constituted a denial of Mr. Juniel's federal due process rights because it "infected the trial with unfairness." (Donnelly v. DeChristoforo (1974) 416 U.S. 637, 643.) The misconduct constituted a violation of state law because it involved the use of deceptive methods to persuade the jury. (Espinoza, supra, 3 Cal. 4th at 820.)

By improperly vouching for the fairness of the trial, the judge, and the district attorney himself, the district attorney attempted to ease its own burden and make it easier for the jury to convict. The district attorney's implication that Mr. Juniel had repeatedly violated the rules of evidence, while all other parties had gone out of their way to be fair, infected the trial with unfairness.

In addition, the district attorney's assertion that he could have objected to much of Mr. Juniel's evidence was insidious and deceptive, based on no specific examples and supported by no legal argument. The district attorney's attempt to show that he remained utterly magnanimous while Mr. Juniel repeated cheated was reprehensible.

The prejudicial error requires reversal under both state and federal law. Even if the error alone is insufficient to require reversal, the cumulative effect of this error combined with others surely does.

## C.    Prejudice

The prosecutor's comments during closing argument violated both state and federal law. The misconduct constituted a denial of Mr. Juniel's federal due process rights because it "infected the trial with unfairness." (Donnelly v. DeChristoforo (1974) 416 U.S. 637, 643.) The misconduct constituted a violation of state law because it involved the use of deceptive methods to persuade the jury. (Espinoza, supra, 3 Cal. 4th at 820.)

By improperly vouching for the fairness of the trial, the judge, and the district attorney himself, the district attorney attempted to ease its own burden and make it easier for the jury to convict. The district attorney's implication that Mr. Juniel had repeatedly violated the rules of evidence, while all other parties had gone out of their way to be fair, infected the trial with unfairness.

In addition, the district attorney's assertion that he could have objected to much of Mr. Juniel's evidence was insidious and deceptive, based on no specific examples and supported by no legal argument. The district attorney's attempt to show that he remained utterly magnanimous while Mr. Juniel repeated cheated was reprehensible.

The prejudicial error requires reversal under both state and federal law. Even if the error alone is insufficient to require reversal, the cumulative effect of this error combined with others surely does.

## CONCLUSION

The petition for review should be granted.

Dated: March 26, 2006

Respectfully submitted;

Lawrence A. Gibbs
Attorney for Appellant

33

## CERTIFICATE PER CAL. RULES OF COURT, RULE 14(c)

I certify that this brief produced in 13-point type and contains

words.

Date:  March 26, 2006

Lawrence A. Gibbs

**APPENDIX**

Filed 2/16/06

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION TWO

**FILED**

FEB 1 6 2006

Court of Appeal - First App. Dist.
DIANA HERBERT

by_____
                        DEPUTY

THE PEOPLE,

      Plaintiff and Respondent,

v.

RICHARD JUNIEL, JR., et al.,

      Defendant and Appellant.

A105203

(Alameda County
Super. Ct. No. C145236)

## I.    INTRODUCTION

A jury found Richard Juniel and Ava McDonald guilty of murdering Stacey Alexander. Juniel was also convicted of unlawful possession of a firearm and possession of an assault weapon. Juniel was sentenced to a total term of 50 years and 8 months to life in prison. McDonald was sentenced to a total prison term of 25 years to life. Juniel and McDonald both appeal the judgment and claim that a number of reversible errors occurred during the proceedings in the lower court. We affirm.

## II.    STATEMENT OF FACTS

### A.    *Background - Events Prior to the Murder*

McDonald and Juniel shared a home on 54th Street in Oakland along with McDonald's sister, Sia Bolden, and other family members. Angelina Bryant lived two doors away with members of her extended family.

In March of 2003, Bryant was 20 years old and seven months pregnant. Bryant knew that McDonald and Juniel were her neighbors but she did not know either of them

very well. Bryant did know Bolden; the two had sometimes worked together and they did not get along well.

On the afternoon of March 3, 2003, Bryant and Bolden had an altercation which escalated into a physical fight. Bryant's grandmother and aunt intervened and the altercation ended when Bryant got into a friend's car and drove away. Bryant returned home at around 6:00 that evening. She found her grandmother on the phone talking to Rita Ammons, Bolden's and McDonald's mother. Bryant took the phone so she could explain what happened between her and Bolden. During the conversation, Bryant's phone came unplugged. When Bryant called back, Ammons was angry because she thought Bryant had hung up on her. After Bryant explained that she did not mean to hang up, the two had a conversation about the altercation that occurred earlier that day. By the end of the conversation, Bryant believed that the matter was settled.

After the phone conversation with Ammons, Bryant walked to the corner store where she saw Juniel. Juniel said he heard that Bryant and her family had "jumped" Bolden. Bryant denied that anyone jumped Bolden but she admitted that she and Bolden had a fight. Juniel told her he was not worried about anyone doing anything to him and told her he had an "A-K."

Later that evening, McDonald called Bryant about the fight that had happened that day. After Bryant explained what had happened, McDonald asked Bryant how far along her pregnancy was. Bryant responded that she was seven months pregnant. Then McDonald said: "Well, in two months your ass is mine," and hung up the phone.

Still later that same evening, Bryant was on her front porch talking to her friend Stacey Alexander about the events of the day when McDonald drove up and parked near her house. Alexander went to McDonald's car to talk about the situation. McDonald got out of her car. Alexander asked why McDonald had threatened Bryant. McDonald responded that she was not concerned about the fight but she was angry that Bryant had disrespected McDonald's mother by hanging up on her. Then McDonald said she would be right back.

While Alexander and Bryant were talking, McDonald got a baseball bat from the trunk of her car and approached Alexander as if to hit her, saying something to the effect that she never backed down. When McDonald began swinging the bat, a neighbor from across the street came and pushed McDonald away. Bryant's grandmother came out and told Bryant and Alexander to go in the house. As they were going inside, McDonald yelled to someone to go into her house and get her "A-K," and said she was "about to pop this bitch."

The next day, Bryant's aunt, Cathy Rivers, saw McDonald. McDonald told Rivers that she wanted to apologize to Bryant; she had misunderstood the events of the prior day and thought that Bryant had disrespected her mother by hanging up during the phone conversation. However, McDonald was still very upset about her altercation with Alexander. McDonald told Rivers that Alexander approached McDonald's car with a knife in hand and started yelling at her. She told Rivers to tell Alexander that McDonald was going to kill her. McDonald said she had a weapon and just needed a "clip." Rivers told McDonald that Alexander had been "high" and would apologize later and that it would not be "worth it" to kill Alexander because McDonald had so much to lose. By the end of the conversation, Rivers thought McDonald had taken her advice.

**B.    *The Murder of Stacey Alexander***

On March 4, 2003, at approximately 11:17 p.m., police responded to a report that a woman was screaming and gunshots were fired at 5413 Dover Street in Oakland. They found Alexander "slumped over" on a porch at 5423 Dover. Alexander had been shot three times. One bullet hit her in the back and exited through her abdomen. A second bullet traveled through her right forearm. The third bullet entered her head three inches above the left ear and traveled in a downward direction through her right cheek.

Alexander died as a result of the gunshot wounds she sustained. Blood tests did not reveal the presence of alcohol or drugs. Evidence suggested that the wound to her back may or may not have been fatal had the gunshot wound to her head not occurred. Alexander could have moved after she was shot in the back but probably not after she was shot in the head. Several witnesses supplied details about how Alexander was shot.

3

Richshalda Williams lived with her sister and her niece, Ciara Baldwin, on the corner of 54th Street and Dover. Williams and Baldwin knew McDonald and Juniel from the neighborhood and were familiar with McDonald's Acura Legend, which had "tweedy birds" on the front and back windows. At around 10:35 p.m. on March 4, Williams and Baldwin walked to a store near their home. On their way home, they saw McDonald's car driving fast and abruptly stopping at the stop sign on 54th Street and Dover. McDonald was driving and Juniel was in the passenger seat. The car remained stopped and the occupants stared at the two women until they reached the intersection at which point it sped away. Williams commented to her niece that the people in the car must have thought they were someone else or perhaps they were looking for someone.

At approximately 11:00 p.m. that night, Williams heard two gunshots outside in front of her house. She ran to her kitchen to get away from the living room window. From the kitchen window, Williams saw McDonald's Acura. When the car backed up around a corner "real fast" and turned onto Dover, it approached a bright street light. At that point, Williams was able to see that McDonald was still driving and Juniel was in the passenger seat. While the car was proceeding on Dover, Williams heard at least one more gunshot.

At trial, Williams identified McDonald and Juniel as the individuals she saw in McDonald's car on March 4 when she was walking home from the store and later that night when gunshots were fired. Baldwin also identified McDonald and Juniel at trial and testified that they were the individuals she saw in McDonald's car when she crossed the intersection with her aunt on the night of the murder. Baldwin also confirmed that she saw McDonald's car driving on Dover when she heard gunshots that night. Baldwin testified that she could see from her window that there were still two individuals in McDonald's car at that time. However, she could not confirm those individuals were McDonald and Juniel.

Seth June lived next door to Williams and Baldwin. He was on his front porch at around 10:45 or 11:00 p.m. on March 4, when he heard two gunshots. Moments after the second shot, a woman who appeared to have been shot, stumbled into view on the

4

sidewalk. She was hunched over, holding her back where there appeared to be a stain. She screamed: "Help, they're trying to kill me," and "they're shooting me." June started down the stairs but was held back by his upstairs neighbor. While the neighbor fumbled with her keys to get into the house, June saw a car he recognized from the neighborhood. The car stopped in the middle of the street and June noticed the passenger was an African-American male. The two stared at each other for a few seconds until the driver gestured to the passenger and the car proceeded slowly in the direction of the injured woman. When it reached the corner, the driver pulled over and parked. The passenger got of the car carrying what appeared to be a pistol and walked back toward the injured woman. The woman turned into a driveway at 5423 Dover, continuing to yell for help. The passenger jogged after her, holding the gun at his side.

At that point, June went into his house, went upstairs and called the police as he ran to a window. After a moment of silence, June heard another gunshot and then saw the passenger exit the driveway and walk toward the street. June went downstairs and opened his front door. The passenger, who was holding something under his shirt, looked at him and then jogged away.

At trial, June identified McDonald's car as the car that followed Alexander on the night she was killed. He testified that he recognized McDonald and Juniel from the neighborhood but he could not identify them as the individuals involved in the shooting. Because it was dark that night, June did not see the features of the male passenger. He described the passenger as an African-American male, around six feet tall, 200 pounds, with short hair.[1] The man wore dark clothes and may have had something on his head. June also described the passenger's behavior as relatively calm.

Natalie Alvarez lived in a duplex at 5408 Dover, in a unit above Seth June. On March 4 at around 11:00 p.m., Alvarez heard two gunshots. From her window, she saw a woman walking hurriedly across the street, holding her back and screaming for help. The

---

[1] Juniel is six feet, one inch tall and weighed approximately 232 pounds in January 2003.

woman looked over her shoulder at a dark car moving slowly down the street. As the car approached her, the woman turned into the driveway at 5423 Dover. At that point, the car stopped, a passenger got out and followed the woman into the driveway, carrying something under his shirt. Alvarez heard another shot and then saw the man exit the driveway and walk toward 54th and Dover, still holding something under his shirt. The man was very calm and "sterile." He stared at Alvarez's house for several seconds before walking away.

At trial, Alvarez identified Juniel as the man who followed Alexander into the driveway on the night of the shooting. However, prior to trial she identified someone other than Juniel when shown a photo lineup. Alvarez thought that Juniel and the man she identified in the photo line up shared similar characteristics.

Wendy Jackson lived at 5423 Dover in the upstairs unit of a duplex. Shortly after 11:00 p.m. on March 4, Jackson heard two gunshots and then a woman "screaming for her life." From her upstairs window, Jackson saw a woman crossing her front lawn. A black Lexus or Acura was stopped in the middle of the street. Moments later, a man carrying a big gun followed the woman up Jackson's driveway. Jackson lost sight of them when she moved to a different room. The woman continued to scream. She begged for her life and pounded on the downstairs side door. Then Jackson heard another gunshot. Jackson described the shooter's movements as "methodical," and thought the woman had been "executed."

At trial, Jackson identified McDonald's car as the car that she saw on the street when Alexander was shot. She could not identify McDonald as the driver. Jackson did not see the face of the man with the gun but she thought Juniel's body resembled that of the man she had seen. Jackson described the shooter as a Black male in his 20's, about six feet tall, 180-190 pounds.

## C.    *Police Investigation*

Shortly after midnight on March 5, McDonald and Juniel were stopped by police while driving in McDonald's car. McDonald's car was seized as evidence after it was

6

positively identified as the car that left the crime scene. However, two individuals who viewed a field lineup were unable to identify Juniel or McDonald.

An expended shell casing was found under the front passenger seat of McDonald's car. Police found another expended shell casing a few feet from Alexander's body. They also recovered a bullet from a pool of blood on the porch after Alexander's body was moved.

On March 9, 2003, police canvassed the neighborhood where Alexander was shot. The next day, Williams and Baldwin went to the police station where they identified McDonald and Juniel in photo lineups. Both women also identified McDonald's car and they were certain that the two people who were in the car when they walked to the store were the same two people that were in the car after the gunshots were fired. Juniel and McDonald were arrested on March 11.

A loaded Intratec 9 millimeter pistol and a magazine containing several rounds of ammunition were recovered from Juniel and McDonald's home. The serial number on the gun had been scratched off. The gun, which is classified as an assault weapon under California law, was examined by Lansing Lee, a criminalist who specializes in firearms. Lee also examined the bullet and shell casings recovered by the police.

Lee determined that the shell casings collected from the crime scene and from McDonald's car were both fired from the pistol that police found hidden in Juniel and McDonald's home. Lee could not conclusively say that the bullet recovered from the crime scene was also fired by that gun. However, Lee did determine that the bullet was fired from an Intratec 9 millimeter pistol that was manufactured within a day or two of the pistol that police found in Juniel and McDonald's home.

On March 12, 2003, Juniel had a telephone conversation with Sia Bolden (McDonald's sister) which was recorded. During the conversation, Juniel asked Bolden what police had found when they searched their house. He also asked her to go to his closet and find his "white K Swiss," and to look inside them. When Bolden confirmed

7

she had seen what was in the shoes, Juniel said "Do what's best, you know."[2] He also asked if the police had checked various other places in the house.

During a March 13 telephone conversation with a person named Myrita, Juniel said: "The only thing they got on anybody is me having that gun." Juniel expressed the opinion that the police would not be able to connect the gun to the "female" who was killed because the serial numbers had been scratched off the gun. According to Juniel, "[t]hey can't tell if it ever killed nobody or nothing without the serial numbers or nothing." Therefore, Juniel opined that he would do a five-year felony probation for the gun which he freely admitted belonged to him.

During another conversation with Bolden on March 15, 2003, Juniel said he was planning to give McDonald the "okay to give me up," but that it had to be done a certain way. Juniel said he would not allow McDonald to serve time in prison because she was pregnant with his child.[3] Juniel tried to assure Bolden that the police did not really have evidence against them but also wanted the family to know that he would take the blame if things went wrong even though it was not all his fault. At another point during the conversation, Juniel admitted that he knew right from wrong and said he did what he did because he wanted to do it.[4]

---

[2] Later, Bolden told police she had disposed of a box of bullets she found in Juniel's shoe.

[3] On March 22, 2003, McDonald had a telephone conversation with a person named Aiesha during which she admitted that she lied to Juniel by telling him she was pregnant.

[4] During this conversation Juniel said: "I'm going to give her the okay to give me up, Sia, alright? But it's a certain way to do it. We've got to wait till a certain time in a certain way. She's going to have to testify against me and that's going to set her free, alright?" Juniel also said: "I'm a grown ass man. Even though I did what I did and I took it upon myself to do what I, what the fuck I wanted to do. No . . . but that don't got shit to do with it. I knew right from wrong." Juniel told Bolden "I'll take it like a man. You feel me? Cause I did what I had to do. I did what I did. You feel me? I did what I did. . . . You know? And I did what I did for, for, for who I wanted to do it for."

On March 29, Juniel made the following statement during a conversation with Bolden: "My nigger's watching everything. Know who everybody is. Got pictures of everybody. My niggers know. My niggers know. And when I come to court on the 8th, I'm going to point mother fuckers out. I'm going to point mother fuckers out to my partners. You will see big light skinned yellow assed Merv back there and little V and all them niggers (unintelligible) and my partner Black ass (unintelligible). They're staying somewhere out there. You'll see them, you know, (unintelligible) mother fuckers, I'm going to point them mother fuckers out, man. . . ."

On April 3, Juniel placed another call to Bolden but a person named Mela answered the phone because Bolden was busy. While talking with Mela, Juniel expressed frustration that he had not been able to get his "wife" out of jail and that he might not be able to have a relationship with his child. Then Juniel made the following statement: "It ain't nothing though, man. A mother fucker, that's a mother fucker's job. You feel me. I was there to provide. I was there to protect. I was there to defend no matter the cost. Whether the mother fucker was right or wrong. Mother fucker wasn't going to disrespect mine, you feel me? And I'm going to lay my life down for mine. . . ."

On April 26, Juniel placed a call and asked the woman who answered the phone to verify that he had reached the home of two individuals named Kim and Percy. He told the woman that he was calling from a resource network and wanted her to identify personal information including Kim's birth date and home address. When the woman responded that she would not give information about the people who lived in her home, Juniel said "this is a mob resource network" and "you know we're uh, pretty heavy on snitches. Don't come to court."

On May 2, police executed a warrant at Juniel's cell in Santa Rita Jail. The warrant was obtained after a witness in this case reported receiving a threatening phone call from a man at Santa Rita who sounded like Juniel. In Juniel's cell, police found a "discovery package" which included police reports. The reports disclosed personal information (including names and phone numbers) about witnesses which should have been deleted before the reports were given to a defendant. In Juniel's pocket, police

9

found a list of witness names with personal information about them including birth dates, addresses, driver's license numbers, occupations, telephone numbers, pager numbers and work addresses.

**D.    *McDonald's Defense***

McDonald testified that she met Juniel in 1996 or 1997. Juniel told her he was 22-years-old and the two became romantically involved. When Juniel was sent to the California Youth Authority in July 1999, McDonald learned he was only 17. After Juniel was released from the Youth Authority in December 2002, he moved in with McDonald. Shortly after Juniel moved into McDonald's home his personality began to change. He started seeing other women, he "put his hands" on McDonald, and he tried to isolate McDonald from her family and friends. McDonald asked Juniel to move out a few times and also began looking for an apartment for herself. But she was conflicted about separating from Juniel because she was in love with him.

McDonald testified that she threatened to hurt Bryant on March 3, 2003, because she assumed Bryant had disrespected Ammons by hanging up during their telephone conversation. After learning of her mistake, McDonald intended to apologize but "never got around to it." At trial McDonald conceded she was 33-years-old when she threatened 20-year-old Bryant. She also admitted that, when she made the threat, she intended to carry it out after Bryant had her baby. McDonald testified that beating up Bryant would have been an appropriate response to Bryant's presumed disrespect toward McDonald's mother.

McDonald testified that she arrived home from work on March 3, 2003, shortly after 11:15 p.m. Stacey Alexander approached her car, knocked on the window and yelled for McDonald to get out. McDonald thought Alexander was high on drugs and hesitated to get out. Alexander started kicking the car and waving a knife. McDonald knew Alexander, but not well, and had never had an argument with her before. After Alexander turned away and began walking back toward Bryant's house, McDonald got

out of her car, retrieved a bat from the trunk and went after Alexander and challenged her. At that point a neighbor intervened.[5]

At trial, McDonald admitted that she had wanted to fight when Alexander confronted her. She intended to hit Alexander with the bat, possibly in the head even though that could have killed her. However, she denied that she threatened to get an "A-K." McDonald also denied that she told Cathy Rivers she intended to kill Alexander. She also maintained that she did not tell Juniel about her conflict with Alexander.

On the evening of March 4, 2003, McDonald and Juniel had a fight. McDonald was angry and upset and decided to drive to a liquor store. Juniel said he did not want her to be alone and went with her. McDonald was driving and Juniel sat in the passenger seat. On the way home from the store, McDonald stopped at a stop sign on the corner of 54th street and Dover. Alexander walked in front of McDonald's car. Juniel rolled down his window and started talking to Alexander about her fight with McDonald whom he referred to as his "wife." Alexander said it was "[n]othing" and McDonald did not disagree. Nevertheless, as McDonald drove through the intersection, Juniel took out a gun and shot Alexander twice. McDonald did not know Juniel had the gun in the car and claimed she was "terrified" when he fired it at Alexander.

McDonald testified that, after Juniel shot Alexander, he "pulled the gun on me and he said either I'm with him or against him." Juniel told McDonald he was "doing this for us," and instructed her to turn the car around. McDonald complied. As she drove down Dover, she thought Juniel was going to shoot her. Juniel told her to stop the car and she complied. Juniel got out and disappeared from view. She drove to the corner and stopped to take a drink of liquor because she was shaking so hard. She heard another shot and then saw Juniel running away. After a few minutes, McDonald drove home, where she found Juniel on the porch yelling at her to go inside.

---

[5] Evidence was presented that, in September 1988, McDonald threatened a different neighbor with a baseball bat because the neighbor was bothering her about an ongoing dispute over a parking space and the woman would not go away.

Later that evening, McDonald and Juniel were stopped by police while returning home from buying fast food. McDonald told the police that she and Juniel had been home fighting and that her car was not involved in a shooting. She also denied that she had a recent confrontation with Alexander. McDonald testified that she did not tell police the truth because she was afraid for herself and her family. She also testified that she did everything Juniel told her to do because he had threatened her and her son and she was afraid of him.

McDonald testified about several incidents when Juniel mistreated her. In December 2002, Juniel called McDonald at work and threatened to tear up her belongings if she did not come home. When McDonald arrived home, Juniel threw her into a closet. He was angry and accused her of "playing with him." Another time McDonald went out with friends against Juniel's wishes. McDonald had too much to drink and a friend asked Juniel to help get her out of the car. After getting her out of the car, Juniel slapped her face which made a mark by her eye. On at least two other occasions Juniel slapped McDonald in the face, once after finding some numbers on her cell phone and another time after she "disrespect[ed]" Juniel by ignoring him and talking to another man in the neighborhood. McDonald testified that, during the period that Juniel lived with her, he was "mean," and "bossy" and "wanted everything done his way."

McDonald testified that she had seen Juniel's gun only once prior to Alexander's murder when Juniel pulled it on her. One night, Juniel woke her up and was pointing the gun at her when he told her she was "his enemy." McDonald told him he was "tripping," and asked him to get the gun out of her face. Juniel put the gun on the bed and continued to talk to her. McDonald testified she was terrified of the gun, asked Juniel to get rid of it and assumed he had done so.

McDonald presented testimony from friends and family members to corroborate her claim that Juniel mistreated her. One such witness, Ayeshia Dubose, testified that within the week before she testified at trial, she received several threatening phone calls warning her not to appear at trial. The first time, a female caller who identified herself as "Richard's people" said that Rich told her to tell Dubose that "snitches get dealt with."

12

McDonald also presented an expert witness who testified about domestic violence and battered women. However, the expert had never spoken to McDonald or Juniel and had not seen the police reports or witness statements relating to this case. She testified that she had "no idea" whether McDonald had been abused or whether Juniel had been abusive and offered no opinion as to whether their relationship involved domestic violence.

### E.    *Juniel's Defense*

On the second day of trial, the court granted Juniel's motion to represent himself. Juniel, who was 21-years-old at the time of trial, also testified in his own defense.

Juniel testified that he met McDonald in June 1997 when he was 15 and became romantically involved with her. While Juniel was confined in the California Youth Authority from 1999 until December 2002, McDonald saw other men which caused some problems. Within a few weeks of moving in with McDonald after he was released from the Youth Authority, Juniel began seeing his old friends and spending time with other women. Juniel saw other women to show McDonald how it felt. He denied that he ever abused McDonald; their problems related to the fact that he saw other women. Despite these problems, Juniel felt close to McDonald and loved her very much.

Juniel testified that he had an argument with McDonald on March 1, 2003, as a result of which he went to stay with a woman named Sherrie Brown for a few days. Juniel returned home on March 4.[6] That afternoon and evening he and McDonald tried to reconcile and make plans for their future but they continued to argue. At around 10:00 or 11:00 that evening, McDonald left in her car and returned approximately 20 minutes later with a bottle of alcohol. Some time later, the two went out for food. On the way home,

---

[6] Juniel called Brown to testify at trial. Brown testified that Juniel spent some time with her during the week or so before Alexander was killed. During cross-examination by the prosecutor Brown admitted she received a call from a woman who identified herself as Juniel's sister and who told her what Juniel wanted her to say at trial. Brown testified that she was frightened by the call but the woman did not threaten her.

they were pulled over by police. Juniel voluntarily took a gunshot residue test and agreed to a police interview.

Juniel testified that McDonald lied when she said that he had abused her and that she had also lied to the witnesses who testified about the alleged abuse. He denied that he ever threatened or hit McDonald's son. Juniel admitted though that he did discipline the boy on occasion. Juniel also claimed that he had never seen the gun that police found in his home. He also denied that he told Bolden to get rid of bullets that were hidden in his shoes. Juniel admitted that he talked to Bolden about various witnesses and their personal information. However he denied that he ever planned to threaten witnesses.

Juniel testified that he made up at least two stories which would exonerate McDonald. One false story was presented in a letter Juniel wrote to his attorney before his preliminary hearing in this case. According to the letter, a man named Eric Hood shot Alexander. Juniel was giving Hood a ride in McDonald's car when Hood asked to get out. Hood then shot a woman two times because the woman was a "dope fiend" who owed him money. Juniel drove slowly behind the woman to see if she was hurt. After the incident, Juniel agreed to hold Hood's gun for him. At trial, Juniel admitted that he made up the name Eric Hood and that the story in his letter was a lie.

Juniel also wrote a letter to McDonald while they were in jail in which he offered to take the blame for the murder. Juniel offered to tell police that he shot Alexander because she stole drugs from him and that McDonald was not involved. Juniel testified this story was also a lie but he wanted to exonerate McDonald because he loved her and thought she was carrying their baby.

Juniel testified that everything he has said or done since Alexander's death, he did to protect McDonald because he loved her even if it meant taking the blame for something he did not do.

14

## III.    DISCUSSION

### A.    *Severance*

In the trial court, Juniel and McDonald made several requests for separate trials all of which were denied. Appellants now contend the trial court committed reversible error by denying them separate trials.

"We review the court's rulings on the motions for separate trials for abuse of discretion. [Citations.] Whether that discretion was abused 'must be decided on the facts as they appear at the time of the hearing on the motion rather than on what subsequently develops." (*People v. Morganti* (1996) 43 Cal.App.4th 643, 671-672 (*Morganti*).) If denying a severance motion did not constitute an abuse of discretion, "'the reviewing court may nevertheless reverse a conviction where, because of the consolidation, a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of the law. [Citation.]' [Citations.]" (*Id.* at p. 672.)

### 1.    *Background*

Prior to trial, Juniel moved for a separate trial. He argued that McDonald intended to present evidence that Juniel had abused her and her young son and that such evidence constituted inadmissible character evidence. McDonald joined the motion, arguing that evidence of Juniel's abuse was relevant to her defense and that she could be impeded from adequately presenting that defense if she was tried with Juniel.

The trial court denied the joint pre-trial motion for severance. The court ruled that prejudicial bad character evidence would not be admitted against Juniel. It reasoned that McDonald's "duress" defense was legally sound only as to events subsequent to the killing because duress is not a defense to murder. Thus, the court would admit some evidence probative of McDonald's state of mind after the murder with an admonition that the evidence was not to be considered as bad character evidence. The court also advised the parties that it would make admissibility rulings with respect to such evidence "as we go along" so that it could properly weigh probative value and prejudice.

Shortly after McDonald's counsel presented her opening statement, Juniel moved for a mistrial and for severance. McDonald's trial counsel had told the jury the evidence

15

would show her client was mentally and physically abused by Juniel. The prosecutor also objected to McDonald's opening statement though he did not request severance. The prosecutor argued that domestic violence evidence was relevant only to show McDonald's state of mind after the killing and only if McDonald testified at trial. The trial court denied the severance motion. It reiterated its prior ruling that evidence of domestic violence would be limited to the state of mind of McDonald after the shooting.

While McDonald was testifying during her defense case, the trial court sustained objections to questions regarding specific instances of abuse by Juniel. During a break in the proceedings, McDonald's attorney renewed her motion to sever. She argued that the ruling excluding evidence of Juniel's domestic violence was preventing her from adequately defending her client. During the ensuing discussion between the court and all counsel, the court pointed out that McDonald's state of mind was "continually" placed before the jury while McDonald was on the stand. The court stated that "[w]e need not go into specific acts of violence on the part of Mr. Juniel to establish that state of mind. She's testified for an hour and a half concerning it." In denying the severance motion, the court reiterated that McDonald was not precluded from presenting evidence that she feared Juniel but that she could not present evidence of prior acts of violence.

The next day, the trial court modified its ruling regarding evidence of Juniel's domestic violence. The court stated that McDonald had a due process right to present some evidence of Juniel's prior acts of violence both to support the testimony of her expert on battered women's syndrome and to support her credibility as a witness. To protect Juniel's rights, the court took an offer of proof during which McDonald testified about eleven separate incidents. The court ruled that McDonald could testify about six of those incidents. It also denied a renewed motion by McDonald for a mistrial and for a separate trial.

Before McDonald began to testify about Juniel's domestic violence, the court admonished the jury that evidence concerning these acts was not to be considered as evidence against Juniel. The evidence was to be considered only for the limited purpose of evaluating the believability of McDonald's testimony and the beliefs, perceptions and

16

behavior of victims of domestic violence. The court expressly advised the jury not to consider McDonald's testimony on this subject as evidence that Juniel is a person of bad character or that he has a disposition to commit crimes. The court reminded the jury of this fact at other points during the trial. [7]

After Juniel cross-examined McDonald, he made a motion for mistrial and for severance on the ground that McDonald had violated the trial court's ruling limiting evidence of Juniel's domestic violence. The trial court agreed that McDonald had testified to some incidents that the court had ruled were not admissible. But, the court found that Juniel himself elicited the evidence by cross-examining McDonald about the incidents and thereby opening the door for evidence of these events. Therefore, the court denied the severance motion.

Subsequently, while McDonald was in the process of eliciting testimony to corroborate her claim of domestic abuse, the court precluded her from presenting evidence from McDonald's son regarding an incident he had witnessed. McDonald's counsel responded by renewing her request for a severance. The court again denied the motion. However, during rebuttal, McDonald's son was permitted to testify about Juniel's alleged abuse of him and his mother.

### 2.    *Analysis*

Juniel and McDonald were jointly charged with the murder of Stacey Alexander. Therefore, their joint trial was proper under Penal Code section 1098, which states: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court orders separate trials." It is well settled that section 1098 establishes a statutory preference for joint trials of defendants jointly charged with an offense. (*People v. Pinholster* (1992) 1 Cal.4th 865,

---

[7] The court also gave a special pinpoint jury instruction based on CALJIC No. 9.35.1 which stated: "'Evidence has been presented to you concerning battered women's syndrome. This evidence and the acts alleged by defendant McDonald may not be considered by you to prove that defendant Juniel is a person of bad character or that he has a disposition to commit crimes.'"

17

932; *Morganti, supra,* 43 Cal.4th at p. 672.) Indeed, because these individuals were charged with the same crime involving the same events and a single victim, this was a "classic case" for a joint trial. (*People v. Hardy* (1992) 2 Cal.4th 86, 168 (*Hardy*).)

Appellants contend the general preference for joint trials did not apply in this case because Juniel and McDonald had antagonistic and conflicting defenses. Initially, we question whether this particular claim has been properly preserved for review. (See *People v. Saunders* (1993) 5 Cal.4th 580, 589-590.) Neither appellant raised it in the trial court. Juniel's motions were based solely on his objection to the admission of improper character evidence while McDonald repeatedly complained that such evidence should not have been excluded. Neither party argued that separate trials were warranted because of conflicting or antagonistic defenses. However, even if the issue is properly before us, we conclude that the fact that appellants advanced conflicting defenses did not require the trial court to order separate trials.

Notwithstanding a clear preference for joint trials, the trial court has discretion to permit separate trials. (*Hardy, supra,* 2 Cal.4th at p. 167.) A court can properly exercise that discretion by ordering separate trials when the defendants assert conflicting defenses. (*Ibid.*) However, we find no California authority holding that a trial court abused its discretion or committed reversible error by conducting a joint trial of defendants who offered conflicting defenses. (See *Hardy, supra,* 2 Cal.4th at p. 168, italics omitted ["'Although several California decisions have stated that the existence of conflicting defenses may compel severance of codefendants' trials, none has found an abuse of discretion or reversed a conviction on this basis.'"].)

Rather, reviewing courts have repeatedly recognized that the existence of conflicting or antagonistic defenses does not compel separate trials. (See *People v. Keenan* (1988) 46 Cal.3d 478, 500 (*Keenan*); *Hardy, supra,* 2 Cal.4th at p. 168; *Morganti, supra,* 43 Cal.App.4th at p. 674.) Indeed, our Supreme Court has stated that "a joint trial is not unfair simply because the codefendants 'have antagonistic defenses and one defendant gives testimony that is damaging to the other and thus helpful to the prosecution. [Citations.]' [Citation.] If the likelihood of antagonistic testimony alone

18

required separate trials, they 'would appear to be mandatory in almost every case.' [Citation.]" (*Keenan, supra,* 46 Cal.3d at p. 500.)

Appellants concede that the fact of conflicting defenses does not in itself mandate severance. But, they contend, this case falls into a narrow category of cases in which the defendants' mutual antagonism *compels* severance. To support this contention, appellants rely on the following passage from *Hardy, supra,* 2 Cal.4th at p. 168: "'[T]o obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.' [Citations.] Stated another way, '"mutual antagonism" only exists where the acceptance of one party's defense will preclude the acquittal of the other.' [Citations.]"

This passage from *Hardy* summarizes holdings from federal cases that attempted to define the concept of an antagonistic defense. When read in context, it is clear that the *Hardy* court did not intend to adopt these federal holdings as binding rules. For this reason, we have previously held that *Hardy* does not "provide a definitive definition of an antagonistic defense which *requires* severance." (*Morganti, supra,* 43 Cal.App.4th. at p. 674 & fn. 26.) Indeed, as we recognized in *Morganti, Hardy* expressly confirms that the existence of conflicting or antagonistic defenses *does not* compel separate trials. (*Hardy, supra,* 2 Cal.4th at p. 168.)

As the *Hardy* court understood, a joint trial can be particularly beneficial when the defendants adopt conflicting defenses. "'That different defendants alleged to have been involved in the same transaction have conflicting versions of what took place, or the extent to which they participated in it, vel non, is a reason for rather than *against* a joint trial. If one is lying, it is easier for the truth to be determined if all are required to be tried together.' [Citations.]" (*Hardy, supra,* 2 Cal.4th at p. 168, fn. 19.)

Thus, we reject appellants' contention that *Hardy* precludes a trial court from conducting a joint trial when co-defendants adopt antagonistic defenses. (See *Morganti, supra,* 43 Cal.App.4th at p. 674.) In fact, both the California and the United States Supreme Court have expressly declined to hold that such a circumstance compels

severance. (See *People v. Cummings* (1993) 4 Cal.4th 1233, 1286 ["Antagonistic defenses alone do not compel severance]; *Zafiro v. United States* (1993) 506 U.S. 534, 538 (Zafiro) ["Mutually antagonistic defenses are not prejudicial per se" and severance may not be required even when prejudice is shown.].)

We also reject appellants' contention that the antagonism between them was somehow more significant than other cases in which joint trials were permissible. In *People v. Alvarez* (1996) 14 Cal.4th 155 (*Alvarez*), Alvarez and Ross were jointly charged with murder. As is the case here, both defendants testified and presented conflicting defenses. Alvarez testified he did not participate in the murder and was the victim of mistaken identity. Ross testified that she was present when Alvarez robbed and murdered the victim, but that she had not even suspected he intended to commit those crimes and she had accompanied him out of fear. (*Id.* at pp. 179-180.) On appeal, the California Supreme court rejected Alvarez's contention the trial court abused its discretion by denying his severance motion.

The *Alvarez* court reasoned that, "[u]nder Penal Code section 1098, a trial court must order a joint trial as the 'rule' and *may* order separate trials only as an 'exception,'" and that the trial court did not err by conforming to the rule and avoiding the exception notwithstanding the showing that defendants would present conflicting defenses and attempt to shift responsibility to each other. (*Alvarez, supra*, 14 Cal.4th at p. 190.) By the same reasoning, we hold that the trial court in this case did not abuse its discretion by denying severance notwithstanding indications that the defendants intended to present conflicting defenses and to blame each other for Alexander's murder.

Juniel contends that he was denied a fair trial, not just because McDonald's defense conflicted with his own, but also because he was unfairly prejudiced by evidence McDonald produced to support her duress defense which would not have been admissible in a separate trial.

*Keenan, supra,* 46 Cal.3d 478, was a murder case in which co-defendants Keenan and Kelly were tried together. Kelly testified in his own defense, admitted participation in the incident but identified Keenan as the actual killer. Kelly maintained that he

participated because he needed money and he was afraid of Keenan. (*Id.* at p. 493.) To support this claim of fear, Kelly presented evidence of a prior incident during which Keenan became upset with a mutual acquaintance whom he beat, abducted and then shot in the back and left for dead. That evidence included testimony by the acquaintance who survived Keenan's attack. (*Id.* at p. 494.)

On appeal after his conviction, Keenan argued his trial should have been severed from Kelly's trial. (*Keenan, supra,* 46 Cal.3d at p. 499.) He maintained he was denied a fair trial not only because of the existence of antagonistic defenses, but because Kelly's defense of duress "allowed him to present prejudicial evidence and argument of uncharged conduct" by *Keenan* that would not have been admissible against Keenan in a separate trial. (*Id.* at p. 500, italics omitted.) The *Keenan* court identified three factors for evaluating the trial court's decision to hold a joint trial, "whether (1) consolidation may cause introduction of damaging evidence not admissible in a separate trial; (2) any such otherwise-inadmissible evidence is unduly inflammatory, and (3) the otherwise-inadmissible evidence would have the effect of bolstering an otherwise weak case or cases." (*Ibid.*)

The *Keenan* court assumed that the uncharged conduct evidence would not have been admissible in a separate trial but nevertheless concluded that severance was not required. The trial court did not abuse its discretion because the uncharged conduct evidence was not unduly inflammatory and, when this evidence was admitted, there was already very strong evidence of Keenan's guilt. Further, and in any event, Keenan was not prejudiced because it was unlikely that admission of the evidence altered the verdict. (*Keenan, supra,* 46 Cal.3d at p. 501.)

Juniel contends that consideration of the three *Keenan* factors illustrates the trial court erred by conducting a joint trial in this case. We strongly disagree.

First, we are not persuaded by Juniel's cursory contention that evidence of Juniel and McDonald's violent relationship would have been inadmissible if Juniel was tried alone. The prosecution's theory was that Juniel and McDonald acted together to carry out *McDonald's* threat to kill Alexander. Thus, Juniel's motive for murder was his desire

to make good on McDonald's threat. Evidence regarding the dysfunctional relationship between Juniel and McDonald was circumstantial evidence of Juniel's motive.

Furthermore, since Juniel's defense was that he did not participate in the killing at all, he would likely have challenged the veracity of McDonald's testimony that Juniel murdered Alexander and that McDonald was an unwilling participant who acted purely out of fear of Juniel.[8] Under those circumstances, evidence of Juniel's prior violence toward McDonald could have been admitted both as probative of McDonald's state of mind or in order to rehabilitate her credibility as a witness.[9]

Second, even if we assume, as the *Keenan* court did, that evidence of Juniel's prior violent acts against McDonald would not have been admissible if Juniel was tried alone, the trial court could reasonably have concluded that admitting this evidence here would be minimally prejudicial to Juniel. In this regard, we reject Juniel's self-serving characterization of the uncharged conduct evidence in this case as unduly inflammatory. In our view, the alleged behavior was relatively mild as compared to the charged conduct. We also disagree with Juniel that the uncharged conduct at issue in this case is more inflammatory than the evidence at issue in *Keenan*, where the trial court admitted testimony by a victim who was attacked and shot by the defendant in an uncharged incident.

In any event, the court took steps to protect Juniel by repeatedly admonishing the jury regarding the limited purpose for which McDonald's evidence was being admitted and it also gave a pinpoint instruction on the subject. The court could reasonably have concluded that these limiting instructions would cure the potential prejudice associated

---

[8] We do not assume that McDonald would have refused to testify in Juniel's separate trial. (See *Kennan, supra*, 46 Cal.3d at p. 500.)

[9] We agree with Juniel that the witnesses McDonald called to support her claim that Juniel abused her would not have testified if Juniel was tried alone. However, contrary to Juniel's contention, these other witnesses were minor players in this trial and their testimony was not an independent source of prejudice.

with admitting this evidence. (See *Zafiro, supra*, 506 U.S. at p. 539 [limiting instructions "often will suffice to cure any risk of prejudice."].)

Finally, admitting this evidence did not bolster an otherwise weak prosecution case. The trial court made the decision to admit the challenged evidence during McDonald's defense case, after the prosecution had rested. By that time, evidence of Juniel's guilt was absolutely overwhelming. As noted above, witnesses had identified Juniel, McDonald and McDonald's car. The murder weapon was found in Juniel's home and Juniel admitted it belonged to him. Juniel repeatedly incriminated himself in tape-recorded conversations that were admitted into evidence. There was also strong evidence of Juniel's pre-trial efforts to manipulate and intimidate witnesses.

Under these circumstances, the trial court could properly have concluded that the benefits of continuing the joint trial outweighed the potential prejudice to Juniel that McDonald's duress evidence might have caused. In this regard, we reject appellants' claim that judicial economy was not a benefit of this joint trial.[10] The prosecution's case was substantial and had already been presented to a jury. By admitting the domestic violence evidence while also protecting Juniel's rights, the trial court eliminated the need to present that case two additional times in separate trials. It also eliminated the possibility of inconsistent verdicts and furthered the goal of truth finding by presenting the appellants' conflicting versions of the relevant events to a single jury.

McDonald separately contends that she "was denied her trial right to present a complete defense to the mental state of murder . . . ." We interpret this vague and cursory complaint as a claim that McDonald was precluded from introducing additional evidence of Juniel's violent conduct which would likely have strengthened her defense. However, McDonald has not identified any specific evidence that was excluded which would have

---

[10] Appellants contend that joinder was counterproductive to the goal of judicial economy because it enabled Juniel and McDonald to waste considerable time and resources attacking each other. But appellants' conduct during this trial is attributable to them personally and was not a consequence of joinder.

23

been admissible if she had been tried separately from Juniel and which would have strengthened her defense in any material way.[11]

Even if we could be persuaded that the trial court abused its discretion or that, in retrospect, the consolidation injected an element of unfairness into the trial, we are certain that reversible error did not occur. In the "absence of federal constitutional compulsion," the erroneous denial of a motion to sever requires reversal only if it is "reasonably probable that [the defendant] would have obtained a more favorable verdict at a separate trial." (*People v. Massie* (1967) 66 Cal.2d 899, 923-924 (*Massie*); see also *People v. Coffman* (2004) 34 Cal.4th 1, 41.) And, when a federal constitutional error has been established, reversal is not required if the record demonstrates the error was harmless beyond a reasonable doubt. (*Massie, supra*, 66 Cal.2d at p. 922, fn. 29.)

As we have already suggested, the evidence presented by the prosecution to prove that Juniel and McDonald committed murder was so compelling and so overwhelming that the failure to order separate trials was harmless under any standard. The strength of that evidence was in no way dependent on evidence relating to McDonald's defense. By the same token, McDonald had ample opportunity to present her defense; she has not identified any evidence that the court excluded which could have strengthened her case. Thus, the record demonstrates to us that any error resulting from the trial court's failure to order separate trials was harmless beyond any reasonable doubt.

---

[11] The only specific example McDonald offers in her brief is that the trial court order limiting her duress evidence prevented her from explaining to the jury that part of the reason she was afraid Juniel would shoot her after he shot Alexander was because Juniel has previously threatened her with a gun. As best we can determine, McDonald's trial counsel never made this specific argument in the trial court. In any event, during her cross-examination, McDonald did testify about the prior incident during which Juniel allegedly pointed his gun at her.

## B. Evidence Issues

### 1. Evidence Code section 1101

Both Juniel and McDonald contend that the trial court committed reversible error by admitting evidence of their bad character in violation of Evidence Code section 1101.[12]

#### a. Legal principles

Section 1101, subdivision (a) (section 1101(a)) establishes a general rule excluding "evidence of a person's character or a trait of his or her character . . . when offered to prove his or her conduct on a specified occasion." However, this provision expressly acknowledges there are exceptions to this rule which may make character evidence admissible. Furthermore, section 1101, subdivision (b) (section 1101(b)), clarifies that "this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*).) Specific examples of such facts are set forth in section 1101(b).

If a trial court has determined that evidence of a criminal defendant's uncharged conduct is not excluded by section 1101(a), it must then consider whether the evidence should nevertheless be excluded pursuant to section 352. (*People v. Balcom* (1994) 7 Cal.4th 414, 426.) The evidence must be excluded if the probative value of the evidence is substantially outweighed by the probability that its admission would "(a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.)

Rulings under section 1101 are also reviewed under the abuse of discretion standard. (*Ewoldt*, *supra*, 7 Cal.4th at p. 405; *People v. Kipp* (1998) 18 Cal.4th 349, 369.)

---

[12] All further statutory references are to the Evidence Code unless otherwise indicated.

### b.    *Juniel's uncharged conduct*

Juniel contends evidence of his uncharged domestic violence should have been excluded pursuant to section 1101(a). In making this argument, Juniel does not individually analyze the specific items of evidence to which he objects notwithstanding the fact that the trial court expressly engaged in just such an analysis. Instead, he simply maintains that all evidence relating to his "bad acts and bad character" was inadmissible. In light of this approach, our analysis of this issue will also be general.

Juniel contends that evidence of his uncharged misconduct constitutes bad character evidence within the meaning of section 1101(a) and this evidence does not fall within any exception set forth in section 1101(b), or any other provision of the Evidence Code. Juniel underscores that the "Code contains no 'joint trial' exception." Therefore, he concludes, the evidence should not have been admitted.

Our Supreme Court rejected a similar argument in *People v. Catlin* (2001) 26 Cal.4th 81 (*Catlin*). As the Court explained: "Section 1101 prohibits the admission of other-crimes evidence for the purpose of showing the defendant's bad character or criminal propensity. It recognizes, however, that there are facts other than criminal propensity to which other-crimes evidence may be relevant. [Citation.] The categories listed in section 1101, subdivision (b), are examples of facts that legitimately may be proved by other-crimes evidence, but, *contrary to defendant's contention, the list is not exclusive.* [Citations.]" (*Id.* at pp. 145-146, emphasis supplied; see also, 1 Witkin, Cal. Evidence (4th ed 2000) Circumstantial Evidence, § 75, p. 411.)

Thus, Juniel fundamentally misconceives the analysis for determining whether evidence must be excluded under section 1101. We begin that analysis by considering whether Juniel's uncharged misconduct is relevant to some fact other than criminal disposition. The trial court found that evidence of Juniel's prior violent acts toward McDonald was relevant to two facts other than Juniel's criminal disposition: (1) McDonald's state of mind; and (2) McDonald's credibility. We agree.

First, McDonald claimed she was not guilty of murder because she lacked the requisite intent to kill and that she participated in Alexander's killing only because she

26

was afraid of Juniel. Evidence of Juniel's domestic violence was relevant to assist the jury in evaluating McDonald's state of mind during the events culminating in Alexander's murder in order to determine whether McDonald had the requisite criminal intent. (See, e.g., *Alvarez, supra*, 14 Cal.4th at p. 180; *Keenan, supra*, 46 Cal.3d. at pp. 493-494.) Second, this evidence was relevant to the battered woman defense that McDonald was permitted to present.[13] Evidence of the prior incidents of domestic violence was probative of McDonald's credibility. (See *People v. Humphry* (1996) 13 Cal.4th 1073, 1087; *People v. Erickson* (1997) 57 Cal.App.4th 1391, 1400.) It also supplied the foundation for her expert's testimony regarding battered women's syndrome. (§ 1107, subd (b).)

As noted above, if the trial court finds that uncharged conduct evidence is relevant to a fact other than criminal disposition, it must then consider whether the evidence should nevertheless be excluded under section 352. (*People v. Balcom, supra*, 7 Cal.4th at p. 426.) Here, the record demonstrates that the trial court took an offer of proof from McDonald, and applied a section 352 prejudice analysis to each incident that McDonald described. Pursuant to that analysis, the court admitted evidence as to some acts and excluded evidence regarding other acts. The court also gave the jury oral and written instructions that the uncharged conduct evidence it heard was not admitted against Juniel and was not to be considered as evidence of his bad character or criminal propensity.

On appeal, Juniel simply ignores the trial court's ruling. Instead, he supplies his own list of evidence that he claims was introduced to support McDonald's defense and that would not have been admissible in a separate trial. We note that many items on Juniel's list relate to evidence that was relevant to matters other than McDonald's defense.[14] In any event, Juniel does not specifically address any specific item of evidence

---

[13] Whether this was a proper defense to the charges is not an issue on appeal.

[14] For example, Juniel maintains that evidence he had a sexual relationship with McDonald's sister, Sia Bolden, would not have been admitted in his separate trial. We note, however, that the prosecutor asked Juniel about that relationship in connection with

on his own list either. Instead, he makes the sweeping claim that the trial court violated
section 352 because evidence of his prior bad acts and bad character "obviously" created
a substantial risk of undue prejudice and of confusing the issues. We are not persuaded
by this conclusory argument.

Further, even if Juniel could convince us that evidence of one or more of the
uncharged acts should not have been admitted, we would nevertheless conclude that
admission of the evidence would not require reversal of the judgment under either the
state or federal law standards for assessing prejudice. We reiterate that, contrary to
appellants' contentions on appeal, the evidence that Juniel and McDonald committed
murder is overwhelming. We find no possibility that the jury would have reached any
different conclusion had the domestic violence evidence been excluded.

###### c.    *McDonald's uncharged conduct*

McDonald contends the trial court violated section 1101 by admitting evidence
that McDonald threatened a 42-year-old neighbor with a baseball bat in September 1998.

At trial, McDonald called her mother, Rita Ammons, as her first witness. Defense
counsel elicited testimony from Ammons that McDonald did not have a short temper, that
"[s]he'll take a lot before she gets mad" and that she did not put herself in "situations"
because she always had "too much to lose."

During his cross-examination of Ammons, Juniel asked if McDonald had
threatened a neighbor with a baseball bat in 1998 when she lived on 7th Avenue.
Ammons could not recall much about the incident other than that there was a
disagreement over a parking place and "tempers had been flaring for a long time, things
were going on there." Ammons agreed that there may have been an ongoing feud

---

evidence that Juniel enlisted Bolden's aid in obtaining personal information about
potential witnesses in this case.

Our point is that we do not share Juniel's assumptions that all evidence which
made him unsympathetic to this jury (1) was admitted solely because McDonald was his
co-defendant at trial or (2) can properly be lumped together to support Juniel's claim of
evidentiary error.

between McDonald and the neighbor. During her subsequent direct testimony, McDonald described the 1998 dispute with her former neighbor and admitted that she threatened the woman with a baseball bat. The prosecutor elicited additional details about the incident.

McDonald characterizes the 1998 incident as bad character evidence which should have been excluded pursuant to section 1101. We disagree.[15]

Section 1102 establishes an exception to the rule that character evidence is inadmissible to prove conduct on a specific occasion. Section 1102 states: "In a criminal action, evidence of the defendant's character or a trait of his character in the form of opinion or evidence of his reputation is not made inadmissible by Section 1101 if such evidence is: [¶] (a) Offered by the defendant to prove his conduct in conformity with such character or trait of character; [¶] (b) Offered by the prosecution to rebut evidence adduced by the defendant under subdivision (a)."

Evidence of the 1998 incident was admissible pursuant to subdivision (b) of section 1102 (section 1102(b)) because it was offered to rebut Ammons's testimony that McDonald was a peaceful person who did not look for trouble and avoided bad situations. McDonald disagrees. She offers no arguments as to why the baseball incident should not be considered proper rebuttal evidence.

First, McDonald's points out that Ammons did not testify about McDonald's "reputation" for peaceful behavior but only shared her personal knowledge about McDonald's character. But that personal knowledge gave rise to an opinion which Ammons shared with the jury -- that her daughter had a peaceful character; that she did not have a short temper, that it took a lot for her to get mad and that she avoided bad situations. Section 1102 applies not just to reputation evidence but also to "evidence of the defendant's character or a trait of his character in the form of an opinion . . . ."

---

[15] Our rejection of this substantive contention makes its unnecessary to address the People's contention that McDonald failed to adequately preserve this issue for review and McDonald's related claim that any failure to preserve this issue constituted ineffective assistance of counsel.

29

Second, McDonald contends the baseball bat incident was not admissible because it was evidence of a specific act and did not constitute opinion or reputation evidence that could properly be admitted under section 1102(b). McDonald maintains that, by introducing good character evidence, the defendant does not open the door to evidence of her prior bad acts offered to show criminal disposition. (Citing *People v Wagner* (1975) 13 Cal.3d 612, 619 (*Wagner*).)

The prosecutor is entitled to a meaningful cross-examination of a good character witness and that examination may include questions about specific acts relevant to the character testimony that has been given. (*Wagner, supra,* 13 Cal.3d. at pp. 618-619; *People v. Hempstead* (1983) 148 Cal.App.3d 949, 954 (*Hempstead*).) "'Obviously, the opinion of a good-character witness must have some basis, and the prosecution must be permitted to test that basis and bring into question the validity of the opinion. [Citation.]'" (*Hempstead, supra,* 148 Cal. App. 3d at p. 954.) When a witness is "called to express an opinion as to the good character of the defendant, the prosecution must have the opportunity to let the jury test the validity of the opinion or the weight to be given to it by asking whether the holder of the opinion has knowledge of events or acts which have indisputably occurred." (*Ibid.*; see also *People v. Clair* (1992) 2 Cal.4th 629, 682-685.)

Therefore, the trial court did not violate section 1101 by admitting evidence regarding the 1998 baseball bat incident.

### 2.    *The gun incident*

Juniel contends the trial court committed reversible error by ruling that evidence that Juniel threatened McDonald with the murder weapon prior to Alexander's murder was admissible pursuant to section 356.

### a.    *Background*

As noted above, the trial court took an offer of proof from McDonald regarding Juniel's prior violent acts and then made separate rulings regarding each of the acts that McDonald described. During that process, the court excluded, pursuant to section 352, evidence regarding an incident during which Juniel allegedly put a gun to McDonald's

head and called her his enemy. McDonald did not testify about that incident during her direct examination by her attorney.

However, during his cross-examination of McDonald, Juniel asked whether she had ever seen the murder weapon before it was used to kill Alexander. After McDonald responded that she had, the following exchange occurred:

"Q: Isn't it true, Ms. McDonald, that yesterday you said you had never saw that gun until that time?

"A: I seen it before.

"Q: How many times had you seen that gun before?

"A: I seen it when you pulled it on me."

A short time later, the prosecutor cross-examined McDonald about the prior incident during which Juniel allegedly pointed the murder weapon at McDonald. When the prosecutor asked McDonald to describe what happened, Juniel's objection was overruled. McDonald then proceeded to describe how she woke from a light sleep when she heard a clicking sound and found Juniel standing over her holding the gun. Juniel said he felt McDonald was his enemy. McDonald asked him to get the gun out of her face and told him he was "tripping," at which point Juniel put the gun down on the bed.

The day after McDonald gave this testimony, Juniel moved for a mistrial and for severance on the ground that McDonald violated the court's evidentiary ruling by testifying about the prior gun incident. The court denied the motion, finding Juniel raised the issue himself during his cross-examination of McDonald.

### b.   *Analysis*

The trial court's ruling permitting the prosecutor to examine McDonald about the prior gun incident was consistent with section 356, which states that "[w]here part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party . . . ." Here, Juniel elicited some testimony about the prior gun incident and thereby opened the door for further inquiry by the prosecutor.

31

Juniel contends that section 356 allows further questioning on a subject "only where necessary to prevent misunderstandings and misleading impressions of the evidence" and that his questioning of McDonald did not raise either of these concerns or merit any further inquiry into the prior incident.

Section 356 " permits introduction only of statements 'on the same subject' or which are necessary for understanding of the statements already introduced." (*People v. Breaux* (1991) 1 Cal.4th 281, 302.) "The purpose of this section is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed. [Citation.] Thus, if a party's oral admissions have been introduced in evidence, he may show other portions of the same interview or conversation, even if they are self-serving, which 'have some bearing upon, or connection with, the admission . . . in evidence.' [Citations.]" (*People v. Arias* (1996) 13 Cal.4th 92, 156.)

Here, the prosecutor was entitled to introduce evidence "on the same subject" that Juniel raised during his cross examination, i.e., McDonald's prior knowledge of Juniel's gun. By questioning McDonald's testimony that she had seen the gun before, Juniel attempted to create doubt as to McDonald's credibility as a witness and as to her ability to identify the murder weapon. By exploring the prior incident, the prosecutor elicited relevant evidence which showed that McDonald (1) was not lying when she testified she had seen the gun before Juniel used it to shoot Alexander, (2) had ample opportunity to examine the murder weapon during the prior incident, and (3) could competently identify Juniel's gun as the murder weapon.

Thus, we reject Juniel's contention that the court erred by overruling his objection to the prosecutor's questions regarding the prior incident when Juniel pointed the murder weapon at McDonald.

### 3.    *The Hood Letter*

As noted in our factual summary, the trial court admitted evidence regarding a letter Juniel wrote to his attorney while in jail in which he attempted to exonerate McDonald by disclosing that he was present when a man named Eric Hood killed

Alexander (the Hood letter). Juniel contends the court committed reversible error by admitting this evidence without conducting a hearing pursuant to section 402 when he claimed that the Hood letter was protected by the attorney-client privilege.

    a.    *Background*

    While cross-examining Juniel, McDonald's counsel asked Juniel if he recognized the Hood letter. Juniel stated that he did and acknowledged he wrote the letter. Then the following exchange occurred:

    "Q: You presented me with this, Mr. Juniel, to tell me about how you were involved in this case and what really happened that night so that I could defend my client, right?

    "A: No, I did not present that to you. In fact I presented that to my lawyer and I had no idea that he would give you that. That's not a statement. That was a note to my lawyer, and I feel that that abuses my rights of lawyer-client privileges. I had no idea you would get that or read that.

    "Q: Mr. Juniel, you gave me this copy of that letter in municipal court.

    "A: No, I did not."

    When counsel indicated her intention to read part of the letter, Juniel stated: "Your Honor, I object. There's no offer of proof -- My lawyer gave this lady this and I found out later after the fact." The court responded: "She has identified it and may read it." Counsel then read various parts of the letter and asked Juniel about its contents.

    After Juniel finished his testimony and another witness was examined, the jury was excused and the court and counsel addressed a variety of issues including jury instructions and trial exhibits. When the court stated it would admit the Hood letter, Juniel objected that admitting the letter would violate his "right to lawyer-client privileges." Juniel claimed he did not know McDonald's lawyer would "come in contact with" the Hood letter, that "it was basically notes of ideas that I had with my lawyer at that time," and that he later discovered that his investigator or prior attorney had given the letter to McDonald's lawyer. McDonald's counsel responded that Juniel himself gave her a copy of the Hood letter during the preliminary hearing in this case and that

Juniel's prior defense counsel and investigator were aware of that fact. She also told the court that "numerous copies" of the letter were available at the hearing. Juniel denied he gave the letter to her.

Then the trial court made the following ruling: "The extent to which Mr. Juniel read from that statement is in the record and that is part of the evidence. The remainder of it, Mr. Juniel's claim of attorney-client privilege, is sustained []and the document will not go in."

The next day, the court clarified the basis for its decision to exclude the Hood letter. It acknowledged the conflicting contentions regarding how the letter was disclosed to McDonald's counsel and stated it was not making "any kind of finding that Mr. Juniel's testimony is correct or that [McDonald's lawyer's] contention is correct." Instead, the court excluded the letter because (1) Juniel claimed it was privileged; (2) McDonald was able to cross-examine regarding the contents of the letter; (3) the letter was cumulative of other letters Juniel wrote that were admitted for impeachment and (4) the letter was more prejudicial than probative.

      **b.**   *Analysis*

Juniel contends that, when McDonald's counsel began to question him about the Hood letter, he made a "prima facie claim of attorney-client privilege," which required the court to conduct a hearing outside the presence of the jury before admitting any evidence pertaining to the letter, and the failure to hold that hearing constituted reversible error.

To support his argument, Juniel relies on *Titmas v. Superior Court* (2001) 87 Cal.App.4th 738 (*Titmas*). *Titmas* was a shareholders' derivative action. The plaintiffs noticed the depositions of two lawyers the defendant had hired to prepare a confidential private placement offering and they also served the deponents' law firm with a subpoena to produce documents. Defendant moved to quash the subpoena on the ground that it sought privileged documents. Before the scheduled hearing on the matter, a judge who was temporarily assigned to the case denied the motion to quash finding that the privilege

had been waived. (*Id.* at pp. 740-741.) The *Titmas* court reversed, finding the defendant was entitled to an oral hearing on his motion to quash. (*Id.* at pp. 742-744.)

Titmas involved a situation very different from what occurred here; it was a pre-trial discovery dispute in a civil case. We simply disagree with Juniel that *Titmas* establishes that the trial court in this case committed reversible error by failing to hold a hearing outside the presence of the jury before making an evidentiary ruling during a criminal trial.

However, *Titmas* is consistent with authority recognizing that a claim of privilege gives rise to a presumption in favor of the claimant. (See, e.g., *Gordon v. Superior Court* (1997) 55 Cal.App.4th 1546, 1557. Indeed, that presumption is codified in section 917, subdivision (a) which states, in part: "Whenever a privilege is claimed on the ground that the matter sought to be disclosed is a communication made in confidence in the course of the lawyer-client . . . relationship, the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish that the communication was not confidential."

The presumption that a communication is confidential "arises only when the claimant first proves the preliminary fact that a *privilege exists*." (2 Witkin, Cal. Evidence, *supra*, Witnesses, § 86, p. 338; see also *Mahoney v. Superior Court* (1983) 142 Cal.App.3d 937, 940-941.) In the present case, it appears that the trial court was not persuaded that Juniel proved the preliminary fact that a privilege existed with respect to the Hood letter. Even if the court erred in this regard, if Juniel did make an adequate prima facie showing that the Hood letter was privileged by denying that he gave the letter to opposing counsel and testifying that the letter was a note to his attorney, the error was harmless for two independent reasons.

First, the record strongly suggests that any presumption the Hood letter was privileged could easily have been rebutted. McDonald's attorney unequivocally represented to the court that Juniel gave her the letter and she also represented that numerous witnesses, including Juniel's former attorney, could confirm that fact. By contrast, Juniel had significant credibility problems. Further, although Juniel claimed he

did not give the letter to McDonald's counsel, he conceded that he knew his representative gave the letter to her before the trial commenced. Despite that knowledge, Juniel took no steps to retrieve the Hood letter or to otherwise prevent disclosure of its contents to others.

Second, and in any event, there is no reasonable possibility that the outcome of this case would have been any different if all evidence relating to the Hood letter had been excluded at trial. Juniel contends that credibility was a central issue in this case and that evidence relating to the Hood letter destroyed his credibility. We emphatically disagree with this assessment of a very minor piece of evidence. Juniel's credibility was destroyed by the staggering evidence of his guilt and by the fact that he was repeatedly impeached with statements he had made in letters, to witnesses and during tape-recorded conversations, all of which directly conflicted with and undermined his testimony at trial.

**C.    *Juniel's Decision to Testify***

Juniel contends the trial court violated his constitutional rights by forcing him to declare whether he would testify in his own defense before he was prepared to make that decision.

### 1.    *Background*

Juniel presented his defense case before McDonald. He called four witnesses, two of whom had already testified during the People's case. Then, Juniel stated he was having difficulty locating additional witnesses and asked the court if he could "rest with your consent that if they are located I would be able to recall my witnesses in my defense." The court stated that Juniel would be allowed to re-open if the additional witnesses he was seeking were located.

Next, McDonald presented her defense case. Ammons testified first, followed by McDonald and then McDonald's domestic violence expert, Linda Barnard. After the direct examination of Barnard was completed, there was a short recess.

Outside the presence of the jury, the court expressed concern that the trial was not proceeding according to schedule. Apparently some jury members had prior commitments that would present problems if the trial was not completed in the next few

days. Because of a miscalculation, McDonald's remaining witnesses were not available to testify that day. The court inquired whether the parties could agree to stipulations regarding the testimony of any of those witnesses. The court also stated that it did not know whether Juniel intended to testify. Juniel stated: "No, your honor. At this time no, I'm not. But I do have witnesses on standby . . . ." Juniel stated he had "about" three more witnesses and that he would be willing to offer stipulations for those witnesses and others. McDonald had already provided Juniel and the prosecutor with witness statements for her remaining witnesses. Juniel had reviewed the statements and noted several objections to the anticipated testimony which the court took under submission.

During the next break, the court continued to review the anticipated testimony of McDonald's remaining witnesses; it attempted to facilitate stipulations as to some and made other rulings regarding the scope and admissibility of the anticipated testimony. After the break, Barnard completed her testimony and the jury was excused for the day.

At that point, the court turned to the issue of jury instructions. The court stated it had some questions for Juniel in order to determine his "desires" regarding instructions. At that point, the following exchange occurred:

"The Court: You indicated to me you do not intend to take the stand. You do not intend to testify, correct?

"The Defendant: At this time I have not yet decided, your honor, and I cannot say whether or not right now - - I can say right now that I have not informed the court I would not or not testify.

"The Court: Mr. Juniel, you now changed what you said before because you did tell me you weren't intending to testify, and I can't finalize the instructions until I know what your position is. So you're telling me right now that you don't know which way you're going to be going, is that correct?

"The Defendant: Yes.

"The Court: Then I can't finalize the instructions. I don't know what to do."

Juniel responded that he wanted to wait for the rest of the witnesses to testify because that would affect whether additional or different instructions should be given.

The court inquired "what possible instructions" Juniel was intending to request. Juniel responded that he had "no idea," but that the anticipated witnesses could have information about domestic violence issues. The court reminded Juniel that he already had statements reflecting the anticipated testimony of the remaining witnesses. If Juniel believed that anticipated testimony would result in a request for additional instructions, the court wanted to know what instructions would be requested. Juniel stated he could not say what additional instructions would be needed because he did not know the "exact words that they would testify to." At that point, the following exchange occurred:

"The Court: Mr. Juniel, I will remind you that you did rest and it is within my discretion to allow you to reopen. Now you have the substance of their testimony. All I'm asking you, sir, is could you give me a yes or a no so that I can adequately frame the instructions, get them to the printer and we don't waste three hours of time on the printer printing instructions. That's all I'm asking you. If you say yes, you are, then I'm going to put certain elements in. If you say you're not going to testify, then I'm going to take certain elements out. If you say yes, you are going to testify, then I am going to delete instruction 2.60 and 2.61, which is the instruction which says that you have a right to remain silent. That's what -- that is that is what my question is about. If you say no, then I'm going to put it in if you so request, but I have to frame these instructions.

"The Defendant: Your honor, I will testify."

When the trial resumed the next morning, the court granted Juniel's request to interrupt the presentation of McDonald's defense case, to re-open his case and present a witness out of order. After that witness testified, McDonald presented the remainder of her witnesses and rested her case. The trial court then permitted Juniel to call another witness, a woman Juniel previously stated was unavailable. When that woman finished her testimony, the court asked Juniel whether he had any additional witnesses. At that point, Juniel expressed his desire to take the stand and was permitted to do so.

38

## 2.    *Analysis*

Juniel contends the trial court violated his constitutional rights by forcing him to declare in advance whether he intended to testify at trial. To support this argument, Juniel relies on *Brooks v. Tennessee* (1972) 406 U.S. 605 (*Brooks*).

In *Brooks*, the United States Supreme Court declared unconstitutional a Tennessee statute that required that a criminal defendant "'desiring to testify shall do so before any other testimony for the defense is heard by the court trying the case.'" (*Brooks, supra,* 406 U.S. at p. 606.) The court found that this statute impermissibly restricted a defendant's right against self-incrimination by casting too heavy a "burden on a defendant's otherwise unconditional right not to take the stand." (*Id.* at pp. 610-611.).

The *Brooks* court reasoned that the decision whether to testify is important and difficult and poses serious dangers to the success of an accused's defense. At the close of the state's case a defendant may have some notion of the strength of his case but cannot be certain that his witnesses will testify as expected and he may, in some cases, be forced to call hostile witnesses whose testimony is even more difficult to predict. Under such circumstances, the defendant might choose to "remain silent at that point, putting off his testimony until its value can be realistically assessed." (*Brooks, supra,* 406 U.S. at p. 611.) However, the Tennessee rule exacted too high a price for that silence by keeping the defendant off the stand entirely unless he testified first. The state's legitimate interest in preventing testimonial influence was not "sufficient to override the defendant's right to remain silent at trial." (*Ibid.*)

For similar reasons, the *Brooks* Court also found that the Tennessee statute infringed on a defendant's due process right. (*Brooks, supra,* 406 U.S. at p. 613.) Requiring the defense to make the important tactical decision as to whether the defendant will exercise his constitutional right before it can evaluate the actual worth of its own evidence restricts the defendant and his counsel in the planning of the defense case. Further, by requiring the defendant to testify first or not at all, the rule deprives the defendant of the assistance of counsel with respect to the "timing of this critical element of his defense." (*Ibid.*)

39

Juniel contends that "[t]he trial judge's action below was a clear and direct violation of *Brooks*." In fact, though, *Brooks* held that a trial court violated a defendant's constitutional rights when it "excluded him from the stand for failing to testify first." (*Brooks, supra*, 406 U.S. at p. 613.) Here, by contrast, Juniel was not excluded from the stand. Nor was he forced to be the first witness in his defense case.

The *Brooks* court found that "the accused and his counsel may not be restricted in deciding whether, and when in the course of presenting his defense, the accused should take the stand." (*Brooks, supra*, 406 U.S. at p. 613.) Here, no such restriction was imposed. Juniel made his own decision not to testify during his defense case. He presented witnesses and then rested. Subsequently, the court permitted Juniel to re-open his case twice. The second time, Juniel elected to testify.

Juniel interprets *Brooks* as holding that "forcing a defendant to decide whether to testify before hearing other evidence violate[s] both his Fifth Amendment right to remain silent and his due process rights." The record simply does not establish that Juniel was "forced" to make that decision in this case. Juniel made the decision to rest his defense case without testifying. Later, he expressly told the court that he did not intend to testify. As the trial neared an end, the court addressed the subject of jury instructions and, in that discrete context, sought confirmation that Juniel had elected not to testify. There was nothing improper about that inquiry; indeed, as the court explained to Juniel, the proper instructions cannot be selected when it is unclear whether the defendant will testify.

The trial in this case took longer than anticipated. The trial court felt pressure to complete the jury instructions and was close to completing that task based on Juniel's express representation that he would not testify at trial. When Juniel changed his mind again, this time making the decision not to decide whether to testify, the court was surprised and, indeed, frustrated. That frustration grew when Juniel further impeded completion of the instructions by claiming he needed to hear the exact testimony of all witnesses before he could propose his own instructions. However, by expressing this frustration, the trial court did not extract an irrevocable commitment to testify.

Juniel contends the trial court implicitly threatened that Juniel would not be allowed to reopen his case unless he made a decision about whether he would testify. We simply disagree. Juniel had repeatedly changed his mind about this issue and there is nothing in the record to suggest either (1) that Juniel felt constrained from changing his mind again or (2) that the court had any intention of forcing Juniel to take the stand in this case.

Juniel maintains that the trial court's conduct was more egregious than the statutory procedure condemned in *Brooks* because he was required to make a decision about his right to testify before hearing McDonald's witnesses whose testimony was more difficult to predict than that of his own defense witnesses. Again, we reject the premise that Juniel was forced to make a decision before he actually took the stand. Furthermore, by the time the discussion about jury instructions occurred, Juniel had heard virtually all of the material evidence in this case. The prosecution had presented its case, Juniel had presented his case, and McDonald had presented her most important witnesses, her mother, herself and her domestic violence expert. Juniel had already reviewed the anticipated testimony of McDonald's few remaining witnesses all of whom were being called in order to corroborate testimony McDonald had already given.[16] Furthermore, the only witness who testified after Juniel was McDonald's son who was called to rebut one small aspect of Juniel's testimony. Therefore, when Juniel made the actual final decision to testify in this case, he was fully informed of all of the evidence against him.

To summarize, Juniel's decisions whether and when to testify at trial were not restricted at all. The record demonstrates that Juniel repeatedly changed his mind about this issue and ultimately made the final decision to testify after hearing all of the evidence

---

[16] Juniel characterizes McDonald's remaining witnesses as the functional equivalents of prosecution witnesses who would primarily offer evidence against Juniel about his alleged abuse. Again, Juniel overstates the materiality of these witnesses' testimony. McDonald's defense simply did not play the major role in this case that Juniel assigns to it. Indeed, the jury's verdict demonstrates that defense was not credible.

41

against him. Therefore, we reject the contention that the constitutional protections at issue in *Brooks* were violated in this case.

**D.    *Juniel's Opportunity to Prepare and Present a Defense***

Juniel contends the trial court denied him a meaningful opportunity to prepare and present a defense in violation of his constitutional rights. To support this claim, Juniel objects to the following three rulings the trial court made: (1) admitting evidence of Juniel's uncharged conduct; (2) limiting the length of Juniel's trial testimony, and (3) limiting the length of Juniel's closing argument.

**1.    *Uncharged conduct evidence***

Juniel characterizes the trial court's decision to admit the domestic violence evidence as a "mid-trial reversal" which deprived him of a meaningful opportunity to prepare a defense. Quoting from *People v. Diaz* (1987) 195 Cal.App.3d 1375, 1383, Juniel maintains that "[a] criminal defendant must be informed in advance of the acts which will be used to 'prove [the] case against him' so that he can have a 'meaningful opportunity to prepare a defense to [those] specific acts.'"

The uncharged domestic violence was not the "acts" the prosecutor used to prove the case against Juniel. Despite his persistence, Juniel simply cannot persuade us that this evidence was material. It was not relevant to and had no bearing on the strength of the prosecutor's evidence that Juniel and McDonald committed murder. Indeed, though relevant to McDonald's defense, this evidence was not particularly compelling; it did not persuade the jury that convicted McDonald of murder. Therefore, we again reject Juniel's contention that the admission of this evidence is a ground for reversal.

**2.    *Rebuttal testimony***

As noted above, after McDonald rested her case, the trial court permitted Juniel to re-open his case and present additional witnesses. After one witness was examined, the court inquired if Juniel had any additional witnesses and Juniel responded that he would testify. Because Juniel represented himself, he was permitted to give testimony as a narrative. When the prosecutor and McDonald's counsel completed their cross-

42

examinations of him, Juniel did not ask to present any additional testimony. At that point, he was excused from the witness stand.

After McDonald presented her rebuttal witness, there was a recess followed by a discussion outside the presence of the jury. At the end of that discussion, Juniel made the following statement: "I would like to say that I don't feel that I was given an adequate right to a fair trial. I feel that this whole thing was rushed through, and I'm sure that counsel as well as prosecution feels that way as well because there were certain points and things that I was not able to explain as a matter of fact as my rebuttal. I have not been given an opportunity of that, I don't feel. I don't feel I have been given an opportunity to explain a lot of the evidence which I should have had the opportunity--"

The court responded that Juniel could return to the witness stand and "give whatever rebuttal you wish for 10 minutes." After Juniel completed his rebuttal testimony, the court instructed the jury.

Juniel now contends that the trial court deprived him of his constitutional right to present an adequate defense by limiting his rebuttal time to ten minutes. There are several problems with this argument. First, Juniel did not even request rebuttal time until after his testimony was completed and he had been excused from the witness stand. Indeed, the court had expected to instruct the jury when Juniel raised the rebuttal issue for the first time. The court accommodated Juniel and allowed him to return to the witness stand. Second, although the court indicated Juniel would be granted ten minutes to present additional testimony, the record does not demonstrate that any such limitation was actually enforced. Juniel testified without interruption and completed his testimony within a few short pages. There is simply no basis for concluding that Juniel had any more to say. Finally, even on appeal, Juniel does not articulate a single issue or piece of evidence that he would have testified about during rebuttal if he had been afforded more time.

Under these circumstances, we find that the ruling affording Juniel a belated opportunity to present rebuttal testimony did not deprive him of his constitutional right to present a defense.

43

3.    *Closing argument*

After the prosecutor completed his closing argument, the court told the jury that Juniel would present his argument after a short recess. During the recess, the following exchange occurred:

"The Defendant: I would like to put on the record I am not ready to proceed at this time. I feel that based on the evidence presented newly today as well as new testimony from witnesses I have not been given adequate time to prepare exactly the strategy for my defense. However, over my objection to giving my closing argument today I will for the convenience of the court start my closing argument. I'm going to need more time than today.

"The Court: Mr. Juniel, I indicated I thought that we -- I told you at the outset that we were going to argue Monday or Tuesday. It is now Wednesday afternoon. The reason we have gone this long is that basically it was your cross-examination of Ms. McDonald that caused the lengthy delay. [¶] I am going to order you to commence your argument and you are going to finish your argument this afternoon sir. I will stay here until you're done. Given the fact that [the prosecutor] has taken less than an hour, and I have instructed [McDonald's counsel] to take less than an hour, I'm going to instruct you also to take one hour of argument."

During Juniel's closing argument, the court advised him when he had seven minutes remaining. When Juniel responded that he likely would not finish in seven minutes, the court asked him to "please conclude during the time limitations that I have set on everyone who's in this case." After complaining to the jury that he was being rushed and that he had not been given a "fair and partial trial," Juniel continued his argument. Shortly thereafter, the court asked Juniel to conclude, which he did.

The next morning, outside the presence of the jury, Juniel requested an additional ten minutes to argue. He acknowledged there were time constraints but maintained he needed the additional time to address important issues that he had not covered the day before. The court granted Juniel an additional eight minutes of argument.

On appeal, Juniel contends that the time limit the court imposed on his oral argument made it impossible for him to present his version of the case and infringed his constitutional right to present a defense.

"A criminal defendant has a well-established constitutional right to have counsel present closing argument to the trier of fact. [Citations.]  This right is not unbounded, however; the trial court retains discretion to impose reasonable time limits and to ensure that argument does not stray unduly from the mark. [Citation.]" (*People v. Marshall* (1996) 13 Cal.4th 799, 854-85; see also *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1184 ["The trial judge has broad discretion to limit counsel to a reasonable time and to terminate argument when continuation would be repetitive or redundant."]; *Herring v. New York* (1975) 422 U.S. 853, 862 [Judge in a criminal case "must be and is given great latitude in controlling the duration and limiting the scope of closing summations."].)

Juniel has not demonstrated the trial court abused its discretion here.  Although he contends he did not have an adequate opportunity to present his version of the facts, Juniel has not identified any material issue or piece of evidence that the time limitation prevented him from addressing.  The record demonstrates that, notwithstanding time constraints the court could not ignore, Juniel was allotted ample time to present his argument.

### E.    *Jury Instructions*

#### 1.    *Duress*

The trial court denied McDonald's request to instruct the jury with CALJIC No. 4.40 which states: "A person is not guilty of a crime [other than _____ ] when [he] [she] engages in conduct, otherwise criminal, when acting under threats and menaces under the following circumstances: [¶]  1.  Where the threats and menaces are such that they would cause a reasonable person to fear that [his] [her] life would be in immediate danger if [he] [she] did not engage in the conduct charged, and [¶]  2.  If this person then actually believed that [his] [her] life was so endangered. [¶]  This rule does not apply to threats, menaces, and fear of future danger to [his] [her] life[,] [nor does it apply to the crime[s] of [(crime punishable by death)].]"

45

However, the court addressed McDonald's defense in the following special instruction to the jury: "In the crime of murder it is no defense that the defendant McDonald acted under threats or menace sufficient to show that she had reasonable cause to believe and did believe that her life would be in danger if she refused."

McDonald contends the court deprived her of her constitutional right to present a defense by rejecting her request for CALJIC No. 4.40 and giving the jury the special instruction quoted above. We disagree.

Duress is not a defense to the crime of murder. (*People v. Anderson* (2002) 28 Cal.4th 767, 772-775 & 777-778 (*Anderson*); *People v. Son* (2000) 79 Cal.App.4th 224, 234-237; see also Pen. Code, § 26.) "[F]ear for one's own life does not justify killing an innocent person." (*Anderson, supra*, 28 Cal.4th at p. 770.) Thus, "duress is not a defense to murder." (*Id.* at p. 780.) Furthermore, "duress cannot reduce murder to manslaughter." (*Id.* at p. 770.) Evidence of duress does not negate malice and killing an innocent person under duress is not a form of manslaughter. (*Id.* at pp. 781-782.) Therefore, the trial court did not err by rejecting McDonald's duress instruction.

McDonald contends that, even if duress is not a defense to murder, the special instruction the trial court gave improperly restricted the jury's consideration of her domestic violence evidence which was relevant to negate premeditation and deliberation and to show that she was not guilty of first degree murder. This argument fails for two independent reasons.

First, "'[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language. [Citation.]' [Citations.]" (*People v. Jones* (1996) 42 Cal.App.4th 1047, 1055.) Here, McDonald made no such request. Second, the challenged instruction did not *improperly* restrict the jury's consideration of McDonald's evidence. "[A] killing under duress, like any killing, may or may not be premeditated, depending on the circumstances. If a person obeys an order to kill without reflection, the jury might find no premeditation and thus convict of second degree murder." (*Anderson, supra*, 28 Cal.4th at p. 784.) However, "this circumstance is not

46

due to a special doctrine of duress but to the legal requirements of first degree murder."
(*Ibid.*)

In the present case, the jury was properly instructed regarding the legal
requirements of first degree murder, including the elements of premeditation and
deliberation. McDonald presented evidence, including her domestic violence evidence,
to support her claim that she neither planned nor intended to kill Alexander. The jury
was expressly instructed that evidence concerning battered women's syndrome and the
acts alleged by McDonald could be considered for the purposes of assessing (1) the
beliefs, perceptions and behavior of a victim of domestic violence and (2) the
believability of McDonald's testimony.

These circumstances demonstrate that McDonald was not precluded from
presenting her defense. While the law precluded McDonald from asserting duress as a
defense to murder, the jury instructions did not prevent her from presenting her domestic
violence evidence in order to support her theory that her participation in the murder was
neither premeditated nor deliberate.

### 2.    *Voluntary Manslaughter*

Both appellants contend the trial court erroneously denied Juniel's request that the
jury be instructed on voluntary manslaughter as a lesser included offense of murder.

"Murder is the unlawful killing of a human being with malice aforethought.
[Citation.] A defendant who commits an intentional and unlawful killing but who lacks
malice is guilty of the lesser included offense of voluntary manslaughter. [Citation.] But
a defendant who intentionally and unlawfully kills lacks malice only in limited, explicitly
defined circumstances; either when the defendant acts in a 'sudden quarrel or heat of
passion' [citation], or when the defendant kills in 'unreasonable self-defense' -- the
unreasonable but good faith belief in having to act in self-defense [citations]." (*People v.
Barton* (1995) 12 Cal.4th 186, 199 (*Barton*).)

A trial court is obligated to instruct on a lesser included offense if there is
substantial evidence to support it. "[T]he existence of 'any evidence, no matter how
weak' will not justify instructions on a lesser included offense, but such instructions are

required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is "'evidence from which a jury composed of reasonable [persons] could . . . conclude[]'" that the lesser offense but not the greater was committed. [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*); see also *Barton, supra*, 12 Cal.4th at p. 201.)

Appellants contend the evidence was consistent with a finding of heat of passion voluntary manslaughter. "Heat of passion arises when 'at the time of the killing the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' [Citations.]" (*Barton, supra*, 12 Cal.4th at p. 201.) "[I]f sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter . . . . [Citation.]" (*Breverman, supra*, 19 Cal.4th at p. 163.)

Relying on evidence that Alexander threatened McDonald with a knife during the March 3 altercation, appellants contend a jury could have found they were provoked by that threat and acted out of passion when they killed Alexander. No reasonable jury could have so found; the evidence is absolutely inconsistent with a finding of heat of passion voluntary manslaughter. Juniel did not participate in or even witness the altercation between McDonald and Alexander. In fact, McDonald testified she did not tell Juniel about that fight. Furthermore, approximately 24 hours elapsed between the altercation and the murder. During that interim period, McDonald had a calm discussion about the altercation with another friend during which she expressed her intent to kill Alexander. Finally, a heat of passion theory was undermined by appellants' own testimony about their conduct at the time of the murder. McDonald testified that Juniel shot Alexander without passion or provocation, while Juniel claimed he played no part in the murder at all.

Alternatively, appellants contend the jury could have found them guilty of manslaughter based on an unreasonable self-defense theory. The only evidence they claim supports such a theory was statements Juniel made during telephone conversations after the murder to the effect that his role was to "protect" and "defend no matter what the cost." Even when considered out of context, these expressions of bravado could lead no reasonable jury to conclude the appellants acted out of self-defense.

### 3.    *CALJIC No. 8.73*

Appellants contend that, even if there was insufficient evidence of provocation to warrant a manslaughter instruction, the court erred by refusing to instruct the jury with CALJIC No. 8.73, which states: "If the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation."

To warrant this instruction, "the evidence of provocation must 'justify a jury determination that the accused had formed the intent to kill as a *direct* response to the provocation and had acted immediately . . . . [Citation.]" (*People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1705.)

Appellants contend there was substantial evidence to support giving this instruction. They maintain that McDonald's testimony supported findings that, on the night of the shooting, Alexander approached McDonald's car, had a heated conversation with Juniel about the prior altercation and provoked Juniel to kill her. No reasonable jury could have drawn these conclusions from McDonald's testimony. Therefore, we reject the contention that appellants were entitled to this instruction.

### F.    *Prosecutor misconduct*

For different reasons, both appellants contend that prejudicial prosecutorial misconduct requires reversal of the judgment.

1.    *Standard of Review*

"'Improper remarks by a prosecutor can "'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'" [Citations.] "But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves "'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"" [Citations.]'" (*People v. Earp* (1999) 20 Cal.4th 826, 858 (*Earp*).)

"To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 970 (*Frye*).)

"'To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.' [Citations.]" (*Earp, supra,* 20 Cal.4th at p. 858.)

2.    *McDonald's contention*

McDonald contends that the prosecutor committed misconduct during his closing argument by misstating the mental state necessary to convict a defendant as an aider and abettor and that the prosecutor's erroneous argument was so prejudicial that it deprived her of her constitutional right to a fair trial.

As the People point out, McDonald did not raise this objection in the trial court. In her reply brief, McDonald contends an objection would have been futile. We find no basis for that contention. Thus, McDonald has waived this claim of error. In any event, we reject McDonald's contention that the prosecutor committed prejudicial misconduct.

According to McDonald, the prosecutor told the jury that McDonald's admission that she knew Juniel intended to commit murder when she complied with his demand to follow the injured Alexander in her car was a confession that she was an aider and abettor

of that murder. This argument, McDonald maintains, constituted a misstatement of the law because aider and abettor liability requires intent to facilitate commission of the crime rather than mere knowledge of the criminal plan.

We agree with McDonald that her knowledge of Juniel's criminal plan was not sufficient, by itself, to convict her of murder based on an aider and abettor theory. "[O]utside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator.[17] 'To prove that a defendant is an accomplice . . . the prosecution must show that the defendant acted "with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." [Citation.] When the offense charged is a specific intent crime, the accomplice must "share the specific intent of the perpetrator"; this occurs when the accomplice "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." [Citation.]' [Citation.]" (*People v. McCoy, supra,* 25 Cal.4th at p. 1118.) Therefore, when the charge is murder, "the aider and abettor must know and share the murderous intent of the actual perpetrator." (*Ibid.;* see also *People v. Beeman* (1984) 35 Cal.3d 547, 560.)

However, the record does not support McDonald's claim that the prosecutor misstated the law regarding the required mental state of an aider and abettor to murder. In this regard, McDonald directs our attention to two separate arguments the prosecutor made to the jury.

First, during his closing, the prosecutor made the following statement about McDonald: "She, according to her testimony, knew Juniel was going to kill, knew that she was helping, intentionally aided and abetted, intentionally helped. That means she is

---

17 "'All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed.' [Citations.] Thus, a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts. [Citation.]" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116-1117.)

an aider and abettor and that means she is guilty of murder. She cannot say, 'I helped and I knew,' that is, 'I helped, because I was afraid I was going to get killed.' Even if you take that as true, that is not a defense to murder."

This statement was part of the prosecutor's response to McDonald's claim that she helped Juniel because he threatened her. The prosecutor expressly challenged the veracity of McDonald's testimony that Juniel threatened her and summarized evidence supporting the contrary conclusion that she was a "willing and anxious" participant in the murder. The prosecutor then went on to explain, in the passage quoted above, that, in any event, duress is not a defense to murder. In this regard, he expressly maintained that McDonald not only knew Juniel was going to kill but that she "intentionally" aided, abetted and helped. By making this argument, the prosecutor did not misstate the law.

McDonald also objects to an argument the prosecutor made on rebuttal. During her closing argument, McDonald's trial counsel argued that aiding and abetting a murder required proof of both (1) knowledge and (2) intent and that there was a reasonable doubt as to whether either element was satisfied as to her client. On rebuttal, the prosecutor made the following argument: "It is clear, it is clear and [McDonald] testified that she knew he was going to kill. She admitted it actually in her testimony; if you take her testimony word for word she confessed to murder. She admitted the murder in her testimony. She admitted she knew he was going to kill. She said she was surprised by the first shot but she knew when she drove that [Juniel] was going to kill. She had the knowledge. She had the intent to help. We obviously know she helped. She did aid him. She helped. She drove the car, he caught up with her. So [McDonald's counsel] is focusing on . . . the intent. But the intent says the intent of committing or encouraging or facilitating. Intent to facilitate. That was her intent."

This excerpt from the prosecutor's closing did not constitute a misstatement of the law regarding the mental state of an aider and abettor to murder. Rather, the prosecutor was responding to and disagreeing with McDonald's trial counsel's argument that there was a reasonable doubt as to whether McDonald had the intent to aid and abet Alexander's murder. There was nothing objectionable about this argument.

52

McDonald contends it was likely the jury construed the prosecutor's arguments as misstating aider and abettor law because the jury instructions that were given in this case could have been interpreted as permitting the jury to convict her of murder without finding she intended to kill Alexander if it found that Juniel had such an intent and that McDonald was only trying to assist Juniel.

The jury was given a series a standard instructions regarding aider and abettor liability including CALJIC No. 3.0, which states that the direct perpetrator and the aider and abettor are both principals in the crime, CALJIC No. 3.01, which defines an aider and abettor and sets forth the required mental state, and CALJIC No. 3.03. which describes how an aider and abettor may withdraw from participation in a crime. The jury was also given separate instructions regarding the mental state required to prove murder.

McDonald does not contend any of these instructions were inaccurate. Instead, she argues that the instructions did not adequately foreclose the prosecutor's erroneous argument that knowledge of Juniel's criminal intent was sufficient to make McDonald an aider and abettor. We reject this argument for three reasons.

First, as discussed above, the prosecutor did not misstate the law during his argument. Second, if McDonald believed a clarification of the instructions was necessary, it was incumbent on her to propose clarifying language which she did not do. (See *People v. Jones, supra*, 42 Cal.App.4th at p. 1055.) Finally, the instructions that were given, particularly CALJIC No. 3.01, accurately informed the jury of the requirements for aider and abettor liability.

### 3.    *Juniel's contentions*

Juniel contends the prosecutor made several improper remarks during his closing which infected the trial with unfairness. All but one of the remarks were part of an argument the prosecutor made at the end of his closing which pertained to the "issue of Mr. Juniel representing himself." The prosecutor told the jury it was important to everyone involved that Juniel was given a fair trial. The prosecutor pointed out that Juniel was afforded an attorney for advice and an investigator and that McDonald's counsel even assisted him at times during the trial. The prosecutor also said that the trial

53

judge had been fair during the trial. He also told the jury it was not relevant whether it was a good idea for Juniel to represent himself because he had a constitutional right to do so. The prosecutor underscored that it was important for the jury to know that the trial had been fair to all the parties.

Juniel also objects to the following argument that the prosecutor made during his rebuttal argument: "Who is Richard Juniel? He can look you in the eye and lie, just lie, 'Never seen that gun before in my life.' Just lie, He can look Lorna Brown in the eye and lie. That letter? 'That was a letter to my attorney. How did you get that?' That's outrageous. That's a lie. I know Lorna Brown. She is not lying. No way. He gave that to her. You know it. We all know it. He's up there lying. He can look you in the eye and just lie."

"'"'[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' [Citation.] 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness'" [citation], and he may "use appropriate epithets . . . ."'" [Citation.]'"" (*People v. Hill* (1998) 17 Cal.4th 800, 819-820.)

Notwithstanding this wide latitude, we are concerned by two aspects of the prosecutor's closing argument. First, the prosecutor should not have offered his opinion that Juniel received a fair trial. "The closing statements of counsel should relate to the law and the facts of the case as each side interprets them." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 60.) The prosecutor should avoid arguments which "direct[] the jury's attention away from the evidence." (*Frye, supra*, 18 Cal.4th at p. 978.) Second, although the prosecutor was free to argue that the evidence showed Juniel was a liar, he should not have expressed his personal opinion that McDonald's counsel is not a liar. That opinion was not based on evidence in the record. Indeed, McDonald's lawyer was not a witness at trial and any statement by her should not have been the subject of closing argument.

54

Although these remarks were likely improper, they do not, either individually or taken together, constitute prejudicial misconduct. These comments were brief and they were improper primarily because they were irrelevant. There was no pattern of egregious misconduct which would have made the trial fundamentally unfair. Thus, there was no denial of due process under the federal Constitution.

Nor is there any basis for concluding that these comments were prejudicial under state law. Nothing in this record suggests that the prosecutor intended to or actually did deceive the jury with respect to any material issue. In this regard, we note the jury was expressly instructed that arguments by counsel are not evidence. On this record, "it is not reasonably probable that the prosecutor's occasional intemperate behavior affected the jury's evaluation of the evidence or the rendering of its verdict. [Citations.]" (*People v. Espinoza* (1992) 3 Cal.4th 806, 820-821.)

## IV.    DISPOSITION

The judgment is affirmed.

_____

Haerle, J.

We concur:


_____

Kline, P.J.


_____

Ruvolo, J.*


_____

* Presiding Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## PROOF OF SERVICE

Case: <u>People v. Richard Juniel</u>

I declare that I am employed in the County of Alameda. I am over the age of eighteen years and not a party to this cause. My business address is P.O. Box 7639, Berkeley, California. Today, I served the foregoing **Petition for Review** on all parties in this cause by placing a true copy thereof enclosed in a sealed envelope with postage fully prepaid, in the United States mail at Berkeley, CA, addressed as follows:

Office of Attorney General
455 Golden Gate Ave., #11000
San Francisco, CA 94102

First District Court of Appeal
450 McAllister St.
San Francisco, CA 94102

FDAP
703 Harrison St.
San Francisco, CA 94102

Alameda County Superior Court
Alameda County Courthouse
1225 Fallon Street
Oakland, CA 94612

Alameda County District Attorney
900 Alameda County Courthouse
1225 Fallon Street
Oakland, CA 94612

Richard Juniel, Jr.
V18808
San Quentin State Prison
San Quentin, CA 94974

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 26, 2006, in Berkeley, California.

Lawrence A. Gibbs