*E-FILED - 5/11/10*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD JAMES JUNIEL, JR.,<br><br>        Petitioner,<br><br>  vs.<br><br>T. FELKNER, Warden,<br><br>        Respondent. | No. C 07-4542 RMW (PR)<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY |

Petitioner, a state prisoner proceeding pro se, filed an amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the amended petition should not be granted. Respondent has filed an answer addressing the merits of the amended petition.[1] Petitioner filed a traverse. Having reviewed the briefs and the underlying record, the court concludes that petitioner is not entitled to relief based on the claims presented and denies the petition.

**BACKGROUND**

Petitioner and his co-defendant, Ava McDonald, lived together in Oakland along with McDonald's sister, Sia Bolden. (Resp. Ex. C (People v. Juniel, California Court of Appeal, Second Appellate District, Case No. A105203, Feb. 16, 2006) at 1.) Angelina Bryant lived two

---

[1] Respondent's application for leave to file an oversized memorandum is granted.

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.07\Juniel452hc.wpd

doors away from petitioner. (Id.) Although Bryant did not know petitioner or his co-defendant, Bryant did know Bolden and the two did not get along well. (Id. at 1-2.) On March 3, 2003, Bryant and Bolden got into a disagreement which turned into a physical fight and was later broken up. (Id. at 2.) When Bryant came home that evening, her grandmother was on the phone with Bolden's and McDonald's grandmother, Rita Ammons. (Id.) Bryant spoke with Ammons on the phone and Bryant's phone accidentally became unplugged. (Id.) Ammons believed that Bryant hung up on her and was angry, but Bryant later explained the misunderstanding and by the time Bryant and Ammons discussed the fight between Bryant and Bolden earlier, Bryant believed that the matter was settled. (Id.)

Later that night, McDonald called Bryant to ask her about the fight that happened earlier. (Id.) Bryant explained what had happened and McDonald threatened that after Bryant gave birth to her baby in two months time, "[Y]our ass is mine." (Id.) Later that same evening, Bryant was talking with her friend, the victim, Stacey Alexander, when McDonald drove up and parked. (Id.) Alexander approached McDonald's car and the two began arguing about why McDonald threatened Bryant and why Bryant hung up on Ammons earlier. (Id.) McDonald then went to get a baseball bat from her car and approached Alexander in a threatening manner. (Id. at 3.) As McDonald began swinging the bat, a neighbor pushed McDonald away while Bryant's grandmother came out and made Bryant and Alexander go inside. (Id.)

The following day, McDonald told Bryant's aunt that she wanted to apologize to Bryant because she misunderstood and believed that Bryant had "disrespected" Ammons by hanging up on her. (Id.) However, McDonald was still upset with Alexander and told Bryant's aunt that Alexander was waving a knife at McDonald. (Id.)

On March 4, 2003, around 11:17 p.m., police found Alexander "slumped over" on a porch on Dover Street in Oakland. (Id.) She had been shot three times -- once in her back, once through her arm, and once in her head. (Id.) One witness testified that she saw McDonald and petitioner around 10:30 p.m. driving in McDonald's Acura at the corner near where Alexander was found. (Id.) Another witness, Seth June, testified that he was on his front porch that night when he heard two gunshots, saw a woman stumble forward begging for help, and recognized

1  McDonald's car. (Id. at 3-4.) June testified he saw a passenger get out of the car and follow the
2  injured woman. (Id. at 5.) As June went inside to call the police, he heard another shot and then
3  saw the passenger jog away. (Id.) A third witness testified that she lived above June and also
4  heard two gunshots. (Id.) She saw the injured woman and saw a dark car approaching the
5  woman. (Id. at 6.) Then the witness saw the passenger get out of the car and follow the woman
6  into the driveway carrying something under his shirt. (Id.) The woman heard a gunshot and
7  then saw the man exit the driveway, appearing very calm. (Id.) Another witness testified that
8  she heard two gunshots and a woman "screaming for her life." (Id.) She then saw a woman
9  crossing her front lawn and a man with a gun following her. (Id.) The witness heard the woman
10 continue to scream and beg for her life before she heard another gunshot. (Id.) The witness
11 identified McDonald's car as the one she saw on the street before the woman was shot. (Id.)

12         Police seized McDonald's car on March 5, 2003. (Id. at 6-7.) Police obtained an
13 expended shell casing from under the front passenger seat of McDonald's car as well as one a
14 few feet from Alexander's body. (Id. at 7.) Police also confiscated a loaded 9 millimeter pistol
15 with the serial number scratched off from petitioner's home. (Id.) Lansing Lee, a criminologist
16 who specializes in firearms determined that the shell casings were both fired from the pistol
17 found at petitioner's home. (Id.)

18         Police also recorded several incriminating telephone conversations between Bolden and
19 petitioner and petitioner and another person named Myrita, in which it can be inferred that
20 petitioner asked Bolden to get rid of evidence and petitioner stated he told McDonald it was
21 "okay to give [him] up" and he "did what [he] had to do" even though he "knew right from
22 wrong." (Id. at 7-8.) Police also obtained evidence of petitioner attempting to intimidate
23 witnesses to prevent them from "snitching." (Id. at 9-10.)

24         At trial, McDonald's theory of defense was that she was involved in the death of
25 Alexander because petitioner threatened her and had a history of mistreating her and her son.
26 (Id. at 11-13.) On the second day of trial, petitioner represented himself and also testified in his
27 own defense. (Id. at 13.)

28         A jury in Alameda County Superior Court convicted petitioner of first degree murder,

1 unlawful possession of a firearm, and possession of an assault weapon.  (Id. at 1.) Petitioner was
2 sentenced to a term of 50 years to life plus 8 months.  (Id.)

3        The state appellate court affirmed petitioner's conviction and sentence on February 16,
4 2006.  (Id.)  The state supreme court denied a petition for review on June 14, 2006.  (Resp. Ex.
5 E.)  Thereafter, the instant amended petition was filed on February 25, 2009.

## DISCUSSION

**A.     Standard of Review**

       This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, Williams v. Taylor, 529 U.S. 362, 384-86 (2000), while the second prong applies to decisions based on factual determinations, Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

       "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if the state court correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  The federal court on habeas review may not issue the writ "simply because

1   that court concludes in its independent judgment that the relevant state-court decision applied
2   clearly established federal law erroneously or incorrectly." Id. at 411.

3         Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination
4   will not be overturned on factual grounds unless objectively unreasonable in light of the
5   evidence presented in the state-court proceeding." Miller-El, 537 U.S. at 340.  The court must
6   presume correct any determination of a factual issue made by a state court unless the petitioner
7   rebuts the presumption of correctness by clear and convincing evidence. See 28 U.S.C. §
8   2254(e)(1).

9         In determining whether the state court's decision is contrary to, or involved an
10  unreasonable application of, clearly established federal law, a federal court looks to the decision
11  of the highest state court to address the merits of a petitioner's claim in a reasoned decision.
12  LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  Here, the opinion of the California
13  Court of Appeal is the last reasoned opinion to address petitioner's claims.

14  **B.      Petitioner's Claims**

15        As grounds for federal habeas relief, petitioner alleges: (1) the trial court violated his
16  right to due process by denying his motions to sever the trial from his co-defendant; (2) the trial
17  court violated his constitutional rights by forcing him to declare in advance whether he would
18  testify in his own defense before hearing all the evidence against him; and (3) the prosecutor
19  committed misconduct during closing argument.

20        1.      Motion to sever trial

21        Petitioner claims that both he and his co-defendant McDonald moved several times for
22  the trial court to sever the trial.  Petitioner states that he was prejudiced by his co-defendant's
23  introduction of petitioner's "character evidence" and prior bad acts.  (Am. Pet. at 3.)  At trial,
24  after the trial court repeatedly denied McDonald's request to bring in evidence of petitioner's
25  prior bad and violent acts, the trial court re-visited the issue and determined that it would allow
26  McDonald to introduce evidence relating to her being subjected to battered women's syndrome
27  and how petitioner's alleged abuses related to her behavior.  (RT 1417-1418.)  The trial court
28  also issued a limiting instruction advising the jury that any evidence of petitioner's prior bad acts

was to be considered only as it related to the behavior of McDonald as a victim of domestic violence and not as to petitioner's disposition to commit crimes. (RT 1431.)

On direct appeal, the California Court of Appeal rejected petitioner's claims. (Resp. Ex. C.) The state appellate court explained that California law prefers joint trials rather than separate trials. (Id. at 18.) Further, it stated that there was no California authority holding that a trial court abuses its discretion by conducting a joint trial of defendants who had conflicting defenses. (Id.) It then applied a three-factor test promulgated by People v. Keenan, 46 Cal. 3d 478, 500 (Cal. 1988) to determine whether a joint trial should be severed, and concluded that no severance was required. (Id. at 21-23.) The court went on to state that even if severance was required, any error was harmless because of the overwhelming evidence against petitioner. (Id. at 24.)

A joinder, or denial of severance, of co-defendants or counts may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process. Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997). A federal court reviewing a state conviction under 28 U.S.C. § 2254 does not concern itself with state law governing severance or joinder in state trials. Id. Nor is it concerned with procedural right to severance afforded in federal trials. Id. Its inquiry is limited to the petitioner's right to a fair trial under the United States Constitution. To prevail, therefore, the petitioner must demonstrate that the state court's joinder or denial of his severance motion resulted in prejudice great enough to render his trial fundamentally unfair. Id. In addition, the impermissible joinder must have had a substantial and injurious effect or influence in determining the jury's verdict. Sandoval v. Calderon, 241 F.3d 765, 772 (9th Cir. 2000).

The Supreme Court has declined to adopt a bright-line rule that severance is required "whenever codefendants have conflicting defenses." Zafiro v. United States, 506 U.S. 534, 538-39 (1993) ("Mutually antagonistic defenses are not prejudicial per se."). "Antagonism between defenses or the desire of one defendant to exculpate himself by inculpating a codefendant . . . is insufficient to require severance." United States v. Throckmorton, 87 F.3d 1069, 1072 (9th Cir. 1996). When a trial involves two or more codefendants, "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate

trials." <u>Zafiro</u>, 506 U.S. at 540. Rather, the Supreme Court has concluded that a "court should grant a severance . . . only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." <u>Id.</u> at 539. When the risk of prejudice is high, a court is more likely to determine that separate trials are necessary. However, less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice. <u>See</u> <u>Zafiro</u>, 506 U.S. at 539.

Petitioner has not shown that he suffered prejudice or that he received a fundamentally unfair trial in violation of due process. The trial court instructed the jury several times that it could only consider evidence of petitioner's uncharged acts for the purpose of determining McDonald's credibility and considering the behavior of victims of domestic violence. (RT at 1431, 1883, 1917.) The trial court specifically instructed the jury not to draw impermissible inferences from the domestic violence evidence. (<u>Id.</u>) The trial court also gave similar jury instructions at the end of the case. (<u>Id.</u> at 2105, 2121.) Further, the trial court gave the standard instructions reiterating the jury's duty to give proper weight to each fact (<u>id.</u> at 2100-2101), determining each witness's credibility (<u>id.</u> at 2106-2108), the acts required to satisfy the elements of the charged offenses (<u>id.</u> at 2117-2124), and that the prosecution has the burden to prove each element of each offense (<u>id.</u> at 2115). Jurors are presumed to follow the court's instructions. <u>See</u> <u>Richardson v. Marsh</u>, 481 U.S. 200, 206 (1987). These measures were sufficient to cure the risk of any prejudice that may have resulted from the evidence of domestic violence abuse by petitioner toward McDonald. <u>See</u> <u>Zafiro</u>, 506 U.S. at 539.

Accordingly, petitioner is not entitled to habeas relief on this claim.

2.  <u>Decision to testify</u>

Petitioner claims that as the trial court was preparing final jury instructions, it forced petitioner to declare whether or not he was going to testify even though he had not yet heard all the evidence against him. (Am. Pet. at 4.) Petitioner asserts that the trial court implied that if petitioner did not decide at that moment it would not let him re-open his case should he change

1   his mind. (Id.) Petitioner claims therefore that he was pressured to choose to testify.

2          The record demonstrates that petitioner presented his case before McDonald. At the
3   close of petitioner's case, the trial court asked him if he had any additional witnesses. (RT
4   1309.) Petitioner indicated that he had been unsuccessful in locating any other witnesses and
5   requested the court allow him to re-open his case should he locate those witnesses, to which the
6   court agreed. (Id. at 1309-1310.) Near the end of trial, the parties were discussing jury
7   instructions outside the presence of petitioner and the trial court requested petitioner's advisory
8   counsel to determine whether petitioner planned to testify before he finalized the jury
9   instructions. (Id. at 1684.) During the testimony of McDonald's expert witness, the trial court
10  took a recess and discussed administrative matters. (Id. at 1804.) Specifically, the court
11  suggested that McDonald proffer what her remaining witnesses would testify to and petitioner
12  and the prosecutor perhaps could stipulate to some of the proffered testimony because some
13  jurors would not be able to serve on the case if the case continued to be delayed. (Id.) The court
14  also indicated it did not know whether petitioner planned to testify and petitioner stated, "No,
15  your Honor. At this time no, I'm not." (Id. at 1805.)

16         The court and parties discussed McDonald's proffered witnesses and determined whose
17  testimony would come in via stipulation and whose testimony would have to be admitted while
18  on the witness stand. (Id. at 1825-1829.) McDonald's proffer of the testimonies of her
19  remaining witnesses concerned their knowledge of McDonald being a victim of petitioner's
20  alleged violent and abusive behavior. (Id.) Finally, at the end of the day, in an effort to have the
21  jury instructions ready for the following day, the court wanted to confirm that petitioner did not
22  wish to take the stand, to which petitioner answered, "At this time I have not yet decided, your
23  Honor, and I cannot say whether or not right now -- I can say right now that I have not informed
24  the court I would not or not testify." (Id. at 1837.) The court informed petitioner that whether or
25  not petitioner testified would impact what instructions the court included or omitted. (Id. at
26  1838.) Petitioner argued that he wanted to hear the exact words McDonald's witnesses would
27  testify to which might affect any jury instructions petitioner wished to include. (Id.) The court
28  reminded petitioner that he knew the substance of the specific subject matter that the witnesses

1  would testify about because they just discussed it, and that the court merely wanted to know that
2  day whether or not to include the jury instructions regarding a defendant's right to remain silent.
3  (Id. at 1839.)  At that point, petitioner stated that he would testify, to which the court responded
4  that it would not include those instructions regarding the right to remain silent.  (Id.)

5          The state appellate court rejected petitioner's claim.  (Resp. Ex. C.)  On direct review,
6  petitioner relied on Brooks v. Tennessee, 406 U.S. 605 (1972), to support his claim that his
7  constitutional rights were violated when the trial court forced him to choose in advance whether
8  he would testify.  (Resp. Ex. C at 39.)  The California Court of Appeal concluded that the facts in
9  Brooks were factually distinguishable from petitioner's case.  The state appellate court
10 determined there was no error, finding that petitioner's decision to testify was not at all restricted
11 and that petitioner changed his mind several times about testifying and finally made his decision
12 after hearing the substance of all the evidence against him.  (Id. at 41-42.)

13         The right to testify on one's own behalf at a criminal trial has sources in several
14 provisions of the Constitution.  It is one of the rights that "[is] essential to due process of law in a
15 fair adversary process."  Rock v. Arkansas, 483 U.S. 44, 51 (1987).  The necessary ingredients of
16 the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due
17 process of law include a right to be heard and to offer testimony.  See id.  A defendant's
18 opportunity to conduct his own defense by calling witnesses is incomplete if he may not present
19 himself as a witness.  See id. at 52.  And every criminal defendant is privileged to testify in his
20 own defense, or to refuse to do so.  See id.

21         Petitioner's reliance on Brooks is unavailing.  In Brooks, the Supreme Court held that a
22 Tennessee statute requiring a criminal defendant to testify as the first witness during the defense
23 case or completely forego his right to testify was unconstitutional.  Brooks, 406 U.S. at 612.  The
24 Court reasoned that forcing a defendant to exercise his right to testify or waive it before he is
25 able to weigh the strength of all the evidence violates his constitutional right to remain silent.  Id.
26 at 611-612.

27         As the state appellate court found, that is not what happened in petitioner's case.
28 Petitioner presented his case after the prosecution rested but before McDonald, and reserved the

1  right to call other planned witnesses if he were able to locate them. (RT 1309-1310.)  Near the
2  end of McDonald's case presentation, the court asked petitioner if he planned to testify, to which
3  petitioner stated that he was not. (Id. at 1805.)  Later in the day, and after all parties knew the
4  substance of McDonald's remaining witnesses' testimonies, petitioner changed his mind and
5  announced that he had not yet decided if he would testify. (Id. at 1837.)  The court expressed
6  frustration because it was trying to efficiently preside over petitioner's trial without
7  unnecessarily wasting time waiting to finalize jury instructions.  The court anticipated having the
8  jury begin deliberations the following day in the hopes that the case could conclude before they
9  would lose individual jurors due to scheduling conflicts. (Id. at 1804.)  The court asked
10 petitioner about his intention to testify because his response would determine the content of the
11 jury instructions.

12     Unlike the defendant in Brooks, petitioner was not forced to make his decision to testify
13 prior to hearing his evidence or McDonald's evidence.  At the time the trial court was trying to
14 finalize the jury instructions, petitioner already presented his case and he already knew the
15 substance of the remaining witnesses' testimony via stipulations and proffers by McDonald.  The
16 concerns expressed in Brooks simply were not present in petitioner's case.

17     In addition, the right to testify, "may, in appropriate cases, bow to accommodate other
18 legitimate interests in the criminal trial process.  But restrictions of a defendant's right to testify
19 may not be arbitrary or disproportionate to the purposes they are designed to serve."  Rock, 483
20 U.S. at 55-56.  "Numerous state procedural and evidentiary rules control the presentation of
21 evidence and do not offend the defendant's right to testify."  Id. at 56 n.11.  Here, the record
22 does not demonstrate that petitioner's right to testify was restricted or limited.  The trial court's
23 request near the close of evidence to know petitioner's decision on whether he would testify was
24 reasonable as it was trying to conduct its trial without losing its jurors.  See, e.g., Neuman v.
25 Rivers, 125 F.3d 315, 317-319 (6th Cir. 1997) (affirming denial of habeas relief on claim that
26 trial court violated petitioner's right to testify when he asked to testify after defense rested its
27 case but before instructing the jury or hearing closing arguments).

28     Thus, petitioner is not entitled to habeas relief on this claim.

3. <u>Prosecutorial misconduct</u>

Petitioner claims that the prosecutor committed misconduct during his closing argument by (1) repeatedly injected his personal opinion that petitioner had received a fair trial and (2) vouching for the veracity of McDonald's counsel.

Near the end of his closing argument, the prosecutor attempted to persuade the jury that even though petitioner represented himself, he received a fair trial. (RT 2151-2153.) For example, the prosecutor said, "The point I'm trying to make is that it is clear that in an effort to have a fair trial [petitioner] has been afforded an attorney for advice, an investigator to help him . . . I think that Judge Conger has been extremely fair to everybody here, and it makes it appropriate for you then to do your job, not have to worry that something here is not appropriate." (<u>Id.</u> at 2152.) Then, in the prosecutor's rebuttal, he stated, "Who is Richard Juniel? He can look you in the eye and lie, just lie, "Never seen that gun before in my life." Just lie. He can look [McDonald's counsel] in the eye and lie. That letter? "That was a letter to my attorney. How did you get that?" That's outrageous. That is a lie. I know [McDonald's counsel.] She is not lying. No way. He gave that to her. You know it. We all know it. He's up there lying. He can look you in the eye and just lie." (<u>Id.</u> at 2211.)

The state appellate court rejected petitioner's claim. It expressed concern about the prosecutor injecting his opinion about the fairness of trial rather than remaining focused on the evidence at trial. (Resp. Ex. C at 54.) The court also opined that the prosecutor's comment about the veracity of McDonald's counsel was improper because it was his personal opinion and not based on anything in evidence. (<u>Id.</u> at 54.) However, the court determined that neither comment was enough to rise to the level of prejudicial misconduct because the comments were brief and not significant enough to make the trial fundamentally unfair. (<u>Id.</u> at 55.)

Prosecutorial misconduct is cognizable in federal habeas corpus. The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power. <u>See</u> <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." <u>See</u> <u>id.</u> Under <u>Darden</u>, the first issue is whether the prosecutor's remarks were improper; if so, the next

question is whether such conduct infected the trial with unfairness. Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005). Moreover, a prosecutor may not vouch for the credibility of a witness. United States v. Sanchez, 176 F.3d 1214, 1224 (9th Cir. 1999). "To warrant habeas relief, prosecutorial vouching must so infect the trial with unfairness as to make the resulting conviction a denial of due process." Davis v. Woodford, 384 F.3d 628, 644 (9th Cir. 2004) (citation and internal quotation omitted).

A review of the closing arguments demonstrates that the prosecutor's challenged remarks do not rise to the level of prejudicial misconduct. The weight of the evidence against petitioner was overwhelming, see United States v. Young, 470 U.S. 1, 19 (1985); the prosecutor's statements were isolated rather than a continued pattern, see Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987); and the comments did not manipulate or misstate any evidence, see Darden, 477 U.S. at 182.

Accordingly, petitioner is not entitled to habeas relief on this claim.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus and COA are DENIED. The Clerk shall enter judgment for respondent and close the file.

## CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling. See Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009). For the reasons set out in the discussion above, petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right [or] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Accordingly, a COA is DENIED.

IT IS SO ORDERED.

Dated: 5/11/10

*Ronald M. Whyte*
RONALD M. WHYTE
United States District Judge

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.07\Juniel452hc.wpd          12